OFFICE OF THE CITY ATTORNEY
CITY AND COUNTY OF SAN FRANCISCO
DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
SARA J. EISENBERG, State Bar #269303
Chief of Strategic Advocacy
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:      (415) 554-4748
Facsimile:      (415) 554-4715
E-Mail:      matthew.goldberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
JAMES R. WILLIAMS, State Bar #271253
County Counsel
GRETA S. HANSEN, State Bar #251471
Chief Assistant County Counsel
LAURA TRICE, State Bar #284837
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, State Bar #255096
Deputy County Counsel
JULIA B. SPIEGEL, State Bar #292469
Deputy County Counsel
H. LUKE EDWARDS, State Bar #313756
Deputy County Counsel
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA  95110-1770
Telephone:      (408) 299-5900
Facsimile:      (408) 292-7240
E-Mail:      luke.edwards@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO and COUNTY OF SANTA CLARA,<br><br>        Plaintiffs,<br><br>    vs.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES; DEPARTMENT OF HOMELAND SECURITY; KEVIN McALEENEN, Acting Secretary of Homeland Security; and KENNETH T. CUCCINELLI, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>        Defendants. | Case No. 3:19-cv-4717<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      Plaintiffs the City and County of San Francisco ("San Francisco") and the County of Santa Clara ("Santa Clara," and together with San Francisco, the "Counties") challenge the U.S. Department of Homeland Security's ("DHS" or the "Department") final rule on *Inadmissibility on Public Charge Grounds*, submitted for publication in the Federal Register on August 12, 2019 (the "Final Rule"). *See* Rule on Inadmissibility on Public Charge Grounds, Federal Register, https://www.federalregister.gov/documents/2019/08/14/2019-17142/inadmissibility-on-public-charge-grounds (Aug. 12, 2019).

2.      By statute, the federal government may deny admission or adjustment of status to noncitizens who are "likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).  The federal government has long applied this provision only to individuals who receive significant public cash assistance or who are institutionalized for long-term care at government expense—i.e., those who are *primarily* dependent on the government for support.  The Final Rule rejects the longstanding, existing definition of public charge, and attempts to redefine it to include even minimal use of a much wider range of non-cash benefits—including non-emergency Medicaid, food stamps (now known as the Supplemental Nutritional Assistance Program or "SNAP"), Medicare Part D subsidies, and various federal housing assistance programs.  It also expands the factors considered in public charge determinations by adding elements such as family size, credit score, and a noncitizen's mere application for benefits, each of which has a dubious relationship to the public charge inquiry.  This abrupt shift in policy undermines the Counties' critical public health and safety-net systems, is arbitrary and capricious, flouts federal law, and seeks to usurp Congress' authority by administratively repealing its longstanding family-based immigration system.

3.      According to the Department's own assessment, the Final Rule will dramatically increase the number of people denied admission to the United States or adjustment of status on public charge grounds.  By design, it will also coerce thousands of immigrants and their family members to forgo or disenroll from critical federally funded, county-administered programs—even benefits not technically covered by the Final Rule—to reduce the risk that they or their family members will be denied admission or permanent residency.  Evidence indicates that residents of the Counties have already

disenrolled from such benefits out of fear of the potential immigration consequences of the new public charge rule.  Indeed, nationwide, even adults in households in which all foreign-born family members are naturalized citizens have reported avoiding non-cash public benefits.

4.      As a result, the Final Rule will worsen the health and well-being of the Counties' residents, increase risks to the public health, undermine the Counties' health and safety-net systems, and inflict significant financial harm on the Counties.

5.      Although noncitizens use public benefits at lower rates, lower per-capita amounts, and total amounts far below those of citizens, the Final Rule specifically targets public benefits usage by noncitizens and their families.  As the Final Rule causes residents to forgo or disenroll from benefit programs, the Counties will continue to suffer directly.  What the Department characterizes as a cost savings that will result from the Final Rule is in truth a cost shift from the federal government to state and local governments.  Like local governments across the country, the Counties provide and pay for health care and other critical services, often regardless of immigration status.  Affected residents once covered by federally funded health insurance, supported by federal cash assistance, and nourished by federal food assistance programs will instead turn to health and other safety-net services paid for and administered by the Counties.  And as the Final Rule forces the Counties' locally funded health and safety-net systems to carry responsibilities once borne by the federal government, it will also harm our broader communities' public health, since many individuals forgoing the benefits covered by the Final Rule will also forgo the preventive and routine care and immunizations that ensure overall community health.  Thus, not only will the Counties have to provide support previously furnished by the federal government, without any corresponding allocation of federal funds, they will face the new, increased costs of dealing with harms to public health.

6.      The Counties must also reorganize their programs and services to account for reduced enrollment in federal benefit programs and increased public health risks.  And on top of these other burdens, the Counties will suffer the economic harm of fewer federal benefit dollars circulating in their economies.  Every dollar issued to a SNAP recipient results in $1.79 in economic activity, so the Counties' economies will suffer harm even beyond the dollar value of benefits the Final Rule causes individuals to forgo.  The Final Rule will thus overburden the Counties' health and safety-net programs

at the very same time that it starves the Counties of the resources needed to protect their residents' health and well-being.

