CITY ATTORNEY'S OFFICE
CITY AND COUNTY OF SAN FRANCISCO
DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
SARA J. EISENBERG, State Bar #269303
Chief of Strategic Advocacy
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:    (415) 554-4748
Facsimile:    (415) 554-4715
E-Mail:    matthew.goldberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
JAMES R. WILLIAMS, State Bar #271253
County Counsel
GRETA S. HANSEN, State Bar #251471
Chief Assistant County Counsel
LAURA TRICE, State Bar #284837
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, State Bar #255096
Deputy County Counsel
JULIA B. SPIEGEL, State Bar #292469
Deputy County Counsel
H. LUKE EDWARDS, State Bar #313756
Deputy County Counsel
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA  95110-1770
Telephone:    (408) 299-5900
Facsimile:    (408) 292-7240
E-Mail:    luke.edwards@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO and COUNTY OF SANTA CLARA,<br><br>       Plaintiffs,<br><br>       vs.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES; DEPARTMENT OF HOMELAND SECURITY; KEVIN McALEENEN, Acting Secretary of Homeland Security; and KENNETH T. CUCCINELLI, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>       Defendants. | Case No. 4:19-cv-04717-PJH<br><br>**CITY AND COUNTY OF SAN FRANCISCO AND COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:   October 2, 2019<br>Time:   9:00 am<br>Judge:   Hon. Phyllis J. Hamilton<br>Place:   Oakland Courthouse<br>       Courtroom 3 - 3rd Floor<br><br>Trial Date:   Not set |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION .......................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

INTRODUCTION ............................................................................................................................ 1

STATEMENT OF FACTS ............................................................................................................... 2

      A.    Longstanding Definition of "Public Charge." ............................................. 2

      B.    The Final Rule Dramatically Changes the Public Charge Assessment. ...... 3

      C.    The Counties Are Responsible for Core Health and Safety-Net
           Functions, Which Depend on the Enumerated Benefits. ............................ 4

ARGUMENT .................................................................................................................................... 6

I.    The Counties are Likely to Succeed in Demonstrating the Final Rule Violates
      the APA ..................................................................................................................... 6

      A.    The Counties Are Likely to Succeed on their Claim that the Final Rule Is
           Contrary to Law. ........................................................................................ 6

      B.    The Counties Are Likely to Succeed in Demonstrating that the Final
           Rule Is Arbitrary, Capricious, and an Abuse of Discretion. ..................... 13

           1.    DHS Enacted the Final Rule Without Adequately Considering
                Issues Raised by Commenters, and Proffered Justifications
                Contrary to the Evidence and Its Predecessor's Conclusions. ........ 13

           2.    The Final Rule's Benefit Use Threshold, Factors, and Weighing
                 Scheme Are Unsupported and Irrational. ....................................... 16

II.    Absent an Injunction, the Counties Will Suffer Irreparable Harm. ....................... 18

      A.    The Counties' Health and Safety-Net Systems Will Incur Substantial
           Costs. ........................................................................................................ 20

           1.    Loss of Millions in Federal Medicaid Funds and Mounting Care
                 Costs. ............................................................................................. 20

           2.    Operational Burdens and Costs. ..................................................... 21

      B.    The Final Rule Harms Public Health. ...................................................... 22

           1.    Increased Risk of Communicable and Infectious Disease. ............ 22

           2.    Increased Food Insecurity and Hunger. ......................................... 23

      C.    The Final Rule Harms the Counties' Economies. ................................... 24

III.    The Balance of the Equities and Public Interest Favor A Preliminary Injunction. 24

IV.    A Nationwide Injunction Is Appropriate in These Circumstances. ....................... 25

CONCLUSION .............................................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Accord Howe v. United States ex rel. Savitsky*
  247 F. 292 (2d Cir. 1917) ........................................................................8

*Albemarle Paper Co. v. Moody*
  422 U.S. 405 (1975) ...............................................................................11

*All. for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) ................................................................24

*Arizona Dream Act Coal. v. Brewer*
  757 F.3d 1053 (9th Cir. 2014) ................................................................21

*Block v. Meese*
  793 F.2d 1303 (D.C. Cir. 1986)...............................................................14

*California v. Azar*
  911 F.3d 558 (9th Cir. 2018) ..................................................................20

*California v. Bureau of Land Mgmt.*
  286 F. Supp. 3d 1054 (N.D. Cal. 2018) ..................................1, 5, 19, 20, 22, 24

*City & Cty. of San Francisco v. Trump*
  897 F.3d 1225 (9th Cir. 2018) ................................................................25

*City of Boston v. Capen*
  61 Mass. 116, 121-22 (1851) ....................................................................7

*Encino Motorcars, LLC v. Navarro*
  136 S. Ct. 2117 (2016)................................................................13, 14, 16

*Ex Parte Hosaye Sakaguchi*
  277 F. 913 (9th Cir. 1922) .......................................................................9

*FCC v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009)................................................................................13

*Forest Grove Sch. Dist. v. T.A.*
  557 U.S. 230 (2009)................................................................................10

*Freeman v. Quicken Loans, Inc.*
  566 U.S. 624 (2012)..................................................................................7

*Gegiow v. Uhl*
  239 U.S. 3 (1915).....................................................................................9

*Hawaii v. Trump*
  878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018)........................25

*INS v. Cardoza-Fonseca*
  480 U.S. 421 (1987)................................................................................................10

*Matter of Martinez-Lopez*
  10 I. & N. Dec. 409 (BIA 1962) .............................................................................9

*Michigan v. EPA*
  135 S. Ct. 2699 (2015)...........................................................................................14

*Mingo Logan Coal Co. v. E.P.A.*
  829 F.3d 710 (D.C. Cir. 2016) ..............................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983)................................................................................................13

*Nat'l Ass'n of Home Builders v. E.P.A.*
  682 F.3d 1032 (D.C. Cir. 2012) ............................................................................14

*Neal v. Clark*
  95 U.S. 704 (1877).................................................................................................8

*Penington v. Thompson*
  5 Del. Ch. 328 (1880) ............................................................................................8

*Regents of the Univ. of California v. D.H.S.*
  908 F.3d 476 (9th Cir. 2018) ............................................................................6, 25

*Sorenson Commc'ns Inc. v. F.C.C.*
  755 F.3d 702 (D.C. Cir. 2014)...............................................................................15

*Stanley v. Colt*
  72 U.S. 119 (1866)..................................................................................................8

*Univ. of Texas v. Camenisch*
  451 U.S. 390 (1981)................................................................................................6

*Univ. of Texas Sw. Med. Ctr. v. Nassar*
  570 U.S. 338 (2013).................................................................................................7

*Util. Air Regulatory Grp. v. EPA*
  573 U.S. 302 (2014).......................................................................................7, 8, 13

*Whitman v. Am. Trucking Ass'ns*
  531 U.S. 457 (2001).........................................................................................11, 13

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008)..............................................................................................6, 18

**Federal Statutes**

5 U.S.C.
  § 706(2)(A) ...................................................................................6, 13

8 U.S.C.
  § 1151(b)-(d) ...........................................................................................12
  § 1182(a)(4) ...........................................................................................2, 3
  § 1182(a)(4)(A) ..........................................................................................2
  § 1601(7) .................................................................................................15
  §§ 1611-15 ..............................................................................................15

42 U.S.C.
  § 1395dd(b)(1) ...........................................................................................4

Illegal Immigration Reform and Immigrant Responsibility Act of 1996
  Pub. L. No. 104-208, 110 Stat. 3009 (1996)......................................9

Immigration Act of 1882
  ch. 376, § 2, 22 Stat. 214 (Aug. 3, 1882) ..............................7, 8, 9

Immigration Act of 1990
  Pub. L. No. 101-649 § 601(a), 104 Stat. 4978 (1990) ....................8

Omnibus Consolidated Appropriations Act of 1997
  Pub. L. No. 104-208, § 531(a), 110 Stat. 3009-546 (1996)...........10

Personal Responsibility and Work Opportunity Reconciliation Act of 1996
  Pub. L. 104-193, 110 Stat. 2105 (1996)........................................9, 15

**Federal Regulations**

8 C.F.R.
  § 212.21(a) ............................................................................................3, 4
  § 212.21(b)(2), (6) ......................................................................................4
  § 212.22 .................................................................................................4, 12
  § 212.22 (b)-(c) .........................................................................................18
  § 212.22(b)(4) .............................................................................................4
  § 212.22(c)(1)(ii) .........................................................................................4

