OFFICE OF THE CITY ATTORNEY
CITY AND COUNTY OF SAN FRANCISCO
DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
SARA J. EISENBERG, State Bar #269303
Chief of Strategic Advocacy
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:    (415) 554-4748
Facsimile:    (415) 554-4715
E-Mail:    matthew.goldberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
JAMES R. WILLIAMS, State Bar #271253
County Counsel
GRETA S. HANSEN, State Bar #251471
Chief Assistant County Counsel
LAURA TRICE, State Bar #284837
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, State Bar #255096
Deputy County Counsel
JULIA B. SPIEGEL, State Bar #292469
Deputy County Counsel
H. LUKE EDWARDS, State Bar #313756
Deputy County Counsel
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA  95110-1770
Telephone:    (408) 299-5900
Facsimile:    (408) 292-7240
E-Mail:    luke.edwards@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO and COUNTY OF SANTA CLARA,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES; DEPARTMENT OF HOMELAND SECURITY; KEVIN McALEENEN, Acting Secretary of Homeland Security; and KEN CUCCINELLI, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>Defendants. | Case No. 4:19-cv-04717-PJH<br><br>**DECLARATION OF TOM WONG IN SUPPORT OF CITY AND COUNTY OF SAN FRANCISCO AND COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:    October 2, 2019<br>Time:    9:00 am<br>Judge:    Hon. Phyllis J. Hamilton<br>Place:    Oakland Courthouse<br>    Courtroom 3 - 3rd Floor<br><br>Trial Date:    Not set |

I, TOM K. WONG, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am a tenured Associate Professor at the University of California, San Diego (UCSD). I work in the Political Science Department, which U.S. News & World Report consistently ranks as one of the top ten political science departments nationally. I first joined the Department at UCSD in 2012, and became an Associate Professor with tenure in 2016. At UCSD, I am the Director of the U.S. Immigration Policy Center (USIPC), which I founded in 2018, and the Director of the International Migration Studies Program Minor.

3. Prior to this, I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year. I received a Ph.D. in Political Science from the University of California, Riverside in 2011.

4. In this declaration, I will (1) describe my professional background; (2) provide some background about the public charge ground of inadmissibility and the Department of Homeland Security's new public charge rule; and (3) explain a study I conducted to evaluate the impact of the new public charge scheme.

**PROFESSIONAL BACKGROUND**

5. I am an expert on U.S. immigration policy. I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on this subject. My most recent book analyzes 31,193 roll call votes on immigration-related legislation in Congress from 2005 to present, which makes it the most comprehensive analysis to date on contemporary immigration policies in the United States.

6. I have expertise in the conceptualization, design, and implementation of survey research, including surveying hard-to-reach undocumented populations. Several of the peer-reviewed academic journal articles and reports that I have published are based on survey research that I conceptualized, designed, and implemented. This includes embedding survey experiments into questionnaires in order to randomize respondents to different experimental conditions to identify causal treatment effects. The

survey and data presented here represent a survey experiment administered to a probability-based sample of undocumented immigrants to identify the causal treatment effect of the then-Proposed Rule.

7. I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration, which includes a list of all of my publications over the past ten years.

## PUBLIC CHARGE INADMISSIBILITY

8. The Immigration and Nationality Act (INA) states that a person seeking admission into the U.S. or seeking to adjust status to that of a person lawfully admitted for permanent residence (i.e., a green-card holder) is inadmissible if the person is determined likely to become a public charge.[1]

9. Under the INA's Section 212(a)(4), inadmissibility based on public charge is determined by the statute's "totality of the circumstances" test, which includes, at minimum, consideration of the following factors: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.[2]

10. Under this framework, an official from the United States Citizenship and Immigration Services (USCIS) operating under authority from the Department of Homeland Security (DHS) and pursuant to DHS regulations, evaluates these factors to determine if the noncitizen applicant is "likely to become primarily dependent on the government for subsistence as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at government expense."[3]  Generally, the Department of Homeland Security (DHS) does not take into account non-cash assistance and special-purpose cash assistance for the purposes of public charge determinations.[4]

11. USCIS explains that, "Non-cash or special-purpose cash benefits are generally supplemental in nature and do not make a person primarily dependent on the government for subsistence."[5]

---

[1] Section 212(a)(4) of the Immigration and Nationality Act (INA); 8 U.S.C. 1182(a)(4).

[2] U.S. Citizenship and Immigration Services (USCIS) (last accessed August 5, 2019), https://www.uscis.gov/greencard/public-charge; Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28, 677 (May 26, 1999).

[3] U.S. Citizenship and Immigration Services (USCIS) (last accessed August 5, 2019), https://www.uscis.gov/greencard/public-charge.

[4] *Ibid*.

[5] *Ibid*.

