| | |
|---|---|
| OFFICE OF THE CITY ATTORNEY<br>CITY AND COUNTY OF SAN FRANCISCO<br>DENNIS J. HERRERA, State Bar #139669<br>City Attorney<br>JESSE C. SMITH, State Bar #122517<br>Chief Assistant City Attorney<br>RONALD P. FLYNN, State Bar #184186<br>Chief Deputy City Attorney<br>YVONNE R. MERÉ, State Bar #173594<br>Chief of Complex and Affirmative Litigation<br>SARA J. EISENBERG, State Bar #269303<br>Chief of Strategic Advocacy<br>MATTHEW D. GOLDBERG, State Bar #240776<br>Deputy City Attorney<br>City Hall, Room 234<br>1 Dr. Carlton B. Goodlett Place<br>San Francisco, California 94102-4602<br>Telephone:    (415) 554-4748<br>Facsimile:     (415) 554-4715<br>E-Mail:          matthew.goldberg@sfcityatty.org<br><br>Attorneys for Plaintiff<br>CITY AND COUNTY OF SAN FRANCISCO | OFFICE OF THE COUNTY COUNSEL<br>COUNTY OF SANTA CLARA<br>JAMES R. WILLIAMS, State Bar #271253<br>County Counsel<br>GRETA S. HANSEN, State Bar #251471<br>Chief Assistant County Counsel<br>LAURA TRICE, State Bar #284837<br>Lead Deputy County Counsel<br>RAPHAEL N. RAJENDRA, State Bar #255096<br>Deputy County Counsel<br>JULIA B. SPIEGEL, State Bar #292469<br>Deputy County Counsel<br>H. LUKE EDWARDS, State Bar #313756<br>Deputy County Counsel<br>70 West Hedding Street<br>East Wing, Ninth Floor<br>San Jose, CA  95110-1770<br>Telephone:     (408) 299-5900<br>Facsimile:      (408) 292-7240<br>E-Mail:           luke.edwards@cco.sccgov.org<br><br>Attorneys for Plaintiff<br>COUNTY OF SANTA CLARA |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO and COUNTY OF SANTA CLARA,<br><br>    Plaintiffs,<br><br>vs.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES; DEPARTMENT OF HOMELAND SECURITY; KEVIN McALEENEN, Acting Secretary of Homeland Security; and KEN CUCCINELLI, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>    Defendants. | Case No. 4:19-cv-04717-PJH<br><br>**DECLARATION OF ADRIENNE PON IN SUPPORT OF CITY AND COUNTY OF SAN FRANCISCO AND COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:    October 2, 2019<br>Time:                  9:00 am<br>Judge:                Hon. Phyllis J. Hamilton<br>Place:                 Oakland Courthouse<br>                          Courtroom 3 - 3rd Floor<br><br>Trial Date:          Not set |

Pon Decl. ISO Counties' Motion for PI;
Case No. 4:19-cv-04717-PJH

I, ADRIENNE PON, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to the matters set forth below.

2. I am the Executive Director of the City and County of San Francisco's ("San Francisco") Office of Civic Engagement and Immigrant Affairs ("OCEIA"), a position I have held since OCEIA's founding in January 2009.  OCEIA is a policy, grant-making, compliance, and direct-services office whose mission is to promote inclusive policies and foster immigrant assistance programs that lead to San Francisco immigrants' full civic, economic, and linguistic integration into the community.  The office also oversees San Francisco's decennial U.S. Census outreach and education campaign.

3. I am also the Executive Director of the San Francisco Immigrant Rights Commission, which advises San Francisco's Mayor and Board of Supervisors on issues and policies related to immigrants who live or work in San Francisco.  The Commission seeks to improve, enhance, and preserve the quality of life and civic participation of San Francisco's immigrants, including by coordinating San Francisco's departments, agencies, and commissions that administer and enforce laws and regulations relating to health, human services, law enforcement, human rights, language access, the sanctuary city ordinance, and all other issues that affect immigrants.

4. Before my current position, I was appointed in January 2008 by then-Mayor Gavin Newsom to head the Mayor's Office of Community Investment.  I also served as chief executive officer of Zeum (now the Children's Creativity Museum), an arts and technology museum; interim executive director of the Asian Law Caucus (now Asian Americans Advancing Justice), which promotes, advances, and represents the legal and civil rights of Asian and Pacific Islander communities; and founding executive director of the Community Technology Policy Council.  In the private sector, I held numerous management positions at Pacific Telesis/SBC (now AT&T), including as external affairs director, where I developed public policy and digital-equity initiatives such as Asian Pacific American Future Communities and Women & Girls Tech Up!

5. I was the president and a commissioner of the San Francisco Civil Service Commission, and board president of The Women's Foundation, Asian Americans/Pacific Islanders in Philanthropy, and the API Women's Leadership Institute.  I also served as co-chair of the San Francisco 49ers

Community Advisory Panel and as a board member for other organizations such as the National Broadband Resource Center (formerly Alliance for Public Technology), Leadership California, and Global Education for Women Executive Leaders Advisory Board.

6. OCEIA serves the entire immigrant community of San Francisco and works with a cross-section of community service providers for low-income and vulnerable communities. Our city is approximately 36 percent immigrant, and my office handles and coordinates all city efforts on issues as varied as attaining information on legal status, securing benefits, and improving language access. As part of OCEIA's mission, each year, we provide millions of dollars in grants to our nonprofit and community partners for various programs and initiatives that complement San Francisco's important work serving the immigrant population. My office has approximately 50 employees, and our 2019 operating budget is $9.6 million.

7. In the course of my career and civic participation, I have dealt with immigrant issues for over 20 years and am knowledgeable about the effects of policies and government actions on immigrant communities. I am familiar with the finalized Rule on Inadmissibility on Public Charge Grounds ("Rule"), and my current position and experience have allowed me to understand the significance, implications, and impact of the Rule.

