OFFICE OF THE CITY ATTORNEY
CITY AND COUNTY OF SAN FRANCISCO
DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
SARA J. EISENBERG, State Bar #269303
Chief of Strategic Advocacy
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:     (415) 554-4715
E-Mail:        matthew.goldberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
JAMES R. WILLIAMS, State Bar #271253
County Counsel
GRETA S. HANSEN, State Bar #251471
Chief Assistant County Counsel
LAURA TRICE, State Bar #284837
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA, State Bar #255096
Deputy County Counsel
JULIA B. SPIEGEL, State Bar #292469
Deputy County Counsel
H. LUKE EDWARDS, State Bar #313756
Deputy County Counsel
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA  95110-1770
Telephone:     (408) 299-5900
Facsimile:     (408) 292-7240
E-Mail:        luke.edwards@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO and COUNTY OF SANTA CLARA,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES; DEPARTMENT OF HOMELAND SECURITY; KEVIN McALEENEN, Acting Secretary of Homeland Security; and KEN CUCCINELLI, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>Defendants. | Case No. 4:19-cv-04717-PJH<br><br>**DECLARATION OF LISA M. NEWSTROM IN SUPPORT OF CITY AND COUNTY OF SAN FRANCISCO AND COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:  October 2, 2019<br>Time:          9:00 am<br>Judge:         Hon. Phyllis J. Hamilton<br>Place:         Oakland Courthouse<br>               Courtroom 3 - 3rd Floor<br>Trial Date:    Not set |

I, Lisa M. Newstrom, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration, except where a fact may be stated on information and belief, and, if called as a witness, could and would testify competently to the matters set forth below.

2. I submit this declaration in support of the City and County of San Francisco and County of Santa Clara's Motion for Preliminary Injunction.

3. In this declaration, I explain how the Notice of Proposed Rule Making on Inadmissability on Grounds of Public Charge (83 Fed. Reg. 51114) ("proposed rule") and Final Rule on Inadmissability on Grounds of Public Charge (84 Fed. Reg. 41292) ("final rule") have impacted Bay Area Legal Aid's clients in a manner that has severely taxed BayLegal's resources and impacted our ability to serve our clients. Specifically, the new rules have a chilling effect preventing families from getting needed food aid or health care even when they are eligible for the benefits and even when receiving the benefits would not actually harm the family's immigration status under the new public charge rule.

**Background**

4. I am Managing Attorney of the Santa Clara County Regional Office of Bay Area Legal Aid ("BayLegal"), the largest provider of legal services to the poor in the Bay Area and one of the largest in California. BayLegal and its predecessor organizations have practiced poverty law in San Francisco County since 1966, and in Santa Clara County since 1960. In the Bay Area, approximately 1.5 million people live in poor or low-income households (under 200% of the federal poverty measure).

5. With regional offices serving the counties of Santa Clara, San Francisco, Alameda, Contra Costa, San Mateo, Marin, and Napa, BayLegal protects and advances the rights of low-income families, immigrants, and language minorities in domestic violence, public benefits, healthcare, consumer protection, and housing matters before the courts, administrative agencies, and legislative bodies. We have 147 staff members, including 100 attorneys and 10 legal advocates; 61 of these attorneys and legal advocates provide services in San Francisco and Santa Clara Counties.

6. BayLegal's primary client intake mechanism is through our Legal Advice Line ("LAL") and Health Consumer Center ("HCC") hotlines. These hotlines are staffed by attorneys and trained legal advocates working under the close supervision of attorneys, and perform eligibility screening, including gathering client demographic data, as well as providing advice and counsel to eligible individuals on a wide range of practice areas, including matters related to immigration, domestic violence, Section 8, public housing, Medi-Cal (California's Medicaid program), Supplemental Security Income ("SSI"), CalWORKs (California's TANF program), and CalFresh (California's SNAP, or "food stamps" program).

7. BayLegal handles over 12,000 cases annually, and our intake units at the LAL and HCC handle over 26,000 calls per year. We also provide legal services to thousands of individuals each year through pro per clinics.

8. I have served as Managing Attorney in Santa Clara County since 2013. Over the last six years, I have supervised attorneys and advocates who provide free legal services to Santa Clara residents in a number of areas, including eligibility for public benefits, immigration law, rights of survivors of domestic violence and human trafficking, housing law, and others.

9. Prior to my position as Managing Attorney, I served as Staff Attorney in BayLegal's Santa Clara County Regional Office from 2009 to 2013. During that time, I worked on cases across a variety of practice areas, including Economic Justice (public benefits law) and Immigration.

