JOSEPH H. HUNT
Assistant Attorney General
DAVID L. ANDERSON
United States Attorney
ALEXANDER K. HAAS, SBN 220932
Branch Director
ERIC J. SOSKIN
Senior Trial Counsel
KERI L. BERMAN
KUNTAL V. CHOLERA
JOSHUA M. KOLSKY, DC Bar No. 993430
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 305-7664
Facsimile:  (202) 616-8470
Email: Joshua.kolsky@usdoj.gov

Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　　　　v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*,<br><br>　　　　Defendants. | Case No. 19-cv-04717-PJH<br><br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Date: October 2, 2019<br>Time: 9:00 a.m.<br>Dept: Courtroom 3, 3rd Floor<br>Judge: Hon. Phyllis Hamilton |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................1

BACKGROUND ............................................................................................................................2

ARGUMENT ..................................................................................................................................5

I.   Plaintiffs Are Unlikely to Succeed on the Merits..................................................................5

    A.   Plaintiffs Lack Article III Standing And Their Claims Are Unripe................................5

    B.   Plaintiffs Are Outside the Zone of Interests Regulated by the Rule ..............................8

    C.   Plaintiffs Have No Likelihood of Success On The Merits............................................10

        1.   The Rule is Consistent With The Plain Meaning Of Public Charge. ..............10

        2.   The Rule is Not Contrary to Immigration Policy ...........................................13

        3.   The Rule Properly Exercises Interpretive Authority That Congress
             Delegated, Implicitly and Explicitly, To The Executive Branch.....................14

        4.   The Rule is Not Arbitrary or Capricious .........................................................15

            a.   DHS Adequately Considered Comments About Potential Harms
                 and Reasonably Described the Benefits of the Rule ..........................16

            b.   The Rule is Not Irrational ..................................................................18

II.   Plaintiffs Fail to Establish Irreparable Harm .....................................................................20

III.  The Remaining Equitable Factors Require Denial of Plaintiffs' Motion...................................23

IV.   The Court Should Not Grant a Nationwide Injunction .......................................................24

CONCLUSION..............................................................................................................................25

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

# TABLE OF AUTHORITIES

**Cases**

*Aguayo v. Jewell,*
  827 F.3d 1213 (9th Cir. 2016) ................................................................... 15, 16

*All. For The Wild Rockies* ["AFWR"] *v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ................................................................... 21, 23

*American Sec. & Tr. Co. v. Utley,*
  382 F.2d 451 (D.C. Cir. 1967) ........................................................................... 12

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) ........................................................................... 16

*Baker v. Johnston,*
  21 Mich. 319 (1870) ........................................................................................... 11

*Bishop Paiute Tribe v. Inyo Cty.,*
  863 F.3d 144 (9th Cir. 2017) ............................................................................... 8

*Boardman v. Pac. Seafood Grp.,*
  822 F.3d 1011 (9th Cir. 2016) ................................................................... 21, 22

*BOKF, NA v. Estes,*
  923 F.3d 558 (9th Cir. 2019) ............................................................................. 21

*Boston v. F.W. Capen,*
  61 Mass. 116 (1851) ........................................................................................... 12

*Cacchillo v. Insmed,*
  638 F.3d 401 (2d Cir. 2011) ................................................................................. 6

*Cal. by and through Becerra v. Azar,*
  927 F.3d 1068 (9th Cir. 2019), *reh'g en banc granted* (July 3, 2019) .............. 16

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................................. 25

ii

*Caplan v. Fellheimer Eichen, Braverman, & Kaskey,*

   68 F.3d 828 (3d Cir. 1995) ..........................................................................................23

*Caribbean Marine Servs. Co., Inc. v. Baldrige,*

   844 F.2d 668 (9th Cir. 1988) ............................................................................... 21, 24

*Chevron, U.S.A., Inc. v. NRDC,*

   467 U.S. 837 (1984) ...................................................................................................14

*Clapper v. Amnesty Int'l USA,*

   568 U.S. 398 (2013) ............................................................................................ 6, 7, 8

*Clark v. Seattle,*

   899 F.3d 802 (9th Cir. 2018) ......................................................................................8

*Clarke v. Sec. Indus. Ass'n,*

   479 U.S. 388 (1987) .............................................................................................. 9, 10

*Colwell v. HHS,*

   558 F.3d 1112 (9th Cir. 2009) ....................................................................................8

*Consumer Elecs. Ass'n v. FCC,*

   347 F.3d 291 (D.C. Cir. 2003) ..................................................................................17

*Crane v. Johnson,*

   783 F.3d 244 (5th Cir. 2015) ......................................................................................7

*Defs. of Wildlife v. Zinke,*

   856 F.3d 1248 (9th Cir. 2017) ............................................................................ 17, 20

*Drakes Bay Oyster Co. v. Jewell,*

   747 F.3d 1073 (9th Cir. 2014) ..................................................................................24

*East Bay Sanctuary Covenant v. Barr,*

   No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) ....................................25

*Ex Parte Horn,*

   292 F. 455 (W.D. Wash. 1923) ................................................................................13

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

*Ex Parte Pugliese,*
   209 F. 720 (W.D.N.Y. 1913) .................................................................................15

*Fed'n for Am. Immigration Reform v. Reno,*
   93 F.3d 897 (D.C. Cir. 1996) ...................................................................................9

*Gegiow v. Uhl,*
   239 U.S. 3 (1915) ...................................................................................................13

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ...........................................................................................25

*Habeas Corpus Res. Ctr. v. U.S. DOJ,*
   816 F.3d 1241 (9th Cir. 2016) ..................................................................................8

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt. Inc.,*
   736 F.3d 1239 (9th Cir. 2013) ................................................................................21

*In re Feinknopf,*
   47 F. 447 (E.D. N.Y. 1891) ....................................................................................11

*INS v. Jong Ha Wang,*
   450 U.S. 139 (1981) ...............................................................................................14

*INS v. Legalization Assistance Proj.,*
   Proj., 510 U.S. 1301 (1993) .....................................................................................9

*Inv. Co. Inst. v. CFTC,*
   720 F.3d 370 (D.C. Cir. 2013) ...............................................................................17

*Karnoski v. Trump,*
   926 F.3d 1180 (9th Cir. 2019) ..................................................................................5

*L.A. Coliseum Comm'n v. NFL,*
   634 F.3d 1197 (9th Cir. 1980) ................................................................................24

*Lam Fung Yen v. Frick,*
   233 F. 393 (6th Cir. 1916) ......................................................................................11

iv

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...................................................................................................9

*Lopez v. Brewer,*
    680 F.3d 1068 (9th Cir. 2012) ...................................................................................5

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...............................................................................................5, 6

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ................................................................................................25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ..................................................................................................9

*Matter of Harutunian,*
    14 I. & N. Dec. 583 (BIA 1974) ........................................................................13, 15

*Matter of Perez,*
    15 I. & N. Dec. 136 (BIA 1974) ........................................................................13, 15

*Native Vill. of Kivalina v. ExxonMobil Corp.,*
    696 F.3d 849 (9th Cir. 2012) ...................................................................................6

