United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al., | Case No.  19-cv-04717-PJH |
| Plaintiffs, | Case No.  19-cv-04975-PJH |
| | Case No.  19-cv-04980-PJH |
| v. | **Related Cases** |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, et al., | **PRELIMINARY INJUNCTION** |
| Defendants. | |
| STATE OF CALIFORNIA, et al., | |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | |
| Defendants. | |
| LA CLINICA DE LA RAZA, et al., | |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

This order concerns three motions for a preliminary injunction filed in three related actions.  Each of the plaintiffs in those actions moved for preliminary injunctive relief.  The motions came on for hearing before this court on October 2, 2019.

Plaintiff the City and County of San Francisco ("San Francisco") appeared through

its counsel, Matthew Goldberg, Sara Eisenberg, and Yvonne Mere. Plaintiff the County of Santa Clara ("Santa Clara" and together with San Francisco, the "Counties") appeared through its counsel, Ravi Rajendra, Laura Trice, and Luke Edwards. Plaintiffs the State of California, District of Columbia, State of Maine, Commonwealth of Pennsylvania, and State of Oregon (together, including D.C., the "States") appeared through their counsel, Anna Rich, Lisa Cisneros, and Brenda Ayon Verduzco. Plaintiffs La Clinica De La Raza and California Primary Care Association (the two together are the "Healthcare Organizations"), Maternal and Child Health Access, Farmworker Justice, Council on American Islamic Relations-California, African Communities Together, Legal Aid Society of San Mateo County, Central American Resource Center, and Korean Resource Center (the "Legal Organizations") (the Legal Organizations and the Healthcare Organizations together are the "Organizations") appeared through their counsel, Alvaro Huerta, Nicholas Espiritu, Joanna Cuevas Ingram, Kevin Herrera, Tanya Broder, Max Wolsen, and Mayra Joachin.

Defendants U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS"), Kevin McAleenen as Acting Secretary of DHS, Kenneth T. Cuccinelli as Acting Director of USCIS, and Donald J. Trump, as President of the United States appeared through their counsel, Ethan Davis, Eric Soskin, and Kuntal Cholera.

Additionally, papers submitted by numerous amici curiae were before the court. Prior to the hearing, the court granted motions to file amicus briefs on behalf of the following non-parties, all of which the court considered in its analysis: American Public Health Association, et al.; Asian Americans Advancing Justice, et al.; City of Los Angeles, et al.; Justice in Aging, et al.; and Members of Congress. A number of other requests to file amici briefs were denied due to the court's insufficient time to consider them on this particular motion, given the already-voluminous filings from the parties, the briefing schedule, and the time-sensitive nature of plaintiffs' request for preliminary relief.

Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby

1    GRANTS CERTAIN PLAINTIFFS' MOTIONS AND ISSUES A PRELIMINARILY

2    INJUNCTION, the scope of which is discussed below, for the following reasons.

3                              **EXECUTIVE SUMMARY**

4          In 1883, Emma Lazarus penned the now-famous sonnet, The New Colossus.

5    Later affixed to the Statue of Liberty in New York Harbor, the poem has been

6    incorporated into the national consciousness as a representation of the country's promise

7    to would-be immigrants:

8                Not like the brazen giant of Greek fame,
9                With conquering limbs astride from land to land;
                 Here at our sea-washed, sunset gates shall stand
10               A mighty woman with a torch, whose flame
11               Is the imprisoned lightning, and her name
                 Mother of Exiles. From her beacon-hand
12               Glows world-wide welcome; her mild eyes command
13               The air-bridged harbor that twin cities frame.

14               "Keep, ancient lands, your storied pomp!" cries she
15               With silent lips. "Give me your tired, your poor,
                 Your huddled masses yearning to breathe free,
16               The wretched refuse of your teeming shore.
17               Send these, the homeless, tempest-tost to me,
                 I lift my lamp beside the golden door!"
18

19         But whether one would prefer to see America's borders opened wide and

20   welcoming, or closed because the nation is full, laws—not poetry—govern who may

21   enter.  And the year before Lazarus wrote The New Colossus, Congress had enacted its

22   first comprehensive immigration law, barring entry to "any convict, lunatic, idiot, or any

23   person unable to take care of himself or herself without becoming a public charge,"

24   among others.  An Act to Regulate Immigration, 22 Stat. 214, Chap. 376 § 2. (1882).

25   Although various iterations of similar laws have since come and gone (the operative

26   statute no longer refers to "lunatics" or "idiots"), since the very first immigration law in

27   1882, this country has consistently excluded those who are likely to become a "public

28   charge."

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    Although Congress has never authored an explicit definition of the term, courts

2    and the executive branch have been considering its meaning as used in the statute for

3    over one hundred and twenty years.  As interpretations from those two branches

4    accreted toward a consistent understanding, Congress repeatedly enacted statutes

5    adopting the identical phrase.

6         In 1999, the executive branch reviewed its historical application of the term and

7    issued formal guidance to executive employees, explaining that the public charge

8    determination has historically, and should continue to, focus on whether an individual is

9    primarily dependent on the government for subsistence.

10        In 2018, DHS published a new rule (scheduled to take effect October 15, 2019)

11   that proposed to dramatically expand the definition of "public charge."  Rather than

12   include only those who primarily depend on the government for subsistence, DHS now

13   proposes for the first time to categorize as a public charge every person who receives 12

14   months of public benefits (including many in-kind benefits, like Medicaid and SNAP/Food

15   Stamps) over any 36-month period, regardless of how valuable those benefits are, or

16   how much they cost the government to provide (receiving two types of benefits in one

17   month would count as receiving benefits for two months).

18        Today, the court is presented with a challenge to DHS's new definition.  The

19   plaintiffs seek to prevent defendants from implementing it before this court can consider

20   this case on the merits.  The plaintiffs argue that the new definition will lead to

21   widespread disenrollment[1] from public benefits by those who fear being labeled a public

22   charge (and by those confused that they may be swept up in the rule), which will cause

23   plaintiffs to lose a substantial amount funding (for example, the federal government

24   heavily subsidizes state expenses for those enrolled in Medicaid).

25        The court finds that the plaintiffs are likely to prevail on the merits, for numerous

26

27   _____

[1] When plaintiffs refer to harms caused by those who will disenroll from public benefits in
28   addition to those who will forego enrollment.  This order considers the two categories
     together, and refers to them interchangeably.

reasons.  DHS's new definition of "public charge" is likely to be outside the bounds of a reasonable interpretation of the statute.  Moreover, plaintiffs are likely to prevail on their entirely independent arguments that defendants acted arbitrarily and capriciously during the legally-required process to implement the changes they propose.  Because plaintiffs are likely to prevail and will be irreparably harmed if defendants are permitted to implement the rule as planned on October 15, this court will enjoin implementation of the rule in the plaintiff states until this case is resolved on the merits, as discussed in more detail below.

## BACKGROUND

In each of the actions before the court, the plaintiffs challenge and seek to preliminarily enjoin implementation of a proposed rule entitled "Inadmissibility on Public Charge Grounds," proposed by DHS and published in the Federal Register on August 14, 2019.  See Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (August 14, 2019) ("the Rule").  The Rule is scheduled to take effect nationwide on October 15, 2019.

**A.    The Three Actions**

In City and County of San Francisco v. U.S. Citizenship and Immigration Services, Case No. 19-cv-04717-PJH, San Francisco and Santa Clara (together, the "Counties") filed a complaint naming as defendants USCIS; DHS; McAleenen as Acting Secretary of DHS; and Cuccinelli as Acting Director of USCIS.  The complaint asserts two causes of action under the Administrative Procedure Act ("APA"):  (1) Violation of APA, 5 U.S.C. § 706(2)(A)—Not in Accordance with Law; and (2) Violation of APA, 5 U.S.C. § 706(2)(A)—Arbitrary, Capricious, and Abuse of Discretion.  The Counties filed the present motion for preliminary injunction on August 28, 2019.

In State of California v. U.S. Department of Homeland Security, Case No. 19-cv-04975-PJH, the States filed a complaint naming the same defendants as the Counties: USCIS; DHS; McAleenen as Acting Secretary of DHS; and Cuccinelli as Acting Director of USCIS.  The complaint asserts six causes of action:  (1) Violation of APA, 5 U.S.C. § 706—Contrary to Law, the Immigration and Nationality Act and the Illegal Immigration

1   Reform and Immigrant Responsibility Act; (2) Violation of APA, 5 U.S.C. § 706—Contrary

2   to Law, Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794 (the

3   "Rehabilitation Act"); (3) Violation of APA, 5 U.S.C. § 706—Contrary to Law, State

4   Healthcare Discretion; (4) Violation of APA, 5 U.S.C. § 706—Arbitrary and Capricious;

5   (5) Violation of the Fifth Amendment's Due Process clause requiring Equal Protection

6   based on race; (6) Violation of the Fifth Amendment's Due Process clause, based on a

7   violation of Equal Protection principles based on unconstitutional animus.  The States

8   filed the present motion for preliminary injunction on August 26, 2019.  On August 27,

9   2019, this court ordered the action brought by the States related to the action brought by

10  the Counties.

11          In La Clinica De La Raza v. Trump, Case No. 19-cv-04980-PJH, the Organizations

12  filed a complaint naming the same defendants as the Counties, and also added Donald J.

13  Trump:  USCIS; DHS; McAleenen as Acting Secretary of DHS; and Cuccinelli as Acting

14  Director of USCIS; and Donald J. Trump, as President of the United States.  The

15  complaint asserts four causes of action:  (1) Violation of APA, 5 U.S.C. § 706—Contrary

16  to the Statutory Scheme; (2) Violation of APA, 5 U.S.C. § 706—Arbitrary, Capricious, or

17  otherwise not in accordance with law; (3) Violation of the Fifth Amendment based on

18  Equal Protection for discriminating against non-white immigrants; (4) under the

19  Declaratory Judgment Act, seeking a determination that the Rule is invalid because it

20  was issued by an unlawfully-appointed agency director.  On August 30, 2019, this court

21  ordered the action brought by the Organizations related to the action brought by the

22  Counties.  The Organizations filed the present motion for preliminary injunction on

23  September 4, 2019.

24  **B.      The Dispute**

25          The Immigration and Nationality Act, 8 U.S.C. §§ 1101, et seq. ("INA"), requires

26  that all noncitizens seeking to be lawfully admitted into the United States or to become

27  lawful permanent residents ("LPRs") prove they are not inadmissible.  8 U.S.C. § 1361; 8

28  U.S.C. § 1225(a).  A noncitizen may be deemed inadmissible on any number of grounds,

including that they are "likely at any time to become a public charge." 8 U.S.C.

§ 1182(a)(4)(A).

The specific INA provision relating to whether an alien is likely to become a "public charge" at issue in this litigation provides, in relevant part:

> Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:
> . . . .
> (4) Public charge
>
> (A) In general
>
> Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.
>
> (B) Factors to be taken into account
>
> (i) In determining whether an alien is inadmissible under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's—
> (I) age;
> (II) health;
> (III) family status;
> (IV) assets, resources, and financial status; and
> (V) education and skills.
>
> (ii) In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 1183a[2] of this title for purposes of exclusion under this paragraph.

8 U.S.C. § 1182(a)(4).

The statute directs a "consular officer" or "the Attorney General" to form an opinion as to whether the applicant "is likely at any time to become a public charge." Id. In

---

[2] Section 1183a is titled "Requirements for sponsor's affidavit of support" and sets forth the requirements of an "affidavit of support . . . to establish that an alien is not excludable as a public charge under section 1182(a)(4) of this title[.]" 8 U.S.C. § 1183a(a)(1).

forming that opinion, immigration officers must consider "at a minimum" five statutorily-defined factors:  (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; (5) education and skills.  8 U.S.C. § 1182(a)(4)(B)(i).

An officer may additionally consider an affidavit of support, which is a legally-enforceable contract between the sponsor of the applicant and the Federal Government.  <u>See</u> 8 U.S.C. § 1182(a)(4)(B)(ii); 8 U.S.C. § 1183a(a).  The sponsor pledges to accept financial responsibility for the applicant and to maintain the applicant at an income of "not less than 125 percent of the Federal poverty line during the period in which the affidavit is enforceable[.]"  8 U.S.C. § 1183a(a)(1)(A).

Certain groups of noncitizens, such as asylum seekers and refugees, are not subject to exclusion based on an assessment that they are likely to become a public charge.  <u>See</u> 8 U.S.C. § 1157 (refugee); 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1159(c) (refugee).

An alien found to be inadmissible as a public charge may "be admitted in the discretion of the Attorney General . . . upon the giving of a suitable and proper bond or undertaking approved by the Attorney General, in such amount and containing such conditions as he may prescribe . . . holding the United States and all States . . . harmless against such alien becoming a public charge."  8 U.S.C. § 1183.

The public charge ground may arise when, inter alia, an alien seeks LPR status, or when noncitizens apply for visas.  8 U.S.C. § 1182(a); 8 U.S.C. § 1255(a).  Aliens "to whom a permit to enter the United States has been issued to enter the United States" are also subject to an inadmissibility determination by DHS at ports of entry when they enter and re-enter the United States.  8 U.S.C. § 1185(d).

Immigrants with LPR status may also be subject to the public charge analysis.  For example, an LPR is considered to be "seeking admission" under various circumstances, for example when returning to the United States after being "absent from the United States for a continuous period in excess of 180 days" or after engaging in any "illegal activity after having departed the United States[.]"  8 U.S.C. § 1101(a)(13)(C)(ii)–(iii).

LPRs can also be denied citizenship and/or placed in removal proceedings if DHS determines retrospectively that they were inadmissible as a public charge at the time of their adjustment.  8 U.S.C. § 1227(a)(1)(A); 84 Fed. Reg. at 41,328 & n.176 (discussing possible impact on naturalizations).

Under a separate provision in the INA, an alien can be deported upon a determination that he has in fact become a public charge since his admission, from causes "not affirmatively shown to have arisen since entry[.]"  8 U.S.C. 1227(a)(5).[3]

On October 10, 2018, DHS began the rule-making process to create a new framework for the public charge assessment by publishing a Notice of Proposed Rulemaking.  See Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018) (the notice of proposed rulemaking is the "NPRM").  The NPRM provided a 60-day public comment period, during which 266,077 comments were collected.  See 84 Fed. Reg. at 41,297.  On August 14, 2019, DHS published the Rule in the Federal Register.  Id. at 41,292.  It is set to become effective on October 15, 2019.  On October 2, 2019—the morning of the hearing on the pending motions for preliminary injunction— DHS published a 25-page list of "corrections" to the proposed final rule.[4]  See Case No. 19-cv-04717-PJH, Dkt. 106, Ex. A.  DHS stated that its October 2 amendments to the rule would not delay its planned implementation on October 15.

The Rule sets out what the parties have referred to as the "12/36 standard."  That is, the Rule "redefines the term 'public charge' to mean an alien who receives one or more designated public benefits for more than 12 months in the aggregate within any 36-

---

[3] Confusingly, DHS's Rule would use completely distinct definitions for the term "public charge" when assessing whether an alien "has become a public charge" (8 U.S.C. 1227(a)(5)) and whether an alien "is likely at any time to become a public charge" (8 U.S.C. 1182(a)(4)(A).

[4] Although defendants described the changes as fixes to "technical and typographical errors" (Case No. 19-cv-04717-PJH, Dkt. 106, Ex. A at 2), the States argued at the hearing that upon their limited review of the corrections (a review that was necessarily limited given the eleventh-hour disclosure of DHS's changes to the rule), the amendments mooted at least one issue underlying the States' motion, regarding treatment of military families.

1   month period (such that, for instance, receipt of two benefits in one month counts as two

2   months).  This Rule defines the term 'public benefit' to include cash benefits for income

3   maintenance, SNAP, most forms of Medicaid, Section 8 Housing Assistance under the

4   Housing Choice Voucher (HCV) Program, Section 8 Project-Based Rental Assistance,

5   and certain other forms of subsidized housing."  84 Fed. Reg. at 41,295.

6          Because the INS directs immigration officers to opine as to whether an alien "is

7   likely at any time to become a public charge," the Rule's new definition requires

8   immigration officers to opine as to whether an alien is likely to receive certain public

9   benefits for more than 12 months in the aggregate within any future 36-month period to

10  determine whether he is likely to become a public charge.  The rule sets out a number of

11  positive, negative, heavily-weighted, and normally-weighted factors to assist in making

12  that determination, and those factors are considered as part of a "totality of the

13  circumstances" assessment of whether an alien is likely to use more than 12 months'

14  worth of benefits in any future 36-month period.

**DISCUSSION**

15

16  **A.     Legal Standard**

17         Federal Rule of Civil Procedure 65 provides federal courts with the authority to

18  issue preliminary injunctions.  Fed. R. Civ. P. 65(a).  Generally, the purpose of a

19  preliminary injunction is to preserve the status quo and the rights of the parties until a

20  final judgment on the merits can be rendered.  See U.S. Philips Corp. v. KBC Bank N.V.,

21  590 F.3d 1091, 1094 (9th Cir. 2010).

22         An injunction is a matter of equitable discretion and is "an extraordinary remedy

23  that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

24  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); see also Munaf v. Geren,

25  553 U.S. 674, 689–90 (2008).  A preliminary injunction "should not be granted unless the

26  movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong,

27  520 U.S. 968, 972 (1997) (per curiam).

28         "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to

1   succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of

2   preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an

3   injunction is in the public interest."  Winter, 555 U.S. at 20.

4       Alternatively, "'serious questions going to the merits' and a hardship balance that

5   tips sharply toward the plaintiff can support issuance of an injunction, assuming the other

6   two elements of the Winter test are also met."  All. for the Wild Rockies v. Cottrell, 632

7   F.3d 1127, 1132 (9th Cir. 2011).  "That is, 'serious questions going to the merits' and a

8   balance of hardships that tips sharply towards the plaintiff can support issuance of a

9   preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

10  irreparable injury and that the injunction is in the public interest."  Id. at 1135; see also

11  Disney Enterprises, Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017).

12      If a plaintiff satisfies its burden to demonstrate that a preliminary injunction should

13  issue, "injunctive relief should be no more burdensome to the defendant than necessary

14  to provide complete relief to the plaintiffs."  Califano v. Yamasaki, 442 U.S. 682, 702

15  (1979).

16      Separately, the APA permits this court to "postpone the effective date of action . . .

17  pending judicial review."  5 U.S.C. § 705;  Bakersfield City Sch. Dist. of Kern Cty. v.

18  Boyer, 610 F.2d 621, 624 (9th Cir. 1979) ("The agency or the court may postpone or stay

19  agency action pending such judicial review.") (citing 5 U.S.C. § 705).  Any such

20  postponement must be made "[o]n such conditions as may be required and to the extent

21  necessary to prevent irreparable injury[.]"  5 U.S.C. § 705.  The factors considered when

22  issuing such a stay substantially overlap with the Winter factors for a preliminary

23  injunction.  See, e.g., Bauer v. DeVos, 325 F. Supp. 3d 74, 104–07 (D.D.C. 2018).

24  **B.    Analysis**

25      In considering plaintiffs' motions for preliminary injunction, the court considers the

26  Winter factors (and the alternative All. for the Wild Rockies) factors in turn.  First, the

27  court considers whether plaintiffs have demonstrated they are likely to succeed on the

28  merits of their claims, or alternatively whether they have demonstrated serious questions

11

United States District Court
Northern District of California

1  going to the merits.  Because a plaintiff must be within a statute's "zone of interest" to

2  succeed on an APA challenge based on the underlying statute, the court considers

3  whether each plaintiff is within the relevant statute's zone of interests when assessing its

4  likelihood of success on the merits.

5  Second, the court considers whether plaintiffs have demonstrated they are likely to

6  suffer irreparable harm in the absence of preliminary relief.  Because plaintiffs' alleged

7  irreparable harms are also their alleged bases for standing, the court considers whether

8  each plaintiff has standing to bring a ripe claim when assessing its irreparable harms.

9  Third, the court considers whether plaintiffs have demonstrated that the balance of

10  equities tip in their favor, and whether the balance of hardships tip sharply in their favor.

11  Fourth, the court considers whether plaintiffs have demonstrated that an injunction

12  is in the public interest.

13  Fifth, the court addresses the scope of injunctive relief necessary and capable of

14  providing complete relief to the harms plaintiffs have demonstrated they are likely to

15  suffer prior to a determination on the merits, absent such relief.

16  **1.**  **The State and County Plaintiffs Are Likely to Succeed on the Merits**

17  **and Have Raised Serious Questions**

18  Plaintiffs argue that they are likely to succeed on three of their causes of action,

19  each alleging a violation of the APA:  (1) that the Rule violates the APA because it is not

20  in accordance with the term "public charge" as used in the INA; (2) that the Rule violates

21  the APA because it is not in accordance with the Rehabilitation Act § 504; and (3) that the

22  Rule violates the APA because it is arbitrary, capricious, and an abuse of discretion.[5]

23  Under the APA, "the reviewing court shall decide all relevant questions of law,

24  interpret constitutional and statutory provisions, and determine the meaning or

25  _____

26  [5] Although some of the arguments supporting these claims are likely to overlap with other
claims plaintiffs assert, plaintiffs have made clear that they are not moving for a

27  preliminarily injunction based on any other claim, including, inter alia, the claim that the
Rule violates the APA because it is contrary to laws giving the States discretion with

28  respect to the provision of healthcare, the claim under the declaratory judgment act that
Cuccinelli was unlawfully appointed, or any of the asserted Constitutional claims.

1   applicability of the terms of an agency action.  The reviewing court shall . . . hold unlawful

2   and set aside agency action, findings, and conclusions found to be . . . arbitrary,

3   capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C.

4   § 706.

5          "In the usual course, when an agency is authorized by Congress to issue

6   regulations and promulgates a regulation interpreting a statute it enforces, the

7   interpretation receives deference if the statute is ambiguous and if the agency's

8   interpretation is reasonable.  This principle is implemented by the two-step analysis set

9   forth in Chevron."  Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2124 (2016)

10  (citing Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984)).