7.     The Final Rule is not only harmful; it is also unlawful.  It conflicts with the language and intent of the statutory provision it purports to interpret, the broader congressional framework of U.S. immigration law, and federal statutes governing the public benefits enumerated in the Final Rule.  It also falls well short of the basic procedural requirements of administrative rulemaking under federal law. The Department's proffered rationales and data do not support the Final Rule or justify its costs, which outweigh whatever benefits the Department believes are gained.  Core aspects of the Final Rule are arbitrary and untethered to the purpose of the Immigration and Nationality Act ("INA"), and the Department has not explained why it has so dramatically changed a longstanding policy that local governments and immigrant communities have relied upon.

8.     The Counties and other members of the public identified these and other infirmities in response to the Department's proposed rulemaking on this topic.  The Department failed to account for these responses, violating its obligations in the rulemaking process.

9.     In short, the Final Rule is contrary to law, is arbitrary and capricious, and should be declared unlawful and enjoined.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction under 28 U.S.C. Section 1331 because this is a civil action arising under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

11.     This Court has the authority to issue declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. § 706.

12.     Venue properly lies within the Northern District of California because the Counties are located in this judicial district, no real property is involved in this action, and a substantial part of the events or omissions giving rise to this action occur in this District.  28 U.S.C. § 1391(e)(1).

**INTRADISTRICT ASSIGNMENT**

13.     Assignment to the San Francisco or Oakland Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action are occurring in the City and County of San Francisco.

## PARTIES

14.     San Francisco is a municipal corporation located in the Northern District of California, organized and existing under and by virtue of the laws of the State of California.  It is also a charter city and county.  It is home to over 850,000 people, approximately thirty-seven percent of whom are foreign-born—the second highest percentage of any county in California.  More than 80,000 noncitizens in San Francisco live in families in which at least one person receives a public benefit included in the Final Rule.

15.     Santa Clara is a charter county and political subdivision of the State of California located in the Northern District of California.  It is home to almost two million people and is more populous than 14 states.  Thirty-eight percent of Santa Clara's residents are foreign-born—the highest percentage of any county in California.  And more than 117,600 noncitizens in Santa Clara live in families in which at least one person receives a public benefit included in the Final Rule.

16.     DHS is the agency of the United States government that promulgated the Final Rule and that bears responsibility for implementing, administering, and enforcing the nation's immigration laws and policies, including conducting public charge assessments under INA Section 212(a)(4) in connection with applications for admission and adjustment of status.

17.     U.S. Immigration and Citizenship Services ("USCIS") is an agency of the United States. It is a component within DHS and is responsible for implementing, administering, and enforcing the nation's immigration laws and policies, including conducting public charge assessments under INA Section 212(a)(4) in connection with applications for admission and adjustment of status.  The Final Rule identifies USCIS as the entity that will implement the Final Rule.

18.     Kevin McAleenan is the Acting Secretary of Homeland Security.  He is sued in his official capacity, in which he has direction, authority, and control over DHS and its component parts, including USCIS.

19.     Kenneth T. Cuccinelli is the Acting Director of USCIS.  He is sued in his official capacity, in which he is responsible for establishing national immigration policies and priorities and oversees USCIS's performance of its responsibilities to implement, administer, and enforce the nation's immigration laws and policies.

# FACTUAL ALLEGATIONS

## I. Background on the "Public Charge" Ground for Inadmissibility.

20.     Under the INA, the federal government may deny admission or adjustment of status to noncitizens who are "likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).

21.     By the plain terms of the statute, the public charge assessment is a prediction about how a noncitizen might respond to their circumstances in the future.  USCIS typically conducts its Section 212(a)(4) public charge assessments in one of three situations: (1) when a noncitizen applies to physically and lawfully enter the United States (admission), (2) when a noncitizen applies for adjustment of status, also known as becoming a lawful permanent resident ("LPR") or getting a green card (adjustment of status), and (3) when an LPR returns to the country after a 180-day absence (also admission).  Accordingly, both LPRs and noncitizens eligible to apply for LPR status may be subject to the Final Rule, as are most other noncitizens seeking entry to the United States.  The Final Rule also claims for the Department the power to require noncitizens applying for changes or extensions of visas to prove that they have not received enumerated public benefits and are unlikely to receive them in the future, even though Section 212(a)(4) does not apply in those circumstances.

22.     The INA does not expressly define "public charge," but since Congress first used the term "public charge" in the late 19th Century, it has referred consistently to an individual who *primarily depends on the government for subsistence*.  In 1999, USCIS's predecessor agency, the Immigration and Naturalization Service ("INS"), formalized this longstanding definition in administrative guidance.  Specifically, INS defined "public charge" to mean a noncitizen who is "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense."  *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689, 28,689 (May 26, 1999) ("1999 Field Guidance"); *accord Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676 (proposed May 26, 1999).  As INS explained, this definition is based upon the plain statutory meaning, historical usage, and case law, and extensive consultation with benefit-granting agencies.  *See* 1999 Field Guidance at 28,692.

23.     Moreover, since 1996 Congress has provided that noncitizens generally should *not* be considered likely to become public charges if they are sponsored by a person in the United States who has executed a legally enforceable and facially adequate affidavit of support.  Congress made such affidavits enforceable and authorized the Department to consider them in public charge assessments, particularly for those seeking admission on the basis of family ties.  *See* 8 U.S.C. §§ 1182(a)(4)(B)(ii), (C), 1183a.