**Federal Rules**

Federal Rules of Civil Procedure
  Rule 65 .......................................................................................................1

**Federal Register**

Inadmissibility on Public Charge Grounds
  84 Fed. Reg. 41, 292 (Aug 14, 2019) .................................1, 4, 14, 15, 16, 17, 18, 19

Field Guidance on Deportability and Inadmissibility on Public Charge Grounds
    64 Fed. Reg. 28, 689, May 26, 1999.................................................................2, 9, 15

83 Fed. Reg. 2, 642 Jan. 18, 2018................................................................17, 21

**Legislative History**

13 Cong. Rec. 5108-10 (June 19, 1882) ......................................................9

142 Cong. Rec. 24425-27 (Sept. 24, 1996)................................................ 10

H.R. Rep. No. 101-723 (1990)...................................................................12

H.R. Rep. No. 101-955 (1990)....................................................................8

H.R. Rep. No. 82-1365 (1952)...............................................................11, 12

H.R. Rep. No. 85-1199 (1957)...................................................................12

Senate Report No. 113-40 (2013) ..............................................................10

**State Statutes and Codes**

Cal. Welf. & Inst. Code
    § 17000 ................................................................................................4

**Other References**

Burr Blackburn, *State Programs of Public Welfare in the South*
    1 J. Soc. Forces 6 (1922)........................................................................8

*Charge*, Webster's Dictionary (1828 Online Edition)...................................7

*Charge*, Webster's Dictionary (1886 Edition)..............................................7

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*
    93 Colum. L. Rev. 1833 (1993) ...............................................................7

Walter I. Trattner, *The Federal Government and Needy Citizens in Nineteenth Century America*
    103 Pol. Sci. Q. 347 (1988) ....................................................................8

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on October 2, 2019, at 9:00 a.m. or as soon thereafter as they may be heard before Judge Phyllis J. Hamilton, plaintiffs the City and County of San Francisco ("San Francisco") and the County of Santa Clara ("Santa Clara," and together with San Francisco, the "Counties") will and do hereby move pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil Local Rules 7-2 and 65-2 for a preliminary injunction prohibiting Defendants from implementing or enforcing the Final Rule of the Department of Homeland Security (DHS) on "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41,292 (Aug. 14, 2019).  Without an order from this Court, the Final Rule will take effect on October 15, 2019, and will irreparably harm the Counties.  This motion is based on this notice; the Memorandum of Points and Authorities; accompanying declarations and requests for judicial notice; this Court's file; and any matters properly before the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

For more than a century, this country's laws have only closed America's doors to immigrants on the grounds that they may become a "public charge" in one, narrow circumstance: if the immigrant is likely to become *primarily dependent* on the government for survival.  And for decades, the federal government has made this determination based on an immigrant's likely use of either cash assistance for income maintenance or long-term institutionalization.

But in promulgating the *Inadmissibility on Public Charge Grounds* rule, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("Final Rule"), DHS now seeks to upend this long-established meaning of public charge, in violation of the Administrative Procedure Act (APA).  Under the new rule, DHS would deem someone a public charge if they used health-promoting benefits, like Medicaid and food stamps, in a total amount as low as $180.  But DHS's effort to rewrite the underlying statute flies in the face of the plain meaning of federal statutes, Congress's clear directives, decades of case law, and federal agency guidance, and would fundamentally undermine Congress's family-based immigration system. In rejecting the statutorily mandated immigration scheme, DHS also failed to account for the far-reaching harms the Final Rule would cause as it deters immigrants from using public benefits. Further, DHS failed to grapple with the fact that its predecessor agency and Congress both concluded

that DHS's purported goals of health, welfare, and the self-sufficiency of noncitizen residents would be better served by noncitizens accessing public benefits—indeed, the overwhelming evidence before DHS supported the same conclusion.  And the Final Rule establishes a new framework for making these public charge determinations that is both irrational and unpredictable.

Unsurprisingly, a rule so at odds with the law would also wreak havoc on the Counties' health and safety-net systems, the public health of their communities, and their economies.  By forcing our residents to forgo life-saving benefits, the Final Rule will strip the Counties of millions of dollars in health-related federal funds while increasing the costs to the Counties of providing care, chilling the use of preventative and primary care, and shifting treatment into more costly emergency departments. Without critical prevention, public health will undoubtedly deteriorate.  The risk of infectious disease outbreaks will rise, forcing the Counties to make greater financial outlays to try to protect their communities.  Only a nationwide injunction will put a stop to these irreparable harms.

## STATEMENT OF FACTS

### A.    Longstanding Definition of "Public Charge."

Under the Immigration and Nationality Act (INA), the federal government may deny admission or adjustment of status to any noncitizen it determines is "likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).  For nearly 140 years, this provision has been consistently understood and applied to deny admission and lawful permanent residence to a narrow category of noncitizens—those who are likely to be primarily dependent on the government for subsistence.

In 1999, DHS's predecessor, the Immigration and Naturalization Service (INS), issued guidance formalizing this longstanding understanding of "public charge."  It was spurred to do so after welfare and immigration reforms caused confusion that led noncitizens and their families to disenroll from public benefits, which INS explained had "an adverse impact not just on the potential recipients, but on public health and the general welfare."  Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, at 28,689 (May 26, 1999) ("1999 Field Guidance").  In the 1999 Field Guidance, INS made clear that a noncitizen would be deemed likely to become a "public charge" only if he or she was likely to become "primarily dependent on the government for subsistence."  *Id.*  And INS explained that it would base its public charge assessment on whether a

noncitizen was likely to receive two discrete kinds of benefits: (1) public cash assistance for income maintenance purposes (*e.g.*, Supplemental Security Income (SSI), Temporary Assistance to Needy Families (TANF), or state or local cash assistance programs); or (2) long-term, institutionalized care at public expense.  *Id.*  INS based this definition on the plain meaning of the term, historical usage, and case law, following extensive consultation with federal benefit-granting agencies.  *See id.*

The public charge assessment was and is a forward-looking inquiry based on the totality of the circumstances.  8 U.S.C. § 1182(a)(4).  This means an immigration official must take into account statutorily mandated factors, such as health, family status, education and skills, resources, assets, and financial status, to determine whether a noncitizen is likely to become a public charge in the future. *Id.*  Public charge determinations generally apply to (1) noncitizens applying to enter the United States (admission), (2) noncitizens applying to adjust their immigration status to become lawful permanent residents (LPRs, also known as green card holders) (adjustment of status), and (3) LPRs returning to the United States after a 180-day absence (also admission).

Congress has repeatedly considered proposals to alter this settled meaning of public charge and scheme for making such determinations—but never enacted any such changes.  *See* pp. 10-11, *infra*.

## B.    The Final Rule Dramatically Changes the Public Charge Assessment.

On August 14, 2019, DHS issued the Final Rule, which, if allowed to take effect, will dramatically overhaul the public charge assessment in four key ways.

*First*, the Final Rule replaces the longstanding definition of the term "public charge"—a noncitizen *primarily* dependent on the government for income maintenance or institutionalized care— with a far broader definition that sweeps in any noncitizen who "receives one or more public benefit," in any amount, even for a limited duration.  8 C.F.R. § 212.21(a).  Even temporary or limited use of benefits is now sufficient for a noncitizen to fall within the meaning of public charge.

*Second*, the Final Rule would take into account non-cash benefits for the first time. Specifically, the Final Rule directs consideration of non-emergency Medicaid, Supplemental Nutrition Assistance Program (SNAP, formerly known as food stamps), public housing, and Section 8 housing assistance (collectively, "non-cash enumerated benefits"), in addition to the cash benefits and institutionalized care previously considered (taken together with the non-cash benefits, the

"enumerated benefits").  8 C.F.R. § 212.21(b)(2), (6).

*Third*, the Final Rule states that a noncitizen who uses any of these benefits for 12 months within a 36-month period (with receipt of two benefits in one month counting as two months of use) is a public charge.  8 C.F.R. § 212.21(a).  It also requires immigration officials to consider receipt of any enumerated benefit—even below that already-low threshold—as part of the "totality of the circumstances" analysis.  Final Rule Part I(C); *see* 8 C.F.R. § 212.22(b)(4).