12. According to USCIS, non-cash assistance and special-purpose cash assistance, includes:

- Medicaid and other health insurance and health services (including public assistance for immunizations and for testing and treatment of symptoms of communicable diseases, use of health clinics, short-term rehabilitation services, and emergency medical services) other than support for long-term institutional care;
- Children's Health Insurance Program (CHIP);
- Nutrition programs, including Supplemental Nutrition Assistance Program (SNAP, formerly "Food Stamps"), the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), the National School Lunch and School Breakfast Program, and "other supplementary and emergency food assistance programs";
- Housing benefits;
- Child care services;
- Energy assistance;
- Emergency disaster relief;
- Foster care and adoption assistance;
- Educational assistance;
- Job-training programs; and
- In-kind, community-based programs, services, or assistance, including soup kitchens, crisis counseling and intervention, and short-term shelter.[6]

## I. DHS'S PROPOSED PUBLIC CHARGE RULE

13. On October 10, 2018, DHS published a Notice of Proposed Rulemaking in the Federal Register entitled "Inadmissibility on Public Charge Grounds" (the Proposed Rule).[7]  The Proposed Rule stated that, "[a]liens who seek adjustment of status or a visa, or who are applicants for admission, must establish that they are not likely at any time to become a public charge."[8]  Additionally, under this Proposed Rule, "DHS propose[d] to require all aliens seeking an extension of stay or change of status to demonstrate that they have not received, are not currently receiving, nor are likely to receive, public benefits as defined in the proposed rule."[9]

14. Among other changes, the Proposed Rule aimed to create significant new definitions:

- Public Charge would mean "an alien who receives one or more public benefit"[10];

- Public Benefits would be expanded to include new programs:  Medicaid, Supplemental Nutrition Assistance Program (SNAP), Medicare Part D Low Income

---

[6] *Ibid.*

[7] DHS, "Inadmissibility on Public Charge Grounds," October 10, 2018, p. 51114.

[8] *Ibid.*

[9] *Ibid.*

[10] *Ibid.*, p. 51289.

Subsidy, Section 8 housing, Section 8 Project-Based rental assistance, and federal Public Housing.

- Benefits would be quantified in a number of ways:[11]

    (1) Monetizable benefits are benefits that can be quantified.  The threshold for use of monetizable benefits would determined by the cumulative value of the benefits exceeds 15 percent of the Federal Poverty Guidelines (FPG) for a household of one within any period of 12 consecutive months;

    (2) Non-Monetizable benefits are benefits with an undetermined value.  The threshold for use of non-monetizable benefits would be limited to 12 months in the aggregate within a three-year period;

    (3) If both monetizable and non-monetizable benefits are used, the use of Non-Monetizable benefit received is limited to 9 months in the aggregate within a three-year period.

## II.   NONCITIZENS IN THE U.S. AND THE PROPOSED PUBLIC CHARGE RULE

15.     The public charge test applies to a person "who is applying for admission to the United States or is applying for adjustment of status to that of lawful permanent resident before DHS."[12] However, the statute exempts select categories of immigrants, such as refugees and asylum seekers, from the public charge test.  Under the Proposed Rule, this would include not only noncitizen immigrants currently living in the U.S. seeking to adjust their status to that of a permanent resident, but also noncitizens seeking to extend their visas or change their visa category.

16.     According to the Proposed Rule, DHS's purpose is to promote self-sufficiency among immigrants seeking admission.

17.     Nevertheless, DHS acknowledges a past policy of public charge determinations based only on the consideration of cash assistance.  For example, the Proposed Rule discusses the implementation of the Immigration Reform and Control Act (IRCA) of 1986, which made noncitizens who had arrived in the country prior to January 1, 1982 eligible for legal permanent residency.  IRCA waived a noncitizen's inadmissibility under Section 212(a)(4), so long as the "applicant demonstrated a

---

[11] *Ibid.,* pp. 51289-51290.

[12] *Ibid.*, p. 51134.

history of self-support through employment and without receiving public cash assistance, he or she would not be ineligible for adjustment of status on public charge grounds."[13]

### III.   EVALUATING THE IMPACT OF THE PROPOSED PUBLIC CHARGE RULE

#### A.   Survey Methodology

18.    To evaluate the impact of the Proposed Rule, I recently conducted a representative survey of undocumented Mexican nationals in San Diego County.  Between January 2019 and May 2019, I fielded a survey that included 506 respondents.

19.    Through a partnership between the US Immigration Policy Center (USIPC) and the Mexican Consulate in San Diego (the Consulate), I created a sample frame of undocumented Mexican nationals in San Diego County.

20.    The sample frame is comprised of individuals who receive consular services unique to those living in the U.S. without authorization.  Consulates provide a broad range of services to their nationals abroad.  The sample frame, which includes approximately 73,000 people, accounts for nearly the entire universe of undocumented Mexican nationals who currently live in San Diego County.  The Center for Migration Studies (CMS), for example, estimates that there are currently 82,406 undocumented immigrants who were born in Mexico who live in San Diego County (CMS 2015).

21.    Working with staff at the Consulate, I assigned random ID numbers to each record and then cut the sample frame into random draws of approximately 5,000 records for each survey module in the "Undocumented in America" project.  The Undocumented in America project is based out of the USIPC at UC San Diego.  Call sheets with limited information about each respondent—the random ID number assigned to each record, first name, and phone number—are then printed out.  Phone numbers are manually dialed by enumerators trained by myself.  Phone numbers are dialed once with no additional follow up.  After each paper call sheet is completed, it is immediately reviewed and then destroyed.  All surveys are conducted in Spanish, unless the respondent prefers to speak in English.

22.    I tested respondents' concerns over the Proposed Rule and its impact on their behavior regarding accessing public benefits using a survey experiment.  In the survey experiment, I randomly

---

[13] *Ibid.*, p. 51125.