8. The Rule will have (and is already generating) huge, devastatingly negative effects on San Francisco and its immigrant community. The Rule is itself cruel and callous towards San Francisco's hardworking immigrant residents and workers by forcing them to choose between receiving crucial government benefits for which they are eligible and jeopardizing their immigration status. Perhaps more harmful and pernicious, however, are the broader effects of the Rule that extend beyond its plain text and requirements. In particular, because of the Rule's complexity and confusion about its provisions—stemming in no small part by the leaks, rumors, and multiple draft iterations by the Administration leading up to its formal promulgation—the Rule has created a massive chilling effect among San Francisco residents who are fearful that availing themselves of federal public benefits could compromise their immigration status or that of their loved ones. Disturbingly, this chilling effect extends even to those who are technically unaffected by the Rule, for example, among U.S. citizens with non-citizen relatives, and with regard to non-federal public benefits, including those provided by state

and local government and non-governmental entities.  The chilling effect has not been limited to new immigrants and their families, but extends to longtime San Francisco residents as well.  Fear and confusion surrounding the Rule was so great that OCEIA and I observed this chilling effect well before the Rule was finalized, and the effects are unlikely to be easily remedied.

9. This chilling effect harms not only San Francisco residents, but also San Francisco itself.  Because of the Rule, my office and other San Francisco departments and agencies have had to divert their critical, limited resources towards combatting the misinformation and confusion generated by the Rule and, in no small part, by the Administration's actions surrounding the Rule's rollout.  These efforts are necessary to ensure that San Francisco residents fully understand what benefits they are entitled to receive, the implications that receiving those benefits could have on immigration status, and what the Rule does *not* do, e.g., prohibit receiving benefits provided by San Francisco.

10. For example, OCEIA's Affirmative Relief and Deferred Action Grants Program has had to adjust its work to now include outreach, education, and legal consultations for individuals concerned about the Rule's potential impact.  The original purpose of the grant program, however, was to provide legal support with affirmative immigration remedies (especially regarding the Deferred Action on Childhood Arrivals, or "DACA," policy) and conduct community education and outreach on services available.  This alteration to the grant program is being made without additional funding.

11. In addition, the Rule has affected OCEIA's community response coordination and planning with its grant recipients.  In addition to funds, OCEIA staff provide grant recipients with training and support to better meet grant objectives.  My staff has and will continue to support grantees by coordinating trainings for immigration legal services providers and outreach workers, and organizing informational meetings about issues affecting the immigrant community.  Now that the Rule has been published, however, OCEIA has had to work with grantees to provide additional trainings regarding the Rule's provisions and effects, and coordinate with our community-based organization partners that will offer informational presentations and immigration attorney consultations for our residents.  All of this is being done without additional grant funding or resources.

12. Our community partners and grant recipients have similarly had to redirect their own resources and our grant money from their original purposes to dealing with the effects of the Rule. OCEIA has already received more requests for funding and grants as a result of the Rule.

13. Furthermore, from the very start when rumors began spreading about a public-charge rule being drafted, OCEIA has hosted multiple inter-agency immigration meetings with liaisons from numerous San Francisco departments to provide information and context on the anticipated rule. Such inter-agency meetings will likely increase now that the Rule has been finalized to ensure that all departments have accurate and current information. Managing such efforts across a city government that serves a population as large and diverse as San Francisco has severely taxed OCEIA.

14. Finally, in order to disseminate clear and accurate information about the Rule to immigrant residents and public benefits recipients, OCEIA's communications team has spent considerable time and money developing various communications tools and resources, often in partnership with San Francisco's Human Services Agency ("HSA"). Our efforts include: creating and maintaining webpages regarding the Rule on San Francisco's Immigrant Support Hub website (https://immigrants.sfgov.org/rights/public-charge); crafting strategies to inform and effectively engage ethnic media (also in partnership with HSA) to ensure that accurate information is being conveyed to immigrants from various communities that speak various languages; increasing translations of our own tools and resources in a whole array of languages (including, among others, Chinese (Cantonese and Mandarin) Spanish, Tagalog, and Russian); hosting immigration and benefits clinics and one-on-one consultations; and designing social media and communications toolkits with key messages to promote accurate understanding about the Rule and to combat misinformation created by the Rule's complexity and rollout.

15. Beyond those projects, the Rule has consumed significant time and resources from me, my deputy directors, and OCEIA's communications and administrative staff in other ways. For instance, all inquiries related to the Rule made through San Francisco's general-information 3-1-1 Call Center are directed to OCEIA, and my staff have to devote significant efforts towards analyzing and understanding the Rule in order to provide accurate information to our residents; we have received many such calls since rumors began swirling about a proposed public-charge rule. Several of my staff also

spend significant and unscheduled time dealing with the Rule and its effects, distracting them from their existing responsibilities. I expect that these resource demands due to the Rule will continue to require a significant amount of additional work and financial resources without any new funding or staff, thus diverting OCEIA and our partners from our original mission and ongoing efforts. OCEIA will have to request more funding from the city (funding that could be used elsewhere) in order to deal with the Rule while still attempting to meet its primary objectives.

16. The Rule has also burdened the Immigrant Rights Commission, of which I am the Executive Director. The Commission has had to hold additional hearings and divert dedicated monthly meeting times to issues relating to the Rule, including its chilling effect. These meetings cost taxpayers money, including costs for facilities rental and cleanup, translators for anyone that requests one (by way of example, one translator we use charges $200 per hour, with a two-hour minimum), and the cost of producing a transcript.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 27 at San Francisco, California.

_____
ADRIENNE PON