10. Over the past ten years working in legal aid, I have developed close ties to low income communities throughout Santa Clara County and an understanding of the legal issues facing these communities. In particular, I have developed an expertise in laws governing public benefit programs such as CalFresh (food stamps), Medi-Cal (Medicaid), housing aid, and cash aid programs, and ways in which these public benefit programs intersect with immigration law. Since 2009, I have served as faculty in many public benefits law trainings for statewide and national audiences, including at the National Organization of Social Security Claimants Representatives (2009), Benchmark Institute (2012 to present), Practising Law Institute (2014 to present), California Victim Assistance Provider training (2017 to present), Freedom Network (national human trafficking conference), and Legal Aid

Association of California (2017). Many of these trainings have focused on the intersection of public benefits law and immigration, particularly as applied to survivors of domestic violence, sexual assault, and human trafficking. I graduated *cum laude* from Cornell Law School in 2008, as Doctor of Law (J.D.) with specialization in International Legal Affairs. I am bilingual in Spanish and have 19 years of professional experience working with immigrant families.

11. To demonstrate the way that the proposed and final rules regarding public charge have impacted BayLegal, I provide information known to me as a longtime legal aid attorney and as a manager at Bay Area Legal Aid, as well as limited information about some people who are suffering harm as a result of the chilling effect caused by the public charge rule. By making this declaration I do not waive any attorney-client privilege or client confidentiality.

**Expertise in the Intersection of Public Benefits Law and Immigration Law**

12. My colleagues at BayLegal and I have developed an expertise in the intersection between public benefits law and immigration law, and specifically in the way that public charge rules affect low income immigrant communities.

13. In addition to more than fifty years of poverty law practice in Santa Clara and San Francisco counties, BayLegal has the largest public benefits practice group in the Bay Area, handling approximately 4500 cases per year, as well as one of the largest immigration practice groups specializing in the representation of immigrant survivors of domestic violence, sexual assault, and human trafficking. Over 40% of our public benefits matters involve an immigrant client (including naturalized citizens) or a mixed-status household.

14. Based on my 10 years of practice in this area, and my review of caseload data provided by state and federal agencies, I believe that the high volume of immigrants seeking help from BayLegal's public benefits practice is not because immigrants receive aid at a higher rate, but because immigrants are more likely to encounter barriers in accessing the aid programs when they need them. The public benefits system is complex and often opaque. There are multiple benefit programs run by different benefit-granting agencies within federal, state, and local government, and each program has a

different set of rules about which immigrants are eligible to receive aid. For most programs that restrict immigrant eligibility, there are also a complex set of exceptions that permit certain immigrants – e.g., those who have asylum, or who are fleeing human trafficking—to access aid that other immigrants cannot receive. This complex web of eligibility rules is confusing to immigrants, many of whom have limited English proficiency, and they therefore seek help from legal experts.

15. Because our attorneys and advocates regularly handle cases at the intersection of immigration and public benefits law, BayLegal is frequently called on to provide trainings, technical assistance, and consultations for other legal organizations, public-sector partners, and CBOs on topics related to immigrant receipt of public benefits, including public charge concerns.

16. BayLegal also conducts a large number of trainings and outreach events targeted directly at low-income immigrant communities. Our attorneys and advocates visit locations such as schools, senior centers, and community clinics, and try to both provide legal education and to gain a deeper understanding of the needs and challenges faced by the communities we represent.

17. Most of our immigrant clients in public benefits matters are Lawful Permanent Residents or humanitarian immigrants, including refugees, asylees, and large numbers of immigrant survivors of domestic violence, child abuse, sexual assault, or human trafficking.

18. BayLegal provides wrap-around legal services to low income survivors of inter-personal violence, including survivors of domestic violence, sexual assault, and human trafficking. We also run domestic violence restraining order clinics through which we assist self-represented litigants in requesting domestic violence restraining orders against their abusers. Survivors come to Bay Area Legal Aid seeking help with housing, domestic violence restraining orders, family law, consumer law, health access, access to public benefits, and immigration, among other legal issues. Survivors often have more than one legal need. Many of the survivors we help are immigrants of varying status. In 2016 alone, we provided legal help to over 9,400 survivors of domestic violence.

19. Economic dependence on the abuser is one of the primary reasons that our clients consistently cite as a barrier to escaping abuse and exploitation, whether in the domestic violence or human trafficking setting. Access to safety net programs, including TANF (known as CalWORKs in

California, Medicaid (known as Medi-Cal in California), SNAP (known as CalFresh in California), and the related job training and child care services they can provide, make it possible for a survivor to safely leave an abuser without facing the impossible choice between safety from abuse and becoming homeless or going hungry.