*New York v. U.S. Dep't of Labor,*
    363 F. Supp. 3d 109 (D.D.C. 2019) ........................................................................7

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ..................................................................................................8

*Overseers of Princeton Tp. v. Overseers of South Brunswick Tp.,*
    23 N.J.L. 169 (N.J. 1851) ........................................................................................11

*Pennsylvania. v. New Jersey,*
    426 U.S. 660 (1976) ...............................................................................................7,8

*Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Tr.,*
    636 F.3d 1150 (9th Cir. 2011) ................................................................................22

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

*ProtectMarriage.com – Yes on 8 v. Bowen,*
  752 F.3d 827 (9th Cir. 2014) ................................................................................8

*Pub. Citizen, Inc. v. FAA,*
  988 F.2d 186 (D.C. Cir. 1993) ............................................................................16

*Stormans v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) ............................................................................24

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .........................................................................................5, 6

*Thomas v. Anchorage Equal Rights Comm'n,*
  220 F.3d 1134 (9th Cir. 2000) ..............................................................................8

*Town of Chester v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017) .......................................................................................25

*U.S. v. Carona,*
  660 F.3d 360 (9th Cir. 2011) ..............................................................................10

*U.S. v. Lipkis,*
  56 F. 427 (S.D.N.Y. 1893) .................................................................................11

*Ventura Cty. Christian H.S. v. San Buenaventura,*
  233 F. Supp. 2d 1241 (C.D. Cal. 2002) ..............................................................23

*Wallis v. U.S. ex rel. Mannara,*
  273 F. 509 (2d Cir. 1921) ...................................................................................15

*Whitmore v. Ark.,*
  495 U.S. 149 (1990) .............................................................................................6

*Winter v. NRDC,*
  555 U.S. 7 (2008) .........................................................................................*passim*

*Wyoming v. U.S. Department of Interior,*
  674 F.3d 1220 (10th Cir. 2012) ............................................................................7

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

Statutes

5 U.S.C. § 706 .................................................................................................15

6 U.S.C. § 542 ...................................................................................................3

6 U.S.C. § 557 (2003) .......................................................................................3

8 U.S.C. 1551 ....................................................................................................3

8 U.S.C. § 1182 ..........................................................................................passim

8 U.S.C. § 1252 .................................................................................................9

8 U.S.C. § 1601 ..........................................................................................passim

22 Stat. 214 .......................................................................................................3

26 Stat. 1084 .....................................................................................................3

32 Stat. 1213 ................................................................................................3, 13

39 Stat. 874 ..................................................................................................3, 13

66 Stat. 163 .......................................................................................................3

Pub. L. 104-193 ................................................................................................4

Pub. L. 104-208 ................................................................................................1

Pub. L. No. 107-296 .........................................................................................3

Other Legislative Materials

H.R. Rep. No. 104-828. ..................................................................................15

IIRIRA Conf Rep ..............................................................................................1

S. Rep. 1515, 81st Cong. 2d (1950) ..........................................................13, 15

S. Rept. 81-1515 (1950) ..................................................................................14

Regulations

8 C.F.R. § 103.7 ..............................................................................................20

64 Fed. Reg. 28676 (May 26, 1999) ...........................................................4, 12

64 Fed. Reg. 28689 (May 26, 1999) ...........................................................4, 12

83 Fed. Reg. 51114 (Oct. 10, 2018) ...........................................................4, 10

84 Fed. Reg. 41292 (Aug. 14, 2019 ) ...................................................1, 4, 5 , 14

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

Other Authorities

Arthur Cook, et al., Immigration Laws of the U.S. (1929) ...................................................11

Black's Law Dictionary (6th ed.).........................................................................................10

C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the
    Law, with References to Authorities (1882) ....................................................................10

Century Dictionary & Cyclopedia (1911) .............................................................................11

E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 (1981) ...............3

Stewart Rapalje et al., Dict. of Am. and English Law (1888)................................................10

Frederic Jesup Stimson, Glossary of the Common Law (1881) .............................................10

Merriam-Webster Dictionary,
    http://www.merriamwebster.com/dictionary/public%20charge .......................................10

Stewart Rapalje et al., Dict. of Am. and English Law (1888)................................................10

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

## INTRODUCTION

For over 135 years, Congress has restricted the admissibility of aliens that are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining the necessities of daily life. A major purpose of the public charge exclusion is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public.  For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admissions to the United States and for adjustments of status to lawful permanent resident, has been governed by interim field guidance adopted without benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("the Rule") in the Federal Register. 84 Fed. Reg. 41292. This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade."  IIRIRA Conf. Rep. at 240-241; *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the Immigration and Naturalization Service ("INS"—a DHS predecessor) with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." Yet for two decades, DHS has provided its officers, current and prospective immigrants, and the public with nothing more than an interim guidance document to specify how these factors are being implemented.

The Rule revises an anomalous definition of "public charge" set forth in interim guidance

1

from 1999 to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for forming an "opinion" about whether aliens seeking admission or adjustment of status are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public.  Finally, the Rule has a limited scope: it does not apply to naturalization applications for lawful permanent residents ("LPRs") or lead to public charge determinations based on the receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

Plaintiffs—the City and County of San Francisco and the County of Santa Clara—nevertheless seek a nationwide preliminary injunction against the Rule. This Court should deny the motion. Plaintiffs, who are municipalities rather than aliens actually governed by the Rule, cannot meet basic jurisdictional requirements, and their claims in any event are meritless. The Rule accords with the longstanding meaning of "public charge" and complies with the APA and other relevant statutes. In short, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into a nationwide injunction.

## BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 1601(2). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* Relatedly, "the availability of public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id.*

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A).[1] The continuous delegation of similar authority to identify and exclude public charges dates back more than 130 years. *See* Immigration Act of 1882, ch. 376, §§ 1–2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1903, 57th Cong. ch. 1012, 32 Stat. 1213, 1214 ("1903 Act"); Immigration Act of 1917, 64th Cong. ch. 29, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, ch. 477, section 212(a)(15), 66 Stat. 163, 183. At the state level, the history of excluding aliens who were believed likely to become public charges dates back further, to the colonial period and early Republic, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981).

In recognition that predicting who will become a public charge is inherently uncertain, Congress has long provided both for exclusion and for the deportation of aliens who become public charges after entry. *See, e.g.*, 1891 Act at 1086 (providing for deportation of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing"); 1917 Act (extending time period for such deportations to five years). In the INA, enacted in 1952 and substantially amended in 1965, Congress further recognized this uncertainty by framing the public charge exclusion as applying to "[a]ny alien likely *at any time* to become a public charge" (emphasis added), while also retaining the above-mentioned deportation provisions.

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge determination. IIRIRA strengthened enforcement of the public charge ground of inadmissibility in several ways. First, Congress added to the predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial

---

[1] As of March 1, 2003, references to the Attorney General in the INA "shall be deemed to refer to the Secretary" of DHS where they describe functions transferred to DHS by the Homeland Security Act of 2002, Pub. L. No. 107-296.  *See* 6 U.S.C. § 557 (2003); 6 U.S.C. § 542 note; 8 U.S.C. 1551 note.