11  "At the first step, a court must determine whether Congress has 'directly spoken to the

12  precise question at issue.'  If so, 'that is the end of the matter; for the court, as well as the

13  agency, must give effect to the unambiguously expressed intent of Congress.'  If not,

14  then at the second step the court must defer to the agency's interpretation if it is

15  'reasonable.'"  Encino Motorcars, 136 S. Ct. at 2124–25 (citations omitted) (quoting

16  Chevron, 467 U.S. at 842–44).

17         "[I]f the statute is silent or ambiguous with respect to the specific issue, the

18  question for the court is whether the agency's answer is based on a permissible

19  construction of the statute."  Chevron, 467 U.S. at 843; see also Michigan v. E.P.A., 135

20  S. Ct. 2699, 2707 (2015) ("Even under this deferential standard, however, agencies must

21  operate within the bounds of reasonable interpretation.") (internal quotation marks

22  omitted).

23         The Chevron analysis calls upon the court to "employ[] traditional tools of statutory

24  construction" to fulfill its role as "the final authority on issues of statutory construction[.]"

25  Chevron, 467 U.S. at 843 n.9; accord Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1630

26  (2018).

27         "Chevron deference, however, is not accorded merely because the statute is

28  ambiguous and an administrative official is involved.  To begin with, the rule must be

United States District Court
Northern District of California

promulgated pursuant to authority Congress has delegated to the official."  Gonzales v.

Oregon, 546 U.S. 243, 258 (2006).  "The starting point for this inquiry is, of course, the

language of the delegation provision itself.  In many cases authority is clear because the

statute gives an agency broad power to enforce all provisions of the statute."  Id. (drawing

a distinction between delegation of authority to carry out the act generally, and authority

to execute the functions assigned to the agency).

First, the court assesses whether plaintiffs are likely to succeed on their claims

under the APA that the Rule is not in accordance with law, as provided in 8 U.S.C.

§ 1182(a)(4).  Second, the court assesses whether plaintiffs are likely to succeed on their

claims under the APA that the Rule is not in accordance with law, as provided in the

Rehabilitation Act § 504.  Third, the court assess whether plaintiffs are likely to succeed

on their claims under the APA, that the Rule is arbitrary and capricious.  Fourth, the court

assesses whether each plaintiff is within the relevant zone of interests, which is required

to succeed on an APA claim.

### a.    Not in Accordance with Law—8 U.S. Code § 1182(a)(4)

Plaintiffs argue that the Rule is not in accordance with the definition of "public

charge" as used in 8 U.S. Code § 1182(a)(4) for three reasons:  (1) DHS's interpretation

should not be accorded any deference, and the Rule's definition is inconsistent with the

statute; (2) even if the term is accorded deference, the term plainly and unambiguously

means "primarily dependent on the government for subsistence," and the Rule conflicts

with that definition; and (3) the Rule's definition of "public charge" is not reasonable or

based on a permissible construction of the statute.

The court did not understand plaintiffs to have raised the first argument in their

moving papers, although the Counties may have raised it obliquely in their reply.  But the

court and defendants were surprised to learn at the hearing that plaintiffs were advancing

an argument that DHS's promulgation of the Rule was wholly outside of Congressionally-

delegated authority.  Cf. Counties' Reply at 8–9 ("Counties do not contest DHS's

authority to issue rational regulations governing the case-by-case application of the

United States District Court
Northern District of California

1   statutory standard, so long as they do not misconstrue the term 'public charge.'"); States'

2   Reply at 9–10 ("the States have never disputed the commonsense point that Congress in

3   8 U.S.C. § 1182(a)(4)(A) assigned responsibility to Defendants to make individual public

4   charge determinations"); Organizations' Reply at 9 ("even if Defendants were correct,

5   Congress could delegate to DHS the power only to adopt *reasonable* interpretations of

6   the statute").  Nevertheless, plaintiffs have not sufficiently supported, or even explained,

7   their argument to satisfy their burden to show likelihood of success on the merits based

8   on it.[6]  Accordingly, the court analyzes the Rule pursuant to the framework set out by

9   Chevron.

10      The second and third arguments concern a challenge under Chevron's framework

11   to the meaning of "public charge" as used in § 1182(a)(4).  Plaintiffs' second argument

12   requires the court to determine whether the Rule contravenes the statute's unambiguous

13   meaning, and their third argument requires the court to determine whether defendants'

14   chosen definition is reasonable and based on a permissible construction of the statute.

15   Both questions require a discussion of the long usage of the term by Congress, as well

16   as the expansive evaluation of the term by courts and executive agencies.

17      As preface to that discussion, a brief outline helps set the stage.  The phrase

18   "public charge" was used in this country's first-ever general immigration statute in 1882.

19   The immigration statutes have been interpreted and modified many time since then, and

20   although many other excluded categories of persons came and went, with each

21   modification through today the phrase "public charge" remained intact.  As a result, the

22   meaning that the persistent term had when first used is relevant to understanding the

23   meaning Congress ascribed to it with each subsequent statutory revision, including the

24   now-operative statute, which most recently saw changes to the relevant provisions in

25   1990 and 1996.

---

[6] However, the court notes that whether DHS's promulgation of the Rule falls within the rulemaking authority delegated to it by Congress may benefit from more attention in the parties' future briefing on the merits.  See generally 8 U.S.C. § 1103(a).

United States District Court
Northern District of California

1     Ultimately, this dispute concerns the meaning of a statutory term passed in 1990—

2   with clarifying language passed in 1996.  As such, the court considers the meaning

3   ascribed to the term by Congress at that time, but in doing so it must afford due

4   consideration to Congress's understanding of the term given the long historical context it

5   was operating within, which the court presently endeavors to describe.  See Forest Grove

6   Sch. Dist. v. T.A., 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of

7   an administrative or judicial interpretation of a statute and to adopt that interpretation

8   when it re-enacts a statute without change.") (quoting Lorillard v. Pons, 434 U.S. 575,

9   580 (1978)); United States v. Argueta-Rosales, 819 F.3d 1149, 1159 (9th Cir. 2016)

10   (same); J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 951 (9th Cir. 2010) (Congress

11   does no "abrogate[] sub silentio the Supreme Court's decision[s]"); Bob Jones Univ. v.

12   United States, 461 U.S. 574, 600–01 (1983) (interpretation informed by the fact that

13   Congress had a "prolonged and acute awareness" of an established agency

14   interpretation of a statute, considered the precise issue, and rejected bills to overturn the

15   prevailing interpretation); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S.

16   353, 381–82 (1982) (Congress is aware "of the 'contemporary legal context' in which" it

17   legislates, and amending a statute while leaving certain statutory provisions intact "is

18   itself evidence that Congress affirmatively intended to preserve that" context); see also

19   I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory

20   construction are more compelling than the proposition that Congress does not intend sub

21   silentio to enact statutory language that it has earlier discarded in favor of other

22   language."); Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n.8 (1975) (rejecting

23   construction of statute that would implement substance of provision that Conference

24   Committee rejected).

25                                    1.     1882 Act

26     In 1882, Congress enacted the country's first general immigration statute.  See

27   An Act to Regulate Immigration, 22 Stat. 214 (1882) (the "1882 Act").  That statute

28   provided, in part:

> That the Secretary of the Treasury . . . shall have power to . . . provide for the support and relief of such immigrants therein landing as may fall into distress or need public aid . . . and it shall be the duty of such State . . . to examine into the condition of passengers arriving at the ports . . . and if on such examination there shall be found among such passengers any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge . . . such persons shall not be permitted to land.

22 Stat. 214, Chap. 376 § 2.

Legislative debate on the 1882 Act shows that at least one member of Congress sought to prevent foreign nations from "'send[ing] to this country blind, crippled, lunatic, and other infirm paupers, who ultimately become life-long dependents on our public charities.'" 13 Cong. Rec. 5108-10 (June 19, 1882) (statement of Rep. Van Voorhis).

The 1882 Act also imposed on each noncitizen who entered the United States a 50-cent head tax for the purpose of creating an "immigrant fund":

> That there shall be levied, collected, and paid a duty of fifty cents for each and every passenger not a citizen of the United States who shall come by steam or sail vessel from a foreign port to any port within the United States. . . . The money thus collected shall . . . constitute a fund to be called the immigrant fund, and shall be used . . . to defray the expense of regulating immigration under this act, and for the care of immigrants arriving in the United States, for the relief of such as are in distress[.]

22 Stat. 214, Chap. 376, § 1; see also Edye v. Robertson, 112 U.S. 580, 590–91 (1884) ("This act of congress is similar, in its essential features, to many statutes enacted by states of the Union for the protection of their own citizens, and for the good of the immigrants who land at sea-ports within their borders.  That the purpose of these statutes is humane, is highly beneficial to the poor and helpless immigrant, and is essential to the protection of the people in whose midst they are deposited by the steam-ships, is beyond dispute.").

Nineteenth-century dictionaries defined "charge" as "That which is enjoined, committed, entrusted or delivered to another, implying care, custody, oversight, or duty to be performed by the person entrusted" and "The person or thing committed to anothers

1     [sic] custody, care or management; a trust.  Thus the people of a parish are called the

2     ministers *charge."*  Charge, Webster's Dictionary (1828 Online Edition),

3     http://webstersdictionary1828.com/Dictionary/charge; Charge, Webster's Dictionary

4     (1886 Edition), https://archive.org/details/websterscomplete00webs/page/218 ("person or

5     thing committed or intrusted [sic] to the care, custody, or management of another; a trust;

6     as, to abandon a *charge*").[7]

7            Another contemporary source defines charge "In its general sense, a charge is an

8     obligation or liability.  Thus we speak of . . . a pauper being chargeable to the parish or

9     town."  Stewart; Lawrence Rapalje, Robert L., Dictionary of American and English Law,

10    with Definitions of the Technical Terms of the Canon and Civil Laws (1888), at 196.

11           Prior to the 1882 Act's enactment, states had played a larger role in immigration

12    than they do today, and state governments had used and interpreted the term "public

13    charge," although of course not in relation to any Congressional act.

14           For example, the New Jersey Supreme Court, when interpreting a statute

15    concerning the procedures to remove an individual from a township in New Jersey,

16    considered whether a pauper was "either chargeable, or likely to become chargeable, to

17    the township of Princeton."  Overseers of Princeton Twp. v. Overseers of S. Brunswick

18    Twp., 23 N.J.L. 169, 170 (Sup. Ct. 1851).  Although the case does not make clear what

19    precise relief is necessary to qualify as a public charge, it contemplated that one became

20    a public charge upon seeking such relief from "the church wardens or overseers of the

21    poor[.]"  Id. at 173.  The concurrence clarified that an "application for relief" is distinct from

22    being "chargeable," although "[t]he probability of his becoming chargeable is sufficiently

23    shown by his application for relief."  Id. at 179 (Carpenter, J. concurring).  The case does

_____

[7] Defendants cite Frederic Jesup Stimson, Glossary of Technical Terms, Phrases, and
Maxims of the Common Law (1881), but that source does not provide a relevant
definition.  The first-listed definition is the most plausibly-relevant:  "A burden,
incumbrance, or lien; as when land is charged with a debt."  Id. at 56.  But that definition
concerns how the word charge relates to real property, which makes sense because at
the time, "[m]ore frequently, however, charge is applied to property" as "a general term[.]"
Stewart; Lawrence Rapalje, Robert L., Dictionary of American and English Law, with
Definitions of the Technical Terms of the Canon and Civil Laws (1888), at 196.

United States District Court
Northern District of California

1   not explain the type or quantum of relief necessary to constitute one's status as a

2   "charge."

3        Another state court opinion, People ex rel. Durfee v. Commissioners of Emigration,

4   27 Barb. 562, 1858 WL 7084 (N.Y. Sup. Ct. 1858), addressed a statute which

5   contemplated bonds being paid on behalf of immigrants, and required the commissioners

6   of immigration who held those bonds to "indemnify so far as may be the several cities,

7   towns and counties of the state, for any *expense* or *charge* which may be incurred for the

8   maintenance and support of the" immigrants.  27 Barb. at 570.  The court held that the

9   statute required indemnification of all expenses made on behalf of the immigrants—

10  whether temporary or permanent—so long as the expenses were lawfully made.  Id.

11  However, the case did not draw a clean line holding that any expense spent on an

12  individual makes him a public charge.  Rather, an equally-plausible reading of the opinion

13  is that the statute requires immunity of all expenses paid to support immigrants for whom

14  bonds have been paid, regardless of whether they are formally considered public

15  charges.[8]

16        City of Bos. v. Capen, 61 Mass. 116, 121 (1851) concerned a statute which

17  required a bond for someone likely to become a public charge.  The court explained that

18  the statute described various categories of people identified as being at risk of becoming

19  a public charge, and for whom bond may be required.  However, what assistance or

20  payment qualified one as a "public charge" was not addressed.[9]

21        As a whole, the statutory language and authority underlying the 1882 Act provide

22

23  [8] The latter reading would be in accordance with the current interpretation of "public
    charge" as used elsewhere in the INA, which requires an alien to be presented with a bill
24  and prove unable or unwilling to pay it to be deemed a public charge.  E.g., Matter of B-,
    3 I. & N. Dec. 323 (A.G. 1948); Field Guidance on Deportability and Inadmissibility on
25  Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999); 84 Fed. Reg. at 41,295.

26  [9] The opinion also suggested that those who were "paupers in a foreign land" must have
    been "a public charge in another country," and then stated without explanation that "the
27  word 'paupers' being used in this connection in its legal, technical sense."  Capen, 61
    Mass. at 121.  Even looking past the confusion, the court might be interpreted as finding
28  that all paupers have been public charges, but from that the conclusion cannot be drawn
    that all public charges must have been paupers.

some clear guidance as to the definition of public charge.  For example, the 1882 Act

contemplated that admitted aliens (not excluded on public charge grounds) would receive

some assistance from the state.  That is made clear by the same statute's establishment

of a fund "for the care of immigrants arriving in the United States, for the relief of such as

are in distress[.]"  22 Stat. 214, Chap. 376, § 1.  Although the quantum of state support

necessary to render one a public charge is less clear, the 1882 Act did not consider an

alien a public charge for simply receiving some assistance from the state.  Also, it

appears that contemporary uses of the term would deem one a public charge after taking

on a particular, chargeable debt from the state and failing to repay it.

### 2.    1891

In 1891, Congress amended the 1882 Act.  That amended statute provided, in

part:

> That the following classes of aliens shall be excluded from
> admission into the United States . . . :  All idiots, insane persons,
> paupers or persons likely to become a public charge, persons
> suffering from a loathsome or a dangerous contagious disease,
> persons who have been convicted of a felony or other infamous
> crime or misdemeanor involving moral turpitude, polygamists,
> and . . . .

An Act in Amendment to the Various Acts Relative to Immigration and the Importation of

Aliens Under Contract or Agreement to Perform Labor, 26 Stat. 1084, Chap. 551 ("1891

Act") § 1 (1891).

The 1891 amendment also provided that "any alien who becomes a public charge

within one year after his arrival in the United States from causes existing prior to his

landing therein shall be deemed to have come in violation of law and shall be returned"

pursuant to the procedures outline in the statute regarding aliens entering unlawfully.

1891 Act § 11.  So, the 1891 Act set out the now-familiar practice of subjecting aliens to

two "public charge" assessments—one in which the government is called on to make a

forward-looking prediction, and another in which the government is called on to make a

backward-looking assessment.  The first asks at the time of entry whether the alien is

likely to become a public charge.  The second asks whether, after some period of time,

the alien has in fact become a public charge due to causes existing before he arrived. Although the relevant time periods of the assessments have grown, this scheme generally remains in place today.

The 1891 Act made a notable change to the law by adding the category "pauper," and including the term pauper with "persons likely to become a public charge" to form a single entry in an expanded list of excluded categories of people.

An early case interpreting the act considered whether "the act of 1891 confers upon the inspection officer power to detain and send back an alien immigrant as being a person liable to become a public charge, in the absence of any evidence whatever tending to establish that fact."  In re Feinknopf, 47 F. 447, 448 (E.D.N.Y. 1891).  Although it did not define the term "public charge" in the abstract, the court provided an explanation given the facts before it that essentially laid out a totality-of-the-circumstances test.  It held that "[o]f course" the following facts, "if believed, would not warrant the conclusion that the petitioner was a person likely to become a public charge," and that the case is "devoid of any evidence whatever of any fact upon which to base a determination that the petitioner is likely to become a public charge":

> the petitioner is 40 years old; that he is a native of Austria; that he is a cabinet-maker by trade, and has exercised that trade for 25 years; that he has no family; that he has baggage with him, worth $20, and 50 cents in cash; that he is a man who can find employment in his trade, and is willing to exercise the same. . . . [I]n addition, that the immigrant has not been an inmate of an almshouse, and has not received public aid or support, and has not been convicted of crime.

Id. at 447–48.  A fair reading suggests that each of the enumerated facts could be relevant to predicting whether someone is likely to become a public charge.

A subsequent court provided even more guidance.  In United States v. Lipkis, 56 F. 427 (S.D.N.Y. 1893), a man had arrived in America before his wife and child.  The wife and child were required to pay a bond because the superintendent of immigration deemed them "likely to become a public charge" based on "the poverty and character of the husband," whose residence gave the appearance of "extreme poverty."  Id. at 427.

United States District Court
Northern District of California

However, that poverty alone did not mean he or the family was a public charge—rather, it meant the family was likely to become a public charge. "About six months after the arrival of the mother she became insane, and was sent to the public insane asylum of the city under the direction of the commissioners of charities and correction, where only poor persons unable to pay for treatment are received, and she was there attended to for a considerable period at the expense of the municipality." Id. at 428. Thus, the mother became a public charge only when she was committed to the public insane asylum with "no effort to provide for her at his [the husband's] own expense[.]" Id.

But the court did not require commitment to an institution to make one a public charge. It reasoned in dicta that the family's financial condition generally subjected the family to the risk of becoming "a public charge under the ordinary liabilities to sickness, or as soon as any other additional charges arose beyond the barest needs of existence. . . . The liability of his family to become a public charge through any of the ordinary contingencies of life existed when the bond was taken, because of his poverty and inefficiency." Id. So, a number of different financial shocks could have rendered the family a public charge.

The court's analysis drew a distinction between being a public charge (in this case, someone committed to an insane asylum with no effort to cover the expense), and someone likely to become a public charge (in this case, someone who can pay for "the barest needs of existence," yet whom an extreme illness could ruin).

The parties cite to state court decisions published during this time using the term public charge, which are informative of what the term generally meant at the time. Those opinions address the duration of benefits that render one a public charge rather than the quantum, and they tend to suggest that temporary relief did not make one a public charge as the term was understood at the time. However, they do not address whether longer-term receipt of a small amount of public benefits qualifies one as a public charge (as the Rule would do). See Yeatman v. King, 2 N.D. 421 (1892) (state loaning seed grain to farmer using the general tax fund, with obligation of repayment, is designed to prevent

farmers "from becoming a public charge by affording them temporary relief"); Cicero v. Falconberry, 14 Ind. App. 237 (1895) ("The mere fact that a person may occasionally obtain assistance from the county does not necessarily make such person a pauper or a public charge.").[10]

Following the 1891 Act, two points are relatively clear.  First, reaffirming the best interpretation of the 1882 Act, the term was not used at the time to include short-term or temporary relief from the state, as the case law continued to demonstrate.  Second, Lipkis could be read to support either of two non-controversial points:  either state-funded institutionalization constitutes becoming a public charge, or state-funded institutionalization with "no effort" to pay the expense after being billed does so.  Simply being able to pay for the barest needs of existence and nothing more does not render one a public charge (although it may make one likely to become a public charge).  A third point begins to materialize in the case law, which is that absent some particularly-identified negative factor, an employable individual is not a public charge.  E.g., In re Feinknopf, 47 F. at 447–48 (40-year-old man willing to exercise his trade); Lipkis, 56 F. at 428 (notwithstanding poverty, working man's family is not a public charge until financial calamity strikes); Yeatman, 2 N.D. at 421 (public aid to working farmer).

### 3.    1903

In 1903, Congress passed a revised version of the act.  That amended statute provided, in part:

> That the following classes of aliens shall be excluded from admission into the United States:  All idiots, insane persons, epileptics, and persons who have been insane within five years previous; persons who have had two or more attacks of insanity at any time previously; paupers; persons likely to become a public charge; professional beggars; persons afflicted with a loathsome or with a dangerous contagious disease; persons who have been convicted of a felony or other crime or

---

[10] The parties also cite Edenburg Borough Poor Dist. v. Strattanville Borough Poor Dist., 5 Pa. Super. 516, 528 (1897), but that case concerns an individual who appears to have formally registered as a pauper by seeking public assistance under state or local law.  It does not concern any immigration statutes, nor does the opinion use the word "charge" or the phrase "public charge."

1

> misdemeanor   involving   moral   turpitude;   polygamists;
> anarchists, or . . . ."

2   An Act to Regulate the Immigration of Aliens Into the United States, 32 Stat. 1213,

3   Chap. 1012 § 2 (1903).

4          This change separated out "paupers" from "persons likely to become a public

5   charge," which the previous act had grouped together as a single item in the list.

6          The 1903 amendment also provided that any alien who "shall be found a public

7   charge . . . from causes existing prior to landing, shall be deported . . . at any time within

8   two years after arrival[.]"  Id. § 20.

9                              4.      1907

10         In 1907, Congress passed a revised version of the act.  That amended statute

11  provided, in part:

> That the following classes of aliens shall be excluded from
> admission into the United States:  All idiots, imbeciles, feeble-
> minded persons, epileptics, insane persons, and persons who
> have been insane within five years previous; persons who have
> had two or more attacks of insanity at any time previously;
> paupers;   persons   likely   to   become   a   public   charge;
> professional beggars; persons afflicted with tuberculosis or with
> a loathsome or dangerous contagious disease; persons not
> comprehended within any of the foregoing excluded classes
> who are . . . mentally or physically defective, such mental or
> physical defect being of a nature which may affect the ability of
> such alien to earn a living; persons who have been convicted
> of or admit having committed a felony or other crime or
> misdemeanor involving moral turpitude; polygamists, or . . . ."

12

13

14

15

16

17

18

19  An Act to Regulate the Immigration of Aliens Into the United States, 34 Stat. 898, Chap.

20  1134 § 2 (1907).