24.     For decades, USCIS has assessed an individual's likelihood of being "primarily dependent on government support" based on use of two discrete sets of benefits: (1) cash benefits under Supplemental Security Income ("SSI"), Temporary Assistance to Needy Families ("TANF"), or state or local cash assistance programs (also known as "General Assistance"), and (2) long-term, government-funded institutionalization—such as in a nursing home or mental health institution.  The Final Rule upends this longstanding precedent.

**II.     The Final Rule Represents a Dramatic Shift in Policy.**

25.     On October 10, 2018, DHS published a notice of proposed rulemaking in the Federal Register titled *Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018) ("Proposed Rule").

26.     In response to the Proposed Rule, DHS received over 266,000 comments.  A wide range of commenters urged DHS to rescind or significantly alter the Proposed Rule.  San Francisco and Santa Clara were among those commenters expressing significant concerns about the Proposed Rule and urging DHS to withdraw it from consideration.

27.     Despite the significant concerns raised during the comment period, DHS submitted the Final Rule for publication in the Federal Register on August 12, 2019.

28.     The Final Rule abruptly changes decades of prior federal practice in at least five critical ways.

29.     **First**, the Final Rule significantly expands the meaning of the term "public charge." Instead of retaining the longstanding definition of a noncitizen who is "primarily dependent" on public assistance to meet basic living requirements—as formalized in the 1999 Field Guidance—the Final Rule defines public charge to include a noncitizen who simply "receives one or more public benefit" for a

relatively brief duration.  8 C.F.R. § 212.21(a).  Mere use of a public benefit, not primary dependence, is now sufficient for a noncitizen to fall within the meaning of public charge.

30.    **Second,** the Final Rule broadens the scope of benefits whose use can make a person a public charge, most notably by sweeping in for the first time several non-cash benefits: non-emergency Medicaid, SNAP, subsidies for Medicare Part D, and public housing and Section 8 housing assistance.  8 C.F.R. § 212.21(b)(2), (6).

31.    **Third**, the Final Rule sets the threshold for use of benefits unreasonably low at 12 months of use within a 36-month period (with receipt of two benefits in one month counting as two months of use).  8 C.F.R. § 212.21(a).  It also authorizes immigration officials to consider receipt of benefits even below that already-low threshold as part of the "totality of the circumstances."  Final Rule Part I(C); *see also* 8 C.F.R. § 212.22(b)(4).  In so doing, the Final Rule makes receipt of *any amount of benefit at all* relevant to the public charge determination.

32.    **Fourth**, the Final Rule broadens the factors considered during the public charge assessment.  *See* 8 C.F.R. § 212.22.  INA Section 212 already directs DHS to consider a noncitizen's age; health; family status; assets, resources, and financial status; and education and skills.  8 U.S.C. § 1182(a)(4)(B)(i).  The Final Rule adds several, more specific criteria—including family size, household size, the mere application for certain benefits, and credit score—that do not help to rationally predict whether a noncitizen is likely to receive more than the threshold amount of public benefits, if any at all.

33.    **Fifth**, as to the "assets, resources, and financial status" factor, the Final Rule disregards the value of the resources that a noncitizen's sponsor has legally committed to providing to support the noncitizen except to the extent the sponsor (i) lives in the noncitizen's household, (ii) is "already providing 50 percent or more of [the noncitizen's] financial support," or (iii) is "otherwise providing income [to the noncitizen] on a monthly or annual basis."  Final Rule Part III(G)(4); *see also* 8 C.F.R. § 212.22(b)(4)(ii)(A), (B).  Similarly, the Final Rule discounts the value of affidavits of support unless the sponsor has a close relationship with the noncitizen (including whether the sponsor lives with the noncitizen) and unless the sponsor has executed only one such affidavit—even though all affidavits of support are equally legally enforceable.  8 C.F.R. § 212.22(b)(7)(A)(2).  Thus, the Final Rule disregards Congress's direction that *all* such affidavits are legally enforceable and Congress's intent that such

affidavits carry significant weight for noncitizens applying for admission or to adjust status on the basis of family ties.

34.     Taken together, these changes dramatically expand the circumstances under which noncitizens will be denied entry and adjustments of status on public charge grounds.

**III.     The Final Rule Inflicts Significant Harms on the Counties and Our Residents.**

**A.     The Final Rule Coerces Noncitizens and Their Families to Forgo Public Benefits.**

35.     The Final Rule coerces individuals to forgo and disenroll from critical benefits and care. Noncitizens who seek—or envision seeking—admission or adjustment of status will face an insoluble dilemma: access any of a wide-range of public benefits and jeopardize the chance for admission or adjustment of status, or forgo such benefits and suffer the resulting harms.  Many of these individuals have chosen, and will continue to choose, the latter, forgoing critical public benefits as a direct result of the Final Rule.

36.     DHS itself projects that the Final Rule will cause a reduction in enrollment in federal public benefits equal to 2.5 percent of the number of noncitizens participating in those programs.  But this projection grossly underestimates the number of individuals and households that will withdraw from participation in public benefit programs.

37.     Other people, unclear about the impact of the Final Rule, will also forgo benefits out of fear of the immigration consequences to themselves or their loved ones.  Indeed, in response to the Proposed Rule and related press accounts, many already have.