*Fourth*, the Final Rule broadens the factors an immigration official must consider when making a public charge determination, including adding family size (as part of the "family status" factor), receipt of a fee waiver for immigration benefits, English-language proficiency, and mere *application* for the enumerated benefits—regardless of their actual receipt or use.  The Final Rule also designates some factors as heavily negative or positive.  *See* 8 C.F.R. § 212.22.  Prior receipt of any of the enumerated benefits for 12 months is a "heavily weighted negative factor."  *Id.* § 212.22(c)(1)(ii).  DHS justified all these changes on the grounds that they would purportedly ensure noncitizens subject to a public charge review are "self-sufficient."  84 Fed. Reg. at 42,195.

## C.   The Counties Are Responsible for Core Health and Safety-Net Functions, Which Depend on the Enumerated Benefits.

The Counties serve as the frontline providers of essential health and safety-net services to their residents, more than one-third of whom are foreign-born.  Márquez Decl. ¶ 4; Pon Decl. ¶ 6.  Both San Francisco and Santa Clara operate extensive safety-net health care systems that serve as providers of last resort, offering care to low-income and other vulnerable residents regardless of their ability to pay.  Lorenz Decl. ¶ 7; Ehrlich Decl. ¶ 3.  Each of the Counties owns and operates a Level I trauma center hospital, additional hospitals, a public health department, and many clinics that together provide residents and visitors with a range of emergency services, as well as specialized, preventive, primary, and routine care.  Lorenz Decl. ¶¶ 4-6; Cody Decl. ¶¶ 4-5; Ehrlich Decl. ¶ 3; Hammer Decl. ¶¶ 2-3.  Santa Clara's health system is the second largest county health system in the United States.  Lorenz Decl. ¶ 7.  Both Counties are required by law to provide emergency care to all persons in need of medical care, regardless of their insurance status or ability to pay.  42 U.S.C. § 1395dd(b)(1); Cal. Welf. & Inst. Code § 17000.  And both Counties spend millions of dollars each year to provide

uncompensated care to patients who are not covered by insurance and cannot pay for their care. Wagner Decl. ¶ 8; Lorenz Decl. ¶ 15.

In addition, the Counties bear responsibility for administering federal public benefits, including SNAP and TANF, and assisting County residents in applying for Medicaid, SSI, and other federal programs.  Shing Decl. ¶¶ 4-8; Márquez Decl. ¶¶ 6-7; Rhorer Decl. ¶¶ 3-4.  They also provide critical locally funded programs such as nutrition assistance to address food insecurity.  Rhorer Decl. ¶ 8.  The Counties often receive questions from current and potential enrollees about eligibility and/or associated immigration concerns.  Shing Decl. ¶¶ 8, 11-12; Rane Decl. ¶ 9; Smith Decl. ¶ 8.  And when there are dramatic changes in the public benefits landscape, the Counties must expend resources to educate their staff on the new regulations, amend communication materials, and adjust programming.  *See* Shing Decl. ¶¶ 11-12; Márquez Decl. ¶¶ 10-11; Smith Decl. ¶¶ 4-9; Pon Decl. ¶¶ 13-15; Rhorer Decl. ¶ 11.

The Counties' health and safety-net programs depend on community members enrolling in federal public benefits that allow them to access healthcare, nutritional, and other benefits available to them.  Lorenz Decl. ¶¶ 14, 19.  California's Medicaid program (known as Medi-Cal), pays for the majority of patients seen at the Counties' hospitals.  Lorenz Decl. ¶ 9; Wagner Decl. ¶ 4.  Delays in, or lack of access to, preventative care can lead to serious and urgent health problems that the Counties' hospitals must treat regardless of a patient's ability to pay.  Lorenz Decl. ¶¶ 14-16; Wagner Decl. ¶ 7; Ehrlich Decl. ¶¶ 5-7; Paule Decl. ¶¶ 4-6; Sung Decl. ¶¶ 5-6.  Further, for the Counties' public health departments to prevent communicable disease, all residents must be able to obtain vaccines and medical treatment.  Cody Decl. ¶ 7; *see also* Aragon Decl. ¶¶ 7-13.  The Counties already expend tremendous local resources—through uncompensated medical care, nutritional support, and other local programs—to *supplement* federal benefit programs, but these locally funded services are not intended to *supplant* federal benefit programs.  Márquez Decl. ¶¶ 6-8; Wagner Decl. ¶ 8.  If residents of the Counties suddenly disenrolled from federal benefits, it would strain these local programs by foisting increasing costs of care onto the Counties, placing the public health of the community-at-large at greater risk.  And it would force the Counties to immediately evaluate restructuring programs and reallocating resources away from other critical functions.  Márquez Decl. ¶¶ 9-11; Wagner Decl. ¶ 8.

**ARGUMENT**

The Counties seek a nationwide preliminary injunction to prevent DHS from implementing a rule that thwarts congressional dictate and intent, runs counter to the evidence in the administrative record, and would have devastating consequences for the Counties and their ability to protect the health and welfare of their communities.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 505 n.20 (9th Cir. 2018); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Counties have met these requirements.

**I.      The Counties are Likely to Succeed in Demonstrating the Final Rule Violates the APA.**

      **A.      The Counties Are Likely to Succeed on their Claim that the Final Rule Is Contrary to Law.**

This Court should hold the Final Rule "unlawful and set aside [the] agency action" under the APA because the Final Rule is "not in accordance with law."  5 U.S.C. § 706(2)(A).  Congress has repeatedly ratified the longstanding definition of public charge and the framework for making public charge determinations that DHS now seeks to upend.  The Final Rule is so wholly out of the bounds of the plain meaning and broader statutory scheme, that this Court's intervention is required.

            **1.      The Final Rule's Definition of "Public Charge" Contravenes the Term's Plain and Longstanding Statutory Meaning.**

For nearly 140 years, Congress has used the statutory term "public charge" to mean a person who depends primarily on the government for subsistence.  The Final Rule abandons this longstanding definition and expands the term dramatically to encompass noncitizens who receive any of a broad array of public benefits, in any amount, for even a brief period of time.  But this new definition—which sweeps in noncitizens likely to receive less than 50 cents in benefits per day (*see* p. 17, *infra*; Shing Decl. ¶ 17)—is far broader than the statute can bear.  It contravenes unambiguous congressional intent, as reflected in the term's plain and longstanding meaning and confirmed by its statutory

context, legislative history, and judicial construction, and it cannot be allowed to take effect.

### a. The Original Meaning of "Public Charge" Requires Long-Term, Primary Dependence on Public Assistance.

The term "public charge" first appeared in federal immigration law in 1882.  In the 1882 Act to Regulate Immigration, Congress authorized immigration officers to refuse entry to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge."  Immigration Act of 1882, ch. 376, § 2, 22 Stat. 214 (Aug. 3, 1882) ("1882 Act").  Congress based this definition on the concept of "public charge" already used in several state and local laws, which described people "incompetent to maintain themselves," who "might become a heavy and long continued charge to the city, town or state," and "not merely destitute persons, who, on their arrival here, have no visible means of support."  *City of Boston v. Capen*, 61 Mass. 116, 121-22 (1851); *see also* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1848-59 (1993).

In its ordinary usage at that time, "public charge" referred to a person who was incapable of providing for his or her own subsistence and depended upon the public for substantial, long-term support.  Nineteenth-century dictionaries defined "charge" as a "person or thing committed to another[']s  custody, care or management; a trust."  *Charge*, Webster's Dictionary (1828 Online Edition), https://perma.cc/R9NN-5HFK; *Charge*, Webster's Dictionary (1886 Edition), https://perma.cc/LXX9-KF3K ("person or thing committed or intrusted [sic] to the care, custody, or management of another; a trust"); *see, e.g.*, *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 633-34 (2012) (normal usage, as reflected in dictionary definitions, governs interpretation of statutory terms).  A "public charge," therefore, was a person committed or entrusted to the public for custody, care, or management—in other words, a person who lacked the ability to care for themselves and depended, primarily or entirely, on the public for their subsistence.