1  assigned respondents to one of two groups.  In one group (*n* = 256 respondents), I prefaced questions

2  with language about the DHS' existing public charge rule.  In the second group (*n* = 250 respondents), I

3  prefaced questions with language about the existing public charge rule and additional language about the

4  Proposed Rule change.  The exact survey text is below:

> Currently, immigration officials can deny an application to become a legal permanent resident (i.e., get a green card) if they think that someone is likely to become a public charge, meaning someone who is primarily dependent on the government for support. To determine whether someone is likely to become a public charge, immigration officials look at whether green card applicants have received cash assistance from the government, among other factors...
>
> **[There is currently a proposal to add more programs to the list of programs that immigration officials look at to determine whether someone is likely to become a public charge. This includes using food stamps (in California, this is called CalFresh), receiving rental assistance for low-income families (these are called Section 8 Housing Vouchers), and obtaining some healthcare services using Medicaid (in California, this is called Medi-Cal).**

> For each of the following, please tell me how likely you are to do the following if needed...
> - Get emergency healthcare services
> - Get preventative healthcare services, such as regular doctor's visits
> - Get free immunization services, such as flu shots, at County Public Health Centers
> - Use food stamps (in California, this is called CalFreh)
> - Use the welfare-to-work program, which helps parents obtain employment and provides services such as childcare and transportation
>
> (for those with children)
> - Get emergency healthcare services for your children
> - Get preventative healthcare services, such as regular doctor's visits, for your children
> - Get free immunization services, such as flu shots, at County Public Health Centers for your children
>
> (for those with children in public K-12 education)
> - Get free or reduced price school meals for your children

20  23.   All respondents were asked about their likelihood of using the following:

- Emergency health services;
- Preventive health services, such as doctor's visits;
- Free immunization services, such as flu shots, at County Public Health Centers;
- Food stamps (in California, this is called CalFresh); and
- Welfare-to-Work program (which helps parents obtain employment and provides services such as childcare and transportation).

24.   Those with children were also asked about their likelihood of using the following:

- Emergency healthcare services for your children;
- Preventive healthcare services, such as regular doctor's visits, for your children;

- Free immunization services, such as flu shots, at County Public Health Centers for your children; and;
- Free or reduced price school meals for their children (for respondents with children in public K-12 education).

25.     An experiment such as this is superior to analyzing observational survey data (i.e., survey data that is not based on an experimental design) because asking respondents about one scenario is insufficient for determining how their behavior may or may not change based on the second scenario. Asking respondents about one scenario and then the second scenario would likely produce biased results because responses related to the first scenario would likely influence responses to the second scenario (e.g., "I said I would do this in the first scenario, so maybe I should say I wouldn't do that in the second scenario").  Random assignment to one of the two groups balances the two groups across the broad range of covariates (e.g., age, gender, etc.) that need to be controlled for in observational analysis. Additionally, random assignment to one of the two groups means that differences in responses can be casually attributed to the variation in the two scenarios (i.e., the treatment effect that results because of the Proposed Rule). Survey experiments embedded into representative probability-based samples of broader populations have "become an ostensible 'gold standard' for generalizable causal inferences."[14]

### SURVEY RESULTS

26.     I found the following results regarding the impact of the Proposed Rule on respondents' future benefit use.

**I.   ALL RESPONDENTS**

*Emergency Health Services*

27.     When respondents are told about the existing public charge rule, 71.5 percent are "likely" or "very likely" to get emergency healthcare services when needed.  When respondents are told about the existing public charge rule and the Proposed Rule, 56.5 percent are "likely" or "very likely" to get emergency healthcare services when needed.  In other words, respondents are 15.1 percent *less likely* to

---

[14] Mullinix, Kevin J., Thomas J. Leeper, James N. Druckman, and Jeremy Freese. "The generalizability of survey experiments." *Journal of Experimental Political Science* 2, no. 2 (2015): 109-138.  The authors further find that results obtained from convenience samples, that is, samples of populations that may not be representative, also "provide causal effects comparable to those found on population-based samples."

get emergency healthcare services when needed when they are told about the Proposed Rule change ($p <$ .001). This result is highly statistically significant.

### *Preventive Health Services*

28.     When respondents are told about the existing public charge rule, 50.6 percent are "likely" or "very likely" to get preventive healthcare services. When respondents are told about the existing public charge rule and the proposed changes, 32.3 percent are "likely" or "very likely" to get preventive healthcare services. In other words, respondents are 18.3 percent *less likely* to get preventive healthcare services when they are told about the Proposed Rule change ($p < $ .001). This result is highly statistically significant.

### *Immunization Services*

29.     When respondents are told about the existing public charge rule, 48.6 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers. When respondents are told about the existing public charge rule and the proposed changes, 39.5 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers. In other words, respondents are 9.1 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers when they are told about the Proposed Rule change ($p = $ .040). This result is also statistically significant.

### *Food Stamps (CalFresh)*

30.     When respondents are told about the existing public charge rule, 24.1 percent are "likely" or "very likely" to use food stamps (in California, this is called CalFresh). When respondents are told about the existing public charge rule and the proposed changes, 17.7 percent are "likely" or "very likely" to use food stamps (in California, this is called CalFresh). In other words, respondents are 6.4 percent *less likely* to use food stamps (in California, this is called CalFresh) when they are told about the Proposed Rule change ($p = $ .080).