**Scarcity of Experts in this Area of Law**

20. One of the reasons BayLegal's Economic Justice practice group is so critical to our clients is because there are so few other attorneys in the Bay Area who do this work. For example, Santa Clara County has a relatively robust legal services community compared to many other counties, yet there are still fewer than 10 legal services attorneys in Santa Clara County who practice public benefits law as their primary practice area, and there are approximately half a million people receiving aid from programs like Medi-Cal and SSI. There are more than 6,000 families receiving CalWORKs (TANF) in Santa Clara County, and only one public benefits attorney whose practice includes a substantial volume of CalWORKs cases.

21. Outside of free civil legal aid, most attorneys have little familiarity with or understanding of the intricacies of public benefits law. Among BayLegal's extensive referral lists for legal resources around the Bay Area, there are *no* private attorney referrals available for CalFresh (food stamps), CalWORKs (TANF), or Medi-Cal (Medicaid) eligibility law, outside of the very specific construction of Medicaid-exempt trusts.

22. For immigrants to make well-informed decisions about when and where they may get help with basic programs such as food aid or healthcare—and whether receipt of such aid will affect their immigration status under the public charge rules—they need to be able to consult with an experienced and knowledgeable public benefits attorney. However, there is an extreme paucity of attorneys qualified to provide such advice.

23. Expertise in public benefits law requires familiarity with a wide variety of programs that exist within each category of aid (e.g., SNAP and the Women, Infants and Children Nutrition Program within food assistance, or SSI and TANF within cash assistance), and an understanding of how the

programs interact with each other and with related social insurance programs like Medicare and Social Security. Each program can be exceedingly complex in itself; for example, in California there are over 90 categories of Medi-Cal in existence, and each type of Medi-Cal has different eligibility rules, funding streams, and scope of services. Program rules are subject to frequent changes in both statute and regulation at the national, state, and local government levels.

24. Moreover, like many other Americans, immigrants regularly move from county to county or state to state, and each local jurisdiction has its own unique programs with their own program rules.

25. To gain sufficient understanding of such public benefits programs to provide advice regarding immigrant eligibility requires, among other things, an understanding of a) noncitizen eligibility rules, which differ for each program, b) how and for whom each type of benefit is counted as "received" in mixed-eligibility households (where, for example, the child is a citizen and is eligible for food aid but the parents are not), c) how local agencies determine "household composition" and "assistance unit composition" for each separate type of benefit; d) how to interpret or understand the various official notices and documents that governmental entities provide for each type of public benefits; and e) how to file and pursue administrative hearings when issues arise with receipt of public benefits.

26. Understanding these complex programs can be critical to assessing public charge risk for immigrants; for example, an immigrant who receives certain "full-scope" Medi-Cal programs which use federal funding streams *may* be subject to exclusion under public charge, while the same immigrant might get a Medi-Cal program that is restricted to a certain age group or type of services, or that uses only state funding streams, and would not be subject to exclusion.

27. Bay Area Legal Aid does not have the resources to hire more attorneys, but even if we did, that would not solve the scarcity problem immediately. Given the complexity of the area of law, it takes a significant amount of time for a new attorney to develop the expertise needed to provide accurate advice regarding the intersection of public benefits law and immigration law.

**Systemic Barriers Complicating Application of the Public Charge Rule**

28. It is very difficult for recipients of aid to obtain documentation in plain language that explains what benefits they have received, what funding streams were implicated in the provision of that aid, which members of a household received aid, and in which months the aid was received, especially if that receipt was several years in the past.

29. In my experience, documentation of aid provided by local welfare agencies is often unclear, often contains errors, and is almost always rife with abbreviations and terms of art that are unfamiliar to the general public. When an agency has made an error and later corrects it—for example, by granting aid to a household member who is ineligible for benefits, and then rescinding that aid—it is often impossible to get accurate documentation or timelines showing all the relevant facts.

30. USCIS officials regularly display a lack of understanding about public benefits programs. For example, BayLegal often asks USCIS to waive filing fees for indigent clients. In connection with our fee waiver petitions, we regularly provide USCIS with documentation that our clients receive means-tested public benefits. We regularly receive incorrect rejections from USCIS decision-makers who are confused by state-specific names for programs (e.g. in California, Medicaid is called Medi-Cal), or by similar-sounding programs (e.g. confusing State Disability Insurance (SDI) with Supplemental Security Income (SSI).)