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B)(i) (Arabic numerals substituted), while otherwise leaving in place the existing broad delegation of authority to the Executive Branch. IIRIRA also raised the standards and responsibilities for those who "sponsor" an alien by signing an affidavit of support pledging to bear financial responsibility for that alien and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. 104-193, restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made sponsorship pledges legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in rulemaking to guide immigration officers, aliens, and the public in understanding the public charge determinations. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("Field Guidance"). The Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge" as a person "primarily dependent on the government for subsistence," *id.,* and barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See id.* at 28678. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely to become a public charge than an alien who was entirely self-sufficient.

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a well-reasoned definition of public charge, providing practical guidance to Executive Branch officials making public charge inadmissibility determinations. DHS began by publishing a Notice of Proposed Rulemaking, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 (Oct. 10, 2018) ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of its decision. Among the Rule's

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

major components are provisions defining "public charge" and "public benefit," which are not defined in the statute, an enumeration of factors to be considered in the totality of the circumstances when making a public charge determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining nonimmigrant status. The Rule supersedes the Interim Field Guidance definition of "public charge," establishing a new definition based on a minimum time threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within a 36-month period. Rule at 42298. The "public benefits" included are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing may now be considered as part of the public charge inadmissibility determination. *Id.* at 41501-02. The Rule also enumerates a non-exclusive list of factors and explains how DHS officers should apply these factors as part of a totality-of-the-circumstances determination of whether an alien is likely at any time to become a public charge.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). Plaintiffs fail to meet any of these requirements.

### I.     Plaintiffs Are Unlikely to Succeed on the Merits.

#### A.  Plaintiffs Lack Article III Standing And Their Claims Are Unripe.

Plaintiffs must establish standing by showing a concrete and particularized injury traceable to the Rule that will be redressed by the relief sought. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be certainly

5

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

impending." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). Where, as here, "the plaintiff is not [itself] the object of the government action," standing "is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562. The Rule governs relevant DHS personnel and certain noncitizens. It "neither require[s] nor forbid[s] any action" on the cities' part, so this higher standard applies. *Summers*, 555 U.S. at 493. The cities have not met this standard, nor have they seriously tried to do so. Neither their Complaint nor their preliminary injunction motion even references standing.

Plaintiffs' claims of irreparable harm do not establish standing because those claims consist of potential future harms that, if they ever came to pass, would be spurred by decisions of third-parties not before the Court. Specifically, the cities claim that certain aliens will (i) forgo Medicaid coverage and rely on the cities' health resources, (ii) forgo health services altogether and risk creating a public health crisis, and/or (iii) forgo all federal funds to the detriment of local economies. *See* Mot. at 2, 14, 20–24, ECF No. 22. Such speculative allegations are insufficient to establish Art. III standing, particularly at the preliminary injunction stage. *See Cacchillo v. Insmed*, 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, [the] burden to demonstrate standing will normally be no less than that required on a motion for summary judgment).

Plaintiffs' purported economic harms from the possibility that certain aliens may unnecessarily forgo federal health benefits and instead turn to health benefits provided by the cities, *see* Mot. at 2, 14, 20-21, do not provide standing. As an initial matter, this theory is inconsistent with Plaintiffs' assertion that aliens will forgo "*any* of a wide-range of public benefits," not just federal health benefits. Compl. ¶ 35, ECF No. 1. Further, a "causal chain involv[ing] numerous third parties whose independent decisions collectively" create injuries is "too weak to support standing." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013) (courts are "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors"). Plaintiffs' theory relies on a material number of aliens making a string of health care decisions that ultimately draw from Plaintiffs' resources in particular. Additionally, Plaintiffs' allegation that the Rule may harm the cities' economies because fewer aliens may receive and then spend federal funds within the Plaintiff cities, *see* Mot. at 2, 24, is equally speculative. Plaintiffs submit no evidence that the reduction in federal funds received by aliens in

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

direct response to the Rule, as a whole, totals any noticeable impact on the overall state of their economies. Numerous courts have concluded that analogous indirect economic effects are insufficient to confer standing on a governmental body. In *Wyoming v. U.S. Department of Interior*, for example, the National Park Service set a cap on the number of snowmobiles permitted in certain national parks. 674 F.3d 1220 (10th Cir. 2012). The Tenth Circuit held that Wyoming's "speculative economic data" alleging "economic detriment" through reduced tourism and tax revenues was "conclusory" and "failed to . . . show[] direct injury to their . . . proprietary interests." *Id.* at 1231 & n.5, 1233-34; *see also Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (no standing for state challenge to DACA).

Plaintiffs also speculate that the Rule could cause some aliens to forgo all health care, possibly causing the spread of "communicable and infectious disease[s]." Mot. at 22. But this alleged harm does not suffice as a basis for standing, because such health effects would be borne by affected individuals, not the cities. *See New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 124 (D.D.C. 2019) ("the States' general responsibility for their citizens' health and welfare . . . cannot directly support State standing because the underlying harms would be suffered by the States' citizens"). Further, like the alleged economic impacts, this allegation is too speculative to support standing—it turns on individual choices by aliens to forgo *all* federal health benefits and, as a result, contract and spread communicable diseases, or otherwise cause a public health crisis. *See Clapper*, 568 U.S. at 410 (rejecting "highly attenuated chain" theory of standing).

The alleged irreparable harm from "administrative costs" due to the Rule, Mot. at 21, is also insufficient for standing. Plaintiffs claim that they will have to invest resources into "changing policies" and "explain[ing] the [Rule] to staff and clients." Mot. at 22. Bureaucratic inconvenience occasioned by a change in federal policy, however, is insufficient to confer standing. *See, e.g., Crane*, 783 F.3d at 253 (rejecting government officials' claim that they have standing since DACA would require that "they . . . alter their current processes to ensure" compliance). Nor could standing exist from the resources Plaintiffs invest into "educating the public about the" Rule. Mot. at 21-22. Plaintiffs' voluntary expenditures in response to the Rule do not give rise to standing. *See Clapper*, 568 U.S. at 416 ("respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm"); *Pa. v. N.J.*, 426 U.S. 660, 664 (1976) (rejecting state standing

7

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

where states could not "demonstrate that the injury . . . was directly caused by the actions" challenged because "nothing prevent[ed]" states from structuring their laws to prevent the harms). "If the law were otherwise, an enterprising plaintiff' could construct standing to challenge virtually *any* new federal statute or regulation. *Clapper*, 568 U.S. at 416.

"Constitutional ripeness," another prerequisite of justiciability, "is often treated under the rubric of standing because 'ripeness coincides squarely with standing's injury in fact prong.'" *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 144, 1153 (9th Cir. 2017) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)). "Ripeness can be characterized as standing on a timeline," *Thomas*, 220 F.3d at 1138, and lack of ripeness precludes "premature" review where "the injury at issue is speculative or may never occur." *ProtectMarriage.com – Yes on 8 v. Bowen*, 752 F.3d 827, 838 (9th Cir. 2014). For the same reasons stated above regarding lack of standing, Plaintiffs have not demonstrated constitutional ripeness. *See, e.g., Clark v. Seattle*, 899 F.3d 802, 809 (9th Cir. 2018).