21         Nothing relevant to the present action appears to have been changed by this

22  revision.[11]

23                              5.      1910

24         In 1910, Congress amended the 1907 act.  The new statute provided, in part:

25

26

27  [11] The only notable change is the introduction of an exclusion for individuals not otherwise
    captured by the categories who cannot earn a living based on mental or physical defect.
28  That suggests that earlier-listed categories also include such people, but not all such
    people.

That the following classes of aliens shall be excluded from admission into the United States:  All idiots, imbeciles, feeble-minded persons, epileptics, insane persons, and persons who have been insane within five years previous; persons who have had two or more attacks of insanity at any time previously; paupers; persons likely to become a public charge; professional beggars; persons afflicted with tuberculosis or with a loathsome or dangerous contagious disease; persons not comprehended within any of the foregoing excluded classes who are . . . mentally or physically defective, such mental or physical defect being of a nature which may affect the ability of such alien to earn a living; persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude; polygamists, or . . . ."

An Act to Amend an Act entitled An Act to Regulate the Immigration of Aliens Into the United States, 36 Stat. 263, Chap. 128 § 2 (1910).

Nothing relevant to the present action appears to have been changed by this revision.

In 1915, the Supreme Court addressed the 1910 act in <u>Gegiow v. Uhl</u>, 239 U.S. 3 (1915).  "The single question" in that case was "whether an alien can be declared likely to become a public charge on the ground that the labor market in the city of his immediate destination is overstocked."  <u>Id.</u> at 9–10.  The immigration commissioners in that action determined that the immigrants were "bound for Portland, Oregon, where the reports of industrial conditions show that it would be impossible for these aliens to obtain employment[.]"  <u>Id.</u> at 8.

The court held that "[t]he statute deals with admission to the United States, not to Portland . . . .  It would be an amazing claim of power if commissioners decided not to admit aliens because the labor market of the United States was overstocked."  <u>Id.</u> at 10.  Because the immigration authorities could not consider labor conditions in a single location to determine whether immigrants would be able to obtain employment, the factual findings that the immigrants could not find work in Portland was insufficient to support a determination that they were likely to become public charges.

The court also reasoned that, because the "public charge" ground for exclusion was "mentioned between paupers and professional beggars, and along with idiots, persons dangerously diseased, persons certified by the examining surgeon to have a

mental or physical defect of a nature to affect their ability to earn a living," the term should

be construed as similar with the rest.  Id.  Under that construction, the court held that

those likely to become public charges "are to be excluded on the ground of **permanent**

**personal objections accompanying them** irrespective of local conditions[.]"  Id.[12]  That

is, the court focused on an alien's general ability and willingness to work and earn a

living, rather than the particular wages or labor conditions that existed in the alien's

destination.

A court in 1916 considered "whether the fact that petitioner entered the United

States as a gambler, and as one having no other permanent means of support, actual or

contemplated, makes him a person 'likely to become a public charge' within the meaning

of the Immigration Act."  Lam Fung Yen v. Frick, 233 F. 393, 396 (6th Cir. 1916):

> It seems clear that the term 'persons likely to become a public
> charge' is not limited to paupers or those liable to become such;
> 'paupers' are mentioned as in a separate class.  In United
> States v. Williams (D.C.) 175 Fed. 274, 275, the term 'persons
> likely to become a public charge' is construed as including, '**not
> only those persons who through misfortune cannot be
> self-supporting, but also those who will not undertake
> honest pursuits, and who are likely to become periodically
> the inmates of prisons**.'   We think this a reasonable
> construction. . . .  Inmates of jails and prisons are for the time
> being public charges, and we think it open to conclusion by
> reasonable minds that those who will not work for a living, but
> rely for that purpose upon gambling, are more likely than
> citizens following the ordinary pursuits of industry to become,
> at least intermittently, public charges.

Id. at 396–97 (emphasis added).

The court reasoned that because the alien was a gambler and gambling is

regarded "within the domain of police supervision and public security," the petitioner is

reasonably likely to become periodically an inmate of a prison.  Id. at 397.  Under the

court's reasoning, someone in a prison is a public charge, akin to someone in an

almshouse or insane asylum.  Id.; see also United States v. Williams, 175 F. 274, 275

---

[12] The Gegiow opinion was subject to some skepticism following a later amendment to
the statute, but the Ninth Circuit subsequently held that its reasoning remained
controlling.  See Ex parte Hosaye Sakaguchi, 277 F. 913 (9th Cir. 1922); see also Ex
parte Mitchell, 256 F. 229 (N.D.N.Y. 1919).

1    (S.D.N.Y. 1910) ("They are surely public charges, at least during the term of their

2    incarceration.").

3          In 1917, the Second Circuit relied on Gegiow's statutory analysis when deciding a

4    case under the 1910 statute.  Howe v. United States, 247 F. 292 (2d Cir. 1917).  In

5    Howe, a Canadian who had allegedly "drawn a check . . . which proved bad," among

6    other things, entered the United States, and an immigration inspector "believed him guilty

7    of dishonest practice in Canada."  Id. at 293–94.  Because the plaintiff had not admitted

8    to or been convicted of a felony, the provision excluding criminals did not apply to him.

9    The court reasoned that (1) the term "public charge" needed to be read in context of its

10   position in the statute's list, and (2) it cannot be interpreted to overlap with other items in

11   the list (e.g., idiots, imbeciles, insane persons, criminals).  As such, "[i]f the words

12   covered jails, hospitals, and insane asylums, several of the other categories of exclusion

13   would seem to be unnecessary."  Id. at 294.  Instead, "Congress meant the act to exclude

14   persons who were likely to become occupants of almshouses for want of means with

15   which to support themselves in the future."  Id.  The Howe court provided a very specific,

16   restrictive, and clear definition of the term.  This also demonstrates an early split in the

17   case law as to whether prison inmates are considered public charges.

18         By 1917, the Supreme Court, the Second Circuit, and the Sixth Circuit had all

19   published opinions construing the term as used in the 1910 act.  These are precisely the

20   sorts of constructions Congress is presumed knowledgeable of when reenacting statutory

21   language.  See Forest Grove, 557 U.S. at 239–40.  The Supreme Court held that

22   predicting whether someone will become a public charge requires consideration of

23   "permanent personal objections accompanying them irrespective of local conditions[.]"

24   Gegiow, 239 U.S. at 10.  The two Circuit decisions are more difficult to reconcile.  First,

25   they directly contradicted one another with respect to whether jail inmates were public

26   charges.  Second, Howe broke with the weight of prior authority in holding that the term

27   was limited to those occupying almshouses for want of a means of support.

28                    **6.    1917**

In 1917, Congress amended the Act.  That amended statute provided, in part:

> That the following classes of aliens shall be excluded from admission into the United States:  All idiots, imbeciles, feeble-minded persons, epileptics, insane persons; persons who have had one or more attacks of insanity at any time previously; persons of constitutional psychopathic inferiority; persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a loathsome or dangerous contagious disease; persons not comprehended within any of the foregoing excluded classes who are . . . mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living; persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude; polygamists, or . . . . ; persons likely to become a public charge . . . ."

An Act to Regulate the Immigration of Aliens to, and the Residence of Aliens in, the United States, 39 Stat. 874, Chap. 29 § 3 (1917).

The statute also provided for the deportability of "any alien who within five years after entry becomes a public charge from causes not affirmatively shown to have arisen subsequent to landing[.]"  Id. § 19.

The "public charge" language remains unchanged, although moved within the list. The Congressional Record suggests that Congress intentionally moved the category of "persons likely to become a public charge" later in the list in response to Gegiow.  See 70 Cong. Rec. 3560 (1929) ("persons likely to become a public charge (this clause excluding aliens on the ground likely to become a public charge has been shifted from its position in section 2 of the immigration act of 1907 to its present position in section 3 of this act in order to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons and with a view to overcoming the decision of the Supreme Court in Gegiow v. Uhl, 239 U. S. 3"); see also 80 Cong. Rec. 5829 (1936) (same).

A district court in 1919 reasoned that although the exact same phrase was shifted within the list, "I am unable to see that this change of location of these words in the act changes the meaning that is to be given them.  A 'person likely to become a public charge' is one who for some cause or reason appears to be about to become a charge

28

on the public, one who is to be supported at public expense, by reason of poverty, insanity and poverty, disease and poverty, idiocy and poverty, or, it might be, by reason of having committed a crime which, on conviction, would be followed by imprisonment." Ex parte Mitchell, 256 F. 229, 230 (N.D.N.Y. 1919).  In that case, there was "no evidence whatever that the alien at any time has relied in any degree on the charity of others," but rather the alien "is able to earn her own living and always has done so[.]"  Id.

The court then stated that mere speculation about the possibility of becoming a public charge does not make one likely to become a public charge:  "The alien may become sick; she may lose her house by fire; she may lose her personal property by bad investments.  All this is possible, but not probable.  There is no claim that this alien is suffering, or that she has suffered at any time, from any mental or physical defect.  It is not claimed this alien has been convicted, or even charged with the commission, of any crime, or that she came to the United States, or is in the United States, for any immoral or improper purpose."  Id. at 231.

The Ninth Circuit agreed in 1922, holding that the 1917 Amendment's movement of the "public charge" exclusion "does not change the meaning that should be given" the exclusion.  Ex parte Hosaye Sakaguchi, 277 F. 913, 916 (9th Cir. 1922).  The court recognized the legislative change and that Gegiow's reliance on the phrase's relative position in the statute was compromised, yet it held:

> Although in the act of February 5, 1917, under which the present case is to be determined, the location of the words 'persons likely to become a public charge' is changed, we agree with Judge Ray in Ex parte Mitchell (D.C.) 256 Fed. 229, that this change of location of the words does not change the meaning that should be given them, and that it is still to be held that **a person 'likely to become a public charge' is one who, by reason of poverty, insanity, or disease or disability, will probably become a charge on the public.**

Id. (emphasis added).[13]

_____

[13] In 1923 a district court in Washington state did not cite these precedents and held instead that Congress's shift was an effective modification in response to Gegiow.  Ex parte Horn, 292 F. 455 (W.D. Wash. 1923).  Interpreting the phrase anew based on its plain meaning, the court reasoned that "a public charge" is "a person committed to the

1     A 1921 Second Circuit opinion relying on <u>Howe</u> and <u>Ex parte Mitchell</u> held that "A

2 person likely to become a public charge is one whom it may be necessary to support at

3 public expense by reason of poverty, insanity and poverty, disease and poverty, idiocy

4 and poverty.  We think that the finding by the administrative authorities, showing a

5 physical defect of a nature that may affect the ability of the relator and appellee to earn a

6 living, is sufficient ground for exclusion.  His physical condition, together with his financial

7 condition, having but $100 with him, justified the conclusion of the administrative

8 authorities in finding that he and his children were aliens likely to become public

9 charges." <u>Wallis v. U.S. ex rel. Mannara</u>, 273 F. 509, 511 (2d Cir. 1921) (citation

10 omitted).

11     A number of courts around this time also held that imprisonment was one way to

12 become a public charge.  <u>E.g.</u>, <u>Ex parte Fragoso</u>, 11 F.2d 988, 989 (S.D. Cal. 1926)

13 ("The fact is this petitioner did become a public charge. He was confined in a jail for a

14 period of nine months."); <u>U.S. ex rel. Lehtola v. Magie</u>, 47 F.2d 768, 770 (D. Minn. 1931)

15 (noting a circuit split as to whether "dependency rather than imprisonment" is grounds for

16 finding a public charge); <u>Ex parte Horn</u>, 292 F. 455, 458 (W.D. Wash. 1923).

17     In 1933, the third edition of Black's Law Dictionary was the first to define "public

18 charge."  The definition relied upon many of the above-cited cases, so for that reason it is

19 derivative of and less probative than those cases themselves.  Nevertheless, the

20 definition is instructive.  It defined the term as:  "A person whom it is necessary to support

21 at public expense by reason of poverty, insanity and poverty, disease and poverty, or

22 idiocy and poverty. . . .  As used in [the 1917 Act], one who produces a money charge on,

23 or an expense to, the public for support and care." <u>See</u> Black's Law Dictionary 311 (3d

24 Ed. 1933).  The term includes paupers as well as those who will not undertake honest

25 pursuits or who are likely to go to prison.

26     In 1948, the Board of Immigration Appeals ("BIA") issued an order, which the

27 _____

28 custody of a department of the government by due course of law," and that committing
someone to prison makes him a public charge.  <u>Id.</u> at 457.

1  acting Attorney General thereafter issued an order approving.  The order set out a very

2  explicit test for the term "public charge" as used elsewhere in the act, which concerned

3  deportation proceedings of aliens who are later determined to have actually become a

4  public charge during their time in the country.  Matter of B-, 3 I. & N. Dec. 323 (A.G.

5  1948).

6  　　　　When interpreting the term as used in the deportation context, the BIA set out a 3-

7  part test requiring (1) an individualized bill for charges incurred, that is (2) presented to

8  the alien (or a family member) by the government, and (3) which the alien (or family

9  member) fails to pay.

10  　　　　　　the following test must be applied to determine whether an alien
11  　　　　　　has become a public charge within the reach of the 1917 act:
　　　　　　(1) The State or other governing body must, by appropriate law,
　　　　　　impose a charge for the services rendered to the alien.  In other
12  　　　　　　words, the State must have a cause of action in contract against
　　　　　　either the person taking advantage of the State services or
13  　　　　　　other designated relatives or friends. If there is no charge
　　　　　　made, and if the State does not have a cause of action, the
14  　　　　　　alien cannot be said to be a public charge.  (2) The authorities
　　　　　　must make demand for payment of the charges upon those
15  　　　　　　persons made liable under State law.  And (3) there must be a
　　　　　　failure to pay for the charges. If there is a failure to pay either
16  　　　　　　because of lack of demand or because the State authorities do
　　　　　　not perform their duty to collect the charges, the alien cannot
17  　　　　　　be said to have become a public charge.

18  Id. at 326 (footnote omitted).

19  　　　　The BIA also reasoned that the same definition would apply to the identical term

20  used earlier in the statute with respect to predicting whether an alien is likely to become a

21  public charge—i.e., the provision at issue in the present action:

22  　　　　　　First, we wish to make the following preliminary observation for
　　　　　　the purpose of clarifying the issue.  The acceptance by an alien
23  　　　　　　of services provided by a State or by a subdivision of a State to
　　　　　　its residents, services for which no specific charge is made,
24  　　　　　　does not in and of itself make the alien a public charge within
　　　　　　the meaning of the 1917 act.  To illustrate, an alien who
25  　　　　　　participates, without cost to him, in an adult education program
　　　　　　sponsored by the State does not become a public charge.
26  　　　　　　Similiarly [sic] with respect to an alien child who attends public
　　　　　　school, or alien child who takes advantage of the free-lunch
27  　　　　　　program  offered  by  schools.    We  could  go  on ad
　　　　　　infinitum setting forth the countless municipal and State
28  　　　　　　services which are provided to all residents, alien and citizen

> alike, without specific charge of the municipality or the State, and which are paid out of the general tax fund. The fact that the State or the municipality pays for the services accepted by the alien is not, then, by itself, the test of whether the alien has become a public charge. . . . [I]f it were to be held that all aliens became public charges by accepting such services, such a holding would necessarily result in making aliens seeking admission to the United States excludable under that clause of section 3 of the act of February 5, 1917, which bars aliens likely to become public charges from entering the United States, provided it were shown the alien would accept the free municipal and State services.

Id. at 324–25 & n.1.

District courts had independently adopted the same meaning under the 1917 Act. E.g., Ex parte Orzechowska, 23 F. Supp. 428, 429 (D. Or. 1938) (individual not a public charge so long as they will "pay the full amount of the cost of keeping the girl at the Oregon State Hospital"); Ex parte Kichmiriantz, 283 F. 697, 698 (N.D. Cal. 1922) (same).

This three-part test is still used for determining whether to deport those who in fact become public charges currently, and DHS proposes to continue doing is in the Rule.

Prior to the 1952 Act's passage, at least one principle had seemingly coalesced in the case law. The reasoning in Gegiow was reaffirmed, and multiple circuits (also recognized by Black's Law Dictionary) agreed that someone likely to become a public charge is one whom it may be necessary to support at public expense by reason of poverty, insanity and poverty, disease and poverty, or idiocy and poverty. Although that oft-used definition (or a close derivative) is not particularly descriptive as to what quantum of support qualifies as "necessary to support" someone at public expense, it reaffirms the principle expressed in Gegiow and prior cases that the inquiry is focused on the individual's inherent ability to support himself. This definition also accords with prior interpretations generally finding that, absent some particularly-identified negative factor, those who appear generally capable and willing to work are not likely to become public charges. And unlike the Howe case, it allows reading the definition of public charge in light of the surrounding categories of excluded persons, such that someone who is excluded due to his disease alone may also be excluded because his disease, in combination with another factor like poverty, is likely to render him a public charge. This

remains in line with other historically-supported, consistent principles described above,

namely that temporary assistance does not render one a public charge and that actual

incursion of debt to the state and refusal to pay could render one a public charge.

The Attorney General's order in 1948 for the first time offered a single, clear

definition of the term "public charge" to be applied consistently throughout the Act.  And it

also specifically ruled that acceptance of publicly-funded services "for which no specific

charge is made" does not make one a public charge.  The three-part test requiring

presentation of a bill and inability or refusal to pay was certainly in accordance with a line

of precedential caselaw, but it was by no means the only or even dominant line at that

time.  Nevertheless, this Attorney-General-issued order was controlling as administrative

law between its issuance in 1948 and at least Congress's next codification of the

immigration statutes in 1952.

### 7.      1952

In 1952, Congress again revised the laws relating to immigration.  That revised

statute provided, in part:

> Except as otherwise provided in this Act, the following classes
> of aliens shall be ineligible to receive visas and shall be
> excluded from admission into the United States:
> (1) Aliens who are feeble-minded;
> (2) Aliens who are insane;
> (3) Aliens who have had one or more attacks of insanity;
> . . .
> (7) Aliens not comprehended within any of the foregoing
> classes . . . having a physical defect, disease, or disability . . .
> to be of such a nature that it may affect the ability of the alien
> to earn a living, unless the alien affirmatively establishes that
> he will not have to earn a living;
> (8) Aliens who are paupers, professional beggars, or vagrants;
> . . .
> (15) Aliens who, in the opinion of the consular officer at the time
> of application for a visa, or in the opinion of the Attorney
> General at the time of application for admission, are likely at
> any time to become public charges"

An Act to Revise the Laws Relating to Immigration, Naturalization, and Nationality; and

for Other Purposes, 66 Stat. 163, 183, Title 2, Chap. 2 ("1952 Act") § 212 (1952).

The 1952 Act also provided for deportation of any alien who, "in the opinion of the

1    Attorney General, has within five years after entry become a public charge from causes

2    not affirmatively shown to have arisen after entry[.]"  Id., Chap. 5  § 241(a)(8).

3          The changes appear to be relatively minor for the purposes of this dispute.

4    Notably, Congress added the phrase "at any time" to specify the scope of time the public

5    charge determination is meant to consider.  But no alteration to the phrase "public

6    charge" appears in the statute.

7          The 1951 edition of Black's Law Dictionary, like the 3rd edition in 1933, assembled

8    its definition based on precedent discussed above:

9                A person whom it is necessary to support at public expense by
             reason of poverty, insanity and poverty, or idiocy and poverty.
10            As used in [the 1917 Act] . . ., one who produces a money
             charge on, or an expense to, the public for support and care.
11            As so used, the term is not limited to paupers or those liable to
             become such, but includes those who will not undertake honest
12            pursuits, or who are likely to become periodically the inmates
             of prison.

13

14   Charge, Public Charge, Black's Law Dictionary (4th ed. 1951) (citations omitted).

15         BIA dispositions following the passage of the 1952 Act addressed the term.  One

16   such disposition surveyed caselaw interpreting the term and held "the statute requires

17   more than a showing of a possibility that the alien will require public support.  Some

18   specific circumstance, such as mental or physical disability, advanced age, or other fact

19   reasonably tending to show that the burden of supporting the alien is likely to be cast on

20   the public, must be present.  **A healthy person in the prime of life cannot ordinarily**

21   **be considered likely to become a public charge, especially where he has friends or**

22   **relatives in the United States who have indicated their ability and willingness to**

23   **come to his assistance in case of emergency**."  Matter of Martinez-Lopez, 10 I. & N.

24   Dec. 409, 421–22 (BIA 1962) (emphasis added) (collecting cases).

25         In that case, the agency held that the individual at issue was not likely to become a

26   public charge given his characteristics, which essentially showed he was able to perform

27   honest work:

28               When respondent applied for a visa he was 22 years of age.

34

He was sound of body and had about ten years of farming experience. He had no specialized training, but had five years of schooling and apparently planned to seek work for which he was qualified. He spoke no English, but this was no handicap for he would work among people who spoke Spanish. He had about $50 in assets. He had a brother gainfully employed in the United States and he had other close relations who were interested in his welfare and who worked to bring him to the United States. The brother was making $85 a week in permanent employment; he was unmarried; he had been sending money to his family in Mexico, and he was interested in helping his brother. Respondent had previous experience in the United States, having spent about three months here as a contract worker. At that time he worked both in the fields and in a cannery. His services appear to have been satisfactory for he was retained here until his contract was completed. Respondent had no criminal record.

Id. at 411.

A 1974 BIA decision emphasized that the public charge determination must consider the totality of the circumstances, and that prior welfare use alone cannot be determinative. Matter of Perez, 15 I. & N. Dec. 136, 137 (BIA 1974) ("The respondent's reliance on welfare for support is a condition which she herself can remedy.").

Another 1974 BIA decision confused matters. Matter of Harutunian, 14 I. & N. Dec. 583, 584 (BIA 1974). The decision outlined "[t]he stages in decisional interpretations of the deportation statute, culminating in Matter of B-":

1. The words "public charge" had their ordinary meaning, that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute.

2. The alien had not yet become a public charge, even though he personally was destitute and his care and support were being paid for by public funds, if there existed close relatives, ready, willing and able to pay the bill, but the appropriate government agency had failed to submit any bill.

3. The alien had not become a public charge where the alien's mother had offered to make reimbursement, but under state law payment could not be accepted for maintenance and treatment of the institutionalized alien.

4. The alien had not become a public charge where the circumstances were like those described in 3, above, except that no one had offered reimbursement.