38.     One recent study found that about one in seven adults in immigrant families (13.7 percent) reported "chilling effects" from the Proposed Rule, in which the respondent or a family member did not participate in a non-cash government benefit program in 2018 for fear of risking future green card status.  Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman, *One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018*, Urban Institute (May 2019).  This chilling was observed in families with various mixes of immigration and citizenship statuses, including 14.7 percent of adults in families where all noncitizen members had green cards and 9.3 percent of those in families where all foreign-born members were naturalized citizens.  *Id.*

39.     This national trend is also evident in San Francisco and Santa Clara.  For example, although participation in Medicaid and SNAP by noncitizens and households with at least one noncitizen has been declining since President Trump took office in January 2017, SNAP participation dropped most precipitously in fall of 2018 when the Proposed Rule was announced and issued. Participation will undoubtedly drop further following issuance and publication of the Final Rule.

40.     Given the technical and complex nature of the Final Rule, it is unsurprising that this "chilling effect" extends beyond those likely to be subject to a public charge review.  The Final Rule has deterred and will continue to deter: (1) the use of benefits by individuals who are not subject to the Final Rule (such as refugees, asylees, and citizens with a noncitizen family member), and (2) participation in health and safety-net programs that are not covered by the Final Rule, including the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") as well as some programs that are entirely state and locally funded.  This chilling effect is hardly surprising; as the Department itself has observed, enactment of welfare and immigration reform laws in 1996 caused dramatic reductions in benefit enrollment, even among populations and benefit programs not directly implicated by the reforms.  *See* Proposed Rule, 83 Fed. Reg. at 51,266.

41.     For example, a comprehensive review of studies of the impact of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 demonstrated immigrant populations whose eligibility was unchanged by the law still withdrew at high levels from benefits.  For example, the United States Department of Agriculture found that between 1994 and 1998, food stamps usage fell by *53 percent* among eligible U.S. citizen children in families with a noncitizen parent—and by *60 percent* among refugees—even though the law did not restrict either group's eligibility.  For Medicaid, the drop was *17 percent* among citizen children in families with a noncitizen parent and *39 percent* among refugees.

42.     Accordingly, even though the Final Rule excludes consideration of the receipt of Medicaid benefits by individuals under the age of 21 and by pregnant women, these particularly vulnerable residents will likely be among those forgoing or disenrolling from these critical programs. And the consequences for these populations will be severe.  Children enrolled in Medicaid in their early years are not only healthier in childhood than children without health insurance, but they also have

better health, income, and employment outcomes in adulthood.  When pregnant women forgo Medicaid, they often lose the critical prenatal care that protects the health of both mother and unborn child. Similarly, the loss of SNAP benefits is particularly harmful to children.  Research demonstrates that access to nutrition is crucial to a child's physical and intellectual development.  Sufficient nutritious food of the type available through SNAP is associated with improved reading and math skills in elementary school, especially for young girls, and increases the likelihood of high school graduation. Indeed, food assistance for girls has been linked to improved economic self-sufficiency later in life.

43.     The Final Rule's harms will extend even beyond these benefits because access to certain state and local benefits depends on individuals applying for federally funded Medicaid.  For example, the California Children's Services program ("CCS"), which is administered by Santa Clara in partnership with the California Department of Health Care Services, coordinates and pays for the cost of treatment of certain serious medical conditions for children and young adults, such as cystic fibrosis and cerebral palsy.  But to qualify for CCS, an individual must apply for Medicaid if CCS believes the individual may be Medicaid-eligible.  Similarly, some of the funding sources for Santa Clara's HIV-related health services is conditioned upon patient enrollment in other programs, including Medicaid. As such, when individuals forgo or disenroll from Medicaid, they will be prohibited from accessing these Medicaid-contingent services.

44.     In addition to these programs, the Final Rule's inclusion of housing-related subsidies and assistance in the public charge analysis will have devastating consequences for immigrants and their families who need even moderate assistance to achieve housing security.  These programs reduce homelessness and expand opportunities for healthy and safe housing, benefiting the entire community. The Final Rule will deter participation in those programs among households that include noncitizen family members.  Because these programs offer some of the most affordable housing in San Francisco and Santa Clara, where housing insecurity and homelessness rates are already alarmingly high, families that are deterred from participation may find themselves in substandard conditions or homeless.

45.     The Department notes in the Final Rule that "numerous" comments raised concerns about these serious chilling effects.  Indeed, over ten pages of the Final Rule are devoted to summarizing these comments.  *See* Final Rule Part III(D)(5).  But the Department disregards these concerns—stating that it

would be "unwarranted" for individuals who are not subject to a public charge determination to disenroll

from benefits and that it "will not alter this rule to account for such unwarranted choices." *Id.*

**B.      By Coercing Residents to Forgo Public Benefits, the Final Rule Increases Programmatic and Administrative Costs to the Counties' Health and Safety-Net Systems.**

46.      San Francisco and Santa Clara operate sophisticated and extensive safety-net health care

systems that serve as providers of last resort, offering care to low-income and other vulnerable residents

regardless of their ability to pay.  Each of the Counties owns and operates a Level I trauma center

hospital, additional hospitals, and many clinics that together provide our residents with a range of

emergency services as well as specialized, preventive, primary, and routine care.