This meaning was also reflected in the "design and structure" of the 1882 Act.  *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)).  Like any statutory term, "public charge" must be understood in light of "'the neighboring words with which it is associated.'" *Freeman*, 566 U.S. at 634-35; *accord Neal v.*

*Clark*, 95 U.S. 704, 708-09 (1877).  In the nineteenth century, the adjoining statutory terms "convict, lunatic, [and] idiot" had specific legal meanings: they were used to describe people "incompetent to act for themselves" and therefore subject to the state's "tutelary authority" as "*parens patriae . . .* to act as the[ir] general guardian and protector."  *Stanley v. Colt*, 72 U.S. 119, 161 (1866); *see Penington v. Thompson*, 5 Del. Ch. 328, 350 (1880) (lunatics and idiots were "incompetent for self-protection" and subject to protection by the government acting as *parens patriae*).  That Congress associated "public charge" with these terms confirms it should "be understood in the same sense," *Neal*, 95 U.S. at 708-09—as referring to individuals incapable of caring for themselves and dependent on the government to serve as their "general guardian and protector."  *Accord Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917) (given the immediate statutory context of the public charge ground, "[w]e are convinced that Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future.").[1]

Moreover, the 1882 Act "as a whole," *Util. Air Regulatory Grp.*, 573 U.S. at 321, and its legislative history make clear that Congress intended "public charge" to refer to persons who depend *primarily* on government support, typically on a long-term basis—and not to those who merely receive some public aid.[2]  At the same time as it established a public charge ground of inadmissibility, the 1882 Act established a fund to provide "for the care of immigrants arriving in the United States [and] for the relief of such as are in distress," and empowered federal immigration officials "to provide for the support and relief of such immigrants therein landing as may fall into distress or need public aid." 1882 Act at §§ 1, 2.  Thus, Congress anticipated that some immigrants would be in need of "support," "relief," or "public aid" after their arrival, and that these immigrants would not be excluded as people "unable to take care of [themselves] without becoming a public charge."  *Id.*  Indeed, legislative debate on the 1882 Act suggests Congress was not concerned with excluding all immigrants who might

---

[1] In 1990, Congress "consolidat[ed]" these "related grounds" under the rubric of "public charge."  Immigration Act of 1990, Pub. L. No. 101-649, § 601(a), 104 Stat. 4978, 5067 (1990); H.R. Rep. No. 101-955, at 128 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784.

[2] In the late nineteenth and early twentieth centuries, government provided public aid well short of institutionalization in a variety of ways.  *See, e.g.*, 1882 Act at §§ 1, 2; Burr Blackburn, *State Programs of Public Welfare in the South*, 1 J. Soc. Forces 6, 6 (1922); Walter I. Trattner, *The Federal Government and Needy Citizens in Nineteenth Century America*, 103 Pol. Sci. Q. 347, 352-53 (1988).

experience a need for public assistance, but rather sought to prevent foreign nations from "'send[ing] to this country blind, crippled, lunatic, and other infirm paupers, who ultimately become *life-long dependents* on our public charities.'"  13 Cong. Rec. 5108-10 (June 19, 1882) (statement of Rep. Van Voorhis) (emphasis added).  Taken together, then, the plain language of the 1882 Act, its structure, and its history evince a clear congressional intent: to exclude as public charges only those who are likely to depend primarily on the government for subsistence.

### b. Congress Has Retained the Term's Original Meaning and Rejected Attempts to Expand the Definition of Public Charge.

The term "public charge" retains its original meaning today.  It has appeared in the nation's immigration laws without interruption since 1882.  Early judicial and administrative interpretations confirmed its original meaning.[3]  And despite hundreds of substantial changes, reorganizations, and reenactments over time to the nation's immigration laws, Congress has never altered that meaning.  Indeed, Congress employed the same term—for the same purpose—when it enacted the INA in 1952, *see* 66 Stat. 183, § 212(a)(15), and retained it even as it expanded welfare programs throughout the twentieth century, and when it enacted significant immigration and welfare reforms in 1996.[4]

The 1999 Field Guidance further confirmed this definition.  There, INS explained that its interpretation of the term public charge—to mean a person "primarily dependent on the Government for subsistence"—was consistent with the plain language of the statute, historical context, and case law.  64 Fed. Reg. at 28,677.  INS, in consultation with federal agencies that administer public benefits, determined that direct cash assistance and long-term institutionalization at government

---

[3] In the early twentieth century, courts similarly interpreted "public charge" to mean primary or complete dependence on public assistance.  *See, e.g.*, *Gegiow v. Uhl*, 239 U.S. 3, 9-10 (1915) (stating that, based on the statutory context, individuals "likely to become a public charge" were those akin to "paupers and professional beggars," *i.e.*, those requiring long-term public aid); 247 F. at 294 ("We are convinced that Congress meant the [1882 Act] to exclude persons who were likely to become occupants of almshouses"—requiring full-time assistance—"for want of means with which to support themselves in the future"); *Ex Parte Hosaye Sakaguchi*, 277 F. 913, 916 (9th Cir. 1922) (determining a person is likely to become a public charge when "the burden of supporting the [person] is likely to be cast upon the public").  Later Board of Immigration Appeals decisions affirmed this understanding.  *See, e.g.*, *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (BIA 1962).

[4] Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 (1996); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

---

expense were the only benefits that indicated this type of dependence.  *Id.* at 28,677-78.

Moreover, since INS issued its 1999 Guidance, Congress has repeatedly declined to revise the provision or enact a contrary definition, even as it made dozens of other amendments to the INA, including two to Section 212(a)(4) itself.  Congress's repeated retention of the term reflects its approval of the existing regulatory interpretation, in line with the term's ordinary, plain, and historical meaning.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

Critically, Congress has not only retained the original meaning of "public charge"—as a person primarily dependent on the public for subsistence—but it has rejected attempts to define it more expansively.  In fact, the Final Rule seeks to impose a definition of "public charge" very similar to one that Congress squarely rejected.  During legislative efforts that ultimately resulted in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), a group of legislators proposed to expand the definition of "public charge" much as the Final Rule does now: to mean a noncitizen who receives specified means-tested benefits, including those enumerated in the Final Rule, "for an aggregate period of at least 12 months."  142 Cong. Rec. 24425-27 (Sept. 24, 1996), https://perma.cc/BD5X-4A7W (*reprinting* H.R. Rep. No. 104-828 (proposing to define "public charge" and "means-tested public benefit" in the deportability context through secs. 532 and 551 of H.R. 2202)).  But Congress rejected the proposal and ultimately enacted an immigration reform bill that made no change to the long-established meaning of the term "public charge."  *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 531(a), 110 Stat. 3009-546, 3009-674-75 (1996).  *See generally INS v. Cardoza-Fonseca*, 480 U.S. 421, 441-43 (1987) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (internal quotation marks and citations omitted)).

Similarly, in 2013, Congress considered—and rejected—another proposed change to the meaning of public charge.  The new proposal would have required applicants for green cards "to show they were not likely to qualify even for non-cash employment supports" such as Medicaid and SNAP. S. Rep. No. 113-40, at 42 (2013); *see also id.* at 63 (rejected amendment "would have expanded the

definition of 'public charge' such that people who received non-cash health benefits could not become legal permanent residents"). But once again, Congress rejected the attempt. *Id.* at 63. DHS cannot resurrect through regulation a change in law that Congress has squarely rejected. *See, e.g.*, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975) (rejecting construction of statute that would implement substance of provision that Conference Committee rejected).

Instead, Congress has retained the original meaning of "public charge," which refers only to a person who is primarily dependent on the government for subsistence. The statutory text, context, and legislative history permit no other interpretation, and Congress has repeatedly ratified this meaning. DHS's new definition is wildly outside the bounds of the statute, sweeping in noncitizens who receive trivial amounts of benefits for a limited period of time. *See* p. 17, *infra*. Because the Final Rule is wholly predicated upon this unlawful definition, it is unlawful in its entirety and cannot stand.

### 2. The Final Rule Undermines the INA's Family-Reunification Scheme and Invades Congress's Policymaking Authority.

DHS's radical expansion of the definition of "public charge" is enough, standing alone, to invalidate the Final Rule completely. But it should also be struck down because, taken together, the provisions of the Final Rule seek to accomplish a policy goal that conflicts with—and will undermine—the family-based immigration system established and maintained by Congress. What DHS calls "interpretation" and "implementation" of existing statutes is in fact an attempt to restructure the federal immigration system, abandoning Congress's longstanding commitment to family reunification and replacing it with a preference for high-skilled, well-resourced, and employer-sponsored immigrants. DHS's authority to interpret the term "public charge" does not extend nearly so far. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (finding it "implausible" that Congress intended to give federal agencies the power to make major policy decisions through interpretation of "modest" statutory terms).