## II.    RESPONDENTS WITH CHILDREN

### *Emergency Health Services*

31.     When respondents with children are told about the existing public charge rule, 88.7 percent are "likely" or "very likely" to get emergency healthcare services for their children when

needed. When respondents with children are told about the existing public charge rule and the proposed changes, 82.1 percent are "likely" or "very likely" to get emergency healthcare services for their children when needed. In other words, respondents with children are 6.6 percent *less likely* to get emergency healthcare services for their children when needed when they are told about the Proposed Rule change ($p$ = .058). This result borders on statistical significance.

*Preventive Health Services*

32.     When respondents with children are told about the existing public charge rule, 79.8 percent are "likely" or "very likely" to get preventive healthcare services for their children. When respondents with children are told about the existing public charge rule and the proposed changes, 71.2 percent are "likely" or "very likely" to get preventive healthcare services for their children. In other words, respondents with children are 8.6 percent *less likely* to get preventive healthcare services for their children when they are told about the Proposed Rule change ($p$ = .043). This result is statistically significant.

*Immunization Services*

33.     When respondents with children are told about the existing public charge rule, 81.8 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers for their children. When respondents with children are told about the existing public charge rule and the proposed changes, 69.3 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers for their children. In other words, respondents with children are 12.4 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change ($p$ = .003). This result is highly statistically significant.

*Free or Reduced Priced School Meals*

34.     When respondents with children in public K-12 education are told about the existing public charge rule, 81.2 percent are "likely" or "very likely" to get free or reduced price school meals for their children. When respondents with children in public K-12 education are told about the existing public charge rule and the proposed changes, 72.1 percent are "likely" or "very likely" to get free or reduced price school meals for their children. In other words, respondents with children are 9.1 percent

1  *less likely* to get free or reduced price school meals for their children when they are told about the

2  Proposed Rule change (*p* = .049). This result is statistically significant.

3  **Table Summary**

|  | Existing Rule | Existing + Proposed Rule | Difference | p-value |
|---|---|---|---|---|
| Emergency Health Services | 71.5% | 56.5% | -15.1% | <.001 |
| Preventive Healthcare Services | 50.6% | 32.3% | -18.3% | <.001 |
| Free Immunization Services | 48.6% | 39.5% | -9.1% | .040 |
| Food Stamps | 24.1% | 17.7% | -6.4% | .080 |
| Welfare-to-Work (w/children) | 18.6% | 18.9% | 0.3% | .915 |
| Emergency Health Services for children | 88.7% | 82.1% | -6.6% | .058 |
| Preventive Healthcare for your children | 79.8% | 71.2% | -8.6% | .043 |
| Free Immunizations for your children (w/children in K-12 education) | 81.8% | 69.3% | -12.4% | .003 |
| Free or reduced-price school meals | 81.2% | 72.1% | -9.1% | .049 |

13  **III.   RESULTS FOR RESPONDENTS WITH U.S. CITIZEN CHILDREN**

14  35.   A total of 370 respondents have U.S. citizen children.  Respondents with U.S. citizen

15  children are 7.7 percent *less likely* to get emergency healthcare services for their children when needed

16  when they are told about the Proposed Rule change (*p* = .032).  Respondents with U.S. citizen children

17  are 9.6 percent *less likely* to get preventive healthcare services for their children when they are told

18  about the Proposed Rule change (*p* = .032).  Respondents with U.S. citizen children are also 12.8 percent

19  *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their

20  children when they are told about the Proposed Rule change (*p* = .004).

21  36.   A total of 318 respondents have U.S. citizen children in public K-12 education.

22  Respondents with U.S. citizen children in public K-12 education are 9.5 percent *less likely* to get free or

23  reduced price school meals for their children when they are told about the Proposed Rule change (*p* =

24  .041).

25  **SUMMARY OF RESULTS**

26  37.   Altogether, my data show:

27  • Undocumented immigrants are 15.1 percent *less likely* to get emergency healthcare
   services for themselves when needed when they are told about the Proposed Rule change
28  (*p* < .001);

- Undocumented immigrants are 18.3 percent *less likely* to get preventive healthcare services for themselves when they are told about the Proposed Rule change ($p < .001$);

- Undocumented immigrants are 9.1 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers when they are told about the Proposed Rule change ($p = .040$);

- Undocumented immigrants with children are 6.6 percent *less likely* to get emergency healthcare services for their children when needed when they are told about the Proposed Rule change ($p = .058$);

- Undocumented immigrants with children are 8.6 percent *less likely* to get preventive healthcare services for their children when they are told about the Proposed Rule change ($p = .043$);

- Undocumented immigrants with children are 12.4 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change ($p = .003$);

- Undocumented immigrants with children are 9.1 percent *less likely* to get free or reduced price school meals for their children when they are told about the Proposed Rule change ($p = .049$);

- Undocumented immigrants with U.S. citizen children are 7.7 percent *less likely* to get emergency healthcare services for their children when needed when they are told about the Proposed Rule change ($p = .032$);

- Undocumented immigrants with U.S. citizen children are 9.6 percent *less likely* to get preventive healthcare services for their children when they are told about the Proposed Rule change ($p = .032$);

- Undocumented immigrants with U.S. citizen children are 12.8 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change ($p = .004$); and

- Undocumented immigrants with U.S. citizen children in public K-12 education are 9.5 percent *less likely* to get free or reduced price school meals for their children when they are told about the Proposed Rule change ($p = .041$)

## CONCLUSION

38.     My survey results show that the changes to public charge, contained in the Proposed Rule, would have had a significant chilling effect on noncitizen families, including families with U.S. citizen children, use of public benefits.