31. Based on my experience, I believe that immigrants subject to the public charge rule would need the help of skilled legal experts if they are to successfully obtain all relevant information from the benefit-granting agencies needed to show whether they have received benefits that triggered the proposed public charge rule, and to explain and negotiate with USCIS to ensure that the information is reviewed correctly. However, as explained above, there are not enough lawyers available and with the expertise to provide such help; further, even with legal representation it may at times be impossible to obtain documentation from the benefits programs that USCIS can understand. As a result, I believe many eligible immigrants will be too afraid to seek the aid they need, and will suffer from lack of nutritional support and healthcare.

**Public Charge Rule Has a Dangerous Chilling Effect**

32. In my experience as both a public benefits practitioner and a manager of other attorneys practicing in this area, I have observed that the recently enacted public charge rule has caused a chilling effect, preventing needy immigrants—including those fleeing human trafficking, and asylees—from getting the food and medical care that are essential to survival. It has this effect even for families that are eligible for aid and who are exempt from the public charge rule, and for whom immigration status would be unaffected by receiving aid. This is because the public charge rule is extremely confusing—both for advocates and for immigrants who are less familiar with our legal system and may have limited English proficiency.

33. As explained above, there are multiple iterations of multiple categories of public benefit programs, and it requires extreme technical proficiency to parse which versions of which aid programs might trigger a presumption that a person is a "public charge," and which do not. There are also a wide variety of different categories of immigration status, some of which are categorically exempted from the public charge exclusion rule, and others of which are at risk of being deemed a public charge if they receive aid. To complicate things further, many families have members each of which has *different* immigration status, different eligibility for benefits, and different risk of being deemed a public charge if they receive aid. As a result, most immigrants—and most immigration advocates—do not know whether they will put their immigration status at risk if they apply for food aid or medical care that their families need.

34. For our humanitarian immigrant clients who are fleeing abuse or exploitation, being denied the ability to adjust their immigration status, and therefore having to return to their country of origin would be devastating. Clients who are asylees and refugees may face persecution, war, and deadly threats if they return, while survivors of domestic violence or human trafficking may face recurrent abuse, loss of the legal protections from their abuser or trafficker, and retaliation for having cooperated with American law enforcement. In short, for many of these immigrants, risking their ability to stay in the United States is risking death.

35. Applications for humanitarian immigration status can take years, prolonging the period of uncertainty during which immigrants must make decisions about accessing needed services. For

example, anticipated wait time for a noncitizen survivor of domestic violence to have a U visa adjudicated has risen to more than 7 years, and it can take another 6 or more years after receiving the U visa before that same immigrant is eligible to apply for lawful permanent residency and have their adjustment of status adjudicated.

36. Even for lawful permanent residents who may have been in the United States for decades, and who are not usually subject to the public charge rule, a decision to apply for benefits can pose risk. As the immigrant or family members abroad get older, I have observed several times how a short trip to visit family can be complicated by a sudden health crisis that requires a lengthier stay, and after 180 days outside the United States, the lawful permanent resident may need to seek readmission—triggering the public charge grounds of exclusion. Predicting whether such a situation may arise in the next 36 months (the look-back period for considering receipt of benefits as a heavily negative factor) can feel like an impossible gamble.

37. If there is a patchwork of different public charge rules across the country, the uncertainty would increase. Benefits that might not have counted against the immigrant for public charge purposes when they received them in one jurisdiction could be interpreted to count against them if they later move to another. Even the chance of such a situation is the sort of uncertainty I have seen drive immigrants away from programs that are supposedly "safe" from the public charge rule.

38. As one of the few legal organizations in the region that practices significantly in both immigration and public benefits law, BayLegal not only handles questions from clients and the general public regarding the public charge rule, but we are frequently approached by community-based organizations (CBOs) for technical assistance, trainings, and consultation on public charge issues as well. Since the proposed rule was posted for publication in October 2018, our staff attorneys and legal advocates have seen a distinct increase in concerns from our community members and the CBOs we work with about public charge. After the proposed rule was published, our Legal Advice Line and Health Consumer Center hotlines have seen significant spikes in calls about public charge and received increased queries from CBOs, especially at legal education and outreach events in the community. Most of these queries have been from service providers working with populations that should see little or no

direct impact from the change to the public charge rule (such as naturalized citizens, lawful permanent residents, or immigrant survivors of domestic violence, most of whom are not subject to the rule), but who are nonetheless dropping needed aid programs out of fear that the rule will prevent them from staying in this country.