Prudential ripeness also counsels against consideration of Plaintiffs' claims. This doctrine "protect[s] . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Habeas Corpus Res. Ctr. v. U.S. DOJ*, 816 F.3d 1241, 1252 (9th Cir. 2016). Ripeness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Here, Plaintiffs' claims are all premised on speculation about the potential future effects of the Rule and disagreement with DHS's predictions based on the available evidence. *See, e.g.*, Mot. at 16-17, 22 (speculation about impact of the public charge totality of the circumstances test); *id.* at 20-21 (speculation about choices to disenroll from public benefits). Thus, "judicial appraisal of these [questions]" should await the "surer footing [of] the context of a specific application of this regulation." *Colwell v. HHS*, 558 F.3d 1112, 1127 (9th Cir. 2009).

**B. Plaintiffs Are Outside the Zone of Interests Regulated by the Rule.**

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would still fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in §1182(a)(4)(A) and related sections. The "zone-of-interests" requirement limits the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision.

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interests are … marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399 (1987). This standard applies with equal force where, as here, Plaintiffs seek to challenge the government's adherence to statutory provisions in the guise of an APA claim. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by interpretations of the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS may deny admission or adjustment of status to certain aliens deemed inadmissible on public charge grounds. By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible as public charges, not municipalities, that "fall within the zone of interests protected" by any limitations implicit in § 1182(a)(4)(A) and § 1183 because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility determinations. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity in proceedings before an immigration judge to contest the definition of public charge and its application to them). Likewise, cities are not conceivably in the category of those served by judicial review of, for example, the time it takes an alien to fill out a federal form or the burdens on DHS itself in processing such forms. *See* Mot. at 21-22. The purported administrative, economic, and health interests asserted by Plaintiffs are not even "marginally related" to those of an alien seeking to demonstrate that the "public charge" ground of inadmissibility has been improperly applied to his detriment. *Cf. INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1302, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations [that provide legal aid to aliens]," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into

9

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

this country, where plaintiffs relied on incidental effects of that policy on workers).[2]

### C. Plaintiffs Have No Likelihood of Success On The Merits.

#### 1. The Rule is Consistent With The Plain Meaning Of Public Charge.

The definition of "public charge" in the Rule is consistent with the plain meaning of the statutory text, which is to be "be determined with reference to its dictionary definition at the time the statute was enacted." *U.S. v. Carona*, 660 F.3d 360, 367 (9th Cir. 2011). Here, it is undisputed that, since 1882, Congress has consistently provided for the exclusion of indigent aliens determined by the Executive Branch as likely to become "public charges." *Compare* Compl. ¶ 33, *with* NPRM at 51125.

Contemporary dictionaries from the 1880s define "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the term "public," such dictionaries explain the term "public" as meaning "[t]he whole body of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire community." Rapalje 1888.[3] Together, these early definitions make clear that an alien becomes a "public charge" when that individual's inability to achieve self-sufficiency imposes an "obligation" or "liability" on "the body of the people at large" to provide for his basic necessities.[4]

Nothing about the plain meaning of this term suggests that a person must be completely destitute or entirely dependent on public support—*i.e.*, a "pauper"—to qualify as a public charge. *See,*

---

[2] Plaintiffs' Fifth Amendment claims fail the zone of interests test even more baldly. The Supreme Court has suggested that a heightened zone-of-interests requirement must be met by a plaintiff seeking to enforce the law through an implied cause of action in equity and that the plaintiff must show the provision is intended for his "*especial* benefit." *Clarke*, 479 U.S. at 400 & n.16.

[3] *See also* C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References to Authorities, 501 (1882) (citing *Baker v. Johnston*, 21 Mich. 319 (1870)).

[4] The original public meaning of "public charge," as derived from the definitions of "public" and "charge," is consistent with modern dictionary definitions of the term "public charge." For example, the online version "of the Merriam-Webster Dictionary defines public charge as 'one that is supported at public expense.'" NPRM at 51158 (quoting Definition of Public Charge, http://www.merriamwebster.com/dictionary/public%20charge (last visited Sept. 3, 2019)). Similarly, "Black's Law Dictionary (6th ed.) . . . defines public charge as 'an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty.'" *Id.*

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

*e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"). Indeed, early versions of the statute make "clear that the term 'persons likely to become a public charge' is not limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (discussing public charge definition in the context of an individual likely "to become, at least intermittently, [a] public charge" as a gambler). For example, the 1891 Act provided "[t]hat the following classes of aliens shall be excluded from admission . . . : "All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes."

Remarkably, although Plaintiffs urge that it is a "fact" that, for "nearly 140 years," the term "public charge" has meant one "primarily dependent" on the government, Mot. at 2, they identify no source—and Defendants are aware of none—that defines "public charge" in these terms (or using the similar phrase  "primary dependence") prior to 1999, when INS issued the nonbinding, interim field guidance. In contrast, there is longstanding evidence that the term "[p]ublic charge means any maintenance, or financial assistance, rendered from public funds." Arthur Cook, et al., Immigration Laws of the U.S., § 285 (1929); *see In re Feinknopf*, 47 F. 447, 447 (E.D. N.Y. 1891) (determining an alien not likely to become a public charge, after considering, as distinct evidence, whether an alien "received public aid or support" or had been an "inmate of an almshouse"). Courts have also suggested that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *U.S. v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment to an insane asylum); *see also Overseers of Princeton Tp. v. Overseers of South Brunswick Tp.*, 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). Such individuals impose a "liability" on "the body of the people at large," even if they are not fully destitute. This

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

interpretation of "public charge" conforms with Congress's explicit instruction that "the immigration policy of the United States [is] that . . . [a]liens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).[5]

Nor does anything in the plain meaning of "public charge" suggest a distinction between benefits provided in cash and benefits provided as services. Both types of aid create an obligation on the part of the public and both equally relieve recipients from the conditions of poverty. For this reason, consideration of an alien's reliance on public programs for "housing, food and medical care," as "examples of the obvious basic necessities of life," *American Sec. & Tr. Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967), is directly relevant to whether that person creates a liability on the body of the public. In fact, Plaintiffs do not appear to dispute that the types of in-kind services provided in, *e.g.*, almshouses, have long been part of the plain meaning of "public charge." *See* Mot. at 7-8.[6]

Plaintiffs' arguments to the contrary are unpersuasive. Congress's creation of a fund for the support of aliens in 1882, *see* Mot. at 8-9, is a logical complement to the exclusion of public charges regardless of how such persons are defined and has no bearing on the statute's plain text meaning.