Id. at 586 (citations omitted).

However, it reasoned that the Attorney General's opinion in <u>Matter of B-</u> "is not necessarily controlling in relation to the provisions for exclusion." <u>Id.</u> at 585.  The BIA reasoned that "[w]hile it may normally be assumed that identical words used in different parts of the same statute are intended to have an identical meaning, this assumption readily yields when the legislative intent requires variant meanings in different contexts." <u>Id.</u> at 586.  The BIA then discussed legislative history in search of congressional intent. <u>Id.</u>  The decision notes that the Senate Judiciary Committee discussed that courts had given different definitions to the term, and ultimately it decided not to define the term, "but rather [decided] to establish the specific qualification that the determination of whether an alien falls into that category rests within the discretion of the consular officers or the Commissioner." <u>Id.</u> at 588 (citing S. Rep. 1515, 81st Cong., 2d Sess., April 20, 1950, p. 349).

The BIA stated that the phrase "public charge" must be "strictly construed" in the deportation context, but not in the exclusion context. <u>Id.</u>  It then reasoned that the old-age benefits at issue in the case were "individualized public support to the needy, as distinguished from essentially supplementary benefits, directed to the general welfare of the public as a whole." <u>Id.</u> at 589.  Even though the state would never ask for repayment of those old-age benefits—and therefore they could not constitute assistance qualifying one as a public charge under the <u>Matter of B-</u> test—the court reasoned that it would not consider "the element of reimbursement" when determining whether someone is likely to become a public charge. <u>Id.</u>

So, the BIA rejected the <u>Matter of B-</u> test and constructed alternate definitions for the same term depending on whether the executive is predicting whether someone is likely to become a public charge or deciding whether someone has already become a public charge.  "Therefore, in our opinion any alien who is incapable of earning a livelihood, who does not have sufficient funds in the United States for his support, and has no person in the United States willing and able to assure that he will not need public support is excludable as likely to become a public charge whether or not the public

36

support which will be available to him is reimbursable to the state." Id. at 589–90.

These BIA decisions are useful to understand the administrative practices and interpretations operating when Congress reenacted the same language. Although this period saw confusion within the agency about the proper way to interpret the phrase as used in different contexts, each of the discussed decisions support the now-consistent theme that a healthy person in the prime of life who can work cannot be considered likely to become a public charge, absent some particularly-identified circumstance evaluated under a totality of the circumstances. E.g., Matter of Martinez-Lopez, 10 I. & N. Dec. at 422 (collecting cases); Matter of Harutunian, 14 I. & N. Dec. at 589 ("alien who is incapable of earning a livelihood"); Matter of Perez, 15 I. & N. Dec. at 137 (totality of circumstances).

### 8.    1987

In 1987, the INS issued a final rule, effective May 1, 1987, following notice and comment. See Adjustment of Status for Certain Aliens, 52 Fed. Reg. 16,205 (May 1, 1987). The rule implemented section 245A of the Immigration and Nationality Act as amended by section 201 of the Immigration Reform and Control Act of 1986. Id. at 16,205. So, the 1987 rule concerned the term "public charge" as used elsewhere in the INA, specifically for aliens adjusting their status to that of aliens lawfully admitted for temporary residence. The "key issues" subject to comments "were the public charge and special rule for determination of public charge[.]" 52 Fed. Reg. at 16,206.

That rule provided: "An applicant . . . is subject to the provisions of section 212(a)(15) of the Act relating to excludability of aliens likely to become public charges unless the applicant demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance. . . . If the alien's period(s) of residence in the United States include significant gaps in employment or if there is reason to believe that the alien may have received public assistance while employed, the alien may be required to provide proof that he or she has not received public cash assistance." 52 Fed. Reg. at 16,211.

Essentially, this provision exempted aliens who had been working domestically from the normal public charge analysis, so long as they could prove a work history and that they had not relied on public cash assistance.  The rule defined cash assistance to exclude in-kind benefits.  52 Fed. Reg. at 16,209 ("'Public cash assistance' means income or needs-based monetary assistance, to include but not limited to supplemental security income, received by the alien or his or her immediate family members through federal, state, or local programs designed to meet subsistence levels.  It does not include assistance in kind, such as food stamps, public housing, or other non-cash benefits, nor does it include work-related compensation or certain types of medical assistance (Medicare, Medicaid, emergency treatment, services to pregnant women or children under 18 years of age, or treatment in the interest of public health).").

This use of the term is somewhat of an aberration given that it essentially concerned an exception to the statute at issue here—and it did not define the term. However, it did reinforce the long-standing principle underlying the construction of the term that, when considering whether someone should be admitted to the country, the concept of "public charge" concerns primarily the prospect of gainful employment or some other private source of support.

### 9.    1990

In 1990, Congress revised the laws relating to immigration.  That revised statute provided, in part:

> Except as otherwise provided in this Act, the following describes classes of excludable aliens who are ineligible to receive visas and who shall be excluded from admission into the United States:
>
> (1) Health-Related Grounds
> . . .
> (2) Criminal and Related Grounds
> . . .
> (3) Security and Related Grounds
> . . .
> (4) Public Charge.—Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to

1    become a public charge is excludable.

2    Immigration Act of 1990, 104 Stat. 4978, Title 6 § 601 (1990).

3        This version of the bill removed language referring to the feeble-minded, paupers,

4    professional beggars, and vagrants.  There is a suggestion in the Congressional Record

5    that the removed terms were meant to be consolidated within the public charge category:

6            The bill removes some of the antiquated and unused
             exclusions that have been in our law since the early 1900's,
7            such as the exclusions based on illiteracy, and the exclusions
             for aliens who are "paupers, professional beggars, or
8            vagrants." These relics have been replaced by one generic
             standard which exclude aliens who are "likely to become a
9            public charge."

10   136 Cong. Rec. 36797, 36844 (1990).

11       In 1990, Black's Law Dictionary defined "public charge" as "an indigent.  A person

12   whom it is necessary to support at public expense by reason of poverty alone or illness

13   and poverty."  Charge, Public Charge, Black's Law Dictionary (6th ed. 1990).

14       Although a statutory term is not defined by reference to one preferred

15   interpretation memorialized in the Congressional Record, that interpretation is consistent

16   with the courts' and executive's general treatment of the term since Gegiow.  That is,

17   following Gegiow and later cases applying it to the 1917 Act, courts had read the term

18   public charge in context of those surrounding terms rather than in exclusion of them, and

19   focused on the alien's ability to work or otherwise provide for himself, which each of the

20   omitted surrounding terms also ultimately spoke to.  But see Howe, 247 F. at 294.

21                        **10.    1996**

22       In 1996, Congress again revised the laws relating to immigration.  That revised

23   statute provided, in part:

24           (4) PUBLIC CHARGE.—

25               (A) IN GENERAL.—Any alien who, in the opinion of the
                 consular officer at the time of application for a visa, or in
26               the opinion of the Attorney General at the time of
                 application for admission or adjustment of status, is
27               likely at any time to become a public charge is
                 excludable.

28

(B) FACTORS TO BE TAKEN INTO ACCOUNT.—

(i) In determining whether an alien is excludable under this paragraph, the consular officer or the Attorney General shall at a minimum consider the alien's—

(I) age;
(II) health;
(III) family status;
(IV) assets, resources, and financial status; and
(V) education and skills.

(ii) In addition to the factors under clause (i), the consular officer or the Attorney General may also consider any affidavit of support under section 213A for purposes of exclusion under this paragraph.

Omnibus Consolidated Appropriations Act, 110 Stat. 3009, Title 5 § 531 (1996). This act is often referred to as the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Elsewhere, the Act provided that "Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable." 8 U.S.C. § 1251(a)(5) (effective April 24, 1996).

The revised law used the same relevant language as all previous versions—public charge. However, the statute then listed five factors that Congress instructed must be considered when determining whether an alien is likely to become a public charge, and it identified another factor that "may also" be considered.

Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. 104-193, restricted most aliens from accessing many public support programs for a period of time.

During legislative efforts that ultimately resulted in the IIRIRA, a group of legislators proposed to define "public charge" with particularity in the statute to include "any alien who receives benefits described in subparagraph (D) for an aggregate period of at least 12 months" (or 36 months in the case of a battered spouse or child). 142 Cong. Rec. 24313, 24425 (1996). The benefits listed in subparagraph D (that would qualify an alien as a public charge) included "means-tested public benefits," but it's not

1    entirely clear what specific benefits that section refers to.[14]  That definition was not

2    enacted into law.

3                                   **11.    1999**

4           The INS attempted in 1999 to engage in rulemaking to guide immigration officers,

5    aliens, and the public in understanding the public charge determinations.  No final rule

6    was ever issued.  Instead, the agency published Field Guidance addressing the issue.

7    <u>See</u> Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64

8    Fed. Reg. 28,689 (May 26, 1999) (the "1999 Field Guidance").

9           The notice was published prior to final rulemaking because it was deemed

10   "necessary to help alleviate public confusion over the meaning of the term 'public charge'

11   in immigration law and its relationship to the receipt of Federal, State, and local public

12   benefits."  64 Fed. Reg. at 28,689.  "The Department decided to publish a proposed rule

13   defining 'public charge' in order to reduce the negative public health consequences

14   generated by the existing confusion and to provide aliens with better guidance as to the

15   types of public benefits that will and will not be considered in public charge

16   determinations."  <u>Id.</u>  The notice "both summarizes longstanding law with respect to

17   public charge and provides new guidance on public charge determinations in light of the

18   recent changes in law," notably the "Illegal Immigration Reform and Immigrant

19   Responsibility Act of 1996 (IIRIRA) and welfare reform laws."  <u>Id.</u>

20          The notice proposed "that 'public charge' means an alien who has become (for

21   deportation purposes) or who is likely to become (for admission/adjustment purposes)

22   'primarily dependent on the government for subsistence, as demonstrated by either (i) the

23   receipt of public cash assistance for income maintenance or (ii) institutionalization for

24   long-term care at government expense.'  Institutionalization for short periods of

25   rehabilitation does not constitute such primary dependence."  <u>Id.</u>

26   _____

27   [14] The record refers to Section 213A(e)(1), which appears to have been codified at 8
     U.S.C § 1183a(e), but that does not describe means-tested benefits.  The currently-
28   operative version of 8 U.S. Code § 1183a(a)(1)(B) also appears to errantly refer to
     subsection (e) for a list of means-tested benefits, so this error is not unique.

                                          41

1    Following the implementation of that interpretation, "officers should not place any

2    weight on the receipt of non-cash public benefits (other than institutionalization) or the

3    receipt of cash benefits for purposes other than for income maintenance with respect to

4    determinations of admissibility or eligibility for adjustment on public charge grounds."  Id.

5    Summarizing current agency practice, the memo explained:

6        The standard for adjudicating inadmissibility under section
         212(a)(4) has been developed in several Service, BIA, and
7        Attorney General decisions and has been codified in the
         Service regulations implementing the legalization provisions of
8        the Immigration Reform and Control Act of 1986. These
         decisions and regulations, and section 212(a)(4) itself, create a
9        "totality of the circumstances" test.

10       In determining whether an alien is likely to become a public
         charge, Service officers should assess the financial
11       responsibility of the alien by examining the "totality of the alien's
         circumstances at the time of his or her application * * * The
12       existence or absence of a particular factor should never be the
         sole criterion for determining if an alien is likely to become a
13       public charge. The determination of financial responsibility
         should be a prospective evaluation based on the alien's age,
14       health, family status, assets, resources and financial status,
         education, and skills, among other factors.  An alien may be
15       considered likely to become a public charge even if there is no
         legal obligation to reimburse the benefit-granting agency for the
16       benefits or services received, in contrast to the standards for
         deportation, discussed below.
17

18   Id. at 28,690 (footnotes omitted).

19       The 1999 Field Guidance then explained that the three-part test for paying back

20   public debt continues to apply, but only as an additional test on top of the totality of the

21   circumstances test for deportation decisions:

22       Repayment is relevant to the public charge inadmissibility
         determination only in very limited circumstances.  If at the time
23       of application for admission or adjustment of status the alien is
         deportable on public charge grounds under section 237(a)(5)
24       of the INA due to an outstanding public debt for a cash benefit
         or the costs of institutionalization, then the alien is inadmissible.
25       Only a debt that satisfies the three-part [Matter of B-] test under
         section 237(a)(5), described below, will render an alien
26       deportable as a public charge and therefore ineligible for
         admission or adjustment. If the debt is paid, then the alien will
27       no longer be inadmissible based on the debt, and the usual
         totality of the circumstances test would apply.
28

1   Id.

2       The Feld Guidance explained that a compelling reason to limit the public charge

3   definition to those receiving cash is that "certain federal, state, and local benefits are

4   increasingly being made available to families with incomes far above the poverty level,

5   reflecting broad public policy decisions about improving general public health and

6   nutrition, promoting education, and assisting working-poor families in the process of

7   becoming self-sufficient.  Thus, participation in such non-cash programs is not evidence

8   of poverty or dependence."  Id. at 28,692

9                    **12.    2013**

10      In 2013, the Senate voted down two amendments to a never-passed bill regarding

11  immigration.  The first amendment proposed "expanding the criteria for 'public charge,'

12  such that applicants would have to show they were not likely to qualify even for non-cash

13  employment supports such as Medicaid, the SNAP program, or the Children's Health

14  Insurance Program (CHIP). . . .  [T]he amendment was rejected by voice vote."  S. Rep.

15  No. 113-40, at 42 (2013).

16      The second amendment "would have expanded the definition of 'public charge'

17  such that people who received non-cash health benefits could not become legal

18  permanent residents.  This amendment would also have denied entry to individuals

19  whom the Department of Homeland Security determines are likely to receive these types

20  of benefits in the future.  The amendment was not agreed to by a voice vote."  S. Rep.

21  No. 113-40, at 63 (2013).

22                    **13.    2019—The Rule**

23      On October 10, 2018, DHS published a Notice of Proposed Rulemaking in the

24  Federal Register.  See 83 Fed. Reg. 51,114.  The NPRM provided a 60-day public

25  comment period, during which 266,077 comments were collected.  See 84 Fed. Reg. at

26  41,297.  On August 14, 2019, DHS published the Rule in the Federal Register.

27      The Rule supersedes the 1999 Field Guidance's definition of "public charge,"

28  establishing a new definition based on a minimum time threshold for the receipt of public

United States District Court
Northern District of California

43

benefits.  Under the newly-proposed "12/36 standard," a public charge is defined as an individual who receives designated public benefits for more than 12 months in the aggregate within a 36-month period, although a single month where multiple types of benefits are received is counted as multiple months of receiving aid.  84 Fed. Reg. at 41,295.  The "public benefits" included are extended by the Rule to include many non-cash benefits, for example Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing.  Id. at 41,501.  Receipt of two categories of benefits in the same months counts as two months of receipt for benefits, so some will qualify as public charges without receiving benefits for 12 months.  Moreover, the rule is agnostic to the value (or cost to the government) of the benefits.  To take a plausible example, someone receiving $182 over 36 months—or an average of less than 17 cents a day—in SNAP benefits is a public charge under the Rule.  See Shing Decl. ¶ 17.

The Rule does not change the definition of public charge in the context of deportability, described elsewhere in the INA.  84 Fed. Reg. at 41,295 ("This rule does not interpret or change DHS's implementation of the public charge ground of deportability.").  Rather, DHS will continue to enforce the 1999 Field Guidance in the deportation context.  Id. at 41,304 ("DHS currently makes public charge determinations in accordance with the 1999 Interim Field Guidance. . . .  This guidance explains how the agency determines . . . whether a person has become a public charge within five years of entry").  The 1999 Field Guidance, which will continue to govern, provided that "the definition of public charge is the same for both admission/adjustment and deportation," although "the standards applied to public charge adjudications in each context are significantly different" because one is forward-looking and one is backward-looking.  64 Fed. Reg. at 28,689.  As such, following the implementation of the Rule, "public charge" will continue to be defined in the deportation context as "an alien who has become . . . 'primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for

44

1   long-term care at government expense.'" Id.  To assess whether an alien qualifies under

2   that definition in the deportability context, the 1999 Field Guidance prescribes the 3-part

3   test established in Matter of B-, 3 I. & N. Dec. 323.

4          So, the Rule proposes to simultaneously apply multiple definitions for the term

5   public charge.  First, its new definition will be used to predict whether an alien is likely at

6   any time to become a public charge.  Second, the 1999 Field Guidance's "primary

7   dependence" definition is left unaltered in the deportation context, and it is evaluated

8   pursuant to the well-known 3-part Matter of B- test.

9          Each step in the Chevron analysis requires the court to consider the terms of the

10  statute in context.  The court first looks to the statutory text, in light of prior agency and

11  judicial interpretation—as explained at length above, although the court notes that judicial

12  and agency interpretation following the most-recent 1996 revision is not particularly

13  relevant to understanding the meaning of the text as enacted in 1996.  Cf. Sec'y of the

14  Interior v. California, 464 U.S. 312, 375 n.36 (1984) (the "view of a subsequent Congress

15  . . . is not without persuasive value").

16         The analysis is also informed to some degree by what Congress decided not to

17  pass, in addition to what it specifically rejected.  "Congress does not intend sub silentio to

18  enact statutory language that it has earlier discarded in favor of other language."

19  Cardoza-Fonseca, 480 U.S. at 442–43; Albemarle Paper Co., 422 U.S. at 414 n.8

20  (rejecting construction of statute that would implement provision Conference Committee

21  rejected); Bob Jones Univ., 461 U.S. at 600–01 (interpretation of statute informed by the

22  fact that Congress had a "prolonged and acute awareness" of an established agency

23  interpretation of a statute, considered the precise issue, and rejected bills to overturn the

24  prevailing interpretation); see also Merrill Lynch, 456 U.S. at 381–82 (interpretation of

25  statute informed by the fact that Congress amended large portions of statute, but not

26  provision at issue).

27         Of particular relevance here, parts of Congress have explicitly and repeatedly

28  rejected efforts to define "public charge" to include those who receive certain in-kind

benefits for a period of 12 months—efforts that are strikingly similar to the definition now adopted for the first time by the executive in the Rule.  E.g., 142 Cong. Rec. 24313, 24425 (1996); S. Rep. No. 113-40, at 42 (2013); S. Rep. No. 113-40, at 63 (2013). Congress's rejection in 1996 is particularly instructive.  As described above, Congress at that time considered a scheme similar to the Rule, wherein use of means-tested benefits for 12 months would qualify one as a public charge.  On September 24, 1996, the conference committee recommended passage of a version of the bill with that definition. See 142 Cong. Rec. 24389 (conference committee recommendation), 24425 (public charge definition).  President Clinton had previously praised the legislation generally, but specifically criticized that bill's disincentive to obtain public benefits.  He called for revision of the statute.  He said "it still goes too far in denying legal immigrants access to vital safety net programs which could jeopardize public health and safety.  Some work still needs to be done.  I urge the Congress to move quickly to finalize and send me this key legislation."  Statement on Senate Action on the "Immigration Control and Financial Responsibility Act of 1996", President William J. Clinton, Weekly Compilation of Presidential Documents Volume 32, Issue 18 (May 6, 1996) at p. 783.  On September 30, 1996, the bill was signed into law, following the removal of the definition of public charge that included use of means-tested public benefits.  This exchange, which deals with the precise issue presented by this litigation, is particularly instructive not because of the president's words but because of Congress's response to those words—it intentionally considered and rejected a definition similar to what the Rule now proposes.  Afterall it is Congress, not the President, who is responsible for writing legislation.

Given the term's long-standing focus on the individual's ability and willingness to work or otherwise support himself, and its longstanding allowance for short-term aid, and the legislative history of the 1996 revision, it is likely that the Rule's interpretation defining anyone who receives any quantity of benefits for 12 months (or fewer) out of a floating 36-month window as a public charge is not a permissible or reasonable construction of the statute.  For example, defendants do not contest that someone receiving less than 50

cents per day—which is a standard SNAP benefit amount for recipients at the higher end of income eligibility, Shing Decl. ¶ 17—would be deemed a public charge under the Rule. That could also be calculated as $182 over 36 months—or an average of less than 17 cents a day.  At no point over the long history described above could that have qualified one as a public charge, unless the bill for those charges was presented to the recipient and he refused to pay.  Moreover, the Rule's double-counting of months where multiple benefits are received raises serious questions with respect to whether the Rule impermissibly considers temporary or short-term relief, receipt of which has never been sufficient to qualify someone as a public charge (absent repayment, following presentation of an invoice).

Deciding otherwise would put this court at odds with persuasive Supreme Court and Ninth Circuit precedent.  The Supreme Court has defined the term to allow exclusion only "on the ground of permanent personal objections accompanying them [the excluded aliens] irrespective of local conditions[.]"  Gegiow, 239 U.S. at 10.  In that case, "the aliens came from a remote province of Russia. They knew no trade. They knew no language but their own. Only one could read or write in his own language. They had sums aggregating slightly more than $25 each. They were not employed, and had no promise of employment. They were ticketed through to Portland, Or., where, owing to depressed labor conditions, the prospect of their obtaining work 'was most unfavorable.'" Ex parte Hosaye Sakaguchi, 277 F. at 916 (citing Gegiow, 239 U.S. at 10).  Still, they were not likely to become public charges within the meaning of the statute.  The Ninth Circuit reaffirmed that definition following reorganization of the statute.  Id. ("change of location of the words does not change the meaning that should be given them").  Since Gegiow and Ex parte Hosaye Sakaguchi, Congress has not altered the term "public charge," which the Ninth Circuit has defined standing alone, irrespective of its placement or context within the list of excluded persons in the statute.  The court therefore sees no good reason to depart from those precedential opinions, which suggest that an able-bodied, working-age individual who is willing to engage in honest work is not excludable

based on a prediction that he will become a public charge unless a particular reason can
be articulated to exclude him.  This reasoning does not allow for exclusion based on the
increasing generosity of society's public assistance to provide for more than the barest
requirements of subsistence.  Gegiow, in fact, explicitly precludes consideration of local
labor conditions.