47.      The San Francisco Health Network includes two hospitals.  Zuckerberg San Francisco

General Hospital ("ZSFG") is a licensed general acute care hospital and Level I trauma center owned

and operated by San Francisco.  ZSFG is San Francisco's safety-net hospital.  It provides care for

approximately one in eight San Franciscans a year, regardless of their ability to pay.  Laguna Honda

Hospital provides a full range of skilled nursing services to adult residents of San Francisco who are

disabled or chronically ill, including specialized care for those with chronic wounds, head trauma,

stroke, spinal cord and orthopedic injuries, HIV/AIDS, and dementia.

48.      Santa Clara is the only public safety-net health care provider in Santa Clara County, and

the second largest such provider in California.  Its County of Santa Clara Health System ("CSCHS")

provides the vast majority of the health care services available to low-income and underserved patients

in Santa Clara, including through Santa Clara Valley Medical Center (a Level I trauma center),

O'Connor Hospital, and St. Louise Regional Medical Center.  In addition to its hospitals, CSCHS

provides essential preventive and other outpatient services to underserved patients through ambulatory

care clinics.  CSCHS also administers and provides a number of programs to promote preventive care

and avoid more costly hospital visits.

49.      Both Counties have a duty to provide emergency care to all persons in need of medical

care, regardless of their insurance status or ability to pay.  And together, the Counties invest billions of

dollars to operate these systems, including tens of millions of dollars each year to provide "charity care,"

discounted care, and other uncompensated care to patients who are not covered by insurance and cannot pay for their care.

50.     As the Final Rule compels eligible noncitizens to forgo or drop Medicaid coverage, the Counties' Emergency Department costs will likely rise.  Some individuals chilled by the Final Rule will lose access to primary care and turn to Emergency Departments instead, presenting conditions not well-suited to Emergency Department treatment.  Others will delay care, including important preventative care.  This will lead to medical conditions that could have been caught and managed much earlier instead presenting as emergencies—which are both much more dangerous to the patient and significantly more costly to treat, particularly in an emergency care setting.  Because in many of these instances the Counties will be providing charity, discounted, or otherwise uncompensated care, the Counties will bear additional costs.  Ultimately, the Counties will incur millions of additional dollars in uncompensated health care costs.  Increased use of County Emergency Departments will also result in rising wait times for all patients who require emergency medical attention.

51.     Moreover, due to the anticipated increase in the use of the Emergency Department, the Counties may need to reorganize their staff and administrative structures to address overcrowding and emergency treatment of conditions that ordinarily would be addressed in primary and ambulatory care settings.  Other hospital divisions, such as Gynecology and Obstetrics, the Neo-Natal Intensive Care Unit, and Primary Care, may need to make staffing and programmatic adjustments, with some divisions likely facing higher demand and others expecting drop-offs.

52.     Other County programs could face higher utilization and attendant costs as well.  These programs include the Healthy Kids program, which provides heavily subsidized services to 3,000 Santa Clara children whose family income is between 250 and 300 percent of the Federal Poverty Guidelines ("FPG"), and the Primary Care Access Program, which provides primary care services to adults who are not eligible for state subsidies, employer health insurance, or full benefits under Medicaid.

53.     Finally, if the Final Rule goes into effect, it will create new administrative challenges for the Counties' agencies administering health care and other safety-net programs and will result in additional work, including: answering consumer questions related to the Final Rule, building new systems to respond to the Final Rule, and modifying existing communications and forms related to the

Final Rule.  The Counties have already had to invest significant resources in educating relevant employees about public charge assessments in anticipation of the Final Rule, and will be forced to invest additional resources in education and training if the Final Rule goes into effect.

54.     To manage the administrative challenges described above, San Francisco's Human Services Agency ("HSA") will have to provide training to hundreds of employees, including several hundred certified bilingual HSA workers.  The San Francisco Department of Public Health ("SFDPH") anticipates that it will have to provide training to over 300 staff who perform Medicaid screening and eligibility, 150 staff conducting other patient-facing activities, and about 80 managers and supervisors. In addition, SFDPH expects that if the Final Rule were to go into effect it would have to provide basic education on the Final Rule to all staff that interact with patients.  This encompasses about 5,000 staff across SFDPH-run clinics and hospitals, and community-based behavioral health clinics contracted out by San Francisco.

55.     Indeed, San Francisco staff have already spent considerable time addressing issues that have been prompted by the Proposed Rule.  At SFDPH, staff have already spent more than 800 hours answering questions from noncitizens about the impact of the Proposed Rule, processing requests for disenrollment, and analyzing the impact of the Proposed Rule on its patients and administrative functions.

56.     Santa Clara's agencies have also expended significant resources training its employees in anticipation of the Final Rule, including Santa Clara's Social Services Agency, whose hundreds of affected staff has already dedicated more than 1,000 hours to answering questions about the Proposed Rule, processing requests for disenrollment from benefits, analyzing the impact of the Proposed Rule, holding discussions with community-based organizations and other partners, and attending public charge-related trainings.  And these agencies will have to expend even more staff time if the Final Rule goes into effect.