Congress has repeatedly declared that the INA "implements the underlying intention of our immigration laws regarding the preservation of the family unit" and reflects "the well-established policy of maintaining the family unit wherever possible." H.R. Rep. No. 82-1365 (1952), *reprinted in*

1952 U.S.C.C.A.N. 1653, 1680, 1691.[5]  This focus on family-reunification is reflected in Congress's

green card allocations: roughly 70% of the annual cap on new LPRs has been dedicated to immigrants

sponsored by their U.S. citizen and LPR relatives and immediate relatives of U.S. citizens are

exempted from the cap altogether.  8 U.S.C. § 1151(b)-(d).  In recent years, roughly two-thirds of new

LPRs obtained their green cards through family ties.  RJN Exh. A at 1.  And Congress's commitment

to family reunification extends to families of varied economic means.  *See* RJN Exh. D at exhibit A

p.15 (one-third of recent LPRs had family incomes below 125% of Federal Poverty Guidelines).

Yet the Final Rule will dramatically restrict the ability of noncitizens to obtain LPR status on

the basis of family ties because these applicants are much more likely to be deemed public charges

under the Final Rule.  Indeed, a recent study found that more than two-thirds of recent LPRs had at

least one characteristic described in the Final Rule as a negative factor, and nearly half had two,

greatly diminishing their green card prospects.  *Id.*  Through the Final Rule, DHS has created a scheme

that directly undercuts Congress's commitment to family reunification "wherever possible."  H.R.

Rep. No. 82-1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680, 1691.  Instead, the Final Rule

preferences wealthy English-speaking noncitizens.  *See* 8 C.F.R. § 212.22.  The only factors under the

new scheme that DHS weighs as *heavily positive* are wealth-based, concerning a noncitizen's financial

assets, resources, support, annual income of at least 250% of the Federal Poverty Guidelines (FPG),

and generally enrollment in a private insurance plan (a facet of wealth and/or employment).  *Id.*  And

many of the negative factors—including heavily-weighted negative ones—likewise focus on wealth,

including whether a noncitizen has income less than 125% of the FPG, does not have other significant

assets, and uses the enumerated benefits.  *Id.*  These new factors and weighing scheme, taken together,

fly in the face of the family-based immigration system that Congress established.

The current Administration seeks to displace family reunification as the foremost priority of

the nation's immigration laws.  RJN Exh. B (Presidential statement proposing to prioritize

immigration based on employable skills rather than family relationships).  But that decision is for

---

[5] *See also* H.R. Rep. No. 85-1199, at 7 (1957), *reprinted in* 1957 U.S.C.C.A.N. 2016, 2020 (Congress's purpose in enacting the INA was to respond to "the problem of keeping families of United States citizens and immigrants united"); H.R. Rep. No. 101-723 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6710, 6717 (Congress has remained "convinced that family reunification should remain the cornerstone of U.S. immigration policy").

Congress to make.  The Final Rule uses the public charge provision to radically revise the purpose of the INA.  But DHS lacks authority to legislate immigration policy in this manner.  *Util. Air Regulatory Grp.*, 573 U.S. at 321, 325-26 ("[a]n agency has no power to tailor legislation to bureaucratic policy goals by rewriting unambiguous statutory terms" (internal quotation marks, alterations, and citations omitted)); *Am. Trucking Ass'ns*, 531 U.S. at 468.  For this reason, too, the Final Rule contravenes congressional intent and is unlawful.

### B.  The Counties Are Likely to Succeed in Demonstrating that the Final Rule Is Arbitrary, Capricious, and an Abuse of Discretion.

In addition to being contrary to law, the Final Rule is also "arbitrary, capricious, and an abuse of discretion."  5 U.S.C. § 706(2)(A).  Agency action is invalid if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  And when an agency departs from prior policy, it must demonstrate that there are "good reasons" for the new policy and offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Encino Motorcars*, 136 S. Ct. at 2125-26 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)) (internal quotation marks omitted).  Here, DHS failed to grapple with key costs of its new policy, to logically support its supposed benefits, and to explain why this dramatic change from prior policy was justified.  It also created factors, benefit use thresholds, and an overarching framework for making public charge determinations that lack basic logical underpinnings.  In doing so, DHS has abused its discretion and promulgated a Final Rule that is arbitrary and capricious.

### 1.  DHS Enacted the Final Rule Without Adequately Considering Issues Raised by Commenters, and Proffered Justifications Contrary to the Evidence and Its Predecessor's Conclusions.

"As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act."  *Mingo Logan Coal Co. v. E.P.A.*, 829 F.3d 710, 732–33 (D.C. Cir. 2016).  And where, as here, "an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable."  *Nat'l*

*Ass'n of Home Builders v. E.P.A.,* 682 F.3d 1032, 1039-40 (D.C. Cir. 2012).  In the Final Rule, DHS ignores or fails to meaningfully consider financial and other harms the Final Rule will cause while merely speculating about key benefits the Final Rule will purportedly generate.  This falls well short of DHS's obligation to offer a "satisfactory explanation" for its decision and a "reasoned explanation" for its departure from longstanding guidance.  *See Encino Motorcars*, 136 S. Ct. at 2125-26.  These serious flaws render the Final Rule invalid.

**Costs:** DHS failed to adequately consider significant costs to local and state governments raised in comments on the proposed rule.  Numerous commenters documented the dangers to individuals and public health generally that stem from disenrollment in public benefits, *see* pp. 20-23, *infra*, and explained that local and state governments will face higher costs because of this disenrollment.  RJN Exhs. C-E; *see* 84 Fed. Reg. at 41,310-12; *id.* at 41,312 (explaining that "[m]any commenters particularly emphasized that disenrollment or forgoing enrollment would be detrimental to the financial stability and economy of communities, States, local organizations, hospitals, safety net providers, foundations, and healthcare centers").  But the Final Rule and Regulatory Impact Analysis (RIA) scarcely mention, and wholly fail to grapple with, the profound effects the rule will have on local governments.  *See* RJN Exh. I at 14, 96-97.

Moreover, despite its concession that the Final Rule will cause members of mixed-status households—including U.S. citizens—to disenroll from benefits, 84 Fed. Reg. at 41,300, DHS refused to consider the costs associated with such disenrollment, stating: "DHS believes that it would be unwarranted for U.S. citizens and aliens exempt from public charge inadmissibility to disenroll from a public benefit program or forgo enrollment in response to this rule when such individuals are not subject to this rule.  *DHS will not alter this rule to account for such unwarranted choices*." *Id.* at 41,313 (emphasis added).  But DHS may not discount an undisputed impact of the Final Rule simply because DHS believes it is "unwarranted"—the costs of widespread disenrollment remains costs that DHS itself anticipates and must consider.  *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions."); *cf. Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) ("[w]hether the public has been irrational in interpreting" a government action is "irrelevant" to whether a party has been harmed by the public perception).

**Benefits:**  DHS's assertions regarding the benefits of the Final Rule are speculative and unsupported.  First, DHS baldly asserts that it "believes" the Rule will enhance health and welfare by denying status to those whom DHS will now deem public charges.  84 Fed. Reg. at 41,314.  But DHS fails to make any effort to quantify those benefits or explain how they will come about, let alone to explain how they outweigh the very real threats to public health and other costs to local governments in the near term that will result from the Final Rule.  Indeed, overwhelming evidence cited in comments shows exactly the opposite—that use of public benefits improves public health and welfare. RJN Exhs. C at 8-9; D at 12-16; F at 20; G at 8, 10-11, 14-15; H at 12.  DHS's disregard for this evidence is particularly egregious since it constitutes a reversal of its predecessor agency's prior position.  In the 1999 Field Guidance, INS stated that disenrollment from public benefits had "an adverse impact not just on the potential recipients, but on public health and the general welfare."  1999 Field Guidance, 64 Fed. Reg. at 28,689.  "An agency's predictive judgments about the likely economic effects of a rule are entitled to deference, but deference to such judgments must be based on some logic and evidence, not sheer speculation."  *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 708 (D.C. Cir. 2014) (citations and alterations omitted).  All DHS offers here is speculation about benefits that runs counter to the evidence in the record and the position of DHS's predecessor.