39.     When undocumented immigrants are told about the Proposed Rule change, they are significantly less likely to get emergency healthcare services for themselves when needed, are

1   significantly less likely to get preventive healthcare services, and are significantly less likely to get free

2   immunization services.  These patterns hold when focusing the analysis on respondents with U.S. citizen

3   children.  Undocumented immigrants with U.S. citizen children are significantly less likely to get

4   emergency healthcare services for their children when needed, are significantly less likely to get

5   preventive healthcare services for their children, and are significantly less likely to get free

6   immunization services, such as flu shots, at County Public Health Centers for their children when they

7   are told about the Proposed Rule change.  Respondents with U.S. citizen children in public K-12

8   education are significantly less likely to get free or reduced-price school meals for their children when

9   they are told about the Proposed Rule change.

10                          *Cross Analysis Comparisons on the Proposed Rule*

11          40.     My survey results also complement other research anticipating the chilling effect, or lack

12   of participation by immigrant groups in public benefit programs because of the Proposed Rule.  For

13   example, using in-depth qualitative interviews with twenty-five adults in immigrant families, the Urban

14   Institute similarly found that interviewees avoided participation in SNAP (formerly "Food Stamps") and

15   Medicaid because of the Proposed Rule, and also raised concerns about additional programs not listed in

16   the Proposed Rule.[15]  My survey results show that the experiences of the individuals who were

17   interviewed are shared more broadly among noncitizens.

18                                       *DHS's Final Rule*

19          41.     It is important to note that these results likely underestimate the impact of DHS's Final

20   Rule, which was published in the Federal Register on August 14, 2019.[16]  When describing the Proposed

21   Rule, the survey experiment used language stating, "There is currently a proposal."

22          42.     The Final Rule, contains many of the same factors and changes contained in the Proposed

23   Rule, with slight differences and exceptions that I anticipate will not cure the chilling effect that my

24   survey results demonstrated.  Like the Proposed Rule, the Final Rule establishes a list of new

25

26   _____

27       [15] Urban Institute. 2019. *Safety Net Access in the Context of the Public Charge Rule: Voices of Immigrant Families.* Washington, DC: Urban Institute.

28       [16] 84 Fed. Reg. 41,292.

1   enumerated public benefit programs, and a set of positive and negative factors that are considered when

2   determining a noncitizen's inadmissibility on public charge grounds.

3     43. The Final Rule includes:  Medicaid, with certain exceptions; SNAP (Supplemental

4   Nutrition Assistance Program); Section 8 housing, Section 8 Project-Based rental assistance, Federal

5   Public Housing; Cash benefits for income maintenance, Social Security Income (SSI), and Temporary

6   Assistance for Needy Families (TANF).  Unlike the various ways used to quantify benefits in the

7   Proposed Rule (Monetizable and Non-Monetizable benefits discussed above), the Final Rule would

8   count use of these benefits as a negative factors when used for more than 12 months in the aggregate

9   within any 36 month period.

10    44. The Final Rule excludes programs such as, the Medicare Part D Low Income Subsidy

11  previously included in the Proposed Rule and marketplace coverage subsidies made available under the

12  Affordable Care Act (ACA), and declines to include the Children's Health Insurance Program, which it

13  was still considering at the Proposed Rule stage.  The Final Rule also carves out as exempted Medicaid

14  use by children under 21 years old and women during pregnancy, including 60 days after pregnancy

15  ends.

16    45. The changes to the Final Rule, do not amount to a significant or meaningful change in

17  direction from those public benefit programs included in the Proposed Rule.  Therefore, I would not

18  alter the survey language in order to evaluate the impact of the Final Rule, and anticipate that the Final

19  Rule will have similar if not more acute negative effects among undocumented immigrant groups.

20    I declare under penalty of perjury that the foregoing is true and correct and that this declaration

21  was executed on August 27, at San Diego, California.



TOM K. WONG
Associate Professor
University of California at San Diego

# EXHIBIT A

# TOM K. WONG, PH.D.

Email: tomkwong@ucsd.edu | Google Voice: (619) 354-9913
Website: www.tomwongphd.com | bit.ly/tomkwong_citations

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2017 - | **ASSOCIATE PROFESSOR, POLITICAL SCIENCE**<br>University of California, San Diego |
| 2012 - 2017 | **ASSISTANT PROFESSOR, POLITICAL SCIENCE**<br>University of California, San Diego |

## OTHER POSITIONS

| | |
|---|---|
| 2019 - | **DIRECTOR, U.S. IMMIGRATION POLICY CENTER (USIPC)**<br>University of California, San Diego |
| 2018 - | **APPOINTED MEMBER (GUBERNATORIAL APPOINTMENT)**<br>**STATE OF CALIFORNIA CENSUS COMPLETE COUNT COMMITTEE** |
| 2016 | **ADVISOR, IMMIGRATION PORTFOLIO**<br>**WHITE HOUSE INITIATIVE ON ASIAN AMERICANS AND PACIFIC ISLANDERS** |
| 2013 - | **DIRECTOR, INTERNATIONAL MIGRATION STUDIES PROGRAM MINOR**<br>University of California, San Diego |