39. When the final rule was published for inspection in the Federal Register on August 12, 2019, our Legal Advice Line and Health Consumer Center hotlines saw a similar sharp increase in calls and inquiries from CBOs and community members. Most of the public-charge-related calls to which our intake unit has responded since August 12 have involved concerns from lawful permanent residents who are eligible for benefit programs, but who are expressing fear that receiving those benefits will hurt their immigration status or create barriers to naturalization. In most cases, these fears are unfounded—since lawful permanent residents are not subject to public charge unless they leave the United States for more than 180 days—but we know that many lawful permanent residents are staying away from aid out of fear.

40. I and those under my supervision in the local offices who handle immigration, housing, and public benefits cases have also seen an increase in inquiries from clients, the general public, and community-based organizations concerned that the new public charge rules are causing people to drop essential health or food programs out of fear for their immigration status.

41. Most of the fears we have heard in our local offices are from lawful permanent residents and survivors of domestic violence, who are contemplating dropping healthcare and nutrition programs, as well as employment support programs. Many of these clients have U.S. citizen children who will also lose access to public benefits programs if their parents simply drop out or refuse to apply for the programs they need.

42. The aid programs that our clients and potential clients are dropping (or considering dropping) most frequently are those that provide basic essentials: food (CalFresh and the Women Infants and Children nutrition program); health care—particularly for children—under Medi-Cal (the state version of Medicaid); and services for pregnant women.

43. Among the sorts of public charge concerns our staff attorneys have handled are a crime victim with a U visa dropping health coverage during treatment for cancer due to fear of triggering public charge; multiple calls from people afraid to access work supports and food assistance, such as a U visa holder afraid to get CalWORKs for herself or her U.S. citizen children, immigrants avoiding public food programs and going to food banks, and lawful permanent residents afraid that getting health insurance for their U.S. citizen children will keep them from naturalizing.

44. I and the staff attorneys working under my supervision regularly reassure many of these exempt clients that they should not be subject to the new public charge rule, and can receive the aid they need without fear of immigration consequences; but we are regularly told by our clients that they are still afraid or unwilling to access the public benefits for which they and their children might otherwise qualify.

**Impact of Public Charge Rule on BayLegal**

45. BayLegal, like many of our sister organizations, has diverted significant resources since the proposed public charge rule was published in order to respond to the volume of inquiries in matters related to public charge. Our limited staff of public benefits attorneys has had to juggle a surge in client inquiries related to public charge while at the same time dedicating significant resources to reviewing the complex draft and final versions of the public charge rule, reviewing legal analyses of the public charge rule, and meeting the demand for trainings and technical assistance by public and private sector service providers. These attorney hours would otherwise have been available to assist clients with a broader array of problems, including helping people who are eligible for aid but were incorrectly denied benefits, people who need emergency help to prevent homelessness, domestic violence survivors who need help to escape abusers, and others.

46. Prior to the publication of the proposed rule, public charge was rarely the sole basis for individuals to seek out our services, but now we are regularly receiving client inquiries and referrals of clients from CBOs focused solely on the impacts of the public charge rule.

47. We have also seen a large uptick in requests from CBOs and other partners to provide trainings and presentations on public charge, even to groups whose clients are unlikely to be impacted, like DV shelters and human trafficking victim services providers, because their clients are avoiding getting needed help out of fear of the potential immigration consequences.

**Conclusion**

48. BayLegal's resources have been diverted and taxed because of the upsurge in inquiries from individuals and communities afraid about the implications of the public charge rule. We are regularly responding to inquiries from people who should not be directly impacted by the rule -- including citizens, lawful permanent residents, and humanitarian immigrants – but who are nonetheless afraid. My direct impressions based on the nature and type of legal inquiries we are receiving from the general public, from CBOs providing services to immigrants, and from other legal service providers, is that the numbers of people who will disenroll from benefits or forego benefits for which they or their children are eligible is much higher than the 2.5% estimate USCIS anticipates as the number of eligible immigrants and mixed-status households who will forego needed aid due to the rule.

49. I believe this chilling effect will cause lawful permanent residents, domestic violence survivors, survivors of human trafficking, and U.S. citizen children with immigrant parents to go without healthcare, nutrition assistance, and housing assistance they need to survive a temporary crisis such as a sudden illness or loss of a job. Without access to these public benefits, I believe the long-term physical and economic wellbeing of many of these individuals will be irreparably harmed.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 27, 2019, in San José, Santa Clara County, California.

Lisa M. Newstrom