---

[5] Plaintiffs' reliance on *Boston v. F.W. Capen*, 61 Mass. 116 (1851), is misplaced. The court's analysis in *Capen* equated "paupers" with "public charges" under state law: "for those who have been paupers in a foreign land; that is, for those who have been a public charge in another country; and not merely destitute persons, who, on their arrival here, have no visible means of support; the word 'paupers' being used . . . in its legal, technical sense." *Id.* at 121. Here, Congress's separate exclusions for "paupers" and "public charges" in early versions of the statute, *Frick*, 233 F. at 396, confirm that Congress did not adopt this definition.

[6] Although the 1999 Interim Field Guidance and the 1999 NPRM adopted a different interpretation, those documents provide further support for DHS's determination that the Rule is consistent with the plain meaning of "public charge." Both documents describe the exclusion of "non-cash public benefits" at that time as "reasonable," confirming that they did not conclude that the meaning of "public charge" *required* consideration of such benefits, the meaning of public charge did not *foreclosed* their consideration, either. 1999 NPRM at 28677 (explaining that the "interpretation of 'public charge' is reasonable"); *see id.* at 28678 ("It has never been [the] policy that the receipt of any public service or benefit *must* be considered") (emphasis added); *accord* 1999 Interim Field Guidance at 28692 (not the case that any receipt of services or benefits automatically "renders an alien a public charge"). Indeed, the only examples of the prior exclusion of non-cash benefits from consideration that the drafters of the interim guidance could identify were: 1) broadly-available public benefits such as "public schools"; and 2) the exclusion of food stamps (i.e., "SNAP") under State Department guidance that apparently did not exclude other forms of non-cash benefits. *See, e.g.*, 1999 Interim Field Guidance at 28692.

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

Congress's adoption for the first time of a federal exclusion of public charges in 1882 did nothing to assist states, localities, and private charities with support for aliens who had *already* entered the United States and who required support, and so creation of a fund made eminent sense. Further, a judgment that an alien is likely to become a public charge is necessarily predictive, and Congress has long recognized that such predictions cannot be made perfectly. Congress thus provided not only for the *exclusion* of aliens likely to become public charges, but the *removal* of aliens who the Executive Branch who *do* become public charges. *See, e.g.*, 1903 Act § 20 (providing for removal of those who become a public charge within 2 years of landing).

Plaintiffs also contend that "public charge" must be interpreted by examining the meaning of "adjoining statutory terms," Mot. at 7-8, which they believe indicate a need for complete dependence on public support. Mot. at 7-8. But when an early Supreme Court opinion cited by Plaintiffs, *Gegiow v. Uhl*, 239 U.S. 3 (1915), employed a similar interpretive approach to overrule the exclusion of aliens based on the (un)availability of jobs in their intended destination city, Congress overruled the Court's interpretation. In the 1917 Act, Congress relocated the term "public charge" so that it would no longer be "mentioned between paupers and professional beggars." *See* 1917 Act § 132 n.5 (explaining the intent of Congress to "overcome" *Gegiow*); *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*" because it "is not associated with paupers or professional beggars").[7] A finding that an alien is likely to become a public charge in light of the likelihood that the alien will need economic support does

---

[7] During the drafting of the 1917 Act, in a letter to the House Committee on Immigration and Naturalization, the Secretary of Labor defined "public charge" as "the fact that such applicant may be a charge (an economic burden) upon the community to which he is going." He requested that Congress amend the statute because the *Gegiow* opinion had identified "a defect in . . . the arrangement of the wording" which, if maintained, would "materially reduce[] the effect of the clause," preventing its use to protect against "economic" burdens caused by aliens. Letter from Sec. of Labor, 64 Cong. (1st Sess.) Doc. 886 (Mar. 11, 1916).[8] The Executive Branch has long applied this delegated authority in the manner provided for by the Rule: through analysis of the "totality of the alien's circumstances" to make "a prediction." *Matter of Perez*, 15 I. & N. Dec. 136 (BIA 1974); *see also Matter of Harutunian*, 14 I. & N. Dec. 583, 589-90 (BIA 1974). In *Harutunian*, the Board of Immigration Appeals concluded that receipt of "old age assistance benefits" in California was sufficient to render an immigrant a "public charge" and explained that Congress broadly delegated authority in this area because "the elements constituting likelihood of becoming a public charge are varied." *Id.* at 588 (quoting S. Rep. 1515 at 349, 81st Cong. 2d (1950)).

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

not, and never has, required a likelihood of institutionalization.

### 2. The Rule is Not Contrary to Immigration Policy.

Plaintiffs are also not likely to succeed on the merits of their claim that the Rule is contrary to law because it undermines family-based immigration under the INA. Mot. at 11. Far from dramatically redirecting the purposes of the INA as Plaintiffs suggest, the Rule *effectuates* Congressional intent with regard to immigration. While "[f]amily reunification…has long been a key principle underlying U.S. immigration policy," ECF No. 44-1 at 1, "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). Indisputably, Congress does not intend for immigration statutes and their interpreting regulations to serve the sole purpose of family reunification. In fact, Congress has explicitly stated that it is "the immigration policy of the United States that … aliens within the Nation's border not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* § 1601(2)(A). Moreover, the public charge statute itself requires Defendants to consider "(1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills" in making that determination.  8 U.S.C. § 1182(a)(4)(B)(i).

### 3. The Rule Properly Exercises Interpretive Authority That Congress Delegated, Implicitly and Explicitly, To The Executive Branch.

The statutory term "public charge" has "never been [explicitly] defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws. Rule at 41308. Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms, thereby "commit[ting] their definition in the first instance to" the agency, *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981), to be exercised within the outer parameters of the plain meaning of the statutory term. *See generally Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984). Congress has long recognized the fact of this implicit delegation, *see, e.g.*, S. Rept. 81-1515 at 349 (1950) (recognizing that because "there is no definition of the term . . . in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). This delegation is reinforced by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). Indeed, Plaintiffs

14

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

themselves appear to acknowledge this delegation in seeking to require adherence to the "primarily dependent" standard originating in a *prior* exercise of this delegated authority in the 1999 Interim Field Guidance. *See* Part C.I, *supra*; Mot. at 1-3, 9-10, 15-16. And the expansiveness of this delegation is widely established in precedent dating back to the early public charge statutes. *See Ex Parte Pugliese*, 209 F. 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference in public charge determinations required "even though the evidence to the contrary [is] very strong.").[8]

The long history of Congressional delegation of definitional authority over "public charge" refutes Plaintiffs' effort to suggest that Congress's failure to adopt alternative definitions has implicitly foreclosed the definition of "public charge" set forth in the Rule. *See* Mot. at 10-11 (asserting that "Congress's . . . retention of the term reflects its approval" of the 1999 Interim Field Guidance). Under Plaintiffs' theory, Congress's rejection of specific definitions of "public charge" excludes those definitions from the scope of proper interpretation. *See id.* (citing, *e.g.*, H.R. Rep. No. 104-828). Not so. Here, Congress's rejection of legislative efforts to create a first-ever *statutory* definition of "public charge" should be interpreted as leaving in force the commonly understood delegation of definitional authority to the Executive Branch to create such a definition through agency action.