The likely unreasonableness of the rule is further demonstrated by just how
expansive the definition is.  The history of the term, evidenced by its repeated verbatim
reenactment, excluded those who were likely to become public charges based on
poverty, or idiocy and poverty, or disease and poverty, etc.  But plaintiffs demonstrate
that in a single year, roughly a quarter U.S.-born citizens receive one or more benefits
used to define who is a public charge under the Rule.  And plaintiffs demonstrate that,
over the course of their lifetimes, about 40% of U.S.-born citizens are expected to receive
one or more of those benefits.  Although these figures do not indicate what percent of
U.S.-born citizens would actually be deemed public charges under the Rule (that would
require determining how many individuals receive multiple benefits per month, in addition
to how many months benefits are received over any 3-year period), it suggests that the
Rule is substantially outside the bounds of a reasonable interpretation of the statute.

With regard to plaintiffs' claim that the Rule is not in accordance with law, for the
foregoing reasons, and given the above discussion of the term's long-standing use and
evolution in the immigration statutes, this court finds that plaintiffs are likely to succeed on
the merits with respect to their claim that the Rule's definition of public charge is
unreasonable and not based on a permissible construction of the statute, under the
second prong of the Chevron analysis.[15]  Alternatively, plaintiffs have raised at least
serious questions with respect to whether "the statute, read in context, unambiguously
forecloses" the precise question at issue, namely DHS's expansive interpretation of the
term to include individuals willing and able work productively in the national economy,

---

[15] For the same reasons that plaintiffs are likely to succeed on this question, they have
undoubtedly raised serious questions with respect to it.

United States District Court
Northern District of California

under the first prong of the <u>Chevron</u> analysis.  <u>See</u> <u>Esquivel-Quintana v. Sessions</u>, 137 S. Ct. 1562, 1572 (2017); <u>see also</u> <u>Whitman v. Am. Trucking Associations</u>, 531 U.S. 457, 471 (2001) (finding a particular construction "unambiguously bar[red]" when "interpreted in its statutory and historical context").

### b.   Not in Accordance with Law—Rehabilitation Act

The Rehabilitation Act prohibits "any program or activity receiving federal financial assistance" or "any program or activity conducted by any Executive agency," from excluding, denying benefits to, or discriminating against persons with disabilities.  29 U.S.C. § 794(a).

"To establish a violation of § 504 of the RA [Rehabilitation Act], a plaintiff must show that (1) she is handicapped within the meaning of the RA; (2) she is otherwise qualified for the benefit or services sought; (3) she was denied the benefit or services solely by reason of her handicap; and (4) the program providing the benefit or services receives federal financial assistance."  <u>Lovell v. Chandler</u>, 303 F.3d 1039, 1052 (9th Cir. 2002); 29 U.S.C. § 794(a) ("[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be . . . subjected to discrimination under . . . any program or activity conducted by any Executive agency").

The States argue that the Rule will exclude some individuals solely based on disability because a disability will predictably be responsible for a number of negative factors in some individuals:  (1) a negative health factor because the Rule adopts a definition of "health" that strongly overlaps with disability; (2) a negative factor if the applicant lacks private insurance; and (3) a negative factor if the applicant has received Medicaid for 12 of the last 36 months, even though use of Medicaid is common for the disabled because it covers services that no other insurer provides.

Defendants first argue that the Rule's multi-factor test means the Rehabilitation Act is not violated because disability cannot be the "sole" determinative factor.  Second, they argue that even if the statutes are in conflict, a specific, later statutory command— such as the INA's requirement that the agency consider health—supersedes section

504's general proscription.

First, the Rehabilitation Act requires that a plaintiff show that a disabled person was denied services "solely" by reason of her disability.  The Rule does not deny any alien admission into the United States, or adjustment of status, "solely by reason of" disability.  All covered aliens, disabled or not, are subject to the same inquiry:  whether they are likely to use one or more covered federal benefits for the specified period of time.  Even though a disability is likely to be an underlying cause of some individuals qualifying for additional negative factors, it will not be the sole cause.  As such, disability is one non-dispositive factor.[16]

Second, the INA explicitly lists "health" as a factor that an officer "shall . . . consider" in making a public charge determination.  8 U.S.C. § 1182(a)(4)(B)(i).  "Health" includes an alien's disability and whatever impact the disability may have on the alien's expenses and ability to work.  Congress, not the Rule, requires DHS to take this factor into account, and the caselaw has long considered this factor.  See, e.g., Knutzen v. Eben Ezer Lutheran Hous. Ctr., 815 F.2d 1343, 1353 (10th Cir. 1987) (section 504 may not "revoke or repeal . . . a much more specific statute . . . absent express language by Congress").

As such, plaintiffs have not demonstrated even serious questions going the merits with respect to this claim.

### c.     Arbitrary and Capricious

> Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for so-called "notice-and-comment rulemaking." First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. § 553(b). Second, if "notice [is] required," the agency must "give interested persons an opportunity to participate in

---

[16] Plaintiffs' citation to Lovell is unavailing.  They claim the case found a multi-factor test violated the Act, "notwithstanding other factors" unrelated to disability.  But in Lovell, defendants asked the court to look at a multifactored system, but the court declined and instead looked at treatment of the disabled under a single program.  It was "undisputed that disabled people who, but for their disability, were eligible for healthcare benefits from the State under" that single program "were denied coverage because of the categorical exclusion of the disabled from" that program.  Lovell, 303 F.3d at 1053.

50

> the rule making through submission of written data, views, or arguments." § 553(c). An agency must consider and respond to significant comments received during the period for public comment. Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." § 553(c). Rules issued through the notice-and-comment process are often referred to as "legislative rules" because they have the "force and effect of law." Chrysler Corp. v. Brown, 441 U.S. 281 (1979).

Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1203 (2015) (citations omitted).

"'[A]rbitrary and capricious' review under the APA focuses on the reasonableness of an agency's decision-making *processes*." CHW W. Bay v. Thompson, 246 F.3d 1218, 1223 (9th Cir. 2001). Agency action is invalid if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also Encino Motorcars, 136 S. Ct. at 2125. A rule is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

Agencies are required to "reflect upon the information contained in the record and grapple with contrary evidence." Fred Meyer Stores, Inc. v. NLRB, 865 F.3d 630, 638 (D.C. Cir. 2017). Where "the agency has failed to 'examine the relevant data' or failed to 'articulate a rational explanation for its actions,'" its decision is arbitrary and capricious. Genuine Parts Co. v. EPA, 890 F.3d 304, 311–12 (D.C. Cir. 2018). And where an agency is uncertain about the effects of agency action, it may not rely on "'substantial uncertainty' as a justification for its actions." Greater Yellowstone Coal., Inc. v. Servheen, 665 F.3d 1015, 1028 (9th Cir. 2011). Instead, it must "rationally explain why the uncertainty" supports the chosen approach. Id. ("Otherwise, we might as well be deferring to a coin flip."). "[A]n internally inconsistent analysis is arbitrary and capricious." Nat'l Parks Conservation Ass'n v. E.P.A., 788 F.3d 1134, 1141 (9th Cir. 2015).

But "[t]he scope of review under the 'arbitrary and capricious' standard is narrow

and a court is not to substitute its judgment for that of the agency." <u>Motor Vehicle Mfrs.</u>

<u>Ass'n</u>, 463 U.S. at 43; <u>San Luis & Delta-Mendota Water Auth. v. Jewell</u>, 747 F.3d 581,

601 (9th Cir. 2014) ("Although our inquiry must be thorough, the standard of review is

highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and

we may not substitute our judgment for that of the agency."). An agency's obligation to

respond to comments on a proposed rulemaking is "not 'particularly demanding.'" <u>Ass'n</u>

<u>of Private Sector Colls. & Univs. v. Duncan</u>, 681 F.3d 427, 441–42 (D.C. Cir. 2012).

"[T]he agency's response to public comments need only 'enable [courts] to see what

major issues of policy were ventilated . . . and why the agency reacted to them as it did.'"

<u>Pub. Citizen, Inc. v. FAA</u>, 988 F.2d 186, 197 (D.C. Cir. 1993).

Rule changes face a higher burden when departing from prior policy:

> Agencies are free to change their existing policies as long as
> they provide a reasoned explanation for the change. When an
> agency changes its existing position, it need not always provide
> a more detailed justification than what would suffice for a new
> policy created on a blank slate. But the agency must at least
> display awareness that it is changing position and show that
> there are good reasons for the new policy. In explaining its
> changed position, an agency must also be cognizant that
> longstanding policies may have engendered serious reliance
> interests that must be taken into account. In such cases it is
> not that further justification is demanded by the mere fact of
> policy change; but that a reasoned explanation is needed for
> disregarding facts and circumstances that underlay or were
> engendered by the prior policy. It follows that an unexplained
> inconsistency in agency policy is a reason for holding an
> interpretation to be an arbitrary and capricious change from
> agency practice. An arbitrary and capricious regulation of this
> sort is itself unlawful and receives no <u>Chevron</u> deference.

<u>Encino Motorcars</u>, 136 S. Ct. at 2125–26 (internal quotation marks and citations omitted);

<u>accord</u> <u>F.C.C. v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009) (agency must

"provide a more detailed justification than what would suffice for a new policy created on

a blank slate . . . when, for example, its new policy rests upon factual findings that

contradict those which underlay its prior policy; or when its prior policy has engendered

serious reliance interests that must be taken into account").

Plaintiffs raise numerous procedural challenges to the Rule. The court addresses

1   them in two general categories.  First, the court considers plaintiffs arguments that DHS

2   failed to adequately consider and address the Rule's costs and benefits.  Second, the

3   court considers plaintiffs' remaining procedural challenges.

4       **i.  DHS Failed to Adequately Consider Costs and Benefits**

5     Plaintiffs argue that DHS failed to consider costs and benefits in three ways.  First,

6   DHS failed to adequately consider significant costs to local and state governments raised

7   in comments, as well as the related issue of DHS's failure to consider evidence when

8   estimating disenrollment figures.  Second, DHS failed to consider concerns about health

9   effects like disease outbreaks.  Third, DHS acted impermissibly with respect to the

10  burden the I-944 form would impose.

11    Based on plaintiffs' first and second arguments, discussed presently, this court

12  finds that they are likely to succeed on the merits with respect to their claim that the Rule

13  is arbitrary and capricious.[17]

14      **A.  Local and State Government Costs and**

15          **Disenrollment Rates**

16    Plaintiffs argue that commenters documented the dangers to individuals and public

17  health generally that stem from disenrollment in public benefits, and explained that local

18  and state governments will face higher costs because of this disenrollment.  See 84 Fed.

19  Reg. at 41,310-12 (explaining that "[m]any commenters particularly emphasized that

20  disenrollment or foregoing enrollment would be detrimental to the financial stability and

21  economy of communities, States, local organizations, hospitals, safety net providers,

22  foundations, and healthcare centers"); id. at 41,469–70; Case No. 19-cv-04717-PJH,

23  Dkt. 44, Exs. C–E (letters submitted in response to NPRM).  Numerous comments

24  included specific cost calculations.  See, e.g., 84 Fed. Reg. at 41,475 (citing specific cost

25  estimates from comments); Cho Decl., Ex. C at 22–23 (estimating losses to California at

26  $1.76 billion in revenue from federal government and 17,700 jobs), Ex. J at 11

27  _____

28  [17] For the same reasons that plaintiffs are likely to succeed on this claim, they have
    undoubtedly raised serious questions with respect to it.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (estimating that the Rule would cost hospitals more than $17 billion in uncompensated

2   care), Ex. K at 5–7 (detailing expected costs to hospitals).

3           Plaintiffs relatedly argue that DHS under-estimated disenrollment figures and the

4   accompanying effects, including the effects on state and local governments.[18]  For

5   example, despite its concession that the Rule will cause members of mixed-status

6   households (i.e., those including U.S. citizens) to disenroll from benefits, 84 Fed. Reg. at

7   41,300, DHS refused to consider the costs associated with such disenrollment, stating:

8   "DHS believes that it would be unwarranted for U.S. citizens and aliens exempt from

9   public charge inadmissibility to disenroll from a public benefit program or forego

10  enrollment in response to this rule when such individuals are not subject to this rule.

11  DHS will not alter this rule to account for such unwarranted choices."  Id. at 41,313.

12          Defendants correctly argue that they are not required to quantify every potential

13  cost and benefit and precisely weigh them out.  They respond to these challenges both in

14  the Rule and before the court with three essential points.  First, DHS read the comments,

15  but the forward-looking economic impact to states, cities, hospitals, and others was too

16  difficult to assess.  Second, with respect to the disenrollment of those who will not be

17  subject to a public charge assessment in the future, the Rule's effect was too difficult to

18  assess.  Third, even if DHS had assessed those costs, they would be outweighed by the

19  benefits of excluding aliens who would rely on public assistance, and of promoting self-

20  sufficiency of aliens already in the United States.  Those benefits are in line with

21  Congressional statements of policy.

22          DHS was required to a certain extent to grapple with estimates and credible data

23

24  _____

25  [18] DHS argues that it's 2.5% figure is not part of the regulatory analysis and cannot be
    challenged because it was calculated pursuant to an executive order.  The court
    disagrees.  See Council of Parent Attorneys & Advocates, Inc. v. DeVos, 365 F. Supp. 3d
26  28, 54 n.11 (D.D.C. 2019) ("The government contended . . . that because its regulatory
    impact analysis was conducted pursuant to Executive Orders, it is not subject to judicial
27  review. . . .  These arguments are contrary to D.C. Circuit precedent.  Because the
    government relied on its cost-benefit analysis . . . a flaw in that analysis can render the
28  regulation arbitrary and capricious.").

explained in the comments, and in turn explain why DHS chose not to credit them.  See Ctr. for Biological Diversity v. Zinke, 900 F.3d 1053, 1068–69 (9th Cir. 2018) (finding agency action arbitrary and capricious where the agency did not explain why it did not credit available data that did not support its action).  Defendants are correct that DHS was not required to parse costs and benefits precisely.  But to the extent the exact harms are unknown or difficult to predict, that does not justify "disregarding the effect entirely." Pub. Citizen v. Fed. Motor Carrier Safety Admin., 374 F.3d 1209, 1219 (D.C. Cir. 2004).

Here, even under the deferential APA analysis, DHS appears to have wholly failed to engage with this entire category of comments.  DHS failed to grapple with the Rule's predictable effects on local governments, and instead concluded that the harms— whatever they may be—are an acceptable price to pay.  At minimum, the APA requires more than reading public comments and responding with a general statement that, however correct the comments may be, the agency declines to consider the issues and costs identified because doing so would contravene the government's favored policy.

For example, under the heading "Increased Costs to Health Care Providers, States, and Localities," the government summarized the comments it was responding to:

> Many commenters particularly emphasized that disenrollment or foregoing enrollment would be detrimental to the financial stability and economy of communities, States, local organizations, hospitals, safety net providers, foundations, and healthcare centers. Commenters offering estimates on the number of people who would disenroll from Medicaid under the proposed rule warned that the costs associated with the resultant rise in uncompensated care would be borne by health systems, hospitals, and insured patients.

84 Fed. Reg. at 41,312.

The government's response, in part, was:

> Response: With respect to the rule's potential "chilling effects" or disenrollment impacts, DHS notes that (1) the rule's overriding consideration, i.e., the Government's interest as set forth in PRWORA, is a sufficient basis to move forward; (2) it is difficult to predict the rule's disenrollment impacts with respect to the regulated population, although DHS has attempted to do so in the accompanying Final Regulatory Impact Analysis; and (3) it is also difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule,

55

although, again, DHS has attempted to do so in the accompanying Final Regulatory Impact Analysis.

First, as discussed above, this rule is rationally related to the Government's interest, as set forth in PRWORA, to: (1) Minimize the incentive of aliens who attempt to immigrate to, or adjust status in the United States due to the availability of public benefits; and (2) Promote the self-sufficiency of aliens within the United States.  DHS has defined public benefits by focusing on cash assistance programs for income maintenance, and an exhaustive list of non-cash food, housing, and healthcare, designed to meet basic living needs. This definition does not include benefits related exclusively to emergency response, immunization, education, or social services, nor does it include exclusively state and local non-cash aid programs. DHS acknowledges that individuals subject to this rule may decline to enroll in, or may choose to disenroll from, public benefits for which they may be eligible under PRWORA, in order to avoid negative consequences as a result of this final rule.  However, DHS has authority to take past, current, and likely future receipt of public benefits into account, even where it may ultimately result in discouraging aliens from receiving public benefits.

Although individuals may reconsider their receipt of public benefits as defined by this rule in light of future immigration consequences, this rule does not prohibit an alien from obtaining a public benefit for which he or she is eligible. DHS expects that aliens seeking lawful permanent resident status or nonimmigrant status in the United States will make purposeful and well-informed decisions commensurate with the immigration status they are seeking. But regardless, DHS declines to limit the effect of the rulemaking to avoid the possibility that individuals subject to this rule may disenroll or choose not to enroll, as self-sufficiency is the rule's ultimate aim.

Second, DHS finds it difficult to predict how this rule will affect aliens subject to the public charge ground of inadmissibility, because data limitations provide neither a precise count nor reasonable estimate of the number of aliens who are both subject to the public charge ground of inadmissibility and are eligible for public benefits in the United States.  This difficulty is compounded by the fact that most applicants subject to the public charge ground of inadmissibility and therefore this rule are generally unlikely to suffer negative consequences resulting from past receipt of public benefits because they will have been residing outside of the United States and therefore, ineligible to have ever received public benefits.

. . . .

Third, DHS finds it difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule, such as people who erroneously believe themselves to be affected. . . . This rule does not prohibit or otherwise discourage individuals who are not subject to the public charge

1    inadmissibility from receiving any public benefits for which they
     are eligible.

2        . . . .

3    Because DHS will not consider the receipt of public benefits by
     U.S. citizens and aliens not subject to public charge
4    inadmissibility, the receipt of public benefits by these
     individuals will not be counted against or made attributable to
5    immigrant family members who are subject to this rule.
     Accordingly, DHS believes that it would be unwarranted for
6    U.S. citizens and aliens exempt from public charge
     inadmissibility to disenroll from a public benefit program or
7    forego enrollment in response to this rule when such individuals
     are not subject to this rule. DHS will not alter this rule to account
8    for such unwarranted choices.

9    DHS appreciates the potential effects of confusion regarding
     the rule's scope and effect, as well as the potential nexus
10   between public benefit enrollment reduction and food
     insecurity, housing scarcity, public health and vaccinations,
11   education health-based services, reimbursement to health
     providers, and increased costs to states and localities. In
12   response to comments, DHS will also issue clear guidance that
     identifies the groups of individuals who are not subject to this
13   rule, including, but not limited to, U.S. citizens, lawful
     permanent residents returning from a trip abroad who are not
14   considered applicants for admission, and refugees.

15       . . . .

16   In sum, DHS does not believe that it is sound policy to ignore
     the longstanding self-sufficiency goals set forth by Congress or
17   to admit or grant adjustment of status applications of aliens who
     are likely to receive public benefits designated in this rule to
18   meet their basic living needs in an [sic] the hope that doing so
     might alleviate food and housing insecurity, improve public
19   health, decrease costs to states and localities, or better
     guarantee health care provider reimbursements. . . .  DHS
20   believes that it will ultimately strengthen public safety, health,
     and nutrition through this rule by denying admission or
21   adjustment of status to aliens who are not likely to be self-
     sufficient.

22

23   84 Fed. Reg. at 41,312–14 (footnotes omitted).

24       That answer entirely fails to discuss costs being borne by the states, hospitals, or

25   others, other than to say DHS will issue guidance in an effort to mitigate confusion.  The

26   answer discusses disenrollment rates being difficult to measure, but flatly refuses to

27   account for certain types of disenrollment (for example those who "erroneously believe

28   themselves to be affected" and make "unwarranted choices").  DHS's response

United States District Court
Northern District of California

1   constitutes a thinly-veiled abdication of the responsibility to consider the issue.  Rather

2   than engage, the response simply elides the issue that the APA requires consideration of.

3        Ending the analysis with the conclusion that "DHS believes that it will ultimately

4   strengthen public safety, health, and nutrition through this rule" fails to show that DHS

5   "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action

6   including a rational connection between the facts found and the choice made." Encino

7   Motorcars, 136 S. Ct. at 2125 (quoting Motor Vehicle Mfrs. Assn., 463 U.S. at 43);

8   Sorenson Commc'ns Inc. v. F.C.C., 755 F.3d 702, 708 (D.C. Cir. 2014) ("Though an

9   agency's predictive judgments about the likely economic effects of a rule are entitled to

10  deference, deference to such judgments must be based on some logic and evidence, not

11  sheer speculation.") (internal quotation marks and citations omitted).  DHS fails to explain

12  how those benefits will come about with any evidentiary support.  In fact, ample evidence

13  cited in the comments shows exactly the opposite—that use of public benefits improves

14  public health and welfare.  DHS's bare assertion to the contrary simply is not enough to

15  satisfy its obligations.  Even ignoring the fact that the conclusion lacks a reasoned

16  explanation of how it was reached, DHS also fails to address why the supposed benefits

17  will outweigh the likely costs (DHS had at this point already declined to discuss what the

18  likely costs are in fact are).  Plaintiffs have shown it is likely that, with respect to

19  consideration of costs imposed on states and localities by the Rule, DHS offers no "path

20  [that] may reasonably be discerned" in its reasoning.  Motor Vehicle Mfrs. Ass'n, 463 U.S.

21  at 43.

22       Moreover, DHS may not discount an undisputed impact of the Rule simply

23  because DHS believes it is "unwarranted." See Michigan, 135 S. Ct. at 2707

24  ("reasonable regulation ordinarily requires paying attention to the advantages and the

25  disadvantages of agency decisions").  DHS flatly refused to consider the costs associated

26  with predicted, likely disenrollment of those not subject to the public charge determination

27  by stating:  "DHS believes that it would be unwarranted for U.S. citizens and aliens

28  exempt from public charge inadmissibility to disenroll from a public benefit program or

58

forgo enrollment in response to this rule when such individuals are not subject to this rule. DHS will not alter this rule to account for such unwarranted choices." 84 Fed. Reg. at 41,313.  But DHS's disagreement with the source of a cost does not make it go away, and it does not discharge DHS's obligation to consider it.  DHS must consider the costs of widespread disenrollment that it anticipates—it cannot ignore costs by calling their causes "unwarranted."  Plaintiffs have shown it is likely that DHS understood that individuals would disenroll even though they are not subject to the public charge determination, yet DHS refused to consider that cost entirely.  Doing so would have been arbitrary and capricious.  Michigan, 135 S. Ct. at 2707 ("'cost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost. . . . Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."); accord Metlife, Inc. v. Fin. Stability Oversight Council, 177 F. Supp. 3d 219, 223 (D.D.C. 2016) ("focus[ing] exclusively on the presumed benefits . . . and ignor[ing] the attendant costs . . . is itself unreasonable under the teachings of Michigan v. Environmental Protection Agency"); Regents of Univ. of California v. United States Dep't of Homeland Sec., 279 F. Supp. 3d 1011, 1046 (N.D. Cal.), aff'd sub nom. Regents of the Univ. of California v. U.S. Dep't of Homeland Sec., 908 F.3d 476 (9th Cir. 2018), cert. granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California, 139 S. Ct. 2779 (2019) (same).