C.     **By Coercing Residents to Forgo Public Benefits, the Final Rule Harms the Counties' Public Health.**

57.     The reduction in access to health care wrought by the Final Rule hurts not only individual health, but also broader public health.  Reduced access to health care services increases the risk of

communicable diseases and microbial threats, and reduced access to diagnosis and treatment of infectious diseases results in increased transmission in the community.  The Counties will confront these harms firsthand, as they exclusively run the public health departments within their jurisdictions.

58.     As a result of the Final Rule and the associated reduction in resident access to health care, the Counties will face a greatly increased likelihood of outbreaks of communicable or infectious disease like measles, tuberculosis ("TB"), and the Zika virus.

59.     TB, for example, can infect anyone who lives, works, or breathes in close proximity to someone with infectious TB.  Since March 2018, the majority of patients seen at the S.F. Tuberculosis Clinic are foreign-born, from Asian and Latin American countries.  Similarly, the vast majority of people in Santa Clara with TB were born outside of the U.S.  If patients delay medical care when they develop symptoms, large community outbreaks could occur—at great risk to public health and enormous cost to the Counties in providing treatment and containing the outbreaks.

60.     Similarly, the Zika virus infection is endemic in all of Latin America and is spread by mosquito bites and sex.  Zika virus infection causes Congenital Zika Syndrome, which includes microcephaly and other birth defects.  Because of the frequent travels between the United States and Latin America, travelers need to have access to information on how to prevent infection and access to health care services for diagnosis and counseling.  Prevention is critical, as there is no vaccine or treatment for Zika virus infections.  As individuals chilled by the Final Rule lose access to primary care, fewer will be educated about these health risks, and the risk of infection rates will increase.

61.     These Final Rule's public health consequences will also impose increased costs on the Counties and our public health departments.  First, the Counties' public health departments will need to make adjustments to their programs to compensate for the increased risk of outbreak.  Second, when people avoid non-emergency medical treatment for infectious diseases—such as treatment for latent TB, which is not yet infectious but can easily progress to full-blown and highly contagious TB—the Counties will ultimately face the costs of treating those infections when they become emergencies, at a significantly higher cost.  For example, although treating latent TB is relatively cheap, it can cost many tens of thousands of dollars to treat a single case of full-blown TB.  Further, the Counties will bear the

costs of treating the spread of disease to additional individuals due to lack of timely preventative treatment, in the first instance.  These costs can easily rise into the millions of dollars.

62.     The Final Rule scarcely mentions these significant risks.

**D.     By Coercing Residents to Forgo Public Benefits, the Final Rule Reduces Economic Activity in the Counties.**

63.     On top of all these increased costs and harms to the public health, the Counties also face a drop in economic activity, and therefore revenue, due to the loss of federal benefits dollars circulating in our economies.  These harmful economic impacts will exceed the mere dollar amount of the benefits that noncitizens and others forgo in response to the Final Rule because benefits dollars have beneficial economic ripple effects as they circulate in the economy.  For example, United States Department of Agriculture economists have determined that SNAP benefits have a high multiplier effect as they circulate through the local economy—every dollar issued to a SNAP recipient results in $1.79 in economic activity.  The Counties' economies can therefore expect to lose out on hundreds of thousands of dollars per year as the Final Rule pressures noncitizens and households that include noncitizens to drop off federal benefits.  This will negatively impact the Counties' economic growth and budgets.

**IV.     The Final Rule is Unlawful.**

**A.     The Final Rule Is Contrary To Law.**

64.     The Final Rule is contrary to law in at least four respects.

65.     **First**, The Final Rule's definition of "public charge" is unlawful because it contradicts the term's plain and longstanding meaning as used in Section 212(a)(4) of the INA: a person "primarily" dependent on public assistance for survival.

66.     **Second**, the Final Rule undermines the broader system of immigration laws enacted by Congress as part of the INA.  For over half a century, the nation has had an immigration system that prioritizes family unification.  However, the Final Rule attempts to undercut this system by dramatically restricting the ability of noncitizens to reunite with their families by gaining admission or LPR status.  Under the Final Rule, applicants for admission and adjustment of status based on family ties are far less likely to pass a public charge test than under the longstanding rules that the Final Rule displaces.  The Final Rule therefore directly undermines the family-based immigration system established and

maintained by Congress.  It may well be the current Administration's policy goal to replace the family-based immigration system embedded in the INA with a so-called "merit"- or "skills"-based system, but no administrative agency may impose by regulation what is reserved for Congress to do by legislation.

67.     **Third**, the Final Rule reflects a misunderstanding and misapplication of the self-sufficiency precept that Congress described in 8 U.S.C. Section 1601 and that the Final Rule purports to implement.  The Final Rule's basic assumption is that *any* receipt of the enumerated benefits conflicts with self-sufficiency principles, but Congress plainly intended otherwise.  In Congress's view, self-sufficiency is best achieved by extending eligibility to certain noncitizens for many federal means-tested benefit programs, including those enumerated in the Final Rule, and making other noncitizens ineligible for those programs.  Yet the Final Rule disregards this view.  It also undervalues the legally enforceable promises, known as affidavits of support, that U.S. residents make to "sponsor" (financially support) noncitizens applying for admission or adjustment of status.  Under the regime enacted by Congress, sponsorship advances self-sufficiency principles by allowing benefit-granting agencies to recoup from sponsors the cost of benefits paid to noncitizens and preventing sponsored noncitizens from burdening taxpayers.  Even though agencies and noncitizens themselves can enforce *all* affidavits of support in court, the Final Rule discounts their weight unless the sponsor lives in the noncitizen's household, has a close relationship with the noncitizen, or provides "continuing monthly or yearly" payments to the noncitizen that the noncitizen relies on as income.  8 C.F.R. § 212.22(b)(4)(ii)(A), (B); *id.* at § 212.22(b)(7)(A)(2).  By discounting affidavits of support except in these limited circumstances and misconstruing Congress's view of "self-sufficiency," the Final Rule undermines Congress's intent.