DHS also asserts that the Final Rule will carry out congressional principles of self-sufficiency and "better ensure" that noncitizens "subject to the public charge ground of inadmissibility are self-sufficient."  84 Fed. Reg. at 41,295.  But DHS's conclusion that *penalizing* the use of the non-cash enumerated benefits will promote self-sufficiency contravenes Congress's determination and INS's own prior statements that the *use* of benefits often promotes self-sufficiency.  Through Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Congress enacted a detailed scheme governing noncitizens' eligibility for public benefits.  Although PRWORA denied benefits to many noncitizens, it extended eligibility to certain "qualified" noncitizens— including those holding LPR status for at least five years.  8 U.S.C. §§ 1611-15.  In enacting this eligibility scheme, Congress was expressly concerned with assuring the self-sufficiency and self-reliance of noncitizens in the United States.  *See* 8 U.S.C. § 1601(7) (explaining that PRWORA's eligibility rules constitute "the least restrictive means available for achieving the compelling

governmental interest of assuring that [noncitizens] be self-reliant in accordance with national immigration policy").  As part of this regime, Congress contemplated that noncitizens granted LPR status would, in the future, avail themselves of benefits, and it made them eligible to do so—thus recognizing that receipt of benefits in this context is entirely consistent with self-sufficiency.

The INS also previously recognized that receipt of benefits in the short-term leads to self-sufficiency over the long-term.  In the 1999 Field Guidance, INS explained that "certain federal, state, and local benefits are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, *and assisting working-poor families in the process of becoming self-sufficient*."  1999 Field Guidance, 64 Fed. Reg at 28,692 (emphasis added).  DHS failed to account for these prior findings and instead enacted a counterproductive Final Rule that coerces people into forgoing benefits altogether.

Finally, DHS's alternative rationale for including the non-cash enumerated benefits—that they "together account for significant federal expenditures on low-income individuals," 84 Fed. Reg. at 41,296—is irrelevant to the statutory inquiry of whether a noncitizen is likely to become a public charge.  The overall cost to the federal government of certain benefit programs has no bearing on whether a specific noncitizen subject to a public charge review is more or less likely to be self-sufficient if they use that benefit.

In sum, DHS ignored the consequences of the Final Rule, failed to explain how the Final Rule would achieve its stated self-sufficiency goal, and failed to explain why the departure from prior policy was justified.  This falls well short of the requirements of reasoned rulemaking.  *See State Farm*, 463 U.S. at 43; *Encino Motorcars*, 136 S. Ct. at 2125.

## 2. The Final Rule's Benefit Use Threshold, Factors, and Weighing Scheme Are Unsupported and Irrational.

In promulgating the Final Rule, DHS dramatically broadened the sweep of the public charge definition, instituted a far-reaching benefit-usage threshold, added many more factors for consideration, and created an entirely opaque weighing scheme.  Together, these facets of the Final Rule create an arbitrary and capricious regulation that is unworkable and unjustified.

First, the Final Rule's benefit-use threshold to consider someone a public charge—12 months of even a minimal amount of benefit usage within a 36-month period (with any two benefits used in one month counting as two months of use)—is irrational.  Under the Final Rule, a person who received *less than 50 cents per day*—a standard SNAP benefit amount for recipients at the higher end of income eligibility, Shing Decl. ¶ 17—would be deemed a public charge.  A person receiving that level of benefit could receive less than 1% of their annual income from the federal government, but still be deemed a public charge under the Final Rule.  *Id.*  It is nonsensical to deem a person using such a minimal amount of benefits a public charge, and DHS has offered no justification for doing so.

Second, the fact that such *de minimis* use of benefits could render someone a public charge is even less rational when considered alongside the income thresholds at which a noncitizen's income is a positive factor under the Final Rule.  For example, the Final Rule states that "the minimum income threshold to be considered a positive factor in the totality of the circumstances is generally 125 percent of the FPG."  84 Fed. Reg. at 41,323.  But individuals whose incomes far exceed that threshold qualify for many of the non-cash benefits use of which would render an individual a public charge.  Some jurisdictions offer Medicaid to adults with household incomes as high as 216% of FPG.  RJN ¶ 11.  And in San Francisco and Santa Clara, two-person households are eligible for Section 8 housing subsidies with annual incomes of up to $93,950 and $75,600, respectively.  *Id.* ¶ 12. Those income levels are more than 450% the FPG for a two-person household, which is $16,140 for 2018.  83 Fed. Reg. 2,642, at 2,643 (Jan. 18, 2018).

Third, DHS added a host of new factors to the public charge assessment, and many of them are wholly irrational.  For example, while the Final Rule considers large family size as a negative factor in a public charge assessment, DHS's own data indicates that non-cash benefit is higher among families of three (22.3%) than families of four (20.7%), and that noncitizens' use of cash benefits *decreases* as family size grows.  84 Fed. Reg. at 41,395.  Further, immigration fee waivers are a nonsensical metric for self-sufficiency because a fee waiver is a one-time benefit usage that allows a person to seek an immigration status adjustment that actually increases the likelihood of self-sufficiency.  It is also irrational for the Final Rule to consider the mere application for benefits in the public charge determination.  The fact of an application for benefits does not indicate a noncitizen is actually

financially and otherwise eligible for the benefit or will decide to use the benefit.  Commenters raised all these issues with these factors.  But DHS disregarded those comments without providing a reasoned explanation for doing so.  *See* 84 Fed. Reg. at 41,395 (family size); *id.* at 41,424-25 (fee waiver); *id.* at 41,424 (consideration of application for benefits).

These arbitrary and capricious aspects of the Final Rule are all compounded by the Final Rule's ultimately irrational, vague, and entirely unpredictable framework for weighing the statutorily authorized and newly added factors.  Although DHS designates some factors as "heavily" negative or positive, the majority are simply "factors" that different immigration officers can weigh as they see fit. *See* 8 C.F.R. § 212.22 (b)-(c).  DHS claims this weighing scheme will "formaliz[e] and standardiz[e] the criteria and process for public charge determinations."  84 Fed. Reg. at 41,302.  But it does the opposite.  Through the Final Rule DHS has created an expansive definition of public charge and encompassed a much broader range of benefits and factors to be considered (including wholly arbitrary ones).  But it has offered no meaningful guidance on how the various factors should be weighed against one another.  *See* 84 Fed. Reg. at 41,397 ("[T]he weight given to an individual factor not designated a heavily weighted factor depends on the particular facts and circumstances of each case and the relationship of the individual factor to other factors in the analysis.").  The result is a Final Rule that gives individual immigration officers standardless discretion to determine whether a noncitizen is likely to become a public charge.

The Final Rule's new formulation of the public charge inquiry—including its benefit use threshold, factors, and weighing scheme—is arbitrary and capricious and cannot stand.

## II.   Absent an Injunction, the Counties Will Suffer Irreparable Harm.

Without court intervention, the Final Rule will imminently and irreparably harm the Counties and the communities they serve.  *See Winter*, 555 U.S. at 22.  The Final Rule forces noncitizens who may seek admission or permanent residency to forgo or disenroll from critical public benefits and services at great cost to their well-being—and to the significant detriment of county health and safety-net programs, public health, and local economies.

There is no dispute that the Final Rule will cause individuals—even noncitizens and naturalized citizens who are not subject to public charge assessments—to disenroll from or forgo

critical public benefits out of fear of potential immigration consequences.  Indeed, County residents have already disenrolled out of fear of the Final Rule, including one noncitizen—not subject to a public charge determination—who dropped Medicaid despite having cancer.  Newstrom Decl. ¶ 43.