## EDUCATION

| | |
|---|---|
| 2011 | **PH.D. IN POLITICAL SCIENCE**<br>University of California, Riverside |
| 2005 | **B.A. IN POLITICAL SCIENCE**<br>University of California, Riverside<br>*Magna Cum Laude* |

## BOOKS

(2) Tom K. Wong. 2017. *The Politics of Immigration: Partisanship, Changing Demographics, and American National Identity.* Oxford University Press.
   NPR, ABC News/Yahoo.com, LA Times, Univision, Monkey Cage

(1) Tom K. Wong. 2015. *Rights, Deportation, and Detention in the Age of Immigration Control.* Stanford University Press.

## JOURNAL ARTICLES

(7) Tom K. Wong, Angela Garcia, and Carolina Valdivia. *2018.* "The Political Incorporation of Undocumented Youth," *Social Problems* vol. 66 no. 3: 356-372.

(6) Tom K. Wong and Hillary Kosnac. 2017. "Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of the Moral Hazard of Legalization," *International Migration* vol. 55 no. 2: 159-173.

Wong: CV (9/2018)

(5) Tom K. Wong and Angela Garcia. 2016. "Does Where I Live Affect Whether I Apply? The Contextual Determinants of Applying for Deferred Action for Childhood Arrivals (DACA)," *International Migration Review* vol. 50 no. 3: 699-727.
C-Span, Associated Press

(4) Tom K. Wong, Donald Kerwin, Jeanne M. Atkinson, and Mary Meg McCarthy. 2014. "Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey," *Journal of Migration and Human Security* vol. 2 no 4: 287-304.
NBC News.com

(3) Tom K. Wong. 2014. "The Politics of Interior Immigration Enforcement," *California Journal of Politics and Policy* vol. 6 no 3: 381-399.

(2) Tom K. Wong and Justin Gest. 2013. "Organizing Disorder: Indexing Migrants' Rights and International Migration Policy," *Georgetown Immigration Law Journal* vol. 28 no 1: 257-269.

(1) Tom K. Wong. 2012. "The Politics of Interior Immigration Control in the United States: Explaining Local Cooperation with Federal Immigration Authorities," *Journal of Ethnic and Migration Studies* vol. 38 no. 5: 737-756.

## POLICY AND DATA REPORTS

(9) Tom K. Wong, Jeremiah Cha, and Erika Villareal-Garcia. 2019. *The Impact of Changes to the Public Charge Rule on Undocumented Immigrants Living in the U.S.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego.

(8) Tom K. Wong et al. 2018. *Do Family Separation and Detention Deter Immigration?* Washington, D.C.: Center for American Progress.

(7) Tom K. Wong et al. 2018. *Amid Legal and Political Uncertainty DACA Remains More Important Than Ever.* Washington, D.C.: Center for American Progress.

(6) Tom K. Wong et al. 2017. *DACA Recipients' Economic and Educational Gains Continue to Grow.* Washington, D.C.: Center for American Progress.

(5) Tom K. Wong. 2017. *The Effects of Sanctuary Policies on Crime and the Economy.* Washington, D.C.: Center for American Progress.

(4) Tom K. Wong et al. 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes.* Washington, D.C.: Center for American Progress.

(3) Tom K. Wong et al. 2015. *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact.* Washington, D.C.: Center for American Progress.

(2) Tom K. Wong. 2014. *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border.* Washington, D.C.: Center for American Progress.

(1) Tom K. Wong et al. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals (DACA).* Washington, D.C.: Center for American Progress.

## BOOK CHAPTERS

(4) Tom K. Wong. 2014. "Conceptual Challenges and Contemporary Trends in Immigration Control." In *Controlling Immigration: A Global Perspective* (3rd edition), edited by James F. Hollifield, Philip Martin, and Pia Orrenius. Stanford University Press.

(3) Tom K. Wong. 2014. "Nation of Immigrants or Deportation Nation? Analyzing Deportations and Returns in the United States, 1892-2010." In *The Nation and Its Peoples: Citizens, Denizens, and Migrants*, edited by John S.W. Park and Shannon Gleeson. Routledge.

(2) James F. Hollifield and Tom K. Wong. 2014. "The Politics of International Migration: How Can We 'Bring the State Back In'?" In *Migration Theory: Talking Across Disciplines* (3rd edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(1) Karthick Ramakrishnan and Tom K. Wong. 2010. "Partisanship, Not Spanish: Explaining Municipal Ordinances Affecting Undocumented Immigrants." In *Taking Local Control: Immigration Policy Activism in U.S. Cities and States*, edited by Monica W. Varsanyi. Stanford University Press.