### 4. The Rule is Not Arbitrary or Capricious.

Certain of Plaintiffs' arguments are raised as claims that the Rule is "arbitrary and capricious" under the APA, but Plaintiffs fail to meet this demanding standard. *See* 5 U.S.C. § 706(2)(A). Arbitrary and capricious review "is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Aguayo v. Jewell*, 827 F.3d 1213, 1226 (9th Cir. 2016). Plaintiffs' arguments repeatedly suffer from the same flaw: a

---

[8] The Executive Branch has long applied this delegated authority in the manner provided for by the Rule: through analysis of the "totality of the alien's circumstances" to make "a prediction." *Matter of Perez*, 15 I. & N. Dec. 136 (BIA 1974); *see also Matter of Harutunian*, 14 I. & N. Dec. 583, 589-90 (BIA 1974). In *Harutunian*, the Board of Immigration Appeals concluded that receipt of "old age assistance benefits" in California was sufficient to render an immigrant a "public charge" and explained that Congress broadly delegated authority in this area because "the elements constituting likelihood of becoming a public charge are varied." *Id.* at 588 (quoting S. Rep. 1515 at 349, 81st Cong. 2d (1950)).

15

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

disregard for the explanations presented in the NPRM and Rule. But the Court may not disregard the agency's logic. Rather, it must consider and defer to DHS's "explanations, reasoning, and predictions." *Cal. by and through Becerra v. Azar*, 927 F.3d 1068, 1079 (9th Cir. 2019), *reh'g en banc granted* (July 3, 2019).

### a.  DHS Adequately Considered Comments About Potential Harms and Reasonably Described the Benefits of the Rule.

Plaintiffs claim that DHS did not adequately respond to certain comments about potential costs to local and state governments, but Plaintiffs fail to show any deficiency in the agency's responses. Mot. at 13-14. An agency's obligation to respond to comments on a proposed rulemaking is "not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441-42 (D.C. Cir. 2012). "[T]he agency's response to public comments need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

The record reveals that DHS carefully considered comments about potential harms to state and local governments from the disenrollment effects of the Rule, and in fact modified the Rule in response. DHS devoted several pages of the Rule to describing and responding to comments that the Rule would lead to disenrollment from public benefits and increase costs for states and localities.  Rule at 41310-14, 41469-70. DHS explained why the Rule was justified, notwithstanding the potential disenrollment impact. The "rule's overriding consideration, *i.e.*, the Government's interest . . . is a sufficient basis to move forward." *Id.* at 41312 (explaining that the relevant Government interest are those set forth in PRWORA and codified at 8 U.S.C. § 1601). DHS has the "authority to take past, current, and likely future receipt of public benefits into account, even where it may ultimately result in discouraging aliens from receiving public benefits." *Id.* at 41312. Also, the extent to which disenrollment might impact state and local governments is unknown because data limitations make it difficult to predict the disenrollment impact.  *Id.* at 41313. Moreover, DHS made a number of changes to the Rule to mitigate some of the concerns raised regarding disenrollment impacts, such as excluding certain benefits from the scope of the Rule. *Id.* at 41313-14. This process—full consideration of the issues and the evidence on both sides, the adoption of changes in response, and an articulated statement of the reasons for the agency's ultimate decision—was neither arbitrary nor capricious.

16

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

Next, it is untrue that DHS "refused to consider the costs associated with" disenrollment by members of mixed-status households, including U.S. citizens. Mot. at 14. DHS *did* consider those potential costs, as Plaintiffs' Motion itself makes clear, *id.*, and DHS reasonably decided that those potential costs did not support abandoning the Rule.  DHS correctly noted that it is "difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule" and explained that it would not amend the Rule because of the potential that these people might choose to disenroll. Rule at 41313. It is not "sound policy to ignore the longstanding self-sufficiency goals set forth by Congress" because of the potential for disenrollment by individuals not regulated by the Rule. *Id.* at 41314. Thus, DHS did not ignore potential harms; rather, it found those harms insufficient to override the legitimate policy goals of the Rule. DHS's decision to move forward notwithstanding potential, unquantifiable harms is a quintessential exercise of the agency's policymaking function and is neither arbitrary nor capricious.  *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) ("When . . . an agency is obliged to make policy judgments where no factual certainties exist . . . we require only that the agency so state and go on to identify the considerations it found persuasive.").

Regarding benefits from the Rule, Plaintiffs do not dispute DHS's conclusion that the "primary benefit" of the Rule is to better ensure that certain aliens "will be self-sufficient, *i.e.*, will rely on their own financial resources, as well as the financial resources of the family, sponsors, and private organizations." Rule at 41301. Instead, Plaintiffs question only a corollary to that conclusion – that the Rule will "ultimately strengthen public safety, health, and nutrition . . . by denying admission or adjustment of status to aliens who are not likely to be self-sufficient." *Id.* at 41314.  Plaintiffs fault DHS for not "quantify[ing]" that benefit, Mot. at 15, but Plaintiffs cite no cases holding that, to comply with the APA, an agency must "quantify" all potential effects of a rule. Nor could they.  *See Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (the "law does not require agencies to measure the immeasurable"); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (sustaining agency action against arbitrary-and-capricious challenge notwithstanding "failure to quantify" effects).  Nevertheless, DHS's explanation of the benefit – that improvements in public safety, health, and nutrition will result from "denying admission or adjustment of status to aliens who are not likely to be self-sufficient" – makes good sense.  Rule at 41314.  DHS rationally concluded that excluding aliens lacking self-

17

sufficiency and encouraging aliens already present in the United States to become self-sufficient – *i.e.*, capable of funding their health care, dietary requirements, etc. – will strengthen public safety, health, and nutrition overall.  And DHS's position here is not inconsistent with the 1999 Interim Field Guidance.  Just as the 1999 Guidance noted that disenrollment from public benefits can have an adverse impact on public health, the Rule similarly acknowledged that potential.  Rule at 41489 (listing "adverse health effects" as potential cost).  But the possibility of adverse health effects from disenrollment does not negate DHS's conclusion that other aspects of the Rule will foster public health benefits.

Plaintiffs also object that the Rule extends the definition of "public charge" to enrollees in a number of programs that serve the goal of self-sufficiency and assert that this undermines DHS's goal of promoting self-sufficiency. Mot. at 15. This argument ignores that Congress's goal of ensuring that aliens do not rely on public resources, *i.e.*, of ensuring self-sufficiency, in the admissibility and adjustment contexts is not identical to the goal of self-sufficiency for those enrolled in public benefit programs. For aliens, Congress's intent is "that aliens should be self-sufficient before they seek admission or adjustment of status," not that they should someday attain self-sufficiency by drawing on public resources to improve their financial condition. Rule at 41308; *see* 8 U.S.C. § 1601. Nothing about the existence of such programs, which also help indigent citizens or aliens who are here but do not intend to remain, obligates Congress or DHS to admit to the United States persons who have not achieved self-sufficiency, even if they aspire to do so someday. For the same reasons, this aspect of the Rule is not inconsistent with a statement in the 1999 Interim Field Guidance noting that public benefits may assist families to become self-sufficient. Mot. at 16. Even if the use of public benefits can promote self-sufficiency, the Rule uses other ways to achieve the same objective.