### B.      Health Effects

Plaintiffs argue that DHS ignored comments describing how loss of benefits would trigger negative health consequences, including the spread of disease and aggravation of chronic illness.  DHS received ample commentary regarding this issue.  See, e.g., 84 Fed. Reg. at 41,384 (summarizing certain comments); Cho Decl., Ex. M at 4 (Kaiser Permanente comment linking the rule's impacts on prescription adherence with increased chance of outbreaks of communicable disease), Ex. N at 9 (Pub. Health Inst. Comment: "We cannot achieve universally agreed upon public health goals, such as reducing

59

1    chronic diseases throughout the U.S., when we directly or indirectly deny large segments

2    of our population the very building blocks they need for good health"), Ex. O at 4 (Nat'l

3    Assoc. Ped. Nurse Practitioners comment discussing "worse health outcomes"), P at 7

4    (Children's HealthWatch comment warning of "increased prevalence of communicable

5    diseases").

6    　　　Defendants offer the same general defenses in response.  First, DHS read the

7    comments, but the forward-looking impact to health was too difficult to assess.  Second,

8    even if DHS had assessed those costs, they would be outweighed by the benefits of

9    excluding aliens who would rely on public benefits and promoting self-sufficiency of aliens

10    already in the United States.  Those benefits are in line with Congressional statements of

11    policy.

12    　　　Relevantly here, similar negative health outcomes were a key rationale for prior

13    agency action.  When issuing the 1999 guidance, INS described its primary motivation "to

14    reduce the negative public health consequences generated by the existing confusion."

15    64 Fed. Reg. at 28,689; see also id. at 28,692 (adopting regulation on an interim basis

16    because "confusion . . . has deterred eligible [immigrants] and their families, including

17    U.S. citizen children, from seeking important health and nutrition benefits," and that

18    "reluctance to access benefits has an adverse impact not just on the potential recipients,

19    but on public health and the general welfare").  In reversing the 1999 guidance,

20    defendants must "'display awareness that it is changing position' and 'show that there are

21    good reasons for the new policy.'"  Encino Motorcars, 136 S. Ct. at 2126 (quoting FCC v.

22    Fox, 556 U.S. at 515).  Moreover, where the prior policy engendered reliance, "a

23    reasoned explanation is needed for disregarding facts and circumstances that underlay

24    or were engendered by the prior policy."  Id.

25    　　　Under the heading "Vaccinations," the government summarized the comments it

26    was responding to:

27    　　　　　Commenters indicated that the public charge rule would make

28    　　　　　immigrant families afraid to seek health-care, including
　　　　　vaccinations against communicable diseases, and therefore,

60

endanger the U.S. population. . . . .  The commenter indicated that engaging with the public health system was critical to ensuring robust immunization to protect the population overall; if a subset of the community were fearful to access government healthcare services, regardless of whether a specific type of service qualified for a narrow exception, it would have a significant impact on the country's ability to protect and promote the public health.  Another commenter indicated that its health department anticipated that promulgation of the rule, as written in the NPRM, will result in decreased utilization of children's healthcare, including vaccinations, which will increase the risk for vaccine preventable diseases . . . increasing the likelihood of an outbreak.

Some commenters stated that since many immigrants live in communities alongside people of the same national origin, reduced vaccinations could result in unvaccinated or under-vaccinated clusters of individuals.  Commenters warned that research shows that uninsured individuals are much less likely to be vaccinated.  One commenter stated that a recent study found that even a five percent reduction in vaccine coverage could trigger a significant measles outbreak. . . .  Another commenter stated that the rule would increase the incidence of childhood diseases like chickenpox, measles, mumps and rubella and deter parents from vaccinating their children.

84 Fed. Reg. at 41,384.

The government's response was:

With this rulemaking, DHS does not intend to restrict the access of vaccines for children or adults or intend to discourage individuals from obtaining the necessary vaccines to prevent vaccine-preventable diseases.  The purpose of this rulemaking is to ensure that those seeking admission to the United States are self-sufficient and rely on themselves or family and friends for support instead of relying on the government for subsistence.  As noted above, this final rule does not consider receipt of Medicaid by a child under age 21, or during a person's pregnancy, to constitute receipt of public benefits.  This should address a substantial portion, though not all, of the vaccinations issue.

Vaccinations obtained through public benefits programs are not considered public benefits under 8 CFR 212.21(b), although if an alien enrolls in Medicaid for the purpose of obtaining vaccines, the Medicaid itself qualifies as a public benefit.  DHS also notes that free or low cost vaccines are available to children who are not insured or underinsured through the Vaccines for Children (VFC) Program.  In addition, local health centers and state health departments provide preventive services that include vaccines that may be offered on a sliding scale fee based on income.  Therefore, DHS believes that vaccines would still be available for children and adults even if they disenroll from Medicaid.

1    84 Fed. Reg. at 41,384–85 (footnotes omitted).

2         DHS's response to the comments was essentially that it understood that fewer

3    people would get vaccines following the Rule, which would present a risk, but there are

4    ways to get vaccines without Medicaid.  As a result, DHS acknowledged that fewer

5    people will get vaccines, but it failed engage at all in the consequences of that fact.

6         Plaintiffs have demonstrated a likelihood of success based upon this argument.

7    This change departs from a longstanding prior policy, as explained in the 1999 Field

8    Guidance, that is likely to have engendered reliance.  That guide explained that certain

9    rules were needed because uncertainty had "deterred eligible aliens and their families,

10   including U.S. citizen children, from seeking important health and nutrition benefits[,

11   which] . . . **has an adverse impact not just on the potential recipients**, but on **public**

12   **health** and the general welfare."  64 Fed. Reg. at 28,692 (emphasis added).  Given that

13   the 1999 Field Guidance was both longstanding precedent and specifically concerned

14   benefits supporting general public health (not simple health of the aliens—e.g., vaccines),

15   DHS must provide "a reasoned explanation . . . for disregarding facts and circumstances

16   that underlay or were engendered by the prior policy."  FCC v. Fox, 556 U.S. at 515–16;

17   accord Encino Motorcars, 136 S. Ct. at 2126 ("an unexplained inconsistency in agency

18   policy is a reason for holding an interpretation to be an arbitrary and capricious change

19   from agency practice") (internal quotation marks omitted).

20        Although DHS acknowledged departure from the 1999 Field Guidance as a

21   general matter (e.g., 84 Fed. Reg. at 41,307–08), DHS simply declined to engage with

22   certain, identified public-health consequences of the Rule.  It made no attempt,

23   whatsoever, to investigate the type or magnitude of harm that would flow from the reality

24   which it admittedly recognized would result—fewer people would be vaccinated.  Instead,

25   and just as with its refusal to consider "unwarranted" choices to disenroll from Medicaid

26   discussed above, DHS responded only that it "believes that vaccines would still be

27   available" through some other channels.  The response is devoid of rationale, but

28   additionally it fails entirely to provide a reasoned explanation for disregarding the facts

1    and circumstances underlying the prior policy.

2                                    **C.      Form I-944**

3           Plaintiffs argue that defendants' estimate of the time and cost burden that the new

4    Form I-944, entitled Declaration of Self Sufficiency, will have on applicants is implausible.

5    They argue that the Rule provides too-low of an estimate for the time required to fill out

6    the form, based on its estimate about the time it takes to fill out another related form.

7    They argue that DHS did not adequately consider the differences between the forms

8    when arriving at their estimate.  Yet DHS considered and responded to comments

9    regarding the time commitment required by Form I-944.  In response DHS modified the

10   form, removed some duplicative questions, and explained that it is important to be filed

11   separately because it is filed by the immigrant himself.  84 Fed. Reg. at 41,484.  Plaintiffs

12   have not demonstrated a likelihood of success or serious questions with respect to this

13   argument.

14                                   **ii.      Other Challenges**

15          Plaintiffs raise a number of other procedural challenges under the APA.  The court

16   finds that plaintiffs have not demonstrated a likelihood of success on the merits or serious

17   questions with respect to any, and it will address some of them briefly.

18          Plaintiffs argue that the Rule stops treating sponsors' affidavits of support as

19   sufficient assurance that immigrant applicants will not become overly dependent on

20   public benefits, yet Congress specified in 8 U.S.C. § 1182(a)(4)(B)(ii) that the executive

21   simply "may also" consider such affidavits.  Although plaintiffs argue that in practice

22   USCIS has accepted affidavits of support as conclusive, the controlling statute and 1999

23   Field Guidance make clear that this is not a change in policy.  See 64 Fed. Reg. at

24   28,690 ("Where such an AOS has been filed on an alien's behalf, it should be considered

25   along with the statutory factors in the public charge determination.").

26          Plaintiffs argue the Rule is inconsistent because DHS included an exemption for

27   individuals under the age of 21 who receive Medicaid benefits, but did not include a

28   similar exemption for individuals under the age of 21 who receive SNAP benefits.  DHS

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | considered this issue and provided a reasoned explanation for providing Medicaid to

2 | children, including that it can provide funding for "in-school health services and serve as

3 | an important way to ensure that children receive the vaccines needed to protect public

4 | health and welfare." 84 Fed. Reg. at 41,380.

5 |       Plaintiffs argue the Rule is inconsistent because the statute requires consideration

6 | of "education and skills" and "health," but the Rule requires a much more searching

7 | inquiry into health than education and skills. For example, the Rule considers details

8 | about an individual's health insurance, benefits receipt, and financial status of household

9 | members, but inconsistently fails to take into account admission or attendance in a

10 | college or trade school. But the Rule in fact allows for consideration of admission or

11 | attendance in a college or trade school, and DHS adequately addressed these issues in

12 | response to comments. See 84 Fed. Reg. at 41,436 ("the exact nature of the education

13 | (or lack thereof) and employment would have to be considered").

14 |       Plaintiffs argue the Rule is inconsistent because it considers past immigration-

15 | related fee waivers, which may be submitted before a noncitizen is legally eligible to work

16 | and as a result punish that individual for applying to work legally. DHS adequately

17 | responded, noting that "[s]ince fee waivers are based on an inability to pay, seeking or

18 | obtaining a fee waiver for an immigration benefit suggests an inability to be self-

19 | sufficient." 84 Fed. Reg. at 41,424–25.

20 |       Plaintiffs argue the Rule is inconsistent because Medicaid use by pregnant women

21 | or children (who are not penalized for using Medicaid under the rule) is counted against

22 | them, because Medicaid is not counted as an asset that could offset the negative factor

23 | of their illness that Medicaid is paying to treat. Plaintiffs argue that is not consistent,

24 | because private insurance is considered an asset. Defendants argue that the Rule does

25 | not count a severe medical condition as a heavily weighed negative factor if the alien has

26 | "the financial resources to pay for reasonably foreseeable medical costs related to such

27 | medical condition," and such "financial resources" can include Medicaid benefits for those

28 | pregnant or under 21. See 84 Fed. Reg. at 41,504 ("resources . . . to pay for reasonably

United States District Court
Northern District of California

foreseeable medical costs" includes "health insurance not designated as a public benefit under 8 CFR 212.21(b)").

Plaintiffs argue the Rule is irrational because an income of 125% of the federal poverty guideline rate counts as a positive factor, yet individuals whose incomes exceed that qualify for non-cash benefits considered under the Rule.  But not all factors in a multifactor test are required to align in outcome to be rational.

Plaintiffs argue the Rule is irrational because while it considers large family size as a negative factor in a public charge assessment, DHS's own data indicates that non-cash benefit is higher among families of three than families of four, and that noncitizens' use of cash benefits decreases as family size grows.  84 Fed. Reg. at 41,395.  The parties appear to disagree about which studies are "good studies" here, but DHS's response explained its interpretation of the studies and concluded that "the data properly reflects that receipt of noncash benefits generally increases with an increase in family size."  Id.

Plaintiffs argue the Rule is irrational because it considers the mere application for benefits in the public charge determination.  Plaintiffs argue that an application for benefits does not indicate a noncitizen is actually financially and otherwise eligible for the benefit or will decide to use the benefit.  DHS reasonably explained that an "application for a public benefit is not the same as receipt but is indicative of an alien's intent to receive such a benefit."  84 Fed. Reg. at 41,422.

Plaintiffs argue the Rule is irrational because it is ultimately a vague and entirely unpredictable framework for weighing the statutorily-authorized and newly-added factors, which results in limitless discretion.  The precise nature of the procedural challenge is unclear here, but the underlying statute requires consideration of "at minimum" five factors, and then specifically mentions another factor that "may" be considered.  Moreover, the statute specifically targets those who are likely to be a public charge "in the opinion of the Attorney General," who as DHS recognized has long been given discretion to make such determinations under the statute.  84 Fed. Reg. at 41,398 ("DHS notes that officer discretion is not a new concept in USCIS immigration benefits adjudications.").

1   Plaintiffs argue the Rule is irrational because some factors are actually

2   determinative, and impossible to overcome because the factors significantly overlap.  As

3   a result, the Rule funnels officials' decision-making towards favoring high-income

4   individuals at the expense of the poor and other marginalized groups.  To the extent

5   plaintiffs challenge the Rule favoring admission of the wealthy over the poor, the plaintiffs'

6   appropriate target is the underlying statute rather than the Rule implementing it.  The

7   statute itself calls for consideration of a number of factors, ultimately aimed at excluding

8   from the country a group comprised of those who are more likely to be poor than rich.

9   **d.   Zone of Interests**

10   In order to succeed on the merits, plaintiffs must be within the zone of interests of

11   the statute that forms the basis of their challenge.  The zone of interests analysis asks

12   "whether Congress created a private cause of action in legislation" (Organized Vill. of

13   Kake v. U.S. Dep't of Agric., 795 F.3d 956, 964 (9th Cir. 2015)), such that "this particular

14   class of persons has a right to sue under this substantive statute" (Lexmark Int'l, Inc. v.

15   Static Control Components, Inc., 572 U.S. 118, 127 (2014)).  It is "not a question of

16   Article III standing" (Organized Vill. of Kake, 795 F.3d at 964), but rather is more

17   appropriately assessed with plaintiffs' likelihood of success.[19]

18   "[A] person suing under the APA must satisfy not only Article III's standing

19   requirements, but an additional test:  The interest he asserts must be 'arguably within the

20   zone of interests to be protected or regulated by the statute' that he says was

21   violated."  Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567

22   U.S. 209, 224 (2012) (quoting Ass'n of Data Processing Serv. Organizations, Inc. v.

23   Camp, 397 U.S. 150, 153 (1970)).  In the APA context, "[t]he 'zone of interest' test is a

24   guide for deciding whether, in view of Congress' evident intent [when enacting the APA]

25   to make agency action presumptively reviewable, a particular plaintiff should be heard to

26

27   [19] The "zone of interests" requirement was formerly referred to as an assessment of "prudential standing," but "prudential standing is a misnomer as applied to the zone-of-interests analysis[.]"  Lexmark, 572 U.S. at 127 (internal quotation marks omitted); accord

28   Organized Vill. of Kake, 795 F.3d at 964 (9th Cir. 2015).

United States District Court
Northern District of California

complain of a particular agency decision.  In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff."  Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399–400 (1987) (footnote omitted); see also Pottawatomi Indians, 567 U.S. at 225–26 (2012).

"Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  Lexmark, 572 U.S. at 127.  "In answering this question, we recognize that 'the breadth of the [applicable] zone of interests varies according to the provisions of law at issue.'"  Sierra Club v. Trump, 929 F.3d 670, 700 (9th Cir. 2019) (quoting Lexmark, 572 U.S. at 130).  "When the [Supreme] Court has applied the zone of interests test in APA actions, however, it has analyzed the zone of interests of the statute the agency is alleged to have violated, not any zone of interests of the APA itself."  Id. at 702; accord Mendoza v. Perez, 754 F.3d 1002, 1016 (D.C. Cir. 2014).  Nevertheless, "when analyzing whether a plaintiff falls within the zone of interests of a particular statute, courts should be particularly lenient if a violation of that statute is being asserted through an APA claim."  Id. at 703 n.26; accord Pottawatomi Indians, 567 U.S. at 225  ("we have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff"); Pit River Tribe v. Bureau of Land Mgmt., 793 F.3d 1147, 1155–56 (9th Cir. 2015) ("The zone-of-interests test should be applied consistent with Congress's intent 'to make agency action presumptively reviewable' under the APA.").

Procedural and substantive challenges under the APA are subject to the same analysis, because "a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing

United States District Court
Northern District of California

1    exercise of that authority[.]" Int'l Bhd. of Teamsters v. Pena, 17 F.3d 1478, 1484 (D.C.

2    Cir. 1994).

3          "Whether a plaintiff's interest is 'arguably ... protected ... by the statute' within the

4    meaning of the zone-of-interests test is to be determined not by reference to the overall

5    purpose of the Act in question (here [in the context of the Endangered Species Act],

6    species preservation), but by reference to the particular provision of law upon which the

7    plaintiff relies." Bennett v. Spear, 520 U.S. 154, 175–76 (1997).  Put differently, "the

8    plaintiff must establish that the injury he complains of ... falls within the 'zone of interests'

9    sought to be protected *by the statutory provision whose violation forms the legal basis for*

10   *his complaint*." Id. at 176 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990))

11   (citing Air Courier Conference v. Postal Workers, 498 U.S. 517, 523–24 (1991)).  For

12   example, an allegation that § 4 of the Bank Service Corporation Act was violated

13   considers whether plaintiffs are within the zone of interests of § 4 itself, not "the overall

14   purpose of the Bank Service Corporation Act of 1962[.]" Id. (citing Data Processing, 397

15   U.S. at 155–156); accord Air Courier Conference, 498 U.S. at 529–30 (The "relevant

16   statute" is generally not the entire act, because "to accept this level of generality in

17   defining the 'relevant statute' could deprive the zone-of-interests test of virtually all

18   meaning."); Pit River Tribe, 793 F.3d at 1157 ("ability to challenge . . . cannot be

19   determined by looking to the broad objectives of the" act); but see E. Bay Sanctuary

20   Covenant v. Trump, 932 F.3d 742, 768 n.9 (9th Cir. 2018) ("E. Bay Sanctuary I") ("'[W]e

21   are not limited to considering the [specific] statute under which [plaintiffs] sued, but may

22   consider any provision that helps us to understand Congress' overall purposes in the

23   [INA].'") (quoting Clarke, 479 U.S. at 401).

24         Although the relevant statute "is the statute whose violation is the gravamen of the

25   complaint" and not the entire act, the court may also look to provisions that "have any

26   integral relationship" with the relevant statute. Air Courier Conference, 498 U.S. at 529–

27   30 (quoting Lujan, 497 U.S. at 886) (citing Clarke, 479 U.S. at 388).  For example, when

28   the challenged statutory section operates as an enumerated exception to another

United States District Court
Northern District of California

section, the court may consider both sections when determining whether a plaintiff falls

within the zone of interests of the challenged section.  <u>Clarke</u>, 479 U.S. at 401

(considering related statutory section to which challenged statute was an exception);

<u>accord</u> <u>Air Courier Conference</u>, 498 U.S. at 529 (recognizing the exception in <u>Clarke</u> as

limited:  "This statement [that the court may look beyond the specific challenged section],

like all others in our opinions, must be taken in the context in which it was made.  In the

next paragraph of the opinion, the Court pointed out that 12 U.S.C. § 36, which the

plaintiffs in that case claimed had been misinterpreted by the Comptroller, was itself 'a

limited exception to the otherwise applicable requirement of [12 U.S.C.] § 81,' . . . .  Thus

the zone-of-interests test was to be applied not merely in the light of § 36, which was the

basis of the plaintiffs' claim on the merits, but also in the light of § 81, to which § 36 was

an exception.").

### i.      The County and State Plaintiffs

The County and State plaintiffs' interests are squarely within the challenged

statute's zone of interests.  For example, that statute allows the Attorney General to

consider an affidavit of support under 8 U.S. Code § 1183a when determining whether to

exclude an alien as a likely public charge.  <u>See</u> 8 U.S.C. §§ 1182(a)(4)(B)(ii).  Although

distinct, Section 1183a is specifically referred to and incorporated into the public charge

analysis set out in the challenged statute.  As a result, § 1183a has an integral

relationship with § 1182(a)(4), such that it should be considered when determining

whether plaintiffs are within the zone of interests of the challenged statute.

Section 1183a explains that someone can sponsor an alien by guaranteeing to

financially support him, and thereby alleviate the concern that he may become a public

charge.  That statute also provides that any such sponsorship can only be considered in

the public charge analysis if it is supported by an affidavit that is "legally enforceable

against the sponsor by . . . any State (or any political subdivision of such State), or by any

other entity that provides any means-tested public benefit[.]"  § 1183a(a)(1)(B); <u>see also</u>

§ 1183a(b)(1)(A) ("Upon notification that a sponsored alien has received any means-

1   tested public benefit, the . . . appropriate entity of the Federal Government, a State, or

2   any political subdivision of a State shall request reimbursement by the sponsor in an

3   amount which is equal to the unreimbursed costs of such benefit."). Moreover, the

4   sponsor must agree to submit to jurisdiction in state courts for actions to compel

5   reimbursement of benefits those states paid to the alien. §§ 1183a(a)(1)(C), (e)(2).