68.     **Fourth**, the Final Rule's inclusion of SNAP is contrary to the statutes governing those federal programs.  Specifically, the Final Rule's consideration of a noncitizen's receipt of SNAP benefits violates a statute that prohibits consideration of those benefits "[as] income or resources for any purpose under any Federal, State, or local laws."  7 U.S.C. § 2017(b).

## B.     The Final Rule Is Arbitrary, Capricious, and an Abuse of Discretion.

69.     The Final Rule does not comply with the basic requirements of administrative rulemaking.  A rule is invalid if the agency has not given adequate reasons for its decisions, examined

the relevant data, or offered a rational connection between the facts found and the choice made.  This failure is especially grave where, as here, an agency is changing its existing policy.

70.     The following allegations are just a few of the myriad ways the Department has subverted or ignored the statutory framework, neglected to account for the harms that its departure from longstanding laws would cause, and failed to offer a reasoned explanation for its policy reversals.

71.     **First**, the Department has failed to account for (much less adequately consider and address) the wide extent and variety of costs and harms the Final Rule will impose on local governments and residents, including serious harm to public health, local economies, and vulnerable communities (*e.g*., children, pregnant women, and individuals confronting housing insecurity)..

72.     **Second**, the Department offers no "reasonable explanation" for disregarding the federal government's prior longstanding and persuasive rationale for excluding non-cash public benefit programs when making a public charge determination: as a practical matter, neither alone nor together can non-cash programs be a person's primary support.  Indeed, receipt of the non-cash public benefits covered under the Final Rule is not a good indicator of self-sufficiency.  As the Department acknowledges, noncitizens may be eligible for Medicaid and housing assistance at incomes that would not suggest dependence on the government.  The Department's alternative basis for choosing which programs to include—its "preference to prioritize those programs that impose the greatest cost on the Federal government"—is irrelevant to the statutorily directed inquiry of whether a specific individual is likely to become a public charge.

73.     **Third**, the Final Rule's benefits use threshold—12 months within a 36-month period (with any two benefits used in one month counting as two months of use)—is irrational.  Such short-term receipt of benefits does not mean that an individual is not self-sufficient or is likely to become a public charge in the future.  And the Final Rule goes even further than this.  By authorizing immigration officials to consider and penalize a noncitizen based on receipt of benefits below the 12-month threshold, the Final Rule effectively eliminates the concept of a minimum threshold altogether.  *See* Final Rule Part I(C); *see also* 8 C.F.R. § 212.22(b)(4).  This is not what Congress envisioned in enacting the public charge ground of inadmissibility.

74.     **Fourth**, the Final Rule's framework for weighing factors considered in the "totality of the circumstances" analysis is irrational, vague, and entirely unpredictable.  The Final Rule requires consideration of a plethora of factors in the public charge analysis, but it does not meaningfully quantify the weight each factor should carry or explain how an immigration officer should conduct this analysis. Some are "heavily" negative, some are "heavily" positive, and others are simply factors that could be either negative or positive.  The Department claims this weighing scheme will "formaliz[e] and standardiz[e] the criteria and process for public charge determinations."  But it does neither.  This failure is particularly grave given that, via the Final Rule, the Department has created a sprawling definition of public charge, encompassing a much broader range of benefits and factors to be considered (including wholly arbitrary ones), that could capture large portions of the Counties' populations.  This extremely broad definition, coupled with a lack of direction, grants individual immigration officers practically standard-less discretion and makes it impossible for noncitizens anticipating a public charge review to predict whether they will pass it.  The Department provides no reason, data, or logic from which to conclude that its proposed weighing framework produces a rational, consistent, or accurate answer to whether a given a noncitizen is likely to fall within the Final Rule's definition of a public charge.

75.     **Fifth**, it is irrational for the Final Rule to consider the mere application for benefits (independent of receipt of such benefits) in the public charge determination.  The fact of an application for benefits, without any consideration of whether the application for benefits was denied or withdrawn or whether the applicant was financially or otherwise eligible, has no bearing on whether a noncitizen will receive enough of the benefits to exceed the Final Rule's durational threshold.

76.     **Sixth,** it is irrational for the Final Rule to make larger family size, considered as part of a noncitizen's "family status," a negative factor when determining whether a noncitizen will become a public charge.  As justification for this factor, the Proposed Rule explained that "the receipt of non-cash benefits generally increased as family size increased."  83 Fed. Reg. 51,184.  But DHS's own data did not support this sweeping statement or the Department's use of family size as a negative factor.  To the contrary, data cited in the Proposed Rule indicated that non-cash benefit usage is higher among families of three (22.3 percent) than families of four (20.7 percent), and that noncitizens' usage of cash benefits actually decreases as family size grows.  The Final Rule notes that this issue was raised in a comment,

but fails to adequately address it—stating without any explanation or analysis that the data contradicting its position is "not statistically significant."  Final Rule Part III(G)(4).