DHS itself projects that 2.5% of "individuals who are members of households with foreign-born noncitizens" will disenroll from programs expressly covered by the new rule.  84 Fed. Reg. at 41,463; RJN Exh. J at 91-93, 97-100.  But DHS provides virtually no justification for this low estimate, and evidence indicates that the rate and scope of disenrollment will in fact be far greater.  A recent University of California study found that the Final Rule will chill the use of public benefits by undocumented noncitizens and their families—including U.S. citizen children—at substantially higher rates than 2.5%.  Wong Decl. ¶¶ 18-45.  This is also evident in local data from San Francisco and Santa Clara.  Both counties have already experienced a greater than 2.5% decline in certain benefits enrollment among impacted households since the proposed rule was issued.  From fall of 2018, when DHS proposed the rule, to May 2019, San Francisco has experienced a 12.8% reduction in SNAP enrollment among households with at least one noncitizen, whereas households with only U.S. citizens decreased by roughly 3%.  Weisberg Decl. ¶ 12.  And although SNAP participation among impacted households has been generally decreasing since President Trump assumed office in January 2017, in San Francisco it dropped most precipitously in fall 2018 when the proposed rule was announced and issued.  *Id.* ¶ 13.  During those same months, enrollment among all-citizen San Francisco households remained relatively steady.  *Id.*  And in Santa Clara, from the rule's proposal through May 2019, households receiving SNAP benefits with at least one noncitizen member *declined* by around 20%, whereas household participation in SNAP where all members are U.S. citizens was *flat* during that same period.  Shing Decl. ¶ 24.  The same trend is true for Medicaid: In Santa Clara, Medicaid participation by households with at least one noncitizen *decreased* by around 13.5% from October 2018 to July 2019, while participation by households with only citizens *increased* by around 6%.  Shing Decl. ¶ 30; *see also* Weisberg Decl. ¶12; *accord* Sandoval Decl. ¶ 7 ("[E]ven individuals who are technically unaffected by the Rule are opting not to receive benefits.").

Moreover, evidence indicates that due to the fear and confusion caused by the Final Rule, individuals will also cease using benefits—such as Women, Infants, and Children (WIC) benefits and

subsidized childcare—that are not covered by the Final Rule.  Lorenz Decl. ¶¶ 11-13; Rane Decl. ¶¶ 8-9; Kanungo Decl. ¶ 9; Shing Decl. ¶¶ 10-12; Hammer Decl. ¶ 6; LeBarre Decl. ¶¶ 7-9; Newstrom Decl. ¶¶ 32-44.  This is in no way surprising, given the near impossibility of an individual evaluating the impact of the Final Rule without assistance of highly specialized legal counsel.  Newstrom Decl. ¶¶ 12, 20-31.  And it will cause even more significant harm to the Counties.  Rane Decl. ¶¶ 10-12; Hammer Decl. ¶¶ 4-5; Kanungo Decl. ¶¶ 10-12.

But even if the Final Rule coerces only 2.5% of noncitizens and their families to forgo and drop benefits and services, the Counties will suffer at least three types of immediate and irreparable harm: economic harm to the Counties' health and safety-net systems, harm to public health, and harm to local economies.  Each, by itself, is sufficient to support the requested preliminary injunction.

## A. The Counties' Health and Safety-Net Systems Will Incur Substantial Costs.

The Counties' life-saving health and safety-net programs will be undermined and burdened by the Final Rule's coercive effects.  Not only will the Counties lose critical federal funds for providing health and other services, but the Counties will have to foot a more expensive bill to provide essential care—imposing millions of dollars in irreparable economic harm on the Counties.  The Counties will also have to undertake time-consuming and costly training and outreach as well as administrative and programmatic changes to maintain the Counties' complex health and safety-net systems.  *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (finding economic harm is irreparable because a jurisdiction "will not be able to recover monetary damages connected to [an APA action]").

### 1. Loss of Millions in Federal Medicaid Funds and Mounting Care Costs.

If the Final Rule takes effect, the Counties will lose millions of dollars in federal Medicaid reimbursement funds.  Both Counties provide a broad array of health services to low-income residents, many of which are at least partially reimbursed with federal Medicaid dollars.  In Santa Clara, for example, Medicaid covers nearly two-thirds of its patients.  Lorenz Decl. ¶ 9.  And Medicaid funds account for such a large percentage of San Francisco's health care funding that even if DHS is correct that only 2.5% of individuals in households with a noncitizen will disenroll from Medicaid, this will translate to a roughly $7.5 million loss in Medicaid reimbursement funds.  Wagner Decl. ¶ 5; *see also* Shing Decl. ¶ 32 (estimating $4.6 million in Medicaid fund losses due to 1.9% decline in enrollment).

But an individual's decision to forgo Medicaid does not mean that they will not get sick.  And the Counties will treat anyone who enters their emergency departments in need of screening and emergency care, regardless of insurance status or ability to pay, as required by federal and state law.  Thus, even assuming DHS's low-end 2.5% drop-off in Medicaid-covered noncitizens, the Counties will incur substantial costs providing uncompensated care to patients who are no longer covered by Medicaid and cannot pay for their care.  Wagner Decl. ¶¶ 5-8; Paule Decl. ¶¶ 4-6; 83 Fed. Reg. 41,301 (acknowledging billions of dollars of reductions in annual federal and state transfer payments due to benefit drop-offs).  On average, in Santa Clara, each time an uninsured person visits the emergency department its hospital incurs $450 in uncompensated care costs.  Lorenz Decl. ¶ 15.

Some individuals chilled by the Final Rule will lose access to primary care and turn to emergency departments instead, presenting conditions not well-suited to treatment in those settings.  *See* Lorenz Decl. ¶ 16.  And others will delay care, including preventative care, forcing the Counties to absorb the costs of treating more expensive and dangerous medical conditions that could have been caught and managed much earlier but instead present as emergencies.  Lorenz Decl. ¶ 16; Ehrlich Decl. ¶¶ 4-7; Sung Decl. ¶¶ 4-6; Hammer Decl. ¶¶ 4-6.  On average, a primary care visit costs an order of magnitude less than an emergency room visit.  Lorenz Decl. ¶ 16; Ehrlich Decl. ¶ 7; Wagner Decl. ¶ 7.  Because in many instances the Counties will be providing uncompensated care, the Counties will bear these additional costs.  These costs cause the Counties irreparable harm.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (district court erred by evaluating the severity of harms rather than irreparability).  And this harm will be compounded further by the requirement of certain state and local benefit programs that individuals apply for Medicaid to be eligible for services.  *See, e.g.*, Cody Decl. ¶¶ 9-12; Blyth-Gaeta Decl. ¶¶ 3, 15.

### 2.    Operational Burdens and Costs.

The Counties will also incur significant administrative costs to mitigate the confusion, distrust, and harm caused by the Final Rule.  Already, Santa Clara and San Francisco staff have spent more than 2,000 hours and 1,100 hours, respectively, on public charge matters.  Shing Decl. ¶¶ 8, 11-12; Cody Decl. ¶ 13, Márquez Decl. ¶ 10, Lorenz Decl. ¶ 19; Smith Decl. ¶ 9.  If the Final Rule goes into effect, the Counties will have to invest substantial additional resources educating the public about the

Final Rule, answering patient and client questions, processing requests for disenrollment, analyzing

the impact of the Final Rule, reviewing and potentially changing policies, discussing the Final Rule

with community partners and organizations, preparing and distributing materials to explain the Final

Rule to staff and clients, and giving and attending public charge-related trainings.  Márquez Decl.

¶¶ 9-11; Smith Decl. ¶¶ 4-9; Pon Decl. ¶¶ 13-15.[6]

> **B.      The Final Rule Harms Public Health.**

The Final Rule also harms public health within the Counties—a harm that "cannot be

recovered."  *California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1076 (N.D. Cal. 2018).  The

Final Rule will also cause the Counties economic harm due to higher costs of protecting public health.

*See California*, 911 F.3d at 581.

> **1.      Increased Risk of Communicable and Infectious Disease.**

By coercing noncitizens and their families to forgo programs that provide access to preventive

care and early medical treatment, the Final Rule increases the risk of communicable and infectious

disease, such as tuberculosis ("TB") and measles.  Santa Clara has one of the highest rates of TB in the

country, and the majority of TB patients in both Santa Clara and San Francisco are foreign-born.