## WORKS UNDER REVIEW/IN PROGRESS (SELECTED LIST)

(Book Project: 2019) DACA: Undocumented Youth and the Politics of Immigrant Illegality
This project leverages five consecutive years of surveying DACA recipients about their economic, societal, and civic integration. These surveys span the Obama and Trump administrations, and include both the periods before and after the rescission of DACA. NPR, CNN, Washington Post, New York Times, NBC News, CNBC, Atlantic, Vox, Forbes, 538, Politifact, WNYC, C-Span, Associated Press

(Book Project: 2019) The Impact of Immigration Enforcement on Undocumented Immigrants.
This project draws from a first-of-its-kind probability-based survey of undocumented immigrants. This project includes several survey experiments that uncover how the day-to-day behaviors of undocumented immigrants, as well as the trust that they have in public institutions, is affected by differential levels of local law enforcement cooperation with federal immigration enforcement officials. Washington Post, NPR, KPBS, USA Today, City Lab, Chicago Tribune, Factcheck.org

(Book Project: 2020) Tom K. Wong. "Mobilizing Low-Propensity Voters of Color." This project examine how demographic changes are reshaping the American electorate and how policymakers are responding. The project includes multiple voter mobilization experiments utilizing direct voter contact run during the 2016 presidential cycle, as well as voter mobilization experiments that will be run during the 2018 midterm cycle.

(Database: ongoing) w/Justin Gest. "International Migrants Bill of Rights." This project aims to create cross-national indicators on government respect for and recognition of the human rights of migrants. Funding from the World Bank (obtained by Gest) will be used to pilot a 58 item index across 5 countries. A pilot of five countries was published by the World Bank (see here)

(Article: 2019) Tom K. Wong and Justin Gest. "Looks Skin Deep: Do Immigrant Legislators Better Represent Immigrant Interests?"

## RESEARCH GRANTS (AS A FACULTY MEMBER)

- $341,127, Multiple Funders, "U.S. Immigration Policy in the 21st Century," 2017-2019
- $22,500, UCSD USMEX Fellowship, 2016-2017
- $16,000, UCLA Institute for Research on Labor and Employment, 2015-2016

- $365,000, MacArthur Foundation, 2015-2017 (partially awarded, terminated after the DAPA program was enjoined by the U.S. Supreme Court)
- $25,000, UCSD Frontiers of Innovation Scholars Program Grant, 2015-2016
- $15,000, UCSD Faculty Career Development Program Grant, 2014-2015
- $30,000, Unbound Philanthropy, 2014
- $100,000, Department of Homeland Security, 2013
- $30,000, Center for American Progress, 2013
- $10,000, UCSD Center for International, Comparative, and Area Studies Grant, 2013
- $10,000, UCSD Academic Senate, 2013
- $1,500, UCSD Diversity, Equity, and Inclusion Grant, 2013

## TEACHING AT UCSD

- Diversity, Equity, and Inclusion Teaching Award, 2014-2015
- The Politics of Immigration (upper-division, 280 students)
- International Human Rights Law: Rights of Migrants (upper-division, 200 students)
- The Politics of Multiculturalism (upper-division, 100 students)
- Immigration Politics and Policy (graduate seminar, 4 students)
- Undergraduate Honors Seminar (upper-division, 15 students)

## INVITED PRESENTATIONS — LAST 5 YEARS (SELECTED)

**2018** |    "Surveying Undocumented Immigrants." UC Berkeley, June 12, 2018.

"The Integration of DACA Recipients." Scripps College, May 3, 2018.

"The Impact of the Trump Administration's Immigration Policies on Undocumented Immigrants: Evidence from Survey Experiments." Race, Ethnicity, and Politics Workshop, Northwestern University, April 13, 2018.

"Immigrant Political Incorporation." UC Migration Conference, UCSD, March 2, 2018.

"The Future of DACA." Columbia University, February 22, 2018.

"Immigration and DACA in the Age of Uncertainty, Middlebury College, February 20, 2018.

**2017** |    "The Future of U.S. Immigration Policy in the Age of Trump." Citizenship and Equality Colloquium, University of Colorado, November 16, 2017.

"The Determinants and Effects of Sanctuary Policies." Cornell University, November 9-10, 2017.

"The Determinants and Effects of Sanctuary Policies." Presentation at the 2017 APPAM Fall Research Conference, Chicago, IL, November 2-4, 2017.

"Immigration and the U.S. Constitution." Seminar at the Robert H. Smith Center for the Constitution at James Madison's Montpelier, Orange, VA, July 31-August 2, 2017.

"The Determinants of U.S. Immigration Policy." University of California, Santa Barbara, June 1, 2017.

"Paths to Legal Status for Undocumented Immigrants." Presentation at the CLINIC annual conference, Atlanta, GA, May 25, 2017.

"The Effects of Sanctuary Policies on Crime and the Economy." Presentation at the Sanctuary Cities Convening, New York City Council, New York, NY, March 27-28, 2017.

"The Future of U.S. Immigration Policy in the Age of Trump." Yankelovich Center for Social Science Research, University of California, San Diego, March 15, 2017.

"Child Migration." World Migration Report workshop, International Organization for Migration (IOM) Geneva, Switzerland, March 9-10, 2017.

"The Politics of Immigration." American Academy of Arts and Sciences, San Diego Program Committee, University of California, San Diego, February 9, 2017.

**2016 |**    "Post-Election Panel." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, November 21, 2016.

"Mobilizing Immigrant Communities in the Age of Trump." Tulane University, October 14, 2016.

"Immigrant Integration and the Obama Administration: DACA, DAPA, and Implications for the 2016 Presidential Election." Institute for Research on Labor and Employment, UCLA, April 28, 2016.