Nor was it arbitrary or capricious for DHS to consider the costs to the government of different benefits programs when deciding which benefits would be subject to the Rule. Mot. at 16. All of the benefits subject to the Rule "bear directly on self-sufficiency" and are therefore properly included as part of the public charge test.  Rule at 41366. The fact that DHS chose not to include other less commonly used and less costly benefits does not render the Rule arbitrary.

### b.  The Rule is Not Irrational.

18

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

Plaintiffs claim that the Rule is "irrational" because a person who uses a "minimal amount" of benefits allegedly "would be deemed a public charge." Mot. at 17. But Plaintiffs have misread the Rule. As the Rule plainly states, "current receipt or past receipt of more than 12 months of public benefits, in the aggregate, in any 36-month period will not necessarily be dispositive in the inadmissibility determination . . . but will be considered a heavily weighted negative factor in the totality of the alien's circumstances." Rule at 41358; *see also id.* at 41,398 (describing circumstances in which positive factors might outweigh the recent receipt of public benefits Moreover, the Rule's *definition* of "public charge" effectively exempts *de minimis* use of public benefits by imposing a durational requirement; only if the alien is likely to receive benefits for more than 12 months in a 36-month period will the public charge test be met. Rule at 41295. It was entirely rational for DHS to conclude that an individual who relies on public assistance for a lengthy amount of time to meet his or her basic needs should be defined as a public charge, particularly where Congress's statutory requirement that the inadmissibility ground apply to a person determined likely "at any time" to become a public charge indicates concern even with short periods of reliance on public assistance. *See* § 1182(a)(4)(A); Rule at 41421-22.

As Plaintiffs observe, some individuals may qualify for public benefits even though they have incomes above the threshold that is considered a positive factor under the Rule (125% of federal poverty guidelines). Mot. at 17. That does not make the Rule irrational. The fact that an individual must rely on public assistance to support himself or herself, notwithstanding his or her income level, indicates a weakness in the alien's overall financial status. At bottom, Plaintiffs' argument reflects nothing more than the unsurprising fact that certain regions of the country, including Plaintiffs, have costs-of-living above the national average and that the income caps to qualify for certain benefits also may be higher in those regions.

Next, Plaintiffs believe it is "wholly irrational" for the Rule to consider family size in the public charge analysis. Mot. at 17. But that argument ignores the express statutory requirement that DHS consider "family status" in determining whether an alien is inadmissible on public charge grounds. 8 U.S.C. § 1182(a)(4)(B)(i)(III). Also, DHS has already explained why the data cited by Plaintiffs is not statistically significant. Rule at 41395. Other data that *was* statistically significant, however, suggested a higher rate of non-cash benefit use as family size increases, *id.*, which supports the commonsense

19

notion that financial strains increase as families grow in size.  Nor is it irrational for the Rule to consider immigration fee waivers.  "Since fee waivers are based on an inability to pay, seeking or obtaining a fee waiver for an immigration benefit suggests an inability to be self-sufficient." *Id.* at 41424-25 (discussing a Senate Appropriations Report, which noted that "those unable to pay USCIS fees are less likely to live in the United States independent of government assistance"); *see also* 8 C.F.R. § 103.7(c) (USCIS may waive fees for specific immigration benefit forms if a person demonstrates "inability to pay"). Likewise, an application for benefits, though "not the same as receipt," is nonetheless "indicative of an alien's intent to receive such a benefit." Rule at 41422. The fact that an alien believed he or she needed public assistance to support his or her basic needs, though not dispositive on its own, is a relevant factor when considering the likelihood that that person will become a public charge. *Id.* ("The fact that an alien has in the past applied for . . . public benefits . . . would never be dispositive on its own, but would be relevant to assessing an alien's likelihood of becoming at any time in the future a public charge.").

Last, there is nothing irrational about the flexible and discretionary nature of the Rule's totality of the circumstances test. Mot. at 18. That flexibility is a consequence of, first, the statutory requirement that DHS evaluate several specified factors when considering public charge inadmissibility and, second, the need to apply the test to a large number of individuals, each with his or her own unique factual circumstances.  Consideration of the mandatory factors necessarily requires a case-by-case determination based on the totality of the alien's circumstances. Rule at 41396. The only conceivable alternative – bright-line rules applicable regardless of individual circumstances – would hardly be acceptable to Plaintiffs. And as DHS noted, "officer discretion is not a new concept in USCIS immigration benefits adjudications," and several immigration benefits "are discretionary in nature, and involve an assessment and weighting of positive and negative factors."  *Id.* at 41398. In any event, USCIS will issue sub-regulatory guidance to its immigration officers and will conduct training for adjudicators to ensure they correctly apply the public charge test. *Id.* at 41396-97.

## II.    Plaintiffs Fail to Establish Irreparable Harm.

Plaintiffs identify ephemeral, speculative harms that, if they ever occurred, would be traceable to the independent choices of third parties. But "plaintiffs *may not* obtain a preliminary injunction

20

unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies* ["AFWR"] *v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (emphasis added). Indeed, *Winter* "requires the plaintiff to make a showing on all four prongs," *Id.* at 1135, and Plaintiffs bear the burden of establishing each of these factors. S*ee BOKF, NA v. Estes*, 923 F.3d 558, 565 (9th Cir. 2019).

To establish that it "is likely to suffer irreparable harm in the absence of preliminary relief," *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016), "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Id.* (quoting *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)); *see also Herb Reed Enters., LLC v. Fla. Entm't Mgmt. Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013) ("Those seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm."). Plaintiffs have failed to carry this burden because their alleged injuries are speculative and they have provided no support for their assertions that these alleged future harms will appear immediately.

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Baldrige*, 844 F.2d at 674. As discussed in detail in Part I, *supra*, Plaintiffs' alleged harms are speculative, founded on an attenuated chain of inferences, and contingent on the aggregate choices of independent third parties to take action not required by the Rule. Assuming the parties are correct in their expectation that some individuals will forgo enrollment or disenroll from federal benefits as a result of the Rule, Plaintiffs must still demonstrate a likelihood that such disenrollment will have sufficiently negative effects to harm the Plaintiffs' interests as opposed to individuals' interests, and that those negative effects will be felt immediately. Plaintiffs allege that at the expected rate of 2.5% disenrollment from federal benefits, they will face immediate and irreparable "economic harm to [their] health and safety-net systems, harm to public health, and harm to local economies." Mot. at 20.[9]

---

[9] Plaintiffs also argue that this 2.5% disenrollment projection is too low. However, it is unnecessary for the Court to consider this factual dispute in evaluating the preliminary injunction motion because Plaintiffs allege their purported harms would be realized at the 2.5% level. Mot. at 19-20.