6       By recognizing that states (and political subdivisions of states) would be paying

7   means-tested public benefits to those subject to a public charge analysis, requiring that

8   states and their subdivisions have legally-enforceable rights to recover those expenses

9   when an alien is admitted based on consideration of an affidavit of support, and

10  guaranteeing state-court jurisdiction for such enforcement actions, Congress clearly

11  intended to protect states and their political subdivisions with the challenged statute.

12      Moreover, given the attention paid to states' rights to recover payment of "any

13  means-tested public benefit" from affiants in § 1183a, it is also more than arguable that

14  Congress intended to protect states and their political subdivisions' coffers when

15  providing for the exclusion of any alien "likely at any time to become a public charge" in

16  the first place. 8 U.S.C. §§ 1182(a)(4)(A). So, the State and County plaintiffs' financial

17  interests are also at least arguably protected by the statute for this independent reason.

18      Therefore, the States' and Counties' interests are more than arguably related to

19  the challenged statute's purpose, and they satisfy the zone-of-interests requirement.

20                      ii.      The Organizations

21      The Organizations move for an injunction based on one claim that the Rule

22  violates the APA because it is substantively contrary to the term "public charge" as used

23  in 8 U.S.C. § 1182(a)(4), and a related procedural APA claim based on the same

24  underlying statute. As such, the Organizations must be within that statute's zone of

25  interest.

26      Their papers argue that they are within the statute's zone of interests for three

27  reasons. First, the Rule itself counts health care providers and nonprofit organizations

28  among those who will be affected by it. Second, plaintiffs' interests in serving low-

1   income, immigrant communities by providing medical or legal services and advice are

2   related to and consistent with the statute's purpose to provide procedures and policies for

3   immigration relief.  Third, and relatedly, the Ninth Circuit has recently held that similar

4   plaintiffs are within the INA's zone of interests.

5       First, the Organizations argue the Rule itself contemplates that organizations like

6   them will be adversely affected by it.  But being negatively affected by a rule

7   implementing a statute is not sufficient to establish that the statute conferred a cause of

8   action encompassing that plaintiff's claim.  The Organizations' argument that they will be

9   hurt by the Rule speaks to their standing to challenge it, rather than whether they are

10   within the statute's zone of interest.  See Air Courier Conference, 498 U.S. at 524 ("injury

11   in fact does not necessarily mean one is within the zone of interests to be protected by a

12   given statute"); see also Lujan, 497 U.S. at 883 ("for example, the failure of an agency to

13   comply with a statutory provision requiring 'on the record' hearings would assuredly have

14   an adverse effect upon the company that has the contract to record and transcribe the

15   agency's proceedings; but since the provision was obviously enacted to protect the

16   interests of the parties to the proceedings and not those of the reporters, that company

17   would not be 'adversely affected within the meaning' of the statute").

18       Second, the Organizations argue that their interests align with the statute.  Yet

19   their briefing failed to identify or explain what statutory provisions support their argument.

20   That failure is fatal given the Supreme Court's direction that the zone of interests analysis

21   "requires us to determine, using traditional tools of statutory interpretation, whether a

22   legislatively conferred cause of action encompasses a particular plaintiff's claim."

23   Lexmark, 572 U.S. at 127.  When asked at the hearing what specific statutory provisions

24   they are relying upon, the Organizations for the first time identified 8 U.S.C. § 1611.  That

25   section outlines the federal public benefits for which aliens are eligible.  But the

26   Organizations do not assert a challenge based on a violation of § 1611, and it is not at all

27   clear that § 1611 has "any integral relationship with" 8 U.S.C. § 1182(a)(4) such that it is

28   proper for the court to consider it in the zone of interests inquiry.  See Air Courier

71

1   Conference, 498 U.S. at 529 (without a particular reason to suggest otherwise, sections

2   within the same act are not sufficiently related); cf. Clarke, 479 U.S. at 401 (considering

3   related statutory section to which challenged statute was an exception).

4        Even if the court were to consider § 1611, the Organizations leave the court to

5   guess at what connection those statutory provisions share, much less how 8 U.S.C.

6   § 1182(a)(4) is related to the Organizations' purposes in light of § 1611.  Finally, the

7   Organizations do not even explain how their interests are more than marginally related to

8   § 1611 itself—which does not even "give institutions like the Organizations a role[.]"  E.

9   Bay Sanctuary I, 932 F.3d at 769.

10       At this stage of litigation, the Organizations have not met their burden to

11  demonstrate that there are serious questions concerning whether they are within the

12  challenged statute's zone of interest, and certainly they have failed to demonstrate a

13  likelihood that they are able to bring the APA actions underlying their present motion.

14       Taking a step back, the Organizations simply fail to explain how their interests

15  relate to § 1182(a)(4)'s purpose of excluding immigrants likely to become public charges.

16  This may be because the Organizations identify, without explanation, the statute's

17  purpose as providing "procedures and policies for immigration relief."  That may be based

18  on an argument about the INA's overall statutory purpose, untethered to the statutory

19  challenge underlying this motion.  In support of that argument, the Organizations rely on

20  E. Bay Sanctuary I, 932 F.3d at 771.  But the statute at issue in that action concerned

21  asylum seekers, and the very statute underlying that challenge contained a provision

22  requiring the Attorney General to refer asylum seekers to pro bono legal aid

23  organizations, such as the plaintiff entities in that action.  The court identified specific

24  references to the role of pro bono legal organizations within the challenged statute itself,

25  and it found that was sufficient.  That is very different from the facts presented here.  See

26  E. Bay Sanctuary I, 932 F.3d at 768 ("Within the asylum statute [underlying the

27  preliminary injunction, 8 U.S.C. § 1158(a)(1)], Congress took steps to ensure that pro

28  bono legal services of the type that the Organizations provide are available to asylum

1 | seekers.  See 8 U.S.C. § 1158(d)(4)(A)–(B)").[20]

## 2.   Plaintiffs are Likely to Suffer Irreparable Harm

The three distinct issues of (i) standing, (ii) ripeness, and (iii) irreparable harm in the absence of an injunction are supported by the same factual analysis for each plaintiff. Although each of the three requirements is independent for plaintiffs to succeed on this motion, a finding that plaintiffs are likely to suffer irreparable harm in the absence of an injunction here is sufficient to establish standing and ripeness.  For the Organizations, the court assesses only standing and ripeness.

The court first addresses the legal standards, and then assesses each plaintiff's demonstrated harms.

### a.   Legal Standards

### i.   Standing

Federal courts may adjudicate only actual cases or controversies, see U.S. Const. Art. III, § 2, and may not render advisory opinions as to what the law ought to be or affecting a dispute that has not yet arisen.  Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240 (1937).  Article III's "standing" requirements limit the court's subject matter jurisdiction.  See Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004).  The burden of establishing standing rests on the party asserting the claim. Renne v. Geary, 501 U.S. 312, 316 (1991).

The "irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the

_____

[20] To the extent the Organizations argue that E. Bay Sanctuary I, 932 F.3d at 771 allows this court to look to unrelated provisions in the INA for a section justifying their interest in the action, the court is at a loss as to how to how reconcile that interpretation with Bennett, 520 U.S. at 175–76, Air Courier Conference, 498 U.S. at 529, and Pit River Tribe, 793 F.3d at 1157.  Absent clarity from an en banc determination of this issue, the court hews to Supreme Court and prior panel authority on the question.

United States District Court
Northern District of California

1   challenged action of the defendant, and not the result of the independent action of some

2   third party not before the court.  Third, it must be likely, as opposed to merely speculative,

3   that the injury will be redressed by a favorable decision."  Lujan v. Defs. of Wildlife, 504

4   U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted); see also

5   Spokeo Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

6         "At least one plaintiff must have standing to seek each form of relief

7   requested, and that party bears the burden of establishing the elements of standing with

8   the manner and degree of evidence required at the successive stages of the litigation."

9   E. Bay Sanctuary I, 932 F.3d at 763–64 (internal quotation marks and citations omitted).

10   At this preliminary stage, plaintiffs "may rely on the allegations in their Complaint and

11   whatever other evidence they submitted in support of their" motion to meet their

12   burden.  Id. at 764.  They "need only establish a *risk* or *threat* of injury to satisfy the

13   actual injury requirement."  Id.

14         Organizations can establish standing two different ways.

15         First, "Organizations can demonstrate organizational standing by showing that the

16   challenged 'practices have perceptibly impaired [their] ability to provide the services [they

17   were] formed to provide.'"  Id. at 765.  "[A] diversion-of-resources injury is sufficient to

18   establish organizational standing for purposes of Article III if the organization shows that,

19   independent of the litigation, the challenged policy frustrates the organization's goals and

20   requires the organization to expend resources in representing clients they otherwise

21   would spend in other ways."  Id. (internal quotation marks and citations omitted) (citing

22   inter alia, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d

23   936, 943 (9th Cir. 2011) (en banc) (advocacy groups had organizational standing to

24   challenge an anti-solicitation ordinance that targeted day laborers based on the

25   resources spent by the groups in assisting day laborers during their arrests and meetings

26   with workers about the status of the ordinance); Nat'l Council of La Raza v. Cegavske,

27   800 F.3d 1032, 1039–40 (9th Cir. 2015) (civil rights groups had organizational standing to

28   challenge alleged voter registration violations where the groups had to "expend additional

74

1    resources" to counteract those violations that "they would have spent on some other

2    aspect of their organizational purpose"); El Rescate Legal Servs., Inc. v. Exec. Office of

3    Immigration Review, 959 F.2d 742, 748 (9th Cir. 1991) (legal services groups had

4    organizational standing to challenge a policy of providing only partial interpretation of

5    immigration court proceedings, noting that the policy "frustrate[d]" the group's "efforts to

6    obtain asylum and withholding of deportation in immigration court proceedings" and

7    required them "to expend resources in representing clients they otherwise would spend in

8    other ways."); Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding

9    organizational standing where the plaintiffs "had to divert resources to educational

10   programs to address its members' and volunteers' concerns about the [challenged] law's

11   effect")).

12         In E. Bay Sanctuary I, the Ninth Circuit held that plaintiffs established

13   organizational standing by declaring that enforcement of a regulation "frustrated their

14   mission of providing legal aid" to asylum applicants by "significantly discourage[ing] a

15   large number of those individuals from seeking asylum given their ineligibility."  932 F.3d

16   at 766.  That regulation would require plaintiffs "to partially convert their affirmative

17   asylum practice into a removal defense program, an overhaul that would require

18   'developing new training materials' and 'significant training of existing staff.'"  Id.  "Finally,

19   the [plaintiff] Organizations have each undertaken, and will continue to undertake,

20   education and outreach initiatives regarding the new rule, efforts that require the

21   diversion of resources away from other efforts to provide legal services to their local

22   immigrant communities."  Id.

23         Second, "Organizations can demonstrate organizational standing by showing that

24   the Rule will cause them to lose a substantial amount of funding.  For standing purposes,

25   a loss of even a small amount of money is ordinarily an 'injury.'  We have held that an

26   organization that suffers a decreased amount of business and lost revenues due to a

27   government policy easily satisfies the 'injury in fact' standing requirement."  Id. at 766–67

28   (internal quotation marks and citations omitted).

United States District Court
Northern District of California

In E. Bay Sanctuary I, the Ninth Circuit held that plaintiffs established organizational standing by declaring that they received a large portion of their funding based on the number of asylum applications they pursue, and that if their prospective clients "became categorically ineligible for asylum, East Bay would lose a significant amount of business and suffer a concomitant loss of funding." Id. at 767.

### ii.    Ripeness

"Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not 'issue advisory opinions [or] declare rights in hypothetical cases.'  A proper ripeness inquiry contains a constitutional and a prudential component." Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017) (citations omitted).

"For a case to be ripe, it must present issues that are definite and concrete, not hypothetical or abstract.  Constitutional ripeness is often treated under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong." Id. (internal quotation marks and citations omitted); Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138–39 (9th Cir. 2000) ("Sorting out where standing ends and ripeness begins is not an easy task. . . . .  [I]n 'measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing.'").  Allegations that a "threat" to a "concrete interest is actual and imminent" are sufficient to allege "an injury in fact that meets the requirements of constitutional ripeness." Bishop Paiute Tribe, 863 F.3d at 1154.  Therefore, if plaintiffs satisfy the Article III standing requirements under Lujan v. Defs. of Wildlife, addressed above, the action here is ripe.  In this case, the analysis for both requirements is the same. See, e.g., Thomas, 220 F.3d at 1139 ("Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.' . . . We need not delve into the nuances of the distinction between the injury in fact prong of standing

76

and the constitutional component of ripeness:  in this case, the analysis is the same.").

"In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations:  'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  Thomas, 220 F.3d at 1141.  When the question presented "is 'a purely legal one'" that "constitutes 'final agency action' within the meaning of § 10 of the APA," that suggests the issue is fit for judicial decision.  Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003).  However, an issue may not be ripe for review if "further factual development would 'significantly advance our ability to deal with the legal issues presented.'"  Id.

### iii.    Irreparable Harm

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'"  California v. Azar, 911 F.3d 558, 581 (9th Cir. 2018) (quoting Winter, 555 U.S. at 22); Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'") (quoting Winter, 555 U.S. at 22)).

"There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection."  Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 886 F.3d 803, 819 (9th Cir. 2018) (citing Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 981–82 (9th Cir. 2011)).  "However, a plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.'"  Id. (quoting M.R. v. Dreyfus, 697 F.3d 706, 728 (9th Cir. 2012)).

The irreparable harm "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'"  Azar, 911 F.3d at 581 (quoting Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999)).  "[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."  Sampson v. Murray, 415 U.S. 61, 90 (1974).  But the general rule that "[e]conomic harm is not normally considered

77

irreparable" does not apply where there is no adequate remedy to recover those damages, such as in APA cases.  <u>Azar</u>, 911 F.3d at 581 (citing 5 U.S.C. § 702).

### b.   The Plaintiffs' Harms

First, the court assesses the Counties' and States' standing, the ripeness of their claims, and whether they have demonstrated irreparable harm in absence of an injunction.  Second, the court assesses the Organizations' standing and the ripeness of their claims.

### i.   The States and Counties

The States and Counties argue that they will suffer five categories of irreparable harm:  (A) loss of federal funds, mostly in Medicaid reimbursement; (B) increased operational costs; (C) increased costs to their own healthcare operations  (D) public health problems and resulting increased costs; and (E) reduced economic activity due to a decrease in federal funds in the community.

### A.   Loss of Federal Funds

The Counties argue that they will lose millions of dollars in federal Medicaid reimbursement funds.  Each provides a broad array of health services to low-income residents, many of which are at least partially reimbursed with federal Medicaid dollars. DHS itself estimates that 2.5% of individuals in households with a noncitizen will disenroll from Medicaid, which would translate to a roughly $7.5 million loss in Medicaid reimbursement funds.

The States similarly argue that DHS itself estimates that the Rule will cause a reduction in payments from the federal government due to disenrollment or foregone enrollment by eligible individuals to be over $1.5 billion, nationwide.  83 Fed. Reg. at 51,267–69.

Defendants argue the harm is too speculative, caused only by third-party actions, and not imminent because the merits can be resolved quickly on summary judgment. Defendants argue that even assuming a 2.5% rate of disenrollment, plaintiffs fail to show that the States and Counties will be harmed, rather than individuals residing within their

1   boundaries.  Defendants argue that harm individual citizens will suffer cannot support the

2   States and Counties claims of irreparable harm.  Finally, defendants argue that any

3   financial harms the States and Counties identify are not sufficiently large to establish

4   irreparable harm.

5          First, regarding the speculative nature of the harm, defendants themselves predict

6   a 2.5% disenrollment rate when assessing the Rule, subject to the procedural

7   requirements of the APA.  84 Fed. Reg. at 41,463.  The Rule itself also estimated that it

8   will cause a reduction in payments from the federal government due to disenrollment or

9   foregone enrollment by eligible individuals of over $1.5 billion.  83 Fed. Reg. at 51,267–

10  69; see also Cisneros Decl. A at 98-99, Table 18 (annual estimates of $1.46 billion to

11  $4.37 billion in reduced payments).  Those figures, which underlie DHS's analysis in

12  support of the Rule pursuant to the APA's requirements, are not speculative conjectures

13  as to what might possibly occur.  They are meant to be serious efforts by an agency to

14  assess the impact of a proposed rule, and it is difficult to fathom how defendants can

15  argue otherwise.  And plaintiffs offer sufficient evidence to demonstrate that disenrollment

16  or non-enrollments will reach at least that level.  See 84 Fed. Reg. at 41,463; Wong Decl.

17  ¶¶ 18-45; Shing Decl. ¶ 30; Weisberg Decl. ¶12; Ponce Decl. ¶¶ 4–11, 25.  This type of

18  predictable result from a broad policy, although not precise to the level of the individual

19  actor, is sufficiently-specific to allege irreparable harm.  See Dep't of Commerce v. New

20  York, 139 S. Ct. 2551, 2565 (2019).  Moreover, plaintiffs offer evidence showing that

21  disenrollment due to the public charge rulemaking has already begun.  See, e.g., Cody

22  Decl. ¶ 8; Newstrom Decl. ¶ 43; Weisberg Decl. ¶¶ 12–14; Shing Decl. ¶¶ 23–24; Chawla

23  Decl. ¶ 13; Fanelli Decl. ¶ 38; Neville-Morgan Decl. ¶ 16; Ruiz Decl. ¶¶ 10, 12; Kofman

24  Decl. ¶ 6; Medina Decl. ¶¶ 18–22.  Plaintiffs offer strong evidence that disenrollment is

25  likely to continue between now and the resolution of this issue on the merits, absent an

26  injunction.

27         Plaintiffs also adequately demonstrate that the loss of Medicaid reimbursement is

28  sure to be immediate, once individuals disenroll.  That is apparent from the very

United States District Court
Northern District of California

United States District Court
Northern District of California

1    mechanics of the harm.  Today, the States and Counties are partially reimbursed by the

2    federal government for care provided to Medicaid enrollees.  As individuals disenroll, the

3    plaintiffs will no longer be reimbursed for treating them.  This will have obvious adverse

4    budgetary consequences.  For one, there will indisputably be fewer individuals covered

5    by Medicaid seeking treatment.  So, the States and Counties will not be reimbursed for

6    treating those disenrolled individuals (whether they treat them or not).  The States and

7    Counties would experience this terminated revenue stream even if they turned away

8    patients without medical insurance (which they will not).  Put differently, there will be

9    fewer people on Medicaid to treat and get reimbursed for.

10         To the extent defendants argue that the mechanics will work out as a budgetary

11   boon to plaintiffs, the argument is not plausible in the context of this preliminary injunction

12   motion.  Although it could potentially work out as a total budgetary savings for the plaintiff

13   entities if they reconfigured their operations, reduced staff, reduced provision of services,

14   and undertook other cost-savings measures, such savings could not plausibly be realized

15   prior to the determination of this action's merits.  See, e.g., Lorenz Decl. ¶¶ 19–22.

16   Instead, the plaintiffs will be continuing to operate with most of the costs and expectations

17   associated with the status quo, with one change—no reimbursements.

18         Second, the States and Counties' argument regarding loss of Medicaid funding

19   does not rely on harms to their citizens.  Rather, the arguments concern the plaintiffs'

20   own loss of funds.

21         Third, plaintiffs must demonstrate that they are likely to suffer irreparable harm, but

22   they need not establish a particular quantum of harm to satisfy the requirement.  Azar,

23   911 F.3d at 581 (irreparable harm "analysis focuses on irreparability, 'irrespective of the

24   magnitude of the injury'").  Nor do defendants explain why San Francisco's likely loss of

25   $7.5 million in Medicaid reimbursements (based on a 2.5% disenrollment rate) is not

26   sufficiently large even under their theory of the requirement.  See Wagner Decl. ¶ 5.

27   Santa Clara similarly estimates $4.6 million in foregone Medicaid funds due to more

28   conservative 1.9% decline in enrollment.  Shing Decl. ¶ 32 (estimating $4.6 million in

Medicaid fund losses due to 1.9% decline in enrollment).  The States similarly demonstrate the harms they are likely to suffer from the loss of Medicaid reimbursements.  See Cantwell Decl. ¶¶ 6, 14 (2.5 million noncitizen Medicaid beneficiaries in California); Ferrer Decl. ¶ 19 (predicted disenrollment figures in L.A. County); Lucia Decl. ¶ 23 (estimates of $957 million in lost funding in California, assuming 15% disenrollment rate); Buhrig I Decl. ¶¶ 4, 8, 10, 27 (330,000 Pennsylvania Medicaid beneficiaries are part of a household with a noncitizen); Allen Decl. ¶¶ 10, 18, 36-40 (63,000 noncitizens participate in the Oregon Health Plan system, a federal/state partnership program; other participants are citizen children part of a household with a noncitizen); Byrd Decl. ¶¶ 18–20 & Ex. A at 2, 4 (16,000 children in the District of Columbia receive Medicaid assistance, and 28% of the District's children are part of a household with a noncitizen; 9,800 immigrants enrolled in Medicaid reside in the District); Probert Decl. ¶¶ 4–8, 15 (13,918 noncitizens enrolled in Medicaid in Maine).

## B.    Increased Operational Costs

The States argue that the Rule will impose burdens on their ongoing operations. Defendants argue that such costs are self-imposed and not cognizable.

Governmental administrative costs caused by changes in federal policy are cognizable injuries.  See Cal. v. Trump, 267 F. Supp. 3d 1119, 1126 (N.D. Cal. 2017) (states' "administrative costs" caused by a disruption to healthcare exchanges they administer were sufficient to demonstrate standing) (collecting cases); see also Azar, 911 F.3d at 573–74.[21]

The Counties have submitted evidence of cognizable, irreparable costs.  Santa Clara explains that they have already spent over 1,000 hours answering questions about the Rule, processing disenrollment, analyzing the impact of the rule on their services and undertaking community education and outreach—and these activities are likely to

---

[21] The government relies on inapposite case law, most notably Crane v. Johnson, 783 F.3d 244, 253-54 (5th Cir. 2015), which addressed individual public employee claims (not claims by the public entity itself) that they might have to change their job practices because of a policy change.

1    continue to be necessary.  E.g., Shing Decl. ¶¶ 8, 11–12; see also Lorenz Decl. ¶ 19;

2    Márquez Decl. ¶¶ 9–10.  San Francisco has submitted evidence of similar measures it

3    has already taken and will continue to take in direct response to the Rule.  See Pon Decl.