77.    **Seventh**, the Final Rule's consideration of a noncitizen's credit history and credit score as factors in the public charge determination is arbitrary and unreasonable as these factors are poor proxies for such a determination.  Credit history and credit score do not relate to a noncitizen's likelihood to become a public charge, the noncitizen's current or future self-sufficiency, or any other consideration that is permissible under the applicable statutory scheme.  Furthermore, credit scores are generally unreliable, especially so for people in immigrant and other vulnerable communities.  Once again, the Final Rule notes that several commenters raised these concerns, but fails to adequately address the issue.  For example, the Final Rule states simply that "DHS disagrees that consideration of credit scores will disparately affect certain groups of aliens."  It provides no support or basis for this bald statement of disagreement.  *See* Part III(L)(5).

78.    **Eighth**, in propounding the Final Rule, the department also failed to adequately address several other comments submitted during the rulemaking process and offered inadequate explanations to justify its decisions implemented in the Final Rule.

## CAUSES OF ACTION

### COUNT ONE
#### Violation of APA (5 U.S.C. § 706(2)(A))
#### Not in Accordance with Law

79.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

80.    The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

81.    The Final Rule is not in accordance with law in at least the following respects:

(A)    The Final Rule's definition of "public charge" for purposes of Section 212(a)(4) of the INA conflicts with the term's plain meaning, longstanding administrative interpretation, legislative history, statutory context, and case law.

//

//

(B)    The Final Rule's definition of "public charge" and weighing framework for conducting public charge assessments conflicts with and undermines the family-based framework of immigration law.

(C)    The Final Rule undermines Congress's understanding of self-sufficiency, by chilling noncitizen use of benefits (despite Congress's decision to extend benefits to certain noncitizens) and undervaluing the congressionally mandated affidavit of support scheme.  *See* 8 U.S.C. §§ 1601, 1182(a)(4)(B)(ii), (C), 1183a.

(D)    The Final Rule's inclusion of SNAP in the definition of "public benefit" (which, in turn, is used in the definition of "public charge") contravenes the statutes governing this program.

82.    Accordingly, the Final Rule is "not in accordance with law" and is invalid.

**COUNT TWO**
**Violation of APA (5 U.S.C. § 706(2)(A))**
**Arbitrary, Capricious, and Abuse of Discretion**

83.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

84.    The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  Agency action should be overturned when, among other things, the agency: (i) relied on factors Congress did not intend for it to consider; (ii) failed to consider important aspects of the problem it is addressing; or (iii) explained its decision counter to the evidence before it.

85.    The Final Rule is "arbitrary, capricious, [and] an abuse of discretion" in at least the following respects:

(A)    The Department failed to account for (much less, adequately consider and address) the wide extent and variety of costs and harms the Final Rule will impose on the Counties and their residents.

(B)    The Final Rule introduces non-cash benefit programs in the public charge determination, yet the Department offers no "reasonable explanation" for

disregarding the longstanding and persuasive rationale for excluding such programs.

(C)     The Final Rule's benefits use threshold is irrational.

(D)     The Final Rule's factor-weighing framework is irrational and vague.

(E)     The Final Rule irrationally considers the mere application for benefits in the public charge determination.

(F)     The Final Rule improperly makes larger family size a negative factor when considering "family status" in determining whether a noncitizen is likely to become a public charge.

(G)     The Final Rule arbitrarily includes consideration of a noncitizen's credit history and credit score as factors in the public charge determination.

(H)     The Department has failed to consider, account for, or respond to critical, relevant public comments regarding the Final Rule.

86.     Accordingly, Defendants' actions were arbitrary, capricious, and an abuse of discretion, and the Final Rule is therefore invalid.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that the Court grant the following relief:

1.     A declaratory judgment that the Final Rule is unlawful;

2.     An order postponing the effective date of the Final Rule pending judicial review;

3.     An order and judgment holding unlawful, setting aside, and vacating the Final Rule;

4.     A preliminary injunction against implementation and enforcement of the Final Rule;

5.     A permanent injunction against implementation and enforcement of the Final Rule;

//

//

//

//

//

//

6.      An award of reasonable costs, attorneys' fees and expenses, other fees and costs; and

7.      Any other further relief that the Court deems fit and proper.


Dated:   August 13, 2019                    Respectfully submitted,

DENNIS J. HERRERA                           JAMES R. WILLIAMS
City Attorney                               County Counsel
JESSE C. SMITH                              GRETA S. HANSEN
RONALD P. FLYNN                             LAURA TRICE
YVONNE R. MERÉ                              RAPHAEL N. RAJENDRA
SARA J. EISENBERG                           JULIA B. SPIEGEL
MATTHEW D. GOLDBERG                         H. LUKE EDWARDS

By:   */s/ Dennis J. Herrera*               By:   */s/ James R. Williams*
       DENNIS J. HERRERA                           JAMES R. WILLIAMS
       City Attorney                               County Counsel

*Attorneys for Plaintiff*                   *Attorneys for Plaintiff*
*City and County of San Francisco*          *County of Santa Clara*