Cody Decl. ¶ 7; Aragon Decl. ¶ 10.  Santa Clara patients who tested positive for TB delayed

evaluation and refused to apply for Medicaid to cover the costs of treating the apparent infection due

to fear it would harm the patient's green card prospects.  Cody Decl. ¶ 8.  Such cases pose significant

risks for the entire community, as TB is easily transmittable and can infect anyone who lives, works,

or breathes in close proximity to someone with infectious TB.  *Id.*  And the consequences are often

fatal: nearly 10% of patients whose TB progresses to infectious TB die.  *Id.* ¶ 6.  Other infectious

diseases pose similar risks.  *See* Cody Decl. ¶ 10; Aragon Decl. ¶¶ 7-8, 11-13.  Additionally, if

---

[6] Additionally, because of Medicaid and SNAP drop-offs, the Counties will have to seek new funds to mitigate the public health harms caused by diminished benefit enrollment.  Santa Clara is already expending resources to explore additional county funding for community-based organizations to provide public charge-related direct legal services given the high demand for—and grave shortage of—organizations available to provide free or low-cost immigration *and* public benefit legal services. Márquez Decl. ¶ 10; Newstrom Decl. ¶¶ 20-27.  And San Francisco is already expending resources to explore additional local funding for enrollment outreach, benefits navigation, and legal education and support.  Rhorer Decl. ¶¶ 7, 8, 11.  If the Final Rule goes into effect, San Francisco will be forced to divert additional resources to complete this analysis and implement necessary changes.  *Id.* ¶ 11.

noncitizens do not receive critically important vaccines they would otherwise receive during preventive care appointments (*e.g*., for measles), communicable disease rates will increase, including among unvaccinated U.S. citizen populations.  *See* Cody Decl. ¶¶ 6-8; Aragon Decl. ¶¶ 8-9, 11; *see also* Espinoza Decl. ¶ 9 (days after the Final Rule was issued, noncitizen parents declined Medicaid funding for vaccinations required for their child to start kindergarten).

The Counties will face the increased costs to protect public health in the face of these increased disease and outbreak risks.  First, the Counties' public health departments are already devoting resources to determining how best to adjust programs to compensate for these elevated threats to public health.  Cody Decl. ¶¶ 13-14; Aragon Decl. ¶ 16.  Second, when noncitizens and their families avoid routine medical treatment for infectious diseases and other ailments, the Counties will incur the uncompensated cost of treating those infections when they become emergencies, at a significantly higher cost.  For example, although treating latent TB is relatively inexpensive, it can cost many tens of thousands of dollars to treat a single case of infectious TB.  Cody Decl. ¶ 6.  Third, the Counties will bear the costs of treating the spread of disease to additional individuals due to lack of timely preventative treatment.  These costs can easily rise into the millions of dollars.  *See* Cody Decl. ¶ 8.

## 2.   Increased Food Insecurity and Hunger.

Disenrollment from SNAP and other food-related programs such as WIC will also exacerbate food insecurity and hunger in the Counties.  For example, due to reduced SNAP and Medicaid enrollment, schools and school districts in the Counties could lose out on federal funds to provide free and reduced meals to their entire student body, undercutting the health and educational prospects of students in largely low-income communities and also potentially reducing funds for nutritional outreach to those same student communities.  Shing Decl. ¶¶ 18, 24; Cody Decl. ¶ 12; LeBarre Decl. ¶¶ 10-11.  SNAP, WIC, and other nutritional programs are critical to child health and development. Sufficient nutritious food of the type available through SNAP is associated with improved reading and math skills in elementary school, especially for young girls, and increases the likelihood of high school graduation.  Cody Decl. ¶ 12.  Indeed, food assistance for girls has been linked to improved economic self-sufficiency later in life—the stated goal of the Final Rule.  *Id.* ¶ 12.

To combat the elevated risk of food insecurity and deficient nutrition caused by the Final Rule,

1    San Francisco is already expending resources to consider increasing support to food pantries and

2    educational outreach.  Rhorer Decl. ¶¶ 7-8, 11.

3         **C.      The Final Rule Harms the Counties' Economies.**

4         The Counties' economies will also suffer as the Final Rule causes noncitizens and their

5    families to forgo and disenroll from medical, food, and other benefits.  SNAP, for example, provides

6    eligible individuals with electronic funds to purchase food from retailers like grocery stores.  Shing

7    Decl. ¶ 13.  Not only does the benefit add money to the local economy via these retailers, but the funds

8    have beneficial economic ripple effects as they circulate in the economy: according to a United States

9    Department of Agriculture study, every dollar issued to a SNAP recipient results in $1.79 in local

10   economic activity.  RJN Exh. J; Weisberg Decl. ¶ 10.  Thus, even under DHS's 2.5% unduly low

11   disenrollment projection, San Francisco stands to lose nearly $1 million in economic activity due to

12   SNAP disenrollment. Weisberg Decl. ¶¶ 8-10.  In short, because of the Final Rule, the Counties will

13   lose out on the economic benefits of these funds, negatively impacting the Counties' economic growth

14   and revenue and causing yet more harm.  *See California*, 911 F.3d at 581.

15   **III.    The Balance of the Equities and Public Interest Favor A Preliminary Injunction.**

16        Analyses of the balance of the equities and the public interest merge when the government is a

17   party. *California*, 911 F.3d at 575.  Here, the equities weigh overwhelmingly in the Counties' favor.[7]

18   The harms to the public health caused by the Final Rule—including the increased risk of

19   communicable disease outbreaks and the loss of nutritional support key to child development and

20   maternal health—weigh heavily in favor of an injunction.  *Id.* at 582.  And both the Counties and the

21   public at large are served by compliance with the APA.  *See id.*  There is no countervailing interest,

22   given that an injunction would merely preserve the status quo that has been in effect for decades, and

23   which better serves DHS's purported self-sufficiency goal than the Final Rule.  *See* pp. 15-16, *supra*.

24

25

26

27        [7] Indeed, the balance of the equities tips so sharply in favor of a preliminary injunction that an
injunction would be justified even on a showing of serious questions going to merits.  *See All. for the*

28   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## IV.     A Nationwide Injunction Is Appropriate in These Circumstances.

In immigration matters, the Ninth Circuit has "consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant v. Trump*, No. 18-17274, 2018 WL 8807133, at *24 (9th Cir. Dec. 7, 2018).  And the Ninth Circuit has emphasized "the need for uniformity in immigration policy." *Regents of the Univ. of California v. D.H.S.*, 908 F.3d 476, 511 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 2779 (2019); *see also Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018).  Further, nationwide relief is "commonplace in APA cases." *Regents of the Univ. of California*, 908 F.3d at 512.

In this case, moreover, a nationwide injunction is necessary to remedy the harm to the Counties.  *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (explaining that nationwide injunctions are proper when "necessary to give Plaintiffs a full expression of their rights.").  A geographically limited injunction is likely to generate more confusion without significantly preventing disenrollment.  Nationwide relief is necessary because an individual resident may move many times over the course of their lawful residency in the United States[8]—and benefits received, or likely to be received, within the Counties cannot meaningfully be carved out of a public charge assessment.    Thus, residents' benefit usage would still be chilled within the Counties, causing ongoing harm.  But it seems entirely impossible for USCIS to operate under an injunction that requires the application of a different test for assessing whether a person was likely to become a public charge depending on where they lived, and applied for or used any of the enumerated benefits, at different points in their history.  Thus, a nationwide injunction is not only legally warranted because this case deals with nationwide immigration policy, but it is also necessary to afford the Counties the relief to which they are entitled.

## CONCLUSION

The Counties respectfully request that the Court enjoin implementation of the Final Rule nationwide.

---

[8] Indeed, according to the Census Bureau more than one million noncitizens move between counties and states annually.  RJN ¶ 13. And tens of thousands of those noncitizens move to the Counties specifically.  Weisberg Decl. ¶ 16.  *See also* RJN ¶ 13 (processing time for an Application to Register Permanent Residence or Adjust Status at the San Francisco field office is 17 to 22.5 months).

1    Dated:   August 28, 2019                    Respectfully submitted,

2    JAMES R. WILLIAMS                           DENNIS J. HERRERA
     County Counsel                              City Attorney
3    GRETA S. HANSEN                             JESSE C. SMITH
     LAURA TRICE                                 RONALD P. FLYNN
4    RAPHAEL N. RAJENDRA                         YVONNE R. MERÉ
     JULIA B. SPIEGEL                            SARA J. EISENBERG
5    H. LUKE EDWARDS                             MATTHEW D. GOLDBERG

6    By:   */s/ Julia B. Spiegel*_____     By:   */s/ Sara J. Eisenberg*_____
            Julia B. Spiegel                             Sara J. Eisenberg
7           Deputy County Counsel                        Deputy City Attorney

8    *Attorneys for Plaintiff*                   *Attorneys for Plaintiff*
     *County of Santa Clara*                     *City and County of San Francisco*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---