"Mobilizing Low-Propensity Voters of Color: Towards an Electorate That Reflects a Changing America." Presentation at the Asian Americans Advancing Justice conference, Los Angeles, CA, March 31, 2016.

"Immigrants in American Society." Presentation at KPBS, San Diego, CA, March 21, 2016.

"Immigration Policy." Presentation to Mi Familia Vota, Riverside, CA, January 14, 2016.

**2015 |**    "The European Refugee Crisis." Center for Comparative Immigration Studies (CCIS), the European Studies Program, the Lifelong Learning Program of the EU, and the Scholars Strategy Network (SSN), University of California, San Diego, October 27, 2015.

"U.S. Immigration Politics and the 2016 Presidential Election." Presentation at the Wilson Center, Washington DC, October 26, 2015.

"The Political Incorporation of Undocumented Youth." Presentation at the "Challenging Borders" conference, University of California, Riverside, October 23, 2015.

"The Consequences of Inequality: Why Does it Matter and How." Symposium on Capital in the 21st Century with Thomas Piketty, University of California, San Diego, October 22, 2015.

"U.S. Immigration Politics and Policy." Presentation at the U.S. Consulate in Tijuana, October 13, 2015.

"UC National Summit on Undocumented Students." University of California Office of the President, May 7-8, 2015.

"Irregular Migration." Presentation at the "Politics and Policies of International Migration: Europe and the U.S." conference, Université Libre de Bruxelles, Belgium, April 28-29, 2015.

"Opportunities and Limits of the Executive Actions Proposed by President Obama." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, April 13-14, 2015.

"Administrative Relief Implementation and Impact Project." Presentation at the Center for Migration Studies (CMS), New York, NY, March 25, 2015.

"Research Roundtable." Presentation at the "Ready America: Implementing Immigration Action" conference, Washington DC, February 9-11, 2015.

**2014** | "Insights from Implementing DACA for Administrative Relief." Presentation at the National Immigrant Integration Conference, Los Angeles, CA, December 16, 2014.

"Deferred Action for Childhood Arrivals." American Immigration Council (AIC), Washington, D.C., November 7, 2014.

"Immigration Policy and the November 2014 Midterm Elections." California Immigrant Policy Center (CIPC), October 29, 2014.

"The Many Paths to Legal Status: Results and Implications from the PERSON Survey." Presentation to the Center for Migration Studies (CMS), New York, NY, September 29, 2014.

"The Congressional Politics of Interior Immigration Enforcement." Presentation at the "Migration During Economic Downturns" workshop, German Historical Institute, Washington, DC, April 4-5, 2014.

"Mapping DACA Renewals." Presentation to U.S. Citizenship and Immigration Services (USCIS), March 13, 2014.

"Latino Politics: Left, Right, or Down the Middle?" Presentation at the Hispanic Radio annual conference, San Diego, CA, March 10, 2014.

**2013** | "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, October 2, 2013.

"DACA Turns 1." Presentation at the Center for American Progress, Washington, DC, August 15, 2013. **[Televised on CSPAN]**

"The Prospects for Comprehensive Immigration Reform." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, August 12, 2013.

"A Look at the Stats: How Will Congressional Representatives Vote on Comprehensive Immigration Reform?" Presentation at the "Changing Face of America" conference, University of California, Berkeley, May 3, 2013.

"Will Comprehensive Immigration Reform Pass? Predicting Legislative Support and Opposition to CIR." Center for Comparative Immigration Studies (CCIS), Univeristy of California, San Diego, April 29, 2013.

"Race, Ethnicity, the 2012 Elections, and the Politics of Comprehensive Immigration Reform." Presentation at the *Beyond the Headlines* speaker series, UCLA, February 26, 2013.

"International Migrants Bill of Rights (IMBR) Initiative." Georgetown Law School, Washington, DC, February 8-9, 2013.

## PROFESSIONAL ACTIVITIES

- Reviewer: *American Journal of Political Science, American Politics Research, American Sociological Review, British Journal of Political Science, Citizenship Studies, Du Bois Review, International Migration, International Migration Review, International Studies Quarterly, Journal of Ethnic & Migration Studies, Journal of Peace Research, Journal of Politics, Journal of Race, Ethnicity, and Politics, Law & Social Inquiry, Migration Studies, National Science Foundation, Oxford University Press, Politics, Groups, and Identities, Political Research Quarterly, Russell Sage Foundation, Social Identities, Social Problems*
- Advisory Board, Center for Comparative Immigration Studies (CCIS), 2012-2018
- Advisory Board, Integrated Voter Engagement study, 2016
- Advisory Board, Unbound Philanthropy, 2015-2017
- APSA, Executive Committee, Migration and Citizenship Section, Treasurer, 2012-2015
- APSA, Migration and Citizenship Section Program Co-Chair, 2018
- Editorial Board, Journal of Migration and Human Security (JMHS), 2014-present
- Editorial Board, Politics, Groups, and Identities (PGI), 2016-present
- Executive Committee, Center for Comparative Immigration Studies (CCIS), 2015-2018
- MPSA, International Relations and Domestic Politics Section Program Chair, 2016
- WPSA, (Im)Migration and Citizenship Section Program Chair, 2015, 2017
- WPSA, Dissertation award committee, 2016