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

Plaintiffs have alleged only a possibility that their alleged harms might result from the Rule, and "[a]n injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury.'" *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 22). Even assuming, as Plaintiffs do, a 2.5% rate of disenrollment from federal benefits, they cannot allege any more specific or immediate injury than that some individuals at some point may use uncompensated county medical services. *See* Lorenz Decl. ¶ 16, ECF No. 40; Wagner Decl. ¶¶ 7-8, ECF No. 29. Plaintiffs also have not alleged, and cannot allege, a likelihood as opposed to a mere possibility that any outbreak in communicable diseases will result from the Rule. *See* Mot. at 22-23; Cody Decl. ¶ 8, ECF No. 43; Aragon Decl. ¶ 8, 13, ECF No. 30. Moreover, some of the harms alleged by Plaintiffs are not even cognizable injuries. Plaintiffs have provided no support for their assertion that they are entitled to federal Medicaid reimbursements for individuals who do not use Medicaid. *See* Mot. at 20-21. Similarly, Plaintiffs have not explained why they believe they are *entitled* to any economic side effects from federal benefits that independent third parties may choose not to use. Mot. at 24.

Plaintiffs have also failed to demonstrate that their alleged harms will be sufficiently immediate to justify preliminary relief. "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman*, 822 F.3d at 1023 (quoting *Winter*, 555 U.S. at 22). Plaintiffs have alleged no facts in support of their conclusory assertions that the economic and public health harms they allege would likely develop before a decision on the merits could be rendered. Such harms, if they ever developed, would be downstream cumulative effects of the independent decisions of thousands of individual third parties over the course of many months and years. Plaintiffs offer no prediction about when these harms might arise and why the Rule's effective date must be enjoined until summary judgment on the administrative record could be rendered, given that such briefing could occur in a matter of months.

Nor have Plaintiffs alleged any facts in support of their assumption that all of the individuals projected to disenroll from federal benefits would do so simultaneously, that those individuals would take such steps immediately upon the Rule's effective date, or that the impact of such individuals

22

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

taking such steps would be immediately felt by the Plaintiffs' economies or public health systems. Indeed, the Plaintiffs' own motion and declarations acknowledge that the speculative and attenuated alleged public health impacts of the Rule, such as worse health outcomes caused by avoidance of preventative care, would necessarily develop over time.[10] *See, e.g.,* Mot. at 21 ("And others will delay care…forcing the counties to absorb the costs of treating…conditions that could have been caught and managed much earlier[.]"); Mot. at 23 ("[T]he counties will bear the costs of treating the spread of disease…due to lack of timely preventative treatment."); Hammer Decl. ¶ 5. Logically, even if a large number of aliens were to simultaneously disenroll from federal public benefits on the effective date of the Rule, a possibility for which there is no support in the record, the alleged large-scale effects of those disenrollments on economies and public health outcomes would take time to develop. The Plaintiffs have supplied no evidence to support a finding that such harms would occur before this case could be decided on the merits.[11]

## III.   The Remaining Equitable Factors Require Denial of Plaintiffs' Motion.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *AFWR*, 632 F.3d at 1135. These two factors merge when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), but Plaintiffs have not made a sufficient showing to meet the standard for either one. "In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Coliseum Comm'n v. NFL*, 634 F.3d 1197, 1203 (9th

---

[10] The same is true for any downstream effects of reduced participation in food-related programs, *see* Mot. at 23. And the Court need not consider these programs in any event because Plaintiffs have not alleged any harms to themselves (as opposed to individuals) that relate to alleged downstream effects on these programs caused by the Rule.

[11] The only arguably immediate harms properly alleged by Plaintiffs, increased administrative burdens caused by Plaintiffs' alleged intent to provide educational materials and funding for local groups to address the Rule, are self-inflicted. *See* Mot. for at 21-22; *id.* at 22 n.6. "If the harm complained of is self-inflicted, it does not qualify as irreparable." *Ventura Cty. Christian H.S. v. San Buenaventura*, 233 F. Supp. 2d 1241, 1253 (C.D. Cal. 2002) (quoting *Caplan v. Fellheimer Eichen, Braverman, & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995)).

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

Cir. 1980)). Plaintiffs assert that the balance of harms tips "overwhelmingly" in their favor because the alleged harms to public health weigh heavily in favor of an injunction. Mot. at 24.[12] They also assert that "[t]here is no countervailing interest" because a preliminary injunction would "merely preserve the status quo." *Id.*

This analysis is facially incorrect and self-serving. As explained in detail *supra*, Plaintiffs' purported public health harms are wholly speculative, and there is no support for their assertions that these harms will be either immediate or irreparable. Conversely, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so. Quite obviously, Defendants have made the assessment in their expertise that the "status quo" referred to by Plaintiffs is insufficient or inappropriate to serve the purposes of proper immigration enforcement. Therefore, imposing the extraordinary remedy of a preliminary injunction and requiring the prior practice to continue before a determination on the merits would significantly harm Defendants.

Plaintiffs' speculative harms have no weight in the balance of hardships compared to the Defendants' interest in avoiding roadblocks to administering the national immigration system. *See Baldrige*, 844 F.2d at 674. Consequently, Plaintiffs have failed to demonstrate that the balance of hardships tips in their favor or that the public interest favors injunction. On this ground alone their motion for preliminary injunction must fail. *See Winter*, 555 U.S. at 26.

## IV.   The Court Should Not Grant a Nationwide Injunction.

Were the Court to order a preliminary injunction here, it should be limited to redressing only any established injuries to Plaintiffs.  Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Equitable principles

---

[12] Plaintiffs also allege that the balance of equities favors them because their interests are "served by compliance with the APA." Mot. at 24. However, the interests of the Defendants, as federal regulators, are also served by proper APA compliance, which was undertaken in this case. *See supra* Part D. Thus this factor is merely neutral in the balance.

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

likewise require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Accordingly, the Ninth Circuit has repeatedly vacated or stayed the nationwide scope of injunctions, including in a challenge to a federal immigration rule. *See, e.g.*, *East Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928, at *2 (9th Cir. Aug. 16, 2019); *see also California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (collecting cases). Here, Plaintiffs have not established that nationwide relief is necessary to remedy their alleged harms.  In particular, their argument that individuals might choose to disenroll from federal benefits while living in the cities because of the possibility that they may someday move their residence to another jurisdiction outside the scope of a *preliminary* injunction is speculative, depends on an attenuated chain of choices made by individuals, and even if correct, would show at best only a *de minimis* disenrollment impact that is insufficient to demonstrate irreparable harm. Mot. at 25.

## CONCLUSION

For the reasons stated herein, the Court should deny preliminary relief.


Dated: September 13, 2019                    Respectfully submitted,


                                             JOSEPH H. HUNT
                                             Assistant Attorney General

                                             ALEXANDER K. HAAS, SBN 220932
                                             Branch Director

                                             */s/ Joshua M. Kolsky*
                                             KERI L. BERMAN
                                             KUNTAL V. CHOLERA
                                             JOSHUA M. KOLSKY, DC Bar #993430
                                             ERIC J. SOSKIN
                                             Trial Attorneys
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O. Box 883
                                             Washington, D.C. 20044

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.

joshua.kolsky@usdoj.gov

*Attorneys for Defendants*

*City and Cnty. of San Fr. v. USCIS*, Case No. 19-cv-4717-PJH
Opp'n to Mot. for Prelim. Inj.