4    ¶¶ 13–16; Rhorer Decl. ¶ 11; Smith Decl. ¶¶ 4–9.  California and Oregon have submitted

5    evidence showing they are likely to imminently suffer similar harms absent an injunction.

6    Ruiz Decl. ¶ 19 (California); Fernandez Decl. ¶¶ 34–36 (California); Fanelli Decl. ¶ 40

7    (California); Salazar Decl. ¶ 37 (Oregon).  Other states submit declarations regarding

8    these issues, but they are too vague or speculative to support issuance of an injunction.

9    E.g., Byrd Decl. ¶¶ 22–23 (discussing past efforts in D.C., and stating the District will

10   generally "need to train staff" on the issue); Probert Decl. ¶ 16 (speculation concerning

11   costs Maine may face).

12          Additionally, certain plaintiff states use Medicaid and SNAP enrollment to

13   automatically certify children into school lunch programs, meaning that those states

14   would face higher administrative costs to certify student eligibility for free lunch following

15   disenrollment caused by the Rule.  To the extent states' administrative costs increase to

16   assess eligibility for free lunch as children disenroll from the federal programs (as

17   opposed to merely an increased burden on the applicants), that administrative cost

18   increase is cognizable harm.  California and D.C. submit competent evidence

19   demonstrating that their costs in administering school lunch programs will increase.  See

20   Palmer Decl. ¶ 16 (declaring D.C.'s costs would go up to process school lunch

21   applications); Fernandez Decl. ¶ 30 (declaring California's "administrative streamlining

22   and efficiency" will suffer when enrolling students for free lunch); see generally Neville-

23   Morgan Decl. ¶ 22 (in California, "paperwork is more burdensome for those without an

24   automatic qualification through Medi-Cal or SNAP, and immigrant eligible families are

25   less likely to obtain school lunch benefits in this way").

26          These costs that the States and Counties have identified are predictable, likely,

27   and imminent.  In fact, DHS specifically contemplated certain of these costs when

28   formulating the Rule.  E.g., 83 Fed. Reg. at 51,260 ("The primary sources of the

consequences and **indirect impacts of the proposed rule would be costs to** various entities that the rule does not directly regulate, such as hospital systems, **state agencies**, and other organizations that provide public assistance to aliens and their households. Indirect costs associated with this rule **include familiarization with the rule** for those entities that are not directly regulated but still want to understand the changes in federal and state transfer payments due to this rule.") (emphasis added); see also 84 Fed. Reg. at 41,389 ("DHS agrees that some entities, such as State and local governments or other businesses and organizations would incur costs related to the changes commenters identify.").

Because the States and Counties have each demonstrated sufficient likely irreparable injury in the form of loss of federal funds to support a preliminary injunction, and the Counties, California, D.C., and Oregon have demonstrated additional irreparable injury in the form of operational costs, the court need not address the remaining three categories of irreparable harm plaintiffs argue they will imminently suffer.

### ii.    The Organizations

"[C]ourts have an 'independent obligation' to police their own subject matter jurisdiction, including the parties' standing.  Accordingly, we must assure ourselves that Plaintiffs have alleged an injury in fact, fairly traceable to the defendant's conduct, and likely to be redressed by a favorable judicial decision." Animal Legal Def. Fund v. United States Dep't of Agric., 935 F.3d 858, 866 (9th Cir. 2019) (citations omitted).

"[A] diversion-of-resources injury is sufficient to establish organizational standing for purposes of Article III if the organization shows that, independent of the litigation, the challenged policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways." E. Bay Sanctuary I, 932 F.3d at 765 (internal quotation marks and citations omitted).

Defendants argue that the Organizations fail to identify any injury they will suffer if they do not divert resources towards addressing their concerns, apart from harm to the health care they are able to provide to low income communities.  For example, if they

United States District Court
Northern District of California

1   failed to divert resources, they would not face staff shortages or provide worse health

2   services.

3         In E. Bay Sanctuary I, the court found standing based on an organization partially

4   converting an asylum practice into a removal defense program, a prediction that

5   applications filed on behalf of the organizations' clients would become more difficult and

6   reduce available funds for other activities, and education and outreach initiatives

7   regarding the new rule.  932 F.3d at 766; see also, e.g., El Rescate Legal Services, 959

8   F.2d at 748 (standing where legal services groups had expended "resources in

9   representing clients they otherwise would spend in other ways"); Fair Hous. Council of

10  San Fernando Valley v. Roommate.com, LLC, 666 F.3d 1216, 1219 (9th Cir. 2012)

11  (finding organizational standing where the plaintiff responded to allegations of

12  discrimination by "start[ing] new education and outreach campaigns targeted at

13  discriminatory roommate advertising").

14        The Healthcare Organizations' missions are to provide high quality health care to

15  low-income and immigrant communities.  Castellano-García Decl. ¶ 5; García Decl. ¶ 3,

16  7–10.  La Clínica and California-Primary-Care-Association-member-organization Asian

17  Health Services have diverted resources from their core missions to address community

18  and individual patient concerns about the public charge determination.  García Decl.

19  ¶¶ 13, 16, 21; Quach Decl. ¶¶ 26–29 (evidence of $1 million diversion to education

20  campaigns about the Rule).  These education efforts take away from their ability to serve

21  their core organizational purposes.  Moreover, they will have to lay off employees and

22  change or cancel programs in response to the Rule.  García Decl. ¶ 18; see also Ku

23  Decl. ¶ 65 (estimating nationwide community health center staffing losses of 3,400 to

24  6,100 employees).

25        The Legal Organizations' missions are to provide advocacy and/or legal services

26  to their clients and members, including obtaining immigration relief and helping to secure

27  public benefits.  Kassa Decl. ¶¶ 3–7; Ayloush Decl. ¶¶ 4–7; Sharp Decl. ¶¶ 4–7;

28  Goldstein Decl. ¶¶ 4–5; Seon Decl. ¶¶ 3– 7; Nakamura Decl. ¶¶ 3–8; Kersey Decl. ¶¶ 6–

1    7, 14–20.

2         Plaintiffs have adequately alleged frustration of their purpose because many of

3    their clients will no longer be eligible for immigration relief, or will choose to not enroll or

4    to disenroll from benefits to remain eligible for immigration relief.  The Rule plainly

5    hinders their clients' ability to obtain immigration relief and/or public benefits.

6         Plaintiffs have also adequately alleged that they will have to divert funding

7    because those who may still be eligible for relief or choose to apply for benefits will

8    require additional time and resources from plaintiffs to address the effects of the Rule,

9    and this additional time and rising ineligibility or disenrollment means that plaintiffs will be

10   able to file fewer cases and help fewer clients.  See Kassa Decl. ¶¶ 10–13, 16; Ayloush

11   Decl. ¶¶ 11–14; Sharp Decl. ¶¶ 12–15, 18; Goldstein Decl. ¶ 8; Seon Decl. ¶¶ 10–14;

12   Nakamura Decl. ¶¶ 12, 14–15; Kersey Decl. ¶¶ 23–30. Kassa Decl. ¶¶ 10, 12–13;

13   Ayloush Decl. ¶¶ 11–12; Sharp Decl. ¶ 13; Seon Decl. ¶¶ 10–14; Nakamura Decl. ¶¶ 14–

14   16; Kersey Decl. ¶¶ 34, 36.

15        Some plaintiffs also have increased operational costs as they address the impact

16   of the Rule on their services, such as by hiring additional staff or adding new programs or

17   services.  Ayloush Decl. ¶ 14; Seon Decl. ¶ 14; Nakamura Decl. ¶¶ 13–14, 16–17;

18   Kersey Decl. ¶¶ 21, 26–30, 35.  Some plaintiffs have had to divert resources from other

19   core services and priorities to staffing, training, education, and public outreach

20   addressing the Rule.  Kassa Decl. ¶¶ 11, 14–17; Ayloush Decl. ¶¶ 13, 15–16; Sharp

21   Decl. ¶¶ 14–16; Goldstein Decl. ¶ 7–12; Seon Decl. ¶ 16–19, 21; Nakamura Decl. ¶¶ 13–

22   14, 16–17; Kersey Decl. ¶¶ 26–29, 35–36.

23        Defendants would have this court require more than the Ninth Circuit does for

24   standing.  Here, it is enough for plaintiffs to allege that their goals of providing healthcare

25   and legal services to low-income immigrants are frustrated, and that the challenged

26   policy has stimulated the organizations into spending money on things they would not

27   otherwise have spent money on.  Plaintiffs' public education efforts, changes to their

28   programs, increased costs of assisting clients, and other diversions of resources qualify

United States District Court
Northern District of California

85

1    under the Ninth Circuit's requirements.[22]

2        **3.    The Balance of Equities and Hardships Tip Sharply in Plaintiffs' Favor**

3        "A court must 'balance the interests of all parties and weigh the damage to each' in

4    determining the balance of the equities."  CTIA - The Wireless Ass'n v. City of Berkeley,

5    928 F.3d 832, 852 (9th Cir. 2019) (quoting Stormans, Inc. v. Selecky, 586 F.3d 1109,

6    1138 (9th Cir. 2009)).

7        There is little question that the balance of equities and hardships tip sharply in

8    favor of the States and Counties.  Defendants have been operating under a consistent

9    definition of "public charge" since at least 1999, when the INS issued Field Guidance

10   specifying "that 'public charge' means an alien . . .  who is likely to become (for

11   admission/adjustment purposes) 'primarily dependent on the government for subsistence,

12   as demonstrated by either (i) the receipt of public cash assistance for income

13   maintenance or (ii) institutionalization for long-term care at government expense.'"  64

14   Fed. Reg. at 28,689.  That standard is specific and workable, and defendants have been

15   administering it for decades.  In fact, defendants conceded that do not argue that they

16   would suffer any hardship in the face of an injunction prohibiting them from replacing

17   those standards with the new Rule until resolution of this case on the merits.  Defendants'

18   only argument with respect to the balance of equities or hardships and the public interest

19   is that Congress has made a policy judgment that aliens should be self-sufficient, and the

20   executive should not be prevented from implementing a rule that advances that policy.

21       On the other hand, implementing the change defendants propose would upend

22   state and local governments' operations as they support immigrants while determining

23   how to adjust to the new Rule and provide services that the federal government once

24   predictably assisted with.  To the extent this factor is merged with the public interest and

25   considers the effects on non-parties, the most severely affected individuals are the aliens

26

27   _____

28   [22] As the issue was not meaningfully addressed by the parties, the court does not decide
     at this time whether California Primary Care Association satisfies the requirements for
     associational standing.

United States District Court
Northern District of California

1   seeking LPR status themselves, who would face uncertainty regarding their access to

2   healthcare and subsidized nutrition as they learn to adapt to and attempt to navigate the

3   Rule's deterrents.

4         In short, implementing the Rule after decades of a consistent policy prior to a

5   determination of this action on the merits—which defendants argue will be accomplished

6   in short order—does little to advance the defendants' interests, and it would entirely

7   upend the plaintiffs' (and the non-party aliens') interests.

8         **4.    An Injunction Is in the Public's Interest**

9         "When the government is a party, the last two factors merge." <u>Azar</u>, 911 F.3d at

10  575.  Therefore, the public interest analysis is subsumed in the balance of equities and

11  hardships, addressed above, and the public interest therefore favors and injunction.

12        Even though the public's interest generally merges with the balance of equities, it

13  can be "appropriate to consider the factors separately," for example when intervenors

14  present distinct interests.  <u>League of Wilderness Defs./Blue Mountains Biodiversity</u>

15  <u>Project v. Connaughton</u>, 752 F.3d 755, 766 (9th Cir. 2014).  In those instances, "[t]he

16  public interest inquiry primarily addresses impact on non-parties rather than parties."  <u>Id.</u>

17        Here, the public interest cuts sharply in favor of an injunction.  Specifically, the

18  public interest supports continuing the provision of medical services through Medicaid to

19  those who would predictably disenroll absent an injunction, for numerous reasons.

20  Although the court has not reached the issue as to whether plaintiffs' arguments

21  regarding the impacts on public health support their argument for imminent harm, the

22  parties and numerous amici have explained that the predictable disenrollment from

23  Medicaid absent an injunction would have adverse health consequences not only to

24  those who disenroll, but to the entire populations of the plaintiff states, for example, in the

25  form of decreased vaccination rates.  The public certainly has an interest in decreasing

26  the risk of preventable contagion.

27        As such, the public interest supports preserving the long-standing status quo

28  pending final, coherent resolution on the merits.

1
2
3
4
5
6
7
8
9
10
11

United States District Court
Northern District of California

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**5.      Scope of the Injunction Necessary to Redress Plaintiffs' Imminent Harms**

      **a.      Legal Standard**

When a plaintiff satisfies its burden to demonstrate that a preliminary injunction should issue, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Califano, 442 U.S. at 702; accord L.A. Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 664 (9th Cir. 2011) (injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court") (internal quotation mark omitted); Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief . . . must be tailored to remedy the specific harm alleged."). "'The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward.'" Azar, 911 F.3d at 582.

But "[t]here is no general requirement that an injunction affect only the parties in the suit." Bresgal v. Brock, 843 F.2d 1163, 1169 (9th Cir. 1987). "[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" Id. at 1170; accord Regents of the Univ. of California v. U.S. Dep't of Homeland Sec., 908 F.3d 476, 511 (9th Cir. 2018), cert. granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California, 139 S. Ct. 2779 (2019).

With respect to immigration matters in particular, the Ninth Circuit has "consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." E. Bay Sanctuary I, 932 F.3d at 779 (citing Regents of the Univ. of Cal., 908 F.3d at 511; Hawaii v. Trump, 878 F.3d 662, 701 (9th Cir. 2017), rev'd on other grounds and remanded, 138 S. Ct. 2392 (2018); Washington v. Trump, 847 F.3d 1151, 1166–67 (9th Cir.), reconsideration en banc denied, 853 F.3d 933 & 858 F.3d 1168 (9th Cir. 2017), and cert. denied sub nom. Golden v. Washington, 138 S. Ct. 448 (2017)). "These are,

88

however, 'exceptional cases.'" E. Bay Sanctuary Covenant v. Barr, 934 F.3d 1026, 1029 (9th Cir. 2019) ("E. Bay Sanctuary II") (quoting City & Cty. of San Francisco v. Trump, 897 F.3d 1225, 1244 (9th Cir. 2018)).  That is because, even though courts have the *authority* to issue nationwide preliminarily injunctions, doing so still requires "an articulated connection to a plaintiff's particular harm[.]"  Id. ("nationwide injunction is [not] appropriate simply because this case presents a rule that applies nationwide"); see also Azar, 911 F.3d at 582–84.  That requirement is not lifted in the immigration context.  E.g., E. Bay Sanctuary II, 934 F.3d at 1029 ("Under our case law, however, all injunctions—even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown.'"); E. Bay Sanctuary I, 932 F.3d at 779 (nationwide scope appropriate where it "is necessary to provide the plaintiffs here with complete redress" and district court could not "have crafted a narrower remedy that would have provided complete relief to the [plaintiffs]") (quoting Regents of the Univ. of Cal., 908 F.3d at 512) (internal quotation mark omitted).[23]

The Ninth Circuit has emphasized that any preliminary injunction must be supported by evidence in the record identifying the likely effect the enjoined conduct would have on the particular plaintiffs.  E.g., San Francisco v. Trump, 897 F.3d at 1244 (the "record is not sufficient to support a nationwide injunction" where "the Counties' tendered evidence is limited to the effect of the Order on their governments and the State of California. . . .  However, the record is not sufficiently developed on the nationwide impact of the Executive Order."); Azar, 911 F.3d at 584 ("On the present record, an

---

[23] The Ninth Circuit requires an articulated connection to a plaintiff's particular harms notwithstanding "the need for uniformity in immigration policy."  See Regents of the Univ. of Cal., 908 F.3d at 511 ("Allowing uneven application of nationwide immigration policy flies in the face of these requirements."); Hawaii v. Trump, 878 F.3d at 701 ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."); see also San Francisco v. Trump, 897 F.3d at 1244 ("These exceptional cases are consistent with our general rule that '[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown'—'an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit ... if such breadth is necessary to give prevailing parties the relief to which they are entitled.'") (quoting Bresgal, 843 F.2d at 1170–71).

1   injunction that applies only to the plaintiff states would provide complete relief to them.  It

2   would prevent the economic harm extensively detailed in the record.  Indeed, while the

3   record before the district court was voluminous on the harm to the plaintiffs, it was not

4   developed as to the economic impact on other states.").  "District judges must require a

5   showing of nationwide impact or sufficient similarity to the plaintiff states to foreclose

6   litigation in other districts, from Alaska to Puerto Rico to Maine to Guam."  Azar, 911 F.3d

7   at 584.

8          Finally, although the scope of the injunction in this action is governed by the

9   controlling Ninth Circuit law explained above, the court notes that the Ninth Circuit and

10   the Supreme Court have both credited prudential considerations supporting their

11   admonition that nationwide preliminary injunctions are appropriate only in "exceptional

12   cases."  See San Francisco v. Trump, 897 F.3d at 1244; E. Bay Sanctuary II, 934 F.3d at

13   1029.  First, nationwide injunctions unconnected to a plaintiff's particular harm

14   "unnecessarily 'stymie novel legal challenges and robust debate' arising in different

15   judicial districts."  E. Bay Sanctuary II, 934 F.3d at 1029; see also Azar, 911 F.3d at 583

16   ("The Supreme Court has repeatedly emphasized that nationwide injunctions have

17   detrimental consequences to the development of law and deprive appellate courts of a

18   wider range of perspectives.").  That consideration is relevant here, where actions raising

19   similar changes are also currently pending in district courts in New York, Maryland, and

20   Washington, and perhaps more.  Second, nationwide injunctions may fail to adequately

21   recognize "the equities of non-parties who are deprived the right to litigate in other

22   forums," who "are essentially deprived of their ability to participate[.]"  Azar, 911 F.3d at

23   583.  Third, "[n]ationwide injunctions are also associated with forum shopping, which

24   hinders the equitable administration of laws."  Id.

25          **b.    Analysis**

26          Here, the Counties and the States have demonstrated a likelihood of irreparable

27   harm based on their loss of Medicaid funding from the federal government and increased

28

operational costs they are likely to carry.[24]  Those harms stem directly from disenrollment of individuals seeking medical care in their jurisdictions, residing in their jurisdictions, and enrolling in certain other public benefits in their jurisdictions (for example, school lunch programs).  Those harms, and the supporting record, are discussed in detail above.  In order to preserve the status quo pending resolution on the merits and to prevent certain of these irreparable harms, it is necessary to enjoin implementation of the Rule with respect to those who reside in the States and Counties any time following the date of this order, until this action is resolved on the merits.  Moreover, defendants must be additionally enjoined from applying the Rule to any individual who is part of a household (as defined in the Rule, 8 C.F.R. § 212.21(d)) that includes a person who has resided in a plaintiff State or County any time following the date of this order, until this action is resolved on the merits.

Defendants may, of course, continue to process applications and otherwise operate pursuant to the standards employed prior to October 15, 2019—that is, pursuant to the status quo.

The plaintiffs request a nationwide injunction based primarily on what they argue would be the inadministrability of an immigration policy that is not administered uniformly nationally.  But a nationwide injunction is not "appropriate simply because this case presents a rule that applies nationwide."  E. Bay Sanctuary II, 934 F.3d at 1029; accord San Francisco v. Trump, 897 F.3d at 1244 (record must also be independently "developed on the nationwide impact" and the statewide impact).

Plaintiffs also argue that a nationwide injunction is necessary to provide certainty to the public and quell confusion about the implementation of the Rule.  They argue that general, nationwide confusion will cause disenrollment even in the States and Counties,

---

[24] Because the Organizations have not demonstrated a likelihood of success on—or serious questions going to—the merits of their APA causes of action (the only claims underlying their motion for preliminary injunction), they have not demonstrated that an injunction should issue to prevent the harms they are likely to suffer, so the court does not consider their alleged harms in determining the scope of the injunction.

United States District Court
Northern District of California

1   causing the above-discussed harms.  Plaintiffs have certainly demonstrated that

2   confusion about the nation's immigration policies is a cause of disenrollment, even for

3   those who will not be subject to the public charge assessment.  However, plaintiffs have

4   not demonstrated the marginal effect a nationwide injunction would have on curing that

5   confusion for their residents over and above an injunction limited to their own borders.

6   Although it is conceivable that a nationwide injunction pending resolution on the merits

7   would lead to less disenrollment due to confusion within California than this injunction

8   covering all of California (and the other States), it is plaintiffs' obligation to demonstrate

9   the necessity of such relief.  This court does not suggest that no evidence could support

10  such an injunction.  Nor does the court suggest that the record evidence is necessarily

11  insufficient.  Rather plaintiffs, by devoting only a few cursory paragraphs in their briefs to

12  the scope the injunction, have failed to sufficiently tie that evidence to the need for an

13  injunction beyond their borders in order to remedy the specific harms alleged and

14  accepted by the court as likely, imminent, and irreparable.

15                                    **CONCLUSION**

16          For the foregoing reasons, the States and Counties' motion for a preliminary

17  injunction is GRANTED, as explained above.  The Organizations' motion is DENIED,

18  because they do not fall within the zone of interests of the statute forming the basis of

19  their APA claims.

20                              **PRELIMINARY INJUNCTION**

21          Defendants U.S. Citizenship and Immigration Services, Department of Homeland

22  Security, Kevin McAleenen as Acting Secretary of DHS, Kenneth T. Cuccinelli as Acting

23  Director of USCIS, and Donald J. Trump, as President of the United States, are hereby

24  enjoined from applying the Rule, in any manner, to any person residing (now or at any

25  time following the issuance of this order) in San Francisco City or County, Santa Clara

26  County, California, Oregon, the District of Columbia, Maine, or Pennsylvania, or to

27  anyone who is part of a household (as defined by the Rule, 8 C.F.R. § 212.21(d)) that

28  includes such a person.  The injunction will remain in effect until a resolution of this action

1    on the merits.

2           **IT IS SO ORDERED.**

3    Dated:  October 11, 2019

4                                              /s/ Phyllis J. Hamilton

5                                              PHYLLIS J. HAMILTON
                                               